# CONDENSED TRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

AMBER HATCHER, by and
through her next friend,
GREGORY HATCHER,

                       CASE NO: 2:13-cv-138-Ftm-38DNF

       Plaintiff,

vs.

DESOTO COUNTY SCHOOL
DISTRICT BOARD OF EDUCATION
and ADRIAN CLINE, as
Superintendent of DeSoto
County School District, SHANNON
FUSCO, as DeSoto County High
School Principal, and ERMATINE
JONES, as DeSoto County High
School Dean of Students, in
their personal and official
capacities, and their successors
in office,

       Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:      AMBER HATCHER

DATE TAKEN:        June 25, 2013

TIME:             1:00 p.m. - 4:44 p.m.

PLACE:           DeSoto County Library
                    125 North Hillsborough Avenue
                    Meeting Room
                    Arcadia, Florida 34266

TAKEN BY:        The Defendants
BEFORE:          ROBIN ROBERTS, RPR, CSR
                    Court Reporter and Notary
                    Public



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF FLORIDA
2         FORT MYERS DIVISION
3  AMBER HATCHER, by and
   through her next friend,
4  GREGORY HATCHER,
              CASE NO: 2:13-cv-138-Ftm-38DNF
5         Plaintiff,
6  vs.

   DESOTO COUNTY SCHOOL
7  DISTRICT BOARD OF EDUCATION
   and ADRIAN CLINE, as
8  Superintendent of DeSoto
   County School District, SHANNON
9  FUSCO, as DeSoto County High
   School Principal, and ERMATINE
10 JONES, as DeSoto County High
   School Dean of Students, in
11 their personal and official
   capacities, and their successors
12 in office,
13        Defendants.
14
   • • • • • • • • • • • • • • • • • • • • • • • •
15
16 DEPOSITION OF:     AMBER HATCHER
17
   DATE TAKEN:     June 25, 2013
18
   TIME:          1:00 p.m. - 4:44 p.m.
19
20 PLACE:         DeSoto County Library
                  125 North Hillsborough Avenue
                  Meeting Room
21                Arcadia, Florida 34266
22 TAKEN BY:      The Defendants
23 BEFORE:        ROBIN ROBERTS, RPR, CSR
24                Court Reporter and Notary
25                Public

## Page 2

1  A P P E A R A N C E S :
2
3  ELIZABETH LYNN LITTRELL, ESQUIRE
     OF:  Lambda Legal Education and Defense Fund
4       Southern Regional Office
        730 Peachtree Street, N.E.
5       Suite 1070
        Atlanta, Georgia 30308
6       (404) 897-1880
7  APPEARING ON BEHALF OF THE PLAINTIFF
8
9  JEFFREY D. JENSEN, ESQUIRE
     OF:  Unice Salzman Radel, P.A.
10      111 2570 Coral Landings Boulevard
        Suite 201
11      Palm Harbor, Florida 34684
        (727) 723-3772
12
        APPEARING ON BEHALF OF THE DEFENDANTS
13
14
15 ALSO PRESENT:
16 CONNIE L. COLLINS, ESQUIRE
17 OF:  Eugene Waldron, P.A.
18      124 North Brevard Avenue
19      Arcadia, Florida 34266
20      (863) 494-4323
21
22
23 ALSO PRESENT:
24 GREGORY HATCHER,
25 FATHER of AMBER HATCHER

## Page 3

1         I N D E X
2
   TESTIMONY OF AMBER HATCHER
3
   Direct Examination by Mr. Jensen....................4
4  Cross-Examination by Ms. Littrell....................97
   Redirect Examination by Mr. Jensen.................115
5  Recross-Examination by Ms. Littrell................128
6
   CERTIFICATE OF OATH................................134
7
   CERTIFICATE OF REPORTER...........................135
8
   ERRATA PAGE.........................................136
9
   NOTIFICATION LETTER................................137
10
11
12         E X H I B I T S
13 Defendants' Exhibit A.............................31
      (Verified Complaint)
   Defendants' Exhibit B.............................67
14    (Plaintiff's Notice)
   Defendants' Exhibit C.............................78
15    (Article)
16         - - - - -
17
18
19         S T I P U L A T I O N S
20      It is hereby agreed and so stipulated by
21 and between the parties hereto, through their respective
22
23 counsel, that the reading and signing of the transcript
24
25 was reserved by the Deponent.

## Page 4

1         P R O C E E D I N G S
2              * * * *
3       THE REPORTER:  Do you swear to tell the
4  truth, the whole truth, and nothing but the
5  truth?
6       THE WITNESS:  I do.
7         AMBER HATCHER
8  having been first duly sworn, testified under
9  oath as follows:
10        DIRECT EXAMINATION
11 BY MR. JENSEN:
12    Q.  Hello.  My name is Jeffery Jensen.  I'm an
13 attorney representing the DeSoto County School District.
14 I'm here for your deposition today.
15     Before we start, is this the first time you've
16 ever been to a deposition?
17    A.  Yes, sir.
18    Q.  All right.  Let me explain the process.
19     This is a pretty informal procedure.  I'm just
20 going to be asking you a series of questions and you'll
21 be answering under oath.
22     This lady over here is our court reporter.  It is
23 her job to write down every word that is said in this
24 room today.  She has a difficult job.  There is a few
25 things we can do to make her job easier.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 5

1    She can type as fast as we can talk but she can
2  only take down one person's words at a time. So if I
3  ask you a question and you anticipate what that question
4  will be, please don't answer it until after I've
5  completely finished my question. And I'll do my best
6  not to ask you another question until you've completely
7  finished your answer.
8        If there is a question that you want to answer a
9  yes or no please verbally respond with a yes or no. If
10  you nod your head I'll understand your answer but it
11  won't translate for a written record.
12        And also uh-huhs and huh-uhs, I may understand
13  your answer but it won't translate well for a written
14  record so please answer yes or no.
15        Most importantly, if I ask you a question that
16  you don't understand don't answer it. Simply tell me
17  that you don't understand the question and I'll rephrase
18  it so you know exactly what is being asked of you.
19        However, if I ask you a question and you answer
20  it, I'm going to assume that you understood the
21  question.
22        Is that fair?
23  A. Yes, sir.
24  Q. Are you under the influence of any type of
25  medication or anything today that would affect your

Page 6

1  ability to sit for deposition?
2  A. No, sir.
3  Q. So we will go ahead and start then.
4        Can I have your name, please.
5  A. Amber Hatcher.
6  Q. Ms. Hatcher, can you give me your date of birth?
7
8  Q. And what is your address.
9  A.
10
11  Q. And who lives with you at that address?
12  A. My mother, my father, and four siblings.
13  Q. And what is your mother's name?
14  A. Cheryl.
15  Q. And her last name?
16  A. Wade.
17  Q. And how about your father, what is his name?
18  A. Gregory Hatcher.
19  Q. And can you give me the names of all your
20  siblings and their ages?
21  A. My sister, Kristina, is out of the house. So I
22  don't know if she counts. It's a K.
23  Q. And how old is she?
24  A. She's 19.
25  Q. Okay. Who else?

Page 7

1  A. My brother, Alex, is -- 15? 15.
2  Q. Okay. Who else?
3  A. My brother, Cameron, is 10.
4        My sister, Leaura, that's L-E-A-U-R-A, is eight.
5        And my youngest sister, Laiellah, that's
6  L-A-I-E-L-L-A-H, is five.
7  Q. Okay. And what school do you attend?
8  A. As of now, DeSoto.
9  Q. What's the full name of the school?
10  A. DeSoto County High School.
11  Q. And how long have you attended that school?
12  A. Two years.
13  Q. And are you in your sophomore or your junior year
14  now?
15  A. I'll be going into my junior year when the school
16  year starts.
17  Q. Now I want you to give me the name of each and
18  every DeSoto County School District employee that you
19  had contact with in any capacity regarding the 2012 Day
20  of Silence event.
21  A. Ms. Shannon Fusco. Ms. Ermatine Jones. I
22  attempted to contact Adrian Cline.
23        I talked a bit with Kathy Griffin. That's her
24  name, right? Ms. Griffin is outside. I'm not sure of
25  her first name.

Page 8

1        And, hmm, I think that's it.
2  Q. Okay. So only four employees of the DeSoto
3  County School District?
4  A. As of now, that's all I can remember.
5  Q. All right. And I think you told me you attempted
6  to have contact with Mr. Cline.
7        Did you ever actually have a communication with
8  Mr. Cline directly?
9  A. He never responded to me.
10  Q. How many e-mails did you send to Mr. Cline?
11  A. I sent him at least three.
12        MS. LITTRELL: I'm going to object to the
13  form of the question.
14  BY MR. JENSEN:
15  Q. Who is Kathy Griffin?
16  A. She is the school social worker.
17  Q. And tell me about the contact you had with
18  Ms. Griffin regarding the 2012 Day of Silence event?
19  A. It was just mentioned in passing. We were
20  talking about stuff that's not relevant and she just
21  kind of mentioned and asked me what it was about.
22  Q. When did this conversation take place?
23  A. I'm not exactly sure of the date.
24  Q. Do you know what month it took place?
25  A. Probably May. We talked about it after.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**ACCURATE**
COURT REPORTING, INC.
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

## Page 9

1 **Q. May of what year?**
2 A. 2012.
3 **Q. And tell me about that conversation?**
4 A. It was just a friendly conversation. We were
5 talking about stuff that's not important at the moment
6 and she just kind of mentioned and she wanted to know
7 what it was about.
8 **Q. Can you tell me what you said?**
9 A. I told her the purpose of the Day of Silence, and
10 I told her what it was. And she just kind of like,
11 okay. And she wanted to understand it more.
12 **Q. Was anything else said?**
13 A. Not pertinent to this, no.
14 **Q. Okay. Did she say anything at all --**
15 A. No.
16 **Q. -- regarding the Day of Silence, or anything**
17 **relevant to this lawsuit?**
18     MS. LITTRELL: I'm going to object to the
19 form of the question.
20 A. Yes.
21 BY MR. JENSEN:
22 **Q. You can go ahead and answer.**
23 A. She didn't know about a lawsuit.
24 **Q. All right. Was anything else said by either you**
25 **or her regarding Day of Silence, or any of the issues of**

## Page 10

1 this lawsuit?
2 A. No.
3 **Q. All right. Let's talk about Ms. Fusco.**
4     When did you first have contact with Ms. Fusco?
5 A. I'm not sure of the exact date, but about a month
6 before the Day of Silence. That's when I started
7 organizing it.
8     And as soon as I started organizing it is when I
9 contacted her.
10 **Q. So that would have been, what, sometime in March?**
11 A. Yes.
12     MS. LITTRELL: Object to the form of the
13 question.
14 BY MR. JENSEN:
15 **Q. Okay. Do you know the exact day in March?**
16 A. No.
17     MS. LITTRELL: Object to the form of the
18 question.
19 BY MR. JENSEN:
20 **Q. All right. And tell me about that contact.**
21 A. It was verbal. I saw her in the student
22 comments -- comment, and I kind of told her what we were
23 planning, and asked her opinion on it.
24     And she said it probably -- well, I'm
25 paraphrasing. But she said something along the lines of

## Page 11

1 that's cool, but I don't know if you are going to be
2 allowed to do this.
3 **Q. All right. Tell me specifically what you told**
4 **her on that day.**
5 A. I told her what the purpose of the Day of Silence
6 was. And I told her my plans, which was to have a
7 silent protest and possibly wear shirts.
8 **Q. And what specific plans did you tell her about?**
9 A. The ones I just -- the wearing the shirts and
10 being quiet throughout the day, and possibly handing out
11 placards.
12 **Q. And did you tell her when you would remain**
13 **silent?**
14 A. Yes.
15 **Q. What did you tell her?**
16 A. April 20th of 2012.
17 **Q. And was that going to be the entire day?**
18 A. I mean the 21st. But, yes.
19 **Q. Was it going to be April 21st that you were going**
20 **to be silent?**
21 A. Yeah.
22     MS. LITTRELL: Object to the form of the
23 question.
24     You can tell him --
25 A. Okay.

## Page 12

1 BY MR. LARSEN:
2 **Q. And you were going to be silent the entire day on**
3 **the -- April 21st?**
4     MS. LITTRELL: Object to the form of the
5 question.
6 BY MR. JENSEN:
7 **Q. You can answer.**
8 A. It was the 19th, wasn't it?
9 **Q. She can't help you, ma'am. Youare going to have**
10 **to answer questions on your own.**
11 A. Yes, for the entirety of the day.
12 **Q. Of the 21st?**
13 A. Yes.
14 **Q. And that would be inside class and outside class?**
15 A. Yes.
16 **Q. And did you tell her you were planning on doing**
17 **anything else?**
18 A. (Shook head).
19 **Q. Is that a no, ma'am?**
20 A. Oh, yes -- I mean, no, sir. Sorry.
21 **Q. Did you tell her any plans about posters?**
22 A. I mentioned it in passing.
23     But, honestly, I wasn't really going to do the
24 whole poster thing anyway.
25 **Q. Now what specifically did you mention to her**



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 13

1  about the posters?
2  A. I mentioned that it was a possibility, and that I
3  would be interested in doing that.
4  Q. Did you tell her where you would hang these
5  posters?
6  A. No.
7  Q. And you said Ms. Fusco said that was cool?
8  A. I'm not quoting directly. She said something
9  along the lines of that.
10      But, I mean, she said that she liked the idea but
11 she wasn't sure if it would work out.
12  Q. Did she say why?
13  A. Something about policy.
14  Q. What specifically did she tell you?
15  A. She said it's probably against policy.
16  Q. Okay. Did she say -- do you remember anything
17 specific that she said?
18      Did she identify any policy?
19  A. No, sir.
20  Q. Did she identify whose policy it would be
21 against?
22  A. The district.
23  Q. But she didn't quote you any policies; is that
24 correct?
25  A. No, sir.

Page 14

1  Q. Was anything else discussed that day?
2  A. Not pertinent to this, no.
3  Q. Did -- when you say not pertinent, did it have
4  anything to do with Day of Silence or any of your plans?
5  A. No.
6  Q. All right. And when was the next time you had
7  contact with her?
8  A. Probably a week and-a-half later, somewhere
9  within the range of a week and-a-half to two weeks. And
10 we had basically the same conversation.
11      And that was after I had sent --
12  Q. Go ahead. Continue, please.
13  A. No, I don't think I'm going to continue.
14  Q. Okay. What specifically was discussed at this
15 week to week and-a-half, two weeks later?
16  A. Just she told me that, yeah, it was against
17 policy. And I told her, well, legally it can't be.
18 So...
19  Q. Where did this contact take place at?
20  A. Same area as last time, student comments, bus
21 area.
22  Q. Did you go to her or did she come to you?
23  A. I went to her.
24  Q. And what specifically did you say to her?
25  A. I told her that we were still on board with doing

Page 15

1  it. Are we going to get in trouble? And she said,
2  yeah, Mr. Cline disapproved.
3  Q. Did you identify for her what you were still on
4  board with doing?
5  A. The Day of Silence.
6  Q. What activity -- did you discuss any specific
7  activity with her that day?
8  A. No.
9  Q. Did Ms. Fusco tell you what activities you could
10 do and what activities you couldn't do?
11      Is that a no?
12  A. No, sir.
13  Q. What specifically did Ms. Fusco tell you?
14  A. She told me that she had talked to Mr. Cline and
15 he disapproved it.
16  Q. Did she tell you specifically what Superintendent
17 Cline disapproved?
18  A. Participation in the Day of Silence.
19  Q. Did she tell you anything specifically that you
20 couldn't participate in, or do?
21  A. No.
22  Q. Did you ask?
23  A. No.
24      MS. LITTRELL: Objection to the form of the
25 question.

Page 16

1      Give me a chance to object, if that's
2  okay.
3      THE DEPONENT: Sorry.
4      MS. LITTRELL: Before you answer.
5      MR. JENSEN: And why don't you tell me your
6  objection for the record, please.
7      MS. LITTRELL: It's a compound question.
8  BY MR. JENSEN:
9  Q. Okay. Did you ask Ms. Fusco anything
10 specifically about what you could or could not do?
11      MS. LITTRELL: Objection to the form of the
12 question.
13  BY MR. JENSEN:
14  Q. You can answer.
15  A. No.
16  Q. You didn't ask --
17      MS. LITTRELL: Do you understand the
18 question as to time?
19  A. No.
20  BY MR. JENSEN:
21  Q. Do you understand what we're talking about?
22  A. Yes, I understand that you were asking me if I
23 asked Ms. Fusco about any specific activities. And that
24 is a, no.
25  Q. Okay. And did Ms. Fusco tell you voluntarily



Page 17

1  what you could or could not do?

2   A. No.

3   Q. Was anything else discussed on that second

4  meeting?

5   A. No, sir.

6   Q. When was the next time you had contact with

7  Ms. Fusco regarding Day of Silence?

8   A. It was about a week before the Day of Silence,

9  and she pulled me out of class.

10   Q. All right. And what class were you in at that

11  time?

12   A. I was in Mr. Jones' chorus.

13   Q. What period is that?

14   A. Fourth.

15   Q. And how were you summoned to go to the office?

16   A. She walked down to his classroom and knocked and

17  asked if she could see me for a moment.

18   Q. And did you go speak with her?

19   A. Yes, sir.

20   Q. Where did this conversation take place at?

21   A. Just outside the room in the hallway.

22   Q. How long did that conversation take place?

23   A. Probably five minutes.

24   Q. And tell me about that conversation.

25   A. She pulled me out and she told me so this is what

Page 18

1  you're allowed to do. You're allowed -- I'm not quoting

2  directly by the way.

3    But she said something along the lines of you're

4  allowed to be quiet on your own time. But you're not

5  allowed to wear shirts or hang posters.

6   Q. Do you remember what specifically she said about

7  wearing shirts?

8   A. I don't remember exactly what she said. But I

9  remember that she said that we weren't supposed to.

10   Q. Did she give you any type of criteria of what

11  type of shirts would be allowed and what type of shirts

12  would not be allowed?

13   A. She --

14    MS. LITTRELL: Objection to form of the

15  question.

16  BY MR. JENSEN:

17   Q. Go ahead.

18   A. She didn't give a criteria at all. I assumed it

19  was what is within the dress code.

20   Q. What is the dress code at the school?

21   A. The dress code for that year was that your -- the

22  straps of your tank top had to be a certain measure wide

23  and just cover up your body. No profanity or elicit

24  images or references to drug use.

25   Q. So during that conversation, it was your

Page 19

1  understanding that you could wear a shirt if it complied

2  with the dress code?

3    MS. LITTRELL: Objection to the form of the

4  question.

5  BY MR. JENSEN:

6   Q. Is that your testimony?

7    MS. LITTRELL: Ask a question. You didn't

8  ask a question.

9    MR. JENSEN: I did ask a question.

10    MS. LITTRELL: Can you read back whether --

11  the question -- whether that was a question, please.

12    MR. JENSEN: I did ask --

13    (Court reporter played back last question.)

14    THE COURT REPORTER: Do you want me to play

15  it again?

16    MR. JENSEN: No, I am not going to play any

17  games. Let me just ask the question again.

18  BY MR. JENSEN:

19   Q. Was it your understanding from that conversation

20  that you could wear a shirt so long as it applied with

21  the dress code?

22   A. It was my understanding that I would be punished

23  for wearing something that talked about the Day of

24  Silence.

25    But it's not like I can get in trouble for

Page 20

1  staying within dress code. There is nothing profane on

2  the shirt, nothing like that.

3   Q. Okay. What specifically did Ms. Fusco tell you

4  you could not wear?

5   A. She said that we couldn't wear shirts advertising

6  it.

7    MS. LITTRELL: We need to take a break and

8  go off the record.

9    (Brief discussion held off the record.)

10    MR. JENSEN: Hold on one second. I'm going

11  to ask that this be on the record so we know exactly

12  what's being discussed now.

13    MS. LITTRELL: Well, you are not going to

14  find out what's going on in terms of attorney/client

15  privilege. But I -- I want to have a conversation

16  with my client and her father.

17    I'd also like to insure that this deposition

18  started without duly swearing in -- the court

19  reporter.

20    And we didn't talk about stipulations and

21  whether the -- the objections would be reserved or

22  waived. And --

23    But I'd like to insure that all of the

24  proper procedures are, you know, complied with,

25  especially considering that we have, you know, a



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 21

1 minor.
2 MR. JENSEN: Okay. Are you going to take a
3 break in this deposition to discuss a privilege with
4 your client?
5 MS. LITTRELL: I'm going to take a -- are
6 you saying that you are not okay with our taking a
7 break?
8 MR. JENSEN: I'm in the middle of my
9 examination and I would prefer not to take a break in
10 the middle of my examination unless the Deponent
11 needs to take a rest room break or there needs to be
12 a discussion about a privilege.
13 MS. LITTRELL: We need to have a
14 conversation.
15 MR. JENSEN: All right.
16 MS. LITTRELL: Okay. It's been 30 minutes.
17 We need to take a break.
18 (Break taken at 1:22 p.m.)
19 (Back on the record at 1:27 p.m.)
20 MR. JENSEN: Can you read back the last
21 question?
22 (Court reporter played back last question.)
23 BY MR. JENSEN:
24 **Q. What specifically did Ms. Fusco tell you you**
25 **could not wear?**

Page 22

1 A. Shirts advertising the Day of Silence.
2 **Q. Anything else?**
3 A. No.
4 **Q. What else was said during that meeting?**
5 A. That was basically it.
6 She asked me if I was going to do it and I said,
7 yeah. And then I went back to class.
8 **Q. Did Ms. Fusco say anything else that you didn't**
9 **already identify?**
10 A. No.
11 **Q. Did you say anything else to her?**
12 A. No, sir.
13 **Q. Was there anyone else around to hear the**
14 **conversation?**
15 A. No, sir.
16 **Q. When was the next time you had contact with**
17 **Ms. Fusco?**
18 A. We saw each other in the hallways and stuff, but
19 we didn't talk about the Day of Silence.
20 **Q. Okay. After this meeting in the hallway, when**
21 **was the next time you had any contact with Ms. Fusco**
22 **regarding Day of Silence or anything to do with the Day**
23 **of Silence?**
24 A. Weeks after the Day of Silence happened.
25 **Q. Tell me about that meeting?**

Page 23

1 A. We just kind of went over it in passing. Just
2 talked about it, you know. Like not debated or anything
3 like that.
4 **Q. What specifically did Ms. Fusco say?**
5 A. I don't remember specifically what she said.
6 **Q. Well, generally, what did she say?**
7 A. Well, this happened. I'm sorry that it happened
8 but it did.
9 **Q. What was she talking about?**
10 A. The --
11 MS. LITTRELL: Objection. Form of the
12 question.
13 BY MR. JENSEN:
14 **Q. You can go ahead and answer.**
15 A. She was referring to the Day of Silence.
16 **Q. Did she say anything else?**
17 A. No, sir.
18 **Q. Did you say anything to her?**
19 A. No, sir.
20 **Q. When was the next time you had contact with**
21 **Ms. Fusco regarding Day of Silence?**
22 A. We haven't talked about the Day of Silence other
23 than that. Actually, can I amend that?
24 We talked about it this year. Is that relevant?
25 MS. LITTRELL: Absolutely.

Page 24

1 A. Okay. We did talk about it this year when I
2 started organizing. And this time I gave them two
3 months' notice.
4 BY MR. JENSEN:
5 **Q. Okay. Did you have any conversations with her**
6 **regarding last year's Day of Silence?**
7 A. Other than --
8 MS. LITTRELL: Asked and answered.
9 Objection. Form of the question.
10 BY MR. JENSEN:
11 **Q. You can go ahead and answer.**
12 A. Just, once again, expressing condolences that
13 something -- that there was a problem with it.
14 **Q. All right. So when you were, just so I**
15 **understand, when you were planning this year's Day of**
16 **Silence you had a conversation with Ms. Fusco and she**
17 **apologized to you about last year's Day of Silence. Is**
18 **that your testimony?**
19 A. She told --
20 MS. LITTRELL: Objection to the form of the
21 question.
22 BY MR. JENSEN:
23 **Q. Go ahead.**
24 A. She told me that she was sorry that there was a
25 fuss.


ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 25

1    She wasn't sorry that I got in trouble or
2    anything like that. She never said that.
3        Q. Any other communications with Ms. Fusco regarding
4    the 2012 Day of Silence?
5        A. No. They switched principals.
6        Q. All right. So if I understand your testimony,
7    you had five contacts with Ms. Fusco on separate days
8    regarding Day of Silence; is that correct?
9        A. As of now that's all I recall.
10       Q. Why did you have contact with Ms. Fusco the first
11   time to ask for her approval?
12       MS. LITTRELL: Objection. Form of the
13   question.
14   BY MR. JENSEN:
15       Q. Go ahead.
16       A. She was the principal. She should know what's
17   going on.
18       Q. So you contacted her just to let her know what
19   was going on?
20       A. Yes, sir.
21       Q. No other reason?
22       MS. LITTRELL: Objection. Form of the
23   question.
24   BY MR. JENSEN:
25       Q. You can go ahead and answer.

Page 26

1        Was that the only reason you had --
2        A. Yes.
3        MS. LITTRELL: Objection to the form of the
4    question.
5    BY MR. JENSEN:
6        Q. All right. Let's talk about Ms. Jones.
7        When did you first have contact with Ms. Jones
8    regarding the 2012 Day of Silence?
9        A. The only time I had contact with her regarding it
10   was the actual day.
11       Q. Okay. And when did you have contact with
12   Ms. Jones?
13       A. When I was called up to her office.
14       Q. Where were you when you were called to go to her
15   office?
16       A. My third period algebra class.
17       Q. And who was that teacher?
18       A. Mr. Wilder.
19       Q. What day were you called to see Ms. Jones?
20       A. The 20th.
21       Q. And how were you summoned to Ms. Jones?
22       Was it someone come by? Was it intercom?
23       A. Mr. Wilder got a phone call and they called me up
24   to the office.
25       Q. Where did Mr. Wilder tell you to go?

Page 27

1        A. To Ms. Jones', the Dean.
2        MS. LITTRELL: Since we haven't reserved
3    objections, I'm going to object to that as hearsay.
4    BY MR. JENSEN:
5        Q. And did Mr. Jones say anything else to you?
6        MS. LITTRELL: Objection.
7        A. That's --
8        MS. LITTRELL: Go ahead.
9        A. But it was Mrs. Jones --
10       (Court reporter asked Deponent to repeat end
11   of answer.)
12       A. Mrs. Jones, the Dean.
13       THE COURT REPORTER: Dean. Thank you.
14   BY MR. JENSEN:
15       Q. Did Mr. Wilder say anything else to you --
16       A. No.
17       Q. -- other than to go to Mr. Jones?
18       A. (Shook head).
19       Q. Or Mrs. Jones? I'm sorry.
20       A. No, he didn't.
21       Q. And did anybody walk you up to Ms. Jones' office,
22   or did you go by yourself?
23       A. I went by myself with a pass.
24       Q. When you got to her office who was there?
25       A. Ms. Jones was. She was standing halfway in and

Page 28

1    halfway out of the door.
2        Q. Were any other students out in the hallway?
3        A. There was one student sitting outside who was
4    also there for the Day of Silence.
5        Q. And who was that?
6        A. Should I put his name out there?
7        Q. Yes.
8        A. Okay.
9        Q. What's his name?
10       A. Richard Maybell.
11       (Court reporter asked to repeat answer.)
12       A. Maybell, M-A-Y-B-E-L-L.
13   BY MR. JENSEN:
14       Q. And did you have a conversation with Ms. Jones in
15   the hallway or in her office?
16       A. In her office.
17       Q. Did you have any conversation with Ms. Jones in
18   the hallway?
19       A. No.
20       Q. When you went into Ms. Jones' office, did she
21   shut the door?
22       A. I don't remember.
23       Q. Who spoke first, you or Ms. Jones?
24       A. Ms. Jones.
25       Q. And what did she say?


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 29

1 A. She asked me if I -- whether -- rather, sorry, go
2 to IR or go home.
3 Q. Did she say why?
4 A. No.
5 Q. What did you say to her?
6 A. I told her that I'd rather go home.
7 Q. And then what was said next?
8 A. She asked my home phone number and I gave it to
9 her.
10 Q. What was said next?
11 A. She called my parents to try to see if they would
12 come pick me up. And they weren't home.
13 Q. What was said next?
14 A. She told me just to go to IR and wait it out.
15 Q. And did you?
16 A. Yes.
17 Q. Did you say anything else?
18 A. No.
19 Q. Did she say anything else?
20 A. No.
21 Q. Were you angry when you were having contact with
22 Ms. Jones?
23 A. Not so much, I was disappointed to say.
24 Q. So you were disappointed but not angry?
25 A. That's right.

Page 30

1 Q. Did you use any profanity during that meeting?
2 A. No, sir.
3 Q. When was the next time you had contact with
4 Ms. Jones regarding Day of Silence?
5 A. We didn't have contact after that.
6 Q. How long did you stay in IR?
7 A. From third period onwards.
8 Q. To the end of the day?
9 A. Yes, sir.
10 Q. Did you refuse to follow any instruction that
11 Dean Jones had given you?
12 A. No, sir.
13 Q. During April 20th, did you remain silent in your
14 first, second, and third period class?
15 A. Yes, sir.
16 Q. Were you called on to answer any questions during
17 your first, second, or third period class?
18 A. No, sir.
19 Q. Were there any group discussions at all during
20 any of your classes that day that you would normally
21 participate in?
22 A. No.
23 Q. Have you seen this document before?
24 A. Yes, sir.
25 Q. Okay. I'm going to go over a few things in this

Page 31

1 document.
2 MS. LITTRELL: Will you be marking the
3 document, Counsel?
4 MR. JENSEN: We will make that Exhibit A.
5 (Defendants' Exhibit A was marked for
6 identification purposes.)
7 BY MR. JENSEN:
8 Q. Did you play any part in drafting this document?
9 MS. LITTRELL: Objection.
10 BY MR. JENSEN:
11 Q. You can go ahead and answer it.
12 A. I read over it and made sure everything was
13 accurate.
14 Q. Did you swear an oath before you signed this
15 document?
16 A. It had to be authorized so, yes.
17 MS. LITTRELL: Why don't you take a minute
18 to look at that document.
19 Let the record reflect that it appears to be
20 about a 50-page document that counsel has just
21 dropped in front of a 16-year old minor, the
22 Plaintiff.
23 And I think it would be appropriate if we
24 had a good 10 minutes to take a look at the document
25 that you have in front of you before he starts asking

Page 32

1 questions about it.
2 MR. JENSEN: If you would like to look over
3 it you are more than welcome to.
4 MS. LITTRELL: Just take all the time that
5 you need to read it.
6 THE DEPONENT: Oh, I'm reading it.
7 BY MR. JENSEN:
8 Q. You had an opportunity to look over the
9 Complaint?
10 A. Yes, sir.
11 Q. Okay. Paragraph 19 of the Complaint, is that the
12 first meeting you had with Ms. Fusco?
13 A. Give me a moment to get to it.
14 Q. Of course.
15 MS. LITTRELL: Has Counsel brought a
16 courtesy copy for opposing counsel?
17 MR. JENSEN: Opposing counsel should have
18 brought her file.
19 A. Yes.
20 BY MR. JENSEN:
21 Q. Okay. Paragraph 27, and I'll give you time to
22 find it, which meeting did that take place in?
23 Was that your first, second, or third meeting
24 with Ms. Fusco?
25 A. That was the second.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

ACR ACCURATE
COURT REPORTING, INC.

Page 33

1    Q. Do you have any personal knowledge regarding the
2 communications between Ms. Fusco and Superintendent
3 Cline?
4      MS. LITTRELL: Objection.
5 BY MR. JENSEN:
6    Q. You can answer.
7    A. Can you define what you mean by personal
8 knowledge?
9    Q. Personal knowledge is something that you
10 personally perceive with your five senses, not what
11 somebody else told you or you read about.
12    A. No.
13      MS. LITTRELL: Objection. It's an
14 inaccurate description of personal knowledge,
15 perception.
16 BY MR. JENSEN:
17    Q. Paragraph 32, which meeting did that take place
18 in?
19     Was that the conversation out in the hallway?
20    A. Yes, sir.
21    Q. In Paragraph 32 you state that Ms. Fusco warned
22 you that if you were quiet there would be disciplinary
23 consequences. You told me during today's deposition
24 that she told you you could be quiet.
25     Which one is true?

Page 34

1      MS. LITTRELL: Objection to the form of the
2 question.
3    A. Can you repeat what you said about what I said?
4 BY MR. JENSEN:
5    Q. Yes.
6     During your deposition today you told my that
7 during that conversation you had with Ms. Fusco in the
8 hallway she told you that you would be allowed to remain
9 quiet.
10     Do you remember testifying about that?
11    A. Yes.
12    Q. But here in your Verified Complaint that you
13 swore of, you said that if she warned you that if you
14 came to school and was quiet there would be disciplinary
15 consequences.
16     Those seem to be inconsistent and I'm trying to
17 figure out which one is true?
18    A. Well --
19      MS. LITTRELL: Objection to the form of the
20 question. There is no inconsistency.
21     You can answer, if you want.
22    A. She told me that I could be quiet on my own time.
23 But if I was quiet in general -- do you know what I
24 mean?
25 BY MR. JENSEN:

Page 35

1    Q. No, that's why I'm asking.
2    A. She told me that I could be quiet on my own time,
3 classes, not during instructional time, and in the
4 hallway and such like that.
5     But she didn't want me to be quiet like during
6 instructional time which -- yeah. That --
7     Please remember that this is over a year ago.
8 So --
9      MS. LITTRELL: Can you read back or playback
10 what exact paragraph from the Complaint, which the
11 teenager did not draft, we are referencing at this
12 point?
13      MR. JENSEN: Wait. Actually, it's my
14 examination right now. And when we start doing stuff
15 on your examination you can call for these things.
16 But I'm the one asking questions right now.
17      MS. LITTRELL: Are you saying that I can't
18 get clarification by asking the court reporter
19 what -- the question you asked?
20      MR. JENSEN: There's no question pending
21 right now.
22 BY MR. JENSEN:
23    Q. Now Paragraph 38 you mentioned that you were
24 going to encourage students to purchase red t-shirts
25 with pro-Day of Silence messages on them.

Page 36

1     Who was making these t-shirts?
2    A. Anybody who wanted to participate.
3     I mean, you can buy one off of the website that
4 GLSEN links you to, or you can make your own.
5    Q. And you had planned to promote these shirts to
6 student body?
7      MS. LITTRELL: Objection.
8 BY MR. JENSEN:
9    Q. You can answer.
10    A. I told them if they wanted to they could. I
11 didn't tell them that it was absolutely mandatory.
12    Q. Does the school have any policies regarding
13 commercial sales during the school day?
14    A. I wasn't --
15      MS. LITTRELL: Objection.
16    A. -- selling.
17 BY MR. JENSEN:
18    Q. You were promoting someone else to buy these
19 shirts, correct?
20      MS. LITTRELL: Objection, the form of the
21 question.
22     You are testifying.
23      MR. JENSEN: No, I'm asking questions.
24      MS. LITTRELL: Objection to the form of the
25 question.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 37

1    Counsel is mischaracterizing evidence and
2    also stating evidence that has no foundation, hasn't
3    been admitted or there is no foundation for.
4    BY MR. JENSEN:
5        Q. Were you going to promote the sale of t-shirts
6    from a particular website?
7        A. I told them where they could buy it. I don't
8    count that as promoting anything.
9        Q. Also, in Paragraph 32, you allege that Principal
10   Fusco interrupted Amber's instruction time by calling
11   her out of class and into her office.
12       Did she call you into her office or did that
13   conversation take place in the hallway?
14       A. That took place in the hallway.
15       Q. Okay. So this part of your Verified Complaint is
16   false, correct?
17           MS. LITTRELL: Objection. Form of the
18   question.
19   BY MR. JENSEN:
20       Q. You can answer.
21       A. It's not like I deliberately said, hey, this
22   happened. I want you to tell it a different way.
23       It was an inconsistency on my part and I'll admit
24   to that. But this is over a year ago. I can't remember
25   every single detail.

Page 38

1        Q. Well, you remembered this conversation taking
2    place in the hallway, correct?
3        A. Yes. At the time of the drafting I may have been
4    under a different — I get confused. I'm 16.
5        Q. Have you ever been diagnosed with memory
6    problems?
7        A. That's in my past history. That's my medical
8    records.
9        Q. Okay. Are you telling me you've had a medical
10   diagnosis of memory problems in the past?
11       A. I'm telling you that's the doctor/patient
12   confidentiality —
13       Q. That doesn't exist in this state.
14       So do you have any past medical history of memory
15   problems?
16       A. I don't.
17       But you're not supposed to ask me about my
18   medical history.
19       Q. Your medical history is fair game during this,
20   where it's relevant, unless your counsel moves for a
21   protective order.
22       And if that happens we'll take a break in the
23   deposition and have the Judge rule on it.
24       A. All right.
25           MS. LITTRELL: Any time you're fatigued or

Page 39

1    just need to take a break or something you just let
2    counsel know. I'm sure he'll be fine with you taking
3    a break.
4        Are you doing okay?
5        THE DEPONENT: Yeah, I'm fine.
6        It's just, I thought that the whole
7    doctor/patient thing, you know -- that's something
8    I've understood, for a very long time, to be true.
9        MS. LITTRELL: We will talk about that on a
10   break.
11       THE DEPONENT: Yes, ma'am.
12   BY MR. JENSEN:
13       Q. Now in Paragraph 53 of your Complaint you say
14   that Principal Fusco had threatened you with punishment,
15   but you haven't identified any such incident during your
16   deposition today.
17       Which is true, did she threaten you with
18   punishment or did she not?
19       A. She told me I would get in trouble. That's the
20   same thing as threatening me with punishment.
21       Q. Did she threaten you at any time during your
22   meetings?
23       MS. LITTRELL: Asked and answered.
24   Objection.
25

Page 40

1    BY MR. JENSEN:
2        Q. You can answer.
3        A. She threatened me with consequences for
4    participating. She didn't physically threaten me or
5    anything like that.
6        Q. What specifically did she tell you?
7        A. She told me that I would get in trouble if I
8    participated in the Day of Silence.
9        Q. Did she tell you what specific punishment you
10   would receive for doing any particular activity?
11       A. No.
12       Q. Okay. Paragraph 56 you allege that the School
13   Board delegated to Superintendent Cline authority to
14   direct activities of his subordinates directing the work
15   of employees --
16       MS. LITTRELL: Object to the form of the
17   question.
18   BY MR. JENSEN:
19       Q. -- of the DeSoto County School District.
20       What facts do you know of that would indicate the
21   School Board delegated any of its authority to
22   Superintendent Cline?
23       And if you don't know that's fine, say you don't
24   know.
25       A. Good, because I don't know.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 41

1  Q. All right.

2  A. Sorry.

3  Q. Are you aware that the School Board has monthly

4  meetings?

5  A. Yes, sir.

6  Q. Are you aware that you have the opportunity to

7  appear before the Board as a student, or just as a

8  general citizen, and address any issue before the Board?

9  A. No, sir.

10  Q. You were not aware of that?

11  A. No, sir.

12  Q. Paragraph 60 you stated Superintendent Cline

13  denied your appeal.

14  What specifically did Superintendent Cline do to

15  deny your appeal?

16  A. He never answered back to my e-mails and told

17  Ms. Fusco that he was not willing to set up a meeting

18  with me to talk about it.

19  Q. Okay. You mentioned the Board provided no actual

20  opportunity to make a full review of that decision.

21  Do you know for a fact that there is no

22  opportunity for you to address the Board regarding this

23  incident?

24  A. I honestly don't know Board policy. I haven't

25  gone to any of the meetings or anything like that. But

Page 42

1  that's something I can look into.

2  Q. All right. Paragraph 61 says Amber has suffered

3  and will continue to suffer harms including but not

4  limited to lost academic opportunity.

5  Tell me what lost academic opportunity you have

6  suffered?

7  A. Well, algebra is extremely trying. And he was

8  going over important aspects of that that I needed to be

9  there to hear. And I didn't get to do that.

10  And I missed four other classes, time that I

11  could have been going through my homework, or trying to

12  figure out whether the teacher is teaching something

13  new.

14  Q. Okay. So your lost academic opportunity, is that

15  four classes?

16  A. Yes.

17  Q. And is that lost academic opportunity important

18  to you?

19  A. Every academic opportunity is important. So,

20  yes.

21  Q. Okay. How many unexcused absences did you have

22  that school year?

23  A. How is that relevant?

24  Q. I'm sorry, ma'am, but I'm the one who gets to ask

25  the questions and you get to answer them. It doesn't

Page 43

1  work the other way around.

2  A. Sorry.

3  Q. How many unexcused absences did you have that

4  school year?

5  A. I honestly don't know.

6  Q. Did you attend school on April 13th?

7  A. I don't remember.

8  MS. LITTRELL: Objection to the form of the

9  question.

10  Can you give a year, Counselor?

11  MR. JENSEN: Okay.

12  BY MR. JENSEN:

13  Q. April 13th, 2012, you have unexcused absences

14  that entire day.

15  MS. LITTRELL: Counsel is testifying.

16  Objection.

17  MR. JENSEN: If you would let me finish my

18  question it would be a form of the question.

19  BY MR. JENSEN:

20  Q. Do you know why you have all those unexcused

21  absences on April 13th?

22  MS. LITTRELL: Objection to the form of the

23  question.

24  A. I don't specifically remember.

25  MS. LITTRELL: Let the record reflect that

Page 44

1  counsel is reading from a document that has not been

2  introduced, and there is no foundation.

3  He is just reading from his own piece of

4  paper.

5  BY MR. JENSEN:

6  Q. April 4th, 2012 you were absent from your first,

7  second, fourth and fifth period classes.

8  Why were you absent on those classes on April --

9  MS. LITTRELL: Objection. Counsel is

10  testifying.

11  BY MR. JENSEN:

12  Q. -- 4th, 2012?

13  A. I was absent that entire day. They marked me

14  there?

15  Q. You have unexcused absences on April 4th, 2012,

16  your first, second, fourth and fifth period classes.

17  I'm asking you if you know --

18  MS. LITTRELL: Objection to the form of the

19  question. You're testifying.

20  MR. JENSEN: Would you let me finish my

21  questions before you interrupt me with your

22  objections?

23  BY MR. JENSEN:

24  Q. Do you know why you have those unexcused absences

25  that day?



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 45

1    MS. LITTRELL: Objection to the form of the
2    question.
3         Counsel is testifying.
4    A. I know that I wasn't in school. I don't know why
5    the other classes marked me there. But I wasn't in
6    school for the entire day.
7         My parents can attest to that.
8    BY MR. JENSEN:
9    Q. Okay. Where were you?
10   A. I was at home mostly likely sick. Although I
11   don't remember exactly what.
12   Q. If you call in sick, do they mark your absences
13   as excused?
14        MS. LITTRELL: Objection to the form of the
15   question.
16        Calls for speculation. She does not work
17   for the school system.
18   BY MR. JENSEN:
19   Q. Do you know the answer to that question?
20   A. I actually don't.
21   Q. Okay. You were absent from class, according to
22   these records, on February 10th, 2012, February 13th,
23   2012, February 15th, 2012, February 16th, 2012, all
24   unexcused absences.
25        Where were you on those days?

Page 46

1    MS. LITTRELL: Objection. Lack of
2    foundation.
3    BY MR. JENSEN:
4    Q. You can go ahead and answer.
5    A. It's February of last year, I don't remember.
6    I'm sorry.
7    Q. Okay. Would you agree that you have numerous --
8    or you had numerous unexcused absences on -- this 2012
9    school year?
10   A. That doesn't change the fact that I still lost
11   instructionable time that I needed. But, yes.
12   Q. And how are you going to continue to suffer lost
13   academic opportunity as a result of this incident?
14   A. Because in all of my classes I have been treated
15   differently.
16        Some teachers kind of pay more attention to me,
17   which is good. But some of them kind of try to ignore
18   me as much as they can.
19        They are too afraid of getting in trouble to
20   really effectively do what they need.
21   Q. Has any teacher indicated to you they're afraid
22   to talk to you because of the Day of Silence?
23   A. Not this year, no.
24        But last year I got that feeling from people and
25   they kind of said, well, in the interest of keeping my

Page 47

1    job, or something along that line.
2    Q. Who specifically told you that they were afraid
3    of losing their job because of the Day of Silence?
4    A. Mr. Wilder and Mr. Henley.
5         They said they couldn't comment any opinions, and
6    that they didn't want to get fired.
7    Q. They couldn't give you any opinions regarding
8    what?
9    A. The Day of Silence, whether or not I should have
10   been punished, et cetera, et cetera.
11   Q. Well, would you agree that has got nothing to do
12   with academic opportunity?
13   A. I would agree that that shapes the way that the
14   teachers look at you differently.
15        The way a teacher treats you it reflects the way
16   that they teach you.
17   Q. Okay. Permanent disciplinary record, do you know
18   whether or not you actually have a disciplinary record
19   as a result of this incident?
20   A. Yes. I received multiple write-ups because of
21   it. Actually, three.
22   Q. Tell me about the first one.
23   A. It was filed the day that I was there and they
24   said I was sent to IR for insubordination, something
25   like that. I don't remember exactly what.

Page 48

1    Q. Tell me about the second one.
2    A. It said something along those lines, and it added
3    something. I don't remember. But I know that I got
4    more than one.
5    Q. Tell me about the third one?
6    A. Yet, again, I reiterate that I don't remember
7    exactly what it says asides from the fact that
8    insubordination and adding on to that.
9    Q. What are these three documents called?
10   A. They are just write-up forms. They print them
11   out.
12   Q. Were you given copies of them?
13   A. They mailed one copy to my house.
14        They're supposed to give you copies for
15   everything you get wrote up for, but they only gave me
16   one. And that was after weeks of pestering them to give
17   me a copy of my write-up already.
18   Q. And how about the other two, have you ever seen
19   copies of these other two documents?
20   A. No.
21   Q. How do they know they exist if you've never seen
22   them?
23        MS. LITTRELL: Objection. Attorney/client
24   privilege.
25        Don't answer that question. That's it.


Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 49

1  BY MR. JENSEN:
2      Q.  Okay.  You alleged and receive and will continue
3  to receive emotional distress.
4          Tell me about the emotional distress that you've
5  received as a result of this incident.
6      A.  Well, A, I reiterate the point that the teachers
7  are treating me differently.  Some in a good way some in
8  a bad way.
9          But there is also students, ever since this has
10 happened, I've been getting ridiculed for getting in
11 trouble for doing something for gay rights.
12         I've been called out with homophobic slurs in
13 the hallways and things like that.
14         And I don't feel secure around my administration
15 anymore.
16     Q.  And you relate all this to the discipline you
17 alleged you received?
18     A.  Yes, sir.
19     Q.  You don't think any of this would have happened
20 if you had not received any disciplinary --
21         MS. LITTRELL:  Asked and answered.
22     Objection.
23 BY MR. JENSEN:
24     Q.  -- action?
25     A.  I don't think it would.

Page 51

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


**ACCURATE**
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 53

1  for a continuation.
2      Do you need to take a break?
3      THE DEPONENT: I'm all right.
4      MS. LITTRELL: No, let's take a break.
5      Yeah. And Dad wants to take a break too.
6      (Break taken at 2:13 p.m.)
7      (Back on the record at 2:22 p.m.)
8  BY MR. JENSEN:
9      Q. Paragraph 76 of your Complaint, tell me all the
10  information that you know of that would lead you to
11  believe that Ms. Fusco imposed, approved, or ratified
12  any disciplinary action taken against you for the Day of
13  Silence?
14      MS. LITTRELL: You might want to read that
15  in context but -- you know, the pages before.
16      A. By ratifying and imposing, you mean that she was
17  going against it? Well, that violated my freedom of
18  expression because, like, I'm -- you're supposed to be
19  able to speak about your political views without having
20  action taken against you.
21  BY MR. JENSEN:
22      Q. Okay. That's not what I asked you, ma'am. We
23  will take this one at a time.
24      What information do you know of that would lead
25  you to believe that Ms. Fusco approved of the

Page 54

1  disciplinary action taken against you?
2      A. Sending out that e-mail.
3      Q. Which e-mail is that?
4      A. Of -- some teachers told me that they received an
5  e-mail saying to discipline anyone they saw
6  participating in the Day of Silence. Ms. Fusco sent it
7  out personally.
8      Q. Have you seen that e-mail?
9      A. Yes, I have.
10      Q. And in that e-mail she told the teachers to
11 discipline anyone who was participating in the Day of
12 Silence. Is that your testimony?
13      A. I got a copy of the e-mail somewhere.
14      "Please note that we have a group of students
15 today" --
16      MS. LITTRELL: Feel free to read the whole
17  thing.
18      A. "If you have students who are wearing placard in
19 protest of an issue, or disrupting the hallways or
20 classrooms, please notify the dean or administration and
21 we will handle it."
22 BY MR. JENSEN:
23      Q. Okay. Is that the e-mail you're talking about?
24      A. Yes.
25      Q. In that e-mail they do not tell the teachers to

Page 55

1  discipline anyone, does she?
2      A. "If you have students who are wearing placard in
3  protest of an issue or disrupting the hallways or
4  classrooms, please notify the dean or administration and
5  we will handle it."
6      Yes.
7      Q. Yes, what?
8      A. Yes, she wanted to punish them by sending them
9  out of the classroom and to the dean. That's widely
10  regarded as a punishment.
11      Q. Doesn't that e-mail simply tell the teachers to
12  inform the office and let the office deal with it?
13      MS. LITTRELL: Objection to the form of the
14  question.
15      It speaks for itself.
16      A. Basically. But -- I see, "and we will handle
17  it."
18      Yes, but that's still disciplinary action, them
19  handling it is disciplinary action.
20  BY MR. JENSEN:
21      Q. Well, that would depend on how they decided to
22  handle it, isn't that correct?
23      A. I guess you could say that, yeah.
24      But, think about it, what are they really going
25  to do?

Page 56

1      Q. They --
2      A. What's the --
3      Q. Isn't it possible that they could get a report
4  that a student is remaining quiet and they could simply
5  say, well, they can do that?
6      MS. LITTRELL: Objection. Calls for
7  speculation.
8  BY MR. JENSEN:
9      Q. Isn't that a possibility?
10      A. I'm not a -- I'm not an administrator.
11      But, if you look at it logically, the things that
12  were happening before, what do you think they do?
13      Q. Okay. Do you have any other information, other
14  than that e-mail, that would lead you to believe that
15  Ms. Fusco approved of disciplinary action taken against
16  you?
17      A. No, sir.
18      Q. How about Superintendent Cline, what information
19  do you have that you would -- would lead you to believe
20  that Superintendent Cline approved of the disciplinary
21  action taken against you?
22      A. If I can find -- I'm trying to find the e-mail
23  that was sent and he replied.
24      He says, "It is inconsistent with the district's
25  past practice to approve student protests on any of our



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

ACR ACCURATE COURT REPORTING, INC.

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 57

1 campuses."

2 So basically he was saying you can't do this.

3 Q. That was sent before this action happened,

4 correct?

5 A. Yes.

6 Q. So, again, do you have any information that would

7 lead you to believe that Mr. Cline approved of the

8 disciplinary action taken against you?

9 A. No, sir.

10 Q. Do you have any information that -- that would

11 lead you to believe that the School Board approved of

12 the disciplinary action taken against you?

13 A. No, sir.

14 Q. So that's part of your Verified Complaint that

15 you sworn to is not correct?

16 Or you have no knowledge; is that correct?

17 A. I have no knowledge of them being for it either.

18 I have no knowledge of them approving or denying.

19 Q. Would you agree that it is inappropriate to swear

20 an oath to something you have no knowledge about?

21 MS. LITTRELL: Objection to the form of the

22 question.

23 These are legal conclusions. They are in

24 the Complaint. They are in the Count. She is not an

25 attorney.

Page 58

1 MR. JENSEN: It's a factual allegation.

2 BY MR. JENSEN:

3 Q. And you can go ahead and answer the question.

4 A. Can you rephrase it for me? Sorry.

5 Q. Would you agree that's inappropriate to swear an

6 oath and say that something happened if you don't have

7 any knowledge whether it happened or not?

8 A. I have to say, yes.

9 Q. All right. Now tell me all information that you

10 have that would lead you to believe that Principal Fusco

11 ratified the decisions and imposed discipline upon you?

12 A. Could you give me a definition of ratified?

13 Q. Yes.

14 She adopted a reason why you were disciplined and

15 the reasoning behind that decision.

16 A. I believe she did just based on what I've heard

17 from her talking to other teachers.

18 And, plus the e-mail, I feel like she's saying go

19 ahead and send them up so that we can give them

20 consequences and stuff.

21 I feel like she's endorsing disciplining the

22 students.

23 Q. Okay. What conversations have you overheard

24 between Ms. Fusco and other teachers relating to this?

25 A. I haven't overheard the conversations. Other

Page 59

1 students have, and they've relayed some information to

2 me.

3 Honestly, it's a matter of being at the right

4 place at the right time.

5 Q. Okay. What was relayed to you?

6 A. That Ms. Fusco has been talking -- had been

7 talking to the other teachers and administration and

8 students have heard them say things like, well, what is

9 this girl going to do other than get herself in trouble,

10 et cetera, et cetera.

11 Q. Is that the only thing that's been relayed to

12 you?

13 A. Only thing that anyone would relate to me, yeah.

14 Q. And who related that to you?

15 A. Students.

16 Q. Who specifically?

17 A. I don't remember specifically who.

18 Q. Paragraph 79, just let me know when you have it.

19 A. I do.

20 Q. Defendant Fusco's discretionary discipline

21 decisions are not subject to approval by School Board.

22 First off, what discretion decisions did

23 Ms. Fusco make regarding you?

24 A. I don't know who made the decision. So I can't

25 answer that.

Page 60

1 Q. All right.

2 In 80 you say, "Defendant Fusco's discretionary

3 decision to punish Plaintiff."

4 You've already indicated you didn't know whether

5 or not she made a decision or not. So what's the

6 rationale behind --

7 MS. LITTRELL: Objection to the form of the

8 question.

9 BY MR. JENSEN:

10 Q. -- Paragraph 80?

11 MS. LITTRELL: Counsel is well aware that

12 this teenager did not draft the Complaint or the

13 Counts in the Complaint.

14 It says Plaintiff. It's not her sworn

15 testimony, as to Paragraph 80.

16 BY MR. JENSEN:

17 Q. Let me rephrase the question.

18 You swore an oath that everything in this

19 Complaint was true.

20 So what information --

21 MS. LITTRELL: Objection to the form of the

22 question.

23 BY MR. JENSEN:

24 Q. -- do you have --

25 MS. LITTRELL: You're testifying.



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 61

1 MR. JENSEN: Again, please remain quiet
2 while I'm asking the question.
3 If you want to object to the form you can.
4 MS. LITTRELL: Object to the form.
5 MR. JENSEN: But please wait until I finish
6 my question.
7 BY MR. JENSEN:
8 Q. What discretionary decision to punish you did
9 Ms. Fusco make?
10 A. I guess you could argue that she didn't make one.
11 Q. Is that your testimony, that she did not make
12 one?
13 A. Yes.
14 Q. Why did you swear an oath that this is true if
15 it's not?
16 MS. LITTRELL: Object to the form of the
17 question.
18 BY MR. JENSEN:
19 Q. You can answer.
20 A. Because I wasn't aware that it was untrue.
21 Q. Are you aware that it's a crime to file an
22 affidavit in a Court if the affidavit is not true?
23 A. I didn't know that it was true -- was untrue.
24 Q. You didn't know one way or the other, did you?
25 A. I didn't, no.

Page 62

1 Q. Paragraph 81, "Defendant Cline's discretionary
2 decision in interpreting, communicating to subordinates
3 and applying the School Board's policy, practice, and/or
4 custom at issue in this action are not subject to
5 approval by the School Board."
6 Do you know one way or the other whether the
7 School Board has the ability to overturn the
8 superintendent's decisions?
9 A. No, sir.
10 Q. 92, "The record of suspension and discipline on
11 Plaintiff's academic record may and/or will have
12 irreparable negative consequences on," your "future as
13 she seeks admissions to college, the military, or seeks
14 to enter the workforce."
15 How is this incident going to affect your ability
16 to enter college, military, or enter the workforce?
17 A. Because colleges are going to look at it and
18 think that I'm a troublemaker, and think that I did
19 something to -- insubordinate.
20 Colleges look at things really extensively.
21 Q. Do you have any disciplinary history with DeSoto
22 County High School prior to this incident occurring?
23 A. Yes, sir.
24 Q. What other disciplinary actions do you have
25 against you?

Page 63

1 A. I don't recall at the moment.
2 Q. Did you have any after this incident, apart from
3 this incident?
4 A. One.
5 Q. What was that?
6 A. It was exam day and I was out of school, and they
7 counted it as skipping.
8 Q. Okay. Anything else?
9 A. Other than that, no.
10 Q. Were you disciplined for shoplifting on a field
11 trip?
12 A. I wasn't disciplined.
13 Q. Okay. Did you have any type of negative
14 consequences imposed against you for shoplifting while
15 you were on a field trip?
16 A. Yes, sir.
17 Q. Okay. And what was that?
18 A. I was taken out of my vocal ensemble.
19 Q. And did you in fact shoplift?
20 A. I took the fall for someone else.
21 Q. Who was shoplifting?
22 A. A friend of mine who I'd rather not identify.
23 Q. And what did they take?
24 A. Multiple items from the amusement parks and
25 things like that. She just took stuff and she was too

Page 64

1 afraid to get in trouble so I took the fall for it and
2 they kicked me out of ensemble.
3 Q. Okay. Did you have possession of any of the
4 shoplifted items?
5 A. She kept it in her backpack.
6 MS. LITTRELL: Objection.
7 You can take the Fifth on this.
8 A. Okay. Well, Fifth then.
9 BY MR. JENSEN:
10 Q. Okay. In Paragraph 125, what information do you
11 know about that would lead you to believe that Defendant
12 Cline knew or should have known that Principal Fusco
13 would engage in unconstitutional conduct?
14 A. Well, there's the fact that I sent them multiple
15 documents displaying laws and multiple things like that,
16 information that was freely from the Internet and from
17 the GLSEN website.
18 And I had a fax sent over to them.
19 Q. Anything else?
20 A. No.
21 Q. Same question about Dean Jones, what information
22 do you know about that would lead you to believe that
23 Superintendent Cline knew that Dean Jones would do some
24 unconstitutional act?
25 A. I don't know how to answer that. I'm not sure


Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

ACCURATE
COURT REPORTING, INC.
1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 65

1  what he knew in regards to her.
2  Q. Paragraph 126, Defendant Fusco knew or should
3  have known that there was danger that Dean Jones would
4  engage in unconstitutional conduct.
5  What information do you know about that would
6  lead you to believe that Ms. Fusco knew or should have
7  known that Dean Jones would do something
8  unconstitutional?
9  A. The legal documents.
10  And the fact that she had -- that Ms. Jones
11  called me up there, that I'd given them legal documents
12  showing why that would be unconstitutional.
13  Q. Do you have any information that would lead you
14  to believe that Ms. Fusco knew what was going on between
15  you and Dean Jones while it was occurring?
16  A. No, sir.
17  Q. Do you have any information to lead you to
18  believe that Dean -- or, strike that.
19  Do you have any information that would lead you
20  to believe that Principal Fusco knew before this
21  incident occurred that Dean Jones would call you up to
22  the office?
23  A. Other than intuition, no.
24  MR. JENSEN: Okay. We are done with this.
25  If you just want to organize it all so that the court

Page 66

1  reporter has her Exhibit.
2  We will make this B.
3  BY MR. JENSEN:
4  Q. This is -- if you would look that over and let me
5  know when you're ready to answer questions about it.
6  A. Yeah.
7  Q. Okay. Before we get on to that document, where
8  were you when you signed the Verified Complaint?
9  A. I'm pretty sure I got it done with the office
10  people, you know, the post office guys, notary,
11  whatever.
12  I think so. I don't quite remember. It's one of
13  the two documents that we've seen.
14  If not then I signed it as soon as I got it under
15  the witness of my dad.
16  Q. The verification page indicates it was signed in
17  Charlotte County. Where in Charlotte County would you
18  have been?
19  MS. LITTRELL: Objection.
20  You're reading from something that is not
21  the document that you just provided her.
22  What are you talking about?
23  MR. JENSEN: I'm talking about the
24  verification form on Exhibit A.
25  MS. LITTRELL: On Exhibit A that you have

Page 67

1  taken away from her?
2  MR. JENSEN: This is available for her to
3  review if she so desires.
4  A. Sorry. But, yeah, it was --
5  MS. LITTRELL: Take a look at it.
6  THE DEPONENT: Yeah.
7  BY MR. JENSEN:
8  Q. It's Page 34.
9  A. Thank you.
10  Yep, it was in Charlotte. There is a little
11  notary place by Domino's. They do things like that.
12  Q. All right. Let's talk about Exhibit B.
13  Did you play any part in the drafting of Exhibit
14  B?
15  MS. LITTRELL: I'm sorry, for clarification,
16  it would be good if you could put a --
17  THE COURT REPORTER: I'll put a sticker on
18  it. If you will hand me that, please.
19  (Defendants' Exhibit B was marked for
20  identification purposes.)
21  THE DEPONENT: Thank you.
22  BY MR. JENSEN:
23  Q. Okay. Answer if you're ready.
24  A. Could you repeat the question?
25  Q. Did you play any part in the drafting of

Page 68

1  Exhibit B?
2  MS. LITTRELL: Objection to the form of the
3  question.
4  Confusing. Vague.
5  BY MR. JENSEN:
6  Q. You can answer.
7  A. Of course a legal person would go over it,
8  et cetera, et cetera.
9  But I've made sure that everything in there is
10  accurate with what I remember and believe. So, yes, I
11  did play a part in drafting it.
12  Q. All right. Did you type any of this yourself, or
13  was this typed for you and then you just went ahead and
14  made sure everything was correct?
15  A. I typed parts of it myself.
16  Q. What parts did you type?
17  A. I went through and changed dates and I rephrased
18  some stuff.
19  I don't know exactly what I rephrased.
20  Q. On Paragraph 15 you indicate, "Many of the
21  students who plan to participate will do so, whether
22  administration approves or not."
23  Who were the students that were going to
24  participate?
25  A. I don't remember everybody. I know it was a

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository



**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 69

1  group of at least 10 students who were going to
2  participate.
3      Q. And who were those 10 people?
4      A. I reiterate the point that I don't remember
5  exactly who, but they do include Richard Maybell and a
6  girl named Logan.
7      Q. Who else?
8      A. My friend, Liz. And I think Jacob. I can't
9  remember.
10     I don't know. I don't know all of the names.
11 But I know that there was within the range of like 10 to
12 15.
13     Q. Tell me the names of everybody that you remember.
14     A. I remember Jacob, Richard, Logan, Shane, two
15 chicks I didn't know who jumped on it at the end.
16     That's all I can remember as for now, although
17 I'm sure I'll think of someone else later.
18     Q. All right. Paragraph 17 you indicate that
19 Ms. Fusco repeatedly told you that you could not take
20 part without facing disciplinary sanctions.
21     How many times was repeatedly?
22     A. The three times that I've talked to her.
23     Q. Paragraph 19 you state that Principal Fusco
24 intended to punish you and other students for your
25 speech.

Page 70

1      MS. LITTRELL: Objection --
2  BY MR. JENSEN:
3      Q. What information --
4      MS. LITTRELL: -- to the form of the
5  question. It's not what it says.
6      Read the entire -- please.
7  BY MR. JENSEN:
8      Q. It says, "Cline was on notice that Principal
9  Fusco intended to punish me --
10     MS. LITTRELL: Object to the form of the
11 question.
12 BY MR. JENSEN:
13     Q. -- and other students for our speech."
14     Tell me all the information that you know of that
15 would indicate that Principal Fusco intended to punish
16 you?
17     MS. LITTRELL: Object to form of the
18 question.
19     Mischaracterizing what the paragraph says.
20 You only read half of the paragraph.
21     To answer the question read the entire --
22     THE DEPONENT: Yeah.
23     MS. LITTRELL: -- into the record, please.
24     A. It says: "without any evidence that it would
25 cause a material and substantial disruption."

Page 71

1      Yeah. She was going to -- I mean, she even sent
2  out the e-mail saying send them up to us and we'll deal
3  with them. That's seeing repercussion action,
4  obviously.
5  BY MR. JENSEN:
6      Q. Okay. What e-mail did she send saying send any
7  student to the office?
8      A. I will find it and read it again.
9      MS. LITTRELL: It's in there.
10     A. In here?
11     "If you have students who are wearing placard in
12 protest of an issue or disrupting the hallways or the
13 classroom, please notify the dean or administration and
14 we will handle it."
15 BY MR. JENSEN:
16     Q. It doesn't say send a student to the office, does
17 it?
18     A. "Please notify dean or administration." It
19 doesn't say sending, but it does mean calling them up.
20     Q. It means communicating to the administration
21 what's going on, does it not?
22     A. Yes.
23     Q. Okay. Doesn't say send a student to the office,
24 does it?
25     MS. LITTRELL: It's been asked and answered.

Page 72

1  BY MR. JENSEN:
2      Q. You can answer.
3      MS. LITTRELL: Objection. It's been asked
4  and answered.
5      Stop badgering this young child.
6      A. All right. I'm probably not allowed to answer
7  this because of speculation but, I mean, they're going
8  to call you up and tell you what's going on and nothing
9  is going to happen. Is that really what --
10     You know what I mean? It's not logical at all,
11 especially seeing what I've seen throughout this entire
12 experience.
13 BY MR. JENSEN:
14     Q. Okay. Is that the only thing that you know of
15 that would indicate that Principal Fusco intended to
16 punish you?
17     A. Yes.
18     Q. Paragraph 20, "Principal Fusco, or someone on her
19 behalf, interrupted my instruction time by calling me
20 out of class and into her office where she warned me
21 again that if I came to school the following day and was
22 quiet there would be disciplinary consequences."
23     Is this the time that you talked to Ms. Fusco
24 while you were attending band class?
25     A. Chorus. But, yes.


ACR ACCURATE
COURT REPORTING, INC.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 73

1   Q. Okay. And then you didn't go to her office,
2   correct?
3   A. No, sir.
4   Q. And she didn't tell you that if you were quiet in
5   school there would be disciplinary consequences, did
6   she?
7       She said --
8   A. She told us that there would be disciplinary
9   consequences.
10  Q. If you were quiet?
11  A. Not that exact phrasing, no. But I reiterated
12  this before, she told us we were going to get in
13  trouble.
14  Q. Why do you have quotations around was quiet there
15  would be disciplinary consequences?
16      Is that a quote of what --
17  A. That's not a quote of what she said. I'm pretty
18  sure I used quotations where they don't belong. But
19  that's not -- they're -- the quotations that aren't
20  really quotations that's paraphrasing.
21  Q. All right. Would you agree that Principal Fusco
22  told you you could be quiet if no one was calling on you
23  in class but if you were called upon a class you would
24  have to have to answer?
25      MS. LITTRELL: Objection. Form of the

Page 74

1   question.
2   A. I can agree to that.
3       But, yet again, we weren't having instructional
4   time, or anything like that, and yet I still got in
5   trouble for it.
6   BY MR. JENSEN:
7   Q. Do you still have the t-shirt?
8   A. No, sir.
9   Q. What happened to it?
10      MS. LITTRELL: Objection. No foundation.
11  BY MR. JENSEN:
12  Q. Do you know what t-shirt I'm talking about?
13  A. Yeah, I know the t-shirt.
14  Q. Okay. What happened to it?
15  A. My friend Lizza's cat had babies on it.
16  Q. Do you have pictures of the t-shirt?
17  A. No. I don't think so. Yeah, I don't.
18      I mean, if you want the thing with afterbirth on
19  it she can dig it out of the trash or something. I
20  don't know.
21  Q. Okay. Paragraph 31 says, When I asked why I was
22  being punished Dean Jones said Ms. Fusco told you not to
23  do this.
24      Now when you talked about this meeting, during
25  your deposition earlier, I asked you if Ms. Jones had

Page 75

1   said anything else and you said, no.
2       So which is correct, your earlier deposition
3   testimony or this affidavit?
4   A. This one now. The earlier one I didn't remember
5   this happening. But now that it's mentioned I do
6   remember it.
7       Some things lapse your memory.
8   Q. So what specifically did Dean Jones say?
9   A. I don't remember exactly what she said, but she
10  said Fusco told me not to.
11      And she asked me whether I wanted IR or to go
12  home. And I told her that they couldn't send me home
13  because it's within my legal right.
14      And then she asked me again and I said the IR.
15  Q. Okay. You have quotations around Ms. Fusco told
16  you not to do this. Is this an exact quote or not?
17  A. No, it's the one thing, that's what I used for
18  paraphrasing.
19  Q. Okay.
20  A. The only one quotation mark thing.
21  Q. Do you know specifically what she said?
22  A. No, I don't.
23  Q. Were you present at all for any interactions
24  between Mr. Maybell and school administration?
25  A. No, sir.

Page 76

1   Q. Okay. In Paragraph 40, "Principal Fusco admitted
2   that I was disciplined because I was dressed in a shirt
3   protesting the occasion."
4       When and where did Principal Fusco admit that
5   that was a reason why you were disciplined?
6   A. I'm pretty sure after, like a day or two. So the
7   next time I talked to her after it.
8   Q. So you had a conversation with Ms. Fusco and she
9   admitted to you that you were disciplined because you
10  wore a t-shirt?
11  A. I believe so.
12  Q. Okay. And which of those meetings that we talked
13  about earlier did she tell you that you were disciplined
14  for wearing a t-shirt?
15  A. The meeting that we had after the Day of Silence,
16  I noted there.
17  Q. Which meeting?
18  A. I said that there was one like -- I said that
19  there was one this year.
20      And I said that there was one a few weeks after
21  last year, didn't I?
22  Q. You indicated that there was a contact about a
23  month before Day of Silence, one contact two weeks
24  before Day of Silence, contact one week before Day of
25  Silence, a contact that was weeks after the Day of



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

1.888.ACR.3335 • 1.800.862.4206 (FAX)
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 77

1  Silence --
2  A. That's the one.
3  Q. Okay. So she came to you and told you that you
4  were disciplined because you wore that t-shirt?
5  A. She didn't seek me out purposely to tell me that,
6  but that information was relayed.
7  Q. Did you hear those words come out of her mouth
8  personally?
9  A. I don't remember the exact phrasing, but
10  something along those lines, yes.
11  Q. What specifically did she say?
12  A. That I got in trouble for wearing the shirt.
13  That's all I -- I don't know her quotes.
14  Q. Paragraph 42, when did you ask Ms. Fusco if you
15  could participate in a Day of Silence this year?
16  A. That was the meeting that I had with her this
17  year, when I was telling her about what happened last
18  year and this year. And she said wouldn't it be better
19  to leave it, or something like that. I don't quite
20  remember which.
21      But she didn't tell me that if I did it I would
22  get in trouble again. But she kind of wanted -- she was
23  trying to urge me not to, real subtle.
24      MR. JENSEN: Okay. If you could mark this
25  Exhibit C, please.

Page 78

1      (Defendants' Exhibit C was marked for
2  identification purposes.)
3      MR. JENSEN: Look over that for me, if you
4  would, please. And then just let me know when you
5  are ready to talk about it.
6      THE DEPONENT: Yes, sir.
7      (Deposition interrupted at 2:57 p.m.)
8      (Brief discussion held off the record.)
9      MR. JENSEN: Well, we got two ways to handle
10  this. We can continue this deposition in another
11  place in the library, or we can relocate over to her
12  office. Whatever you guys want to do.
13      MS. LITTRELL: Well, I'm sorry, what do you
14  mean another place?
15      (Brief discussion held off the record.)
16      MS. LITTRELL: Before we go off the record,
17  you reserved a one-hour deposition? You reserved a
18  room for one hour?
19      THE COURT REPORTER: Two hours.
20      THE LIBRARIAN: The room was reserved from
21  1:00 to 3:00.
22      MS. LITTRELL: Okay. You think you will
23  take one more hour?
24      MR. JENSEN: Maybe.
25      MS. LITTRELL: You realize I flew in from

Page 79

1  Atlanta for this, and you only reserved a room for
2  two hours but we might go longer?
3      MR. JENSEN: Well, the thing is, a lot of my
4  time was eaten up with your frequent breaks.
5      If we didn't take those breaks we might have
6  been able to finish this on time.
7      MS. LITTRELL: Again, we've had one hour.
8      And how long do we have your office for
9  this afternoon? I just want to make sure that you
10  provided ample time wherever that might be.
11      (Brief discussion held off the record.)
12      (Off the record at 2:59 p.m.)
13      (Deposition moved to Ms. Collins' office at
14  124 North Brevard Avenue, Arcadia, Florida 34266.)
15      (Back on the record at 3:23 p.m.)
16  BY MR. JENSEN:
17  Q. Have you had an opportunity to review Exhibit C
18  yet?
19  A. Yes, sir.
20  Q. Okay. Did you write that article?
21  A. One of the -- I don't remember exactly what his
22  job is but it's something to do with --
23      MS. LITTRELL: I'm going to have to object.
24  It's work product.
25      MR. JENSEN: Well, it was disclosed so it's

Page 80

1  no longer privileged.
2  BY MR. JENSEN:
3  Q. So, again, I'm going to ask, did you write this?
4  A. No.
5  Q. So even though the title is, "In My Own Words:
6  Day of Silence, by Amber Hatcher" --
7      MS. LITTRELL: Objection.
8  BY MR. JENSEN:
9  Q. -- this was not written by you?
10      MS. LITTRELL: Objection. It's the form of
11  the question. It's not a fact -- it mischaracterizes
12  the evidence.
13      Just read what it does say under In My Own
14  Words. By --
15  BY MR. JENSEN:
16  Q. -- Amber Hatcher.
17  A. By Lambda Legal.
18  Q. And right here it says by Amber Hatcher, does it
19  not?
20  A. I reviewed it.
21      I didn't write it in its entirety, but I reviewed
22  it. And that's where it says by Amber Hatcher.
23      But in my own words it says by Lambda Legal,
24  meaning I didn't write it by myself.
25  Q. Okay. Which portions of this document are yours?



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository
**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 81

1    MS. LITTRELL: Objection as to the form of
2    the question.
3        If you don't understand a question you don't
4    have to answer it.
5    BY MR. JENSEN:
6    Q. Do you understand the question?
7    A. Like, do --
8        MS. LITTRELL: Please don't guess.
9    A. All right. I'm just --
10   BY MR. JENSEN:
11   Q. Well, let me rephrase it so you know exactly what
12   is being asked of you.
13   A. Okay.
14   Q. This article here --
15   A. Yes.
16   Q. -- on Exhibit C, which paragraphs did you write,
17   if any?
18       MS. LITTRELL: Objection as to form.
19       I think he means typed it out.
20   A. Oh, I didn't type it out. I edited it. I didn't
21   type it out.
22   BY MR. JENSEN:
23   Q. Okay. I didn't ask you if you typed it out.
24   A. Okay. Well, I went through the parts about it
25   that says, "I've always been interested," from there.

Page 82

1        And then, "I was inspired," I wrote that part of
2    it. And then the two girl thing.
3        And this paragraph that says, "Although I have,"
4    I wrote that part.
5        And this part he wrote in, like my person, but I
6    went through it.
7        And there is a lot of it that he wrote in my
8    person that I went through it and changed it around.
9    Q. Who is he?
10   A. It was one of the people at Lambda Legal. It
11   was -- I think it was Mr. --
12       MS. LITTRELL: Don't guess.
13   A. Okay. Then I don't know who it was.
14   BY MR. JENSEN:
15   Q. Okay. Now the first paragraph starts off, "I've
16   always been treated" and ends "with me."
17   A. Yes.
18   Q. How much of that did you write?
19   A. I wrote the, "I've always been treated
20   differently," thing.
21       And then kids were making fun of me for being a
22   lesbian before I even came out to myself.
23       And then feel like I have to be on guard and it's
24   hard to pay attention in school.
25   Q. Okay. So --

Page 83

1        MS. LITTRELL: I have to object to the
2    Exhibit because you haven't laid a foundation for it.
3        I've never -- I haven't seen it. You
4    haven't provided me a copy. It's not in evidence in
5    the record.
6        So --
7        MR. JENSEN: It's entered as an Exhibit
8    so --
9        MS. LITTRELL: It's not part --
10   BY MR. JENSEN:
11   Q. That part you've written, correct?
12   A. I've written through a lot of it, yeah.
13   Q. The rest of it was added in?
14   A. Not the rest of it added in, no. There is a lot
15   of personal parts in here too.
16   Q. Well, I'm talking about the first paragraph right
17   now.
18   A. Oh, yes.
19   Q. You've identified for me the parts that you
20   wrote?
21   A. Yes.
22   Q. The rest of it was filled in?
23   A. Yeah.
24   Q. Was that filled in by somebody else who just made
25   it up? Or did you dictate that information?

Page 84

1    A. I dictated it to him. And he changed around the
2    phrasing for it to make it sound better. But --
3    Q. All right. So from paragraph one, it seems that
4    the troubles you were having that -- from other students
5    that you related to your disciplinary --
6    A. Yes.
7    Q. -- action taken against you, you were having
8    before this incident took place, correct?
9        MS. LITTRELL: Objection to the form of the
10   question. It's vague, ambiguous and confusing.
11   BY MR. JENSEN:
12   Q. You can answer.
13   A. Are you asking me if I've got bullied before,
14   yeah.
15   Q. Okay. Because you mentioned, when you talked
16   about your emotional stress, says that you were
17   distressed because of the way other students were
18   treating you. But they were treating you like this
19   before you received any disciplinary action, correct?
20       MS. LITTRELL: Object to the form.
21       Go ahead.
22   A. Not to such an extent, no.
23       It spit-balled as soon as this happened, as soon
24   as I got wrote up.
25       If I hadn't gotten wrote up they were fine with



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

ACR≣ACCURATE
COURT REPORTING, INC.

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

# DEPOSITION OF AMBER HATCHER, JUNE 25, 2013

## Page 85

1 it. But now as soon as you were wrote-up they are like,
2 oh, in your face. We're going to pick on you.
3 BY MR. JENSEN:
4   Q. So that part about you've always been treated
5 differently, that doesn't apply to the rest of the
6 paragraph?
7   A. Um --
8       MS. LITTRELL: Object to the form.
9       Read the question. It's confusing.
10   A. Basically. But it is in regards to it.
11   It's -- I've always been treated differently.
12   And then it gives examples of the way I've been
13 treated differently.
14 BY MR. JENSEN:
15   Q. So the examples given in paragraph one have been
16 examples of how you've always been treated differently
17 even before this incident occurred, correct?
18   A. Because of the part that says making fun of me
19 before I came out to myself and then having to be on
20 guard.
21   And then they started like -- the spitballs and
22 things like that happened after.
23   Q. Okay.
24   A. It escalated is what I'm trying to say,
25 basically.

## Page 86

1   Q. Okay. The fourth paragraph, it begins with the
2 words "Last April."
3   A. Yes.
4   Q. And ends with "suspended from school for the
5 day."
6   A. Yeah.
7   Q. What parts of that did you write?
8   A. "I did everything by the rules, but the principal
9 repeatedly told me that I could not participate,"
10 et cetera, et cetera -- calling parents -- Lambda Legal.
11   I dictated the calling parents and principal, the
12 e-mail one. But the rest of it is stuff that I've
13 written.
14   Q. Okay. The rest of that you wrote yourself then?
15   A. I've gone through it and I've written.
16   Q. All right. Now you say the principal repeatedly
17 told you that you could not participate. Okay.
18   Is that the same as the three or four contacts
19 you had?
20   A. Yes.
21   Q. Nothing else different from what you testified to
22 earlier?
23   A. No.
24   Q. And did she actually threaten you, or did she
25 just tell you that's against school policy?

## Page 87

1   A. She told me that there would be repercussions.
2   Q. Did she tell you what those repercussions were?
3   A. No.
4   Q. Did she tell you who was going to impose those
5 repercussions?
6   A. No.
7   Q. How many times did Principal Fusco call your
8 parents?
9   A. Once.
10       MS. LITTRELL: Objection. Form of the
11   question.
12       Calls for speculation.
13   A. Yeah, it --
14       MS. LITTRELL: Personal foundation.
15   A. Yeah, I don't know how many times they called --
16 BY MR. JENSEN:
17   Q. I'm sorry, what did you just say?
18   A. I said I know they've called at least once.
19       But other times than that I'm not really the one
20 you should ask. Sorry.
21   Q. Well, I'm just asking you what you know.
22   A. Yes, sir.
23   Q. Tell me what you know about that phone call.
24   A. I know that they called the house and my dad
25 picked up.

## Page 88

1   I don't know the exact conversation, but I do
2 know that it was revealed that they asked my parents to
3 keep me home on the Day of Silence because they didn't
4 want to deal with me.
5   Q. Anything else that you know about about that
6 phone call?
7   A. No.
8   Q. And did you in fact stay home?
9   A. No, sir.
10   Q. All right. Did that phone call affect how you
11 did anything on the Day of Silence?
12   A. No.
13   Q. You say the principal sent an e-mail to all
14 teachers telling them to send anyone that appeared to be
15 participating in the event to the office.
16   What e-mail was that?
17   A. The e-mail that I've read out multiple times
18 before saying if you -- I'll find it.
19   Q. You don't have to go through it.
20   A. Yeah. But you know the e-mail?
21   Q. Yes, I know which e-mail you are talking about.
22   A. Okay. Cool.
23   Q. So would you agree that the e-mail does not
24 instruct teachers to send anyone that appears to be
25 participating to the office?



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 89

1     MS. LITTRELL: Let the record reflect that
2   we are going to actually let her read the e-mail that
3   was put in front of her.
4     A. I have -- I have to agree that they didn't say to
5   send them up.
6       But, yet again, I would like to point out that
7   what they are going to do, just not go?
8       Or are they going to be like, oh, this kid is
9   doing a call, we don't want to see them or anything,
10  just leave them alone.
11  BY MR. JENSEN:
12    Q. All right. It says not too long after arriving
13  at school wearing a red t-shirt with the message DOS,
14  April 20th, 2012.
15      Where did you get that shirt?
16    A. I made it.
17    Q. All right. And the lettering, were those decals
18  or did you just write -- handwrite something on it?
19    A. I handwrote it, but I tried to be all cursive.
20    Q. And you were not suspended from school for the
21  day, correct? You were in school the entire day?
22      MS. LITTRELL: Objection to the form of the
23    question.
24  BY MR. JENSEN:
25    Q. Is that true?

Page 90

1     A. I was in in-school suspension.
2     Q. Okay. So you were not actually suspended from
3   the school, correct?
4       MS. LITTRELL: Objection to the form of the
5     question.
6     A. That's being suspended.
7   BY MR. JENSEN:
8     Q. Okay. Last paragraph, what parts of that last
9   paragraph did you write?
10      And I'm talking about the one at the end with
11  "when," and ending with "too."
12    A. The surprised and the hurt and close-minded.
13      And I kind of said that I was upset, like angry
14  about it, but not to such an extent.
15      So he put I was really angry too. That's
16  something I dictated.
17    Q. Okay. You dictated the words, "I was really
18  angry too"?
19    A. No.
20      I dictated that, yeah, I was angry. But I was
21  mostly disappointed. And he changed it to I was real
22  angry.
23    Q. But according to your earlier deposition
24  testimony you weren't angry at all, correct?
25    A. I didn't say I wasn't angry at all. I said I

Page 91

1   wasn't angry to display it.
2       Then again, that may be a wrongness of phrasing
3   on my part earlier. Sorry.
4     Q. Now have you reviewed the website at Lambda
5   Legal?
6     A. I've gone a few times. I've refreshed it to try
7   to keep myself up with what's going on in the legal
8   world.
9     Q. And this -- just for the record, on Exhibit C, is
10  that your photograph?
11    A. Yes, sir.
12    Q. Have you authorized all this information to be
13  disclosed on their website?
14    A. How do you mean? Like did I tell them --
15      MS. LITTRELL: Objection. That's
16    privileged.
17      What she told her counsel is privileged.
18  BY MR. JENSEN:
19    Q. Is this an authorized disclosure?
20    A. I don't know the answer to that.
21    Q. Is this information being disclosed on this
22  website with your permission?
23    A. Yeah.
24    Q. Okay. I want to ask you a few questions about
25  the 2011, 2012 school year.

Page 92

1     A. Okay.
2     Q. It indicates you had 14 unexcused absences during
3   that school year?
4       MS. LITTRELL: Objection. Lack of
5     foundation.
6       We don't know what you're reading from.
7       MR. JENSEN: You also don't know my question
8     because you won't let me finish before interrupting
9     me.
10  BY MR. JENSEN:
11    Q. Do you know why you had 14 unexcused absences?
12      MS. LITTRELL: Objection. Assumes facts not
13    in evidence.
14  BY MR. JENSEN:
15    Q. You can answer.
16    A. Okay. I don't know exactly why for each time,
17  that's basically what you're asking.
18      But every time I've stayed home I've stayed home
19  because I was sick or had migraines. I suffer from
20  chronic migraines.
21    Q. Do you know if anyone had notified the school
22  that you were sick those days?
23      MS. LITTRELL: Objection. Personal
24    knowledge.
25    A. Yeah, because I don't know actually.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository


ACCURATE
COURT REPORTING, INC.

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**
info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 93

BY MR. JENSEN:

1 BY MR. JENSEN:
2 Q. How frequently do you skip school?
3 MS. LITTRELL: Objection. Leading.
4 Argumentative.
5 MR. JENSEN: You do know leading questions
6 are permitted when I'm --
7 MS. LITTRELL: Argumentative. I clarified
8 my objection.
9 Objection to the form of the question.
10 BY MR. JENSEN:
11 Q. You can answer.
12 A. I don't skip school.
13 Q. You've never skipped school?
14 A. I don't skip school, no.
15 Q. All right. On April 20th, were you wearing a
16 placard at all while you were at school?
17 A. Wearing one?
18 Q. Yes.
19 A. No.
20 MS. LITTRELL: Objection as to the form of
21 the question.
22 Do you know what year he's talking about?
23 BY MR. JENSEN:
24 Q. Okay. Day of Silence, April 20th, 2012, the
25 reason why we're here today, were you wearing a placard

Page 94

1 that day?
2 A. No.
3 Q. Asides the t-shirt, were you wearing any type of
4 poster board or any other type of message?
5 A. No.
6 Q. Did you refuse to follow any class rules at all
7 that day?
8 A. No.
9 Q. Tell me what happened during your first period
10 class.
11 A. My first period class we didn't really do
12 anything.
13 My home teacher, she didn't feel good. So we
14 went to the cafeteria. It was a gym glass. So we went
15 to the cafeteria and put on a movie, something about
16 football and Jesus. And we stayed in there.
17 And at one point I had my whiteboard. And I
18 asked if I could go to the rest room. She just glanced
19 and gave me the go-ahead. Kind of gave me a funny look
20 but that's about it.
21 Q. Tell me about your second period class.
22 A. My second period class, I had English and she was
23 doing a silent reading games [sic]. We were trying to
24 finish the Hunger Games so -- silent reading day.
25 Sorry.

Page 95

1 Q. Did you have any interactions with any faculty
2 members at all between the date -- the time you showed
3 up to school that day and until the time that Mr. Wilder
4 told you to go up to the office?
5 A. I went up to attendance to get a bus pass and
6 they -- I wrote it down and they asked me to verbally
7 speak it so I did.
8 Q. When did you show up for the bus pass?
9 A. I really don't remember the time of the day.
10 But I remember getting it because I went to my
11 friend's house after Day of Silence.
12 Q. Did you go in-between classes or did you go
13 during class?
14 A. Probably in-between. I don't know. I don't
15 remember.
16 Q. Do you know if it was between your second and
17 third period class?
18 MS. LITTRELL: Objection. Asked and
19 answered.
20 MR. JENSEN: I didn't ask her that
21 question before.
22 A. Anyway, I really don't remember. I'm sorry.
23 BY MR. JENSEN:
24 Q. Where do you pick up a bus pass from?
25 A. You have to go up to attendance. That's where

Page 96

1 they -- the teachers drop off their roll and things like
2 that, and where people get checked out, et cetera. You
3 have to go up there.
4 There is a window thing. And the attendance
5 ladies will take your letter, whatever you have to prove
6 that you're allowed to go somewhere, and will look at it
7 and be, okay, and write you a bus pass.
8 Q. How close is that to the dean's office?
9 A. It's like right next door.
10 Q. And, just for clarification, I'm talking about
11 Dean Jones.
12 A. Well, yeah. But it's right next door.
13 Q. All right. What documents, if any, did you
14 review prior to the start of this deposition in
15 preparation for this deposition?
16 A. I went -- the night -- no, the night before I
17 went over that. (Deponent indicating) And then I had
18 some verbal conversation. But --
19 Q. All right. When you -- just for the record, when
20 you say that, what are you talking about?
21 A. The Verified Complaint. Whatever that's called.
22 Q. All right. Did you review, other than Exhibits
23 A, B, and C, during this deposition, or any other breaks
24 in-between, did you review any written documents?
25 A. No, sir.

Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

 **ACCURATE**
COURT REPORTING, INC.

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 97

1  Q. Do you have any written notes or diaries
2  regarding this event?
3  A. No, sir.
4      MR. JENSEN: All right. That's all the
5  questions I have for you.
6      Thank you very much.
7      MS. LITTRELL: We would like to take a short
8  break and then I'd like to ask a few questions.
9      (Break taken at 3:42 p.m.)
10     (Back on the record at 3:57 p.m.)
11         CROSS-EXAMINATION
12 BY MS. LITTRELL:
13     Q. Well, I'm going to ask you just a couple of
14 questions on redirect [sic] here to make sure that
15 everything, as best we can, is accurate.
16     Now when Mr. Jensen asked you about conversations
17 that you had with Principal Fusco, is it fair to say
18 that you don't recall every single word that was said --
19     A. Yes.
20     Q. -- and those exchanges?
21     A. Yes, ma'am.
22     Q. And you talked about the fact that Principal
23 Fusco said that you would get in trouble, or gave you
24 the impression -- actually, let me rephrase.
25     How did you get the -- did you have the

Page 98

1  impression, from your conversations with Principal
2  Fusco, that you would get in trouble if you participated
3  in Day of Silence?
4      MR. JENSEN: Object to form.
5  BY MS. LITTRELL:
6      Q. You can answer.
7      A. She flat out told me.
8      Q. So it was -- is it fair to say that you had the
9  impression --
10     A. Yes.
11     Q. -- from your conversations with Principal Fusco
12 that you would get into trouble?
13     A. Yes, ma'am.
14         MR. JENSEN: Object to form.
15 BY MS. LITTRELL:
16     Q. And just because she may not have told you
17 exactly what the discipline was, is it fair to say that
18 you were concerned that if you participated in Day of
19 Silence you would -- you could get into trouble?
20     A. Yes.
21     Q. Okay. And on Day of Silence, can you tell me
22 what you intended to do, and your understanding of the
23 limitations of your right to engage in free speech on
24 the Day of Silence?
25     A. I knew that legally between instructional times,

Page 99

1  and if I'm not addressed by a teacher, that I don't have
2  to answer them. And I knew that that was also in-school
3  policy.
4      So I planned on being quiet, and wearing a shirt,
5  and carrying around a whiteboard to communicate with the
6  people that I needed to.
7      Q. You talked a little bit about the ramifications
8  or the consequences of what happened on Day of Silence.
9      Backing up to a month before, whenever you had
10 your first conversation with Principal Fusco, between
11 that time and the Day of Silence were you anxious or --
12 were you anxious at all about what would happen on Day
13 of Silence?
14     A. I was worried for the consequences that would
15 fall on the participants, including myself.
16     I was anxious as to whether or not people would
17 want to participate because of the fear of consequence.
18     All in all it was just -- I mean, it wasn't very
19 fun. But --
20     Q. And the conversation you had with your dad, or
21 your parents, after the phone call that you testified
22 about, was that -- did that cause you some anxiety to
23 find out that the school had called your house?
24     A. Yeah. I thought my parents were actually going
25 to get mad for a split second.

Page 100

1  Q. And if you had not gotten the impression that you
2  would get into trouble if you participated, how might
3  Day of Silence in 2012 have been different?
4      MR. JENSEN: Object to form.
5  BY MS. LITTRELL:
6      Q. Go ahead.
7      A. It would have -- I would have organized it with
8  more bravado.
9      I would have been able to go out there more
10 without fear of persecution.
11     And it probably would have gone a lot better. I
12 could have made a very big impact.
13     Q. Is it fair to say that your ability to
14 participate in Day of Silence was interfered with?
15     A. Yes.
16     Q. What about being put in in-school suspension for
17 the day would you say interfered with your ability to
18 express whatever you were trying to express?
19     A. Yes, I was isolated from everybody. There was no
20 way for me to make a stand.
21     Q. Were you planning on any -- getting any
22 commercial gain from the sale of t-shirts, or the sale
23 of anything, as it relates to Day of Silence?
24     A. No. I told kids they could buy stuff if they
25 wanted to, or make their own things. But I didn't send



Nationwide Depositions, Hearings and Trials ● Conference Facilities
Videoconferencing ● Legal Video Services ● Exhibit Scanning
Transcript / Video Synchronization ● 24-7 Online Repository

**1.888.ACR.3335 ● 1.800.862.4206 (FAX)**

info@acrdepos.com ● www.acrdepos.com ● scheduling@acrdepos.com

Page 101

1  out order forms and I didn't collect money.

2  Q. Did you say to any school official that you were

3  planning to sale anything --

4  A. No.

5  Q. -- on campus?

6  Do you have a fear that the discipline, the

7  negative discipline record, disciplinary record in your

8  student record will adversely affect your ability to get

9  into college?

10  A. I am.

11  Q. I am referencing now what Defense has marked as

12  Exhibit A, which is the Verified Complaint. And

13  Mr. Jensen asked you questions about paragraphs --

14  beyond Paragraph 63.

15  So do you see on Paragraph 63, above that, what

16  the heading is, and could you read that for the record?

17  A. "Claims for damages against Defendant DeSoto

18  County Board of Education and Defendants Adrian Cline,

19  Shannon Fusco and Ermatine Jones in their official

20  capacities, for violation of the First Amendment to the

21  United States Constitution and 42 U.S.C. 1983."

22  Q. Is it fair to say that you're personally

23  personally unfamiliar, with 42 U.S.C. Section 1983?

24  A. Yeah.

25  Q. Is it fair to say that the information contained

Page 102

1  in the counts of the Complaint are beyond your

2  understanding as a teenager, and that you relied on your

3  attorneys to draft the Complaint properly?

4  A. Yes, I trusted them for all of it.

5  Q. Okay. So, in particular, Paragraph 76, for

6  example, there is a lot of -- there are a lot of words

7  in there.

8  A. Yeah.

9  Q. Imposing, approving, ratifying, enforcing --

10  A. Yeah.

11  Q. -- color of law, authority of state law.

12  Is it fair to say that this paragraph is accurate

13  to the best of your knowledge but that you're not a

14  lawyer?

15  A. Yeah, the legal jargon threw me off. But other

16  than that --

17  Q. Okay. In Paragraph 80, spent some time talking

18  about whether or not Principal Fusco's discretionary

19  decision, and I'm reading now from the Complaint, "to

20  punish Plaintiff and otherwise interfere with her

21  instructional time and her efforts to participate in

22  expressive activity on April 20th, 2012 was not subject

23  to approval by the School Board."

24  To the best of your knowledge, do you think that

25  that is a true statement?

Page 103

1  A. I think that the -- there is a hierarchy of

2  things, School Board, and then superintendent,

3  et cetera, et cetera, and they kind of had to know what

4  was going on.

5  Q. But it's fair to say that you trusted your

6  attorneys --

7  A. Yes.

8  Q. -- to draft the counts of the Complaint, and that

9  you agreed with what you -- what you understood to be

10  true?

11  A. Yes, ma'am.

12  Q. Okay. And just, generally, with respect to the

13  hierarchy that you just mentioned, what is your

14  understanding of the hierarchy in DeSoto County High

15  School?

16  A. I don't know if the superintendent is above the

17  School Board, or if the School Board is above the

18  superintendent, but one of the two. And then the other

19  one of the two. And then principal and then dean and

20  then teachers.

21  Q. Okay. So when you say, for example in Paragraph

22  125, the superintendent knew, or should have known, that

23  Principal Fusco and Dean Jones would engage in this

24  unconstitutional conduct that we have talked about on

25  Day of Silence. Is it -- is it fair to say that your

Page 104

1  understanding that the boss knows what the employee

2  right below him is going to do?

3  A. Yes, ma'am. That's generally how it works.

4  Q. And is that where you got that idea that --

5  A. Yes, ma'am.

6  Q. -- the principal knows what the dean is doing,

7  and when she knows what the dean has done and doesn't do

8  anything to reverse it that she approves of that?

9  A. Yes, ma'am.

10  Q. And when the superintendent knows what the

11  principal is going to do, because the principal has told

12  him here's what I'm going to do, if he doesn't say

13  anything about that is it fair to say that you believe

14  that he is approving of that action?

15  A. Yes, ma'am.

16  Q. And when he knows and is put on direct notice

17  that -- for example, you or any other student was

18  disciplined for participating in Day of Silence and

19  doesn't do anything to correct that, that that's -- that

20  that puts him on knowledge, puts him on actual knowledge

21  that he approves of what happened, or that -- let me

22  strike that. Start again. I got a little confused

23  there.

24  If the superintendent knows that somebody was

25  disciplined, engaging in speech, and doesn't take any



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 105

1  action to correct that, it's fair to say that -- that
2  the superintendent approves --
3      MR. JENSEN: Object to form.
4  BY MS. LITTRELL:
5  Q. -- of what happened?
6  A. I would agree with that, yes.
7  Q. Okay. You have seen the e-mails that have been
8  referenced a couple of times that are attached to the
9  Complaint, one is from Principal Fusco to Superintendent
10 Cline that says I've addressed this issue with Miss
11 Hatcher, she has come to me twice with documentation on
12 why a Day of Silence should not be allowed, and each
13 time I told her no and what her ramifications would be
14 if the protest occurred?
15    Is it fair to say that this information helped
16 form your allegations in the Complaint that the
17 superintendent knew and approved what the principal was
18 going to do in terms of punishing you and other students
19 for taking --
20 A. Yes, ma'am.
21 Q. -- in part in Day of Silence?
22    MR. JENSEN: Object to form.
23 BY MS. LITTRELL:
24 Q. Turning now to the declaration that you signed,
25 which is Exhibit B to this deposition.

Page 106

1  Mr. Jensen read only some of the paragraph and
2  you may have been confused. So I'd like to read the
3  whole paragraph and see what's accurate.
4      It says as set forth in the Verified Complaint in
5  this action, in Paragraph 25, included in the e-mails
6  Defendant Cline described above, and here that's talking
7  about Principal Fusco, I also provided seven reasons why
8  allowing me -- I'm sorry, allowing us to participate
9  would benefit in school in my correspondence with
10 Defendant Cline. And then closing e-mail with the
11 following explanation.
12    And then there is a paraphrase -- or there is
13 actual quotations from your e-mail.
14    Were you aware that when Mr. Jensen asked that
15 question that he was referencing an e-mail and not a
16 conversation that you had?
17    MR. JENSEN: Object to form.
18 A. No, ma'am.
19 BY MS. LITTRELL:
20 Q. Okay. Can you read Paragraph 19 from the
21 beginning and tell me whether you agree with that
22 statement or disagree with that statement?
23 A. Yes, ma'am.
24 Q. And feel free to -- in fact, please read it out
25 loud.

Page 107

1  A. "As set forth in the Verified Complaint in this
2  action at Paragraph 31, according to the e-mails that I
3  have seen, even though Superintendent Cline was on
4  notice that Principal Fusco intended to punish me and
5  other students for our speech, without any evidence that
6  it would cause a material and substantial disruption to
7  the work of the school, he did not send the responsive
8  e-mail to her clarifying that students have the right to
9  participate without ramification in the free speech
10 activities described in the documents that I provided to
11 him. I am not aware of any action or effort by anyone,
12 including Superintendent Cline or Principal Fusco, to
13 insure that my rights were not infringed."
14 Q. Is that an accurate statement?
15 A. I do agree with that, yes.
16 Q. Okay. And then Paragraph 20, and, again, in the
17 Declaration, Exhibit B, starting with the word on, can
18 you read that, "On April 19, 2012."
19 A. "On April 19, 2012, the day before Day of
20 Silence, Principal Fusco, or someone on her behalf,
21 interrupted my instruction time by calling me out of
22 class and into her office where she warned me --
23 again -- that if I came to school the following day and
24 was quiet there would be disciplinary consequence."
25 Q. And so we talked a little bit about dates. And

Page 108

1  is it possible that you got the day confused, it might
2  not have been the day before but it was within a few
3  days --
4  A. Yeah.
5  Q. -- of it happening?
6  A. I don't really remember exact dates. I remember
7  events more than --
8  Q. Okay.
9  A. Yeah.
10 Q. And even though the language that's been quoted
11 in there may not be an exact quote, is the essence of
12 the allegation accurate?
13 A. Yes.
14 Q. Okay. And by that, do you mean when you were
15 pulled out of class and had the conversation with
16 Principal Fusco that you got the impression that if you
17 came to school and participated you would get into
18 trouble?
19 A. That's what I understood.
20 Q. Okay. And on Paragraph 31, had some -- a little
21 bit of what was either confusion or you -- you testified
22 at first that Dean Jones said simply do you want
23 in-school suspension or out-of-school suspension.
24    And then when you read Paragraph 31 it had
25 additional information in there with respect to



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 109

1  Ms. Fusco?

2  A. Yes, ma'am.

3  Q. And so would you say that your memory was

4  refreshed, that your recollection was refreshed when you

5  read that paragraph?

6  A. Yes, ma'am. I forgot about that event until it

7  was blatantly pointed out to me and then I remembered.

8  Q. And so when you say you remembered, can you tell

9  me what you remember that Dean Jones said about

10  Principal Fusco and her acting on instruction from

11  Ms. Fusco?

12  A. I remember that she said you were told not to do

13  this. And, obviously, she means by Ms. Fusco. Who else

14  would it be?

15  Q. Okay. On Paragraph 40, again, I believe

16  Mr. Jensen read only some of that paragraph, or perhaps

17  you were unaware that it references an e-mail that

18  you've seen. This is in evidence that we talked about.

19    So, for the record, and for clarity, can you

20  please read what is marked as Exhibit, it's Exhibit H of

21  the Verified Complaint. So the index to Complaint

22  Exhibit, Exhibit H, which is e-mail, Fusco to Melba,

23  April 23rd.

24    Can you look in there and see if there is

25  anyplace in there that says that -- from Principal

Page 110

1  Fusco -- that says that you were dressed in a shirt

2  protesting the occasion?

3  A. "Amber Hatcher was dressed in a shirt protesting

4  the occasion. When her teacher sent her up to the

5  office she was belligerent to the dean. She initially

6  refused to answer then refused to step into IR,"

7  et cetera, et cetera.

8  Q. So you've seen this e-mail?

9  A. Yes.

10  Q. Right?

11    And so when you signed the declaration, is it

12  fair to say that that sentence, that Principal Fusco

13  admitted that you were disciplined based on the shirt,

14  you got that impression from this e-mail?

15  A. Yes, ma'am.

16  Q. So even though she may not have said it to you

17  personally, you feel that this was the information that

18  you were basing that -- that declaration on, right?

19  A. Yes, ma'am.

20  Q. Okay. Can you talk a little bit more about this

21  allegation that -- or the declaration, Paragraph 42.

22  And that is, if you could just, in your own words,

23  again, talk about whether Principal Fusco told you that

24  you could or could not participate in Day of Silence,

25  2013?

Page 111

1  A. She told us -- she told me that she'd rather I

2  didn't.

3  Q. Did you get the impression from that conversation

4  with the principal of the school, who has the ability to

5  discipline students, that if you went against her wishes

6  you might get in trouble?

7  A. Yes.

8  Q. Okay. All right. Let's talk a little about this

9  Exhibit C, what Defense counsel has marked Exhibit C.

10  Let's make sure that we're talking on the same

11  vocabulary.

12    You mentioned that you dictated some information

13  in here. By that, did you mean to imply that what you

14  said was being dictated directly into the article?

15  A. Yeah, that was the wrong usage of the word. I

16  was interviewing and I told him what type and he changed

17  it around, put it the way that it looked better. I

18  didn't -- you know what I mean?

19  Q. Right.

20  A. Yeah.

21  Q. I understand. I wanted to clarify --

22  A. Yes, ma'am.

23  Q. -- that when you say dictate, you didn't mean

24  that he was writing down verbatim what you were saying?

25  A. No.

Page 112

1  Q. And regardless of words that may or may not have

2  been put into your mouth, or may or may not have been

3  accurate, is it fair to say that you were interviewed by

4  someone and you told your story?

5  A. Yes.

6  Q. And that someone that works for Lambda Legal

7  presumably took the information, like any reporter

8  would, quote you that it was accurate and drafted the

9  story for you to review?

10  A. Yes.

11  Q. So when you say that you wrote it, is that what

12  you mean by wrote it, just that you -- you told your

13  story, you reviewed what was written, it seemed

14  accurate?

15  A. Yeah, like we wrote it together is what I mean,

16  really.

17  Q. But you didn't actually --

18  A. No.

19  Q. -- type anything?

20    And you didn't send it to print?

21  A. No.

22  Q. Okay. You talked to someone and you told your

23  story?

24  A. Yeah.

25  Q. And then you looked at what was written?



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 113

1  A. Yeah.
2  Q. And decided if it was right or wrong, if you
3  wanted to change the words you would ask him to do that;
4  is that right?
5  A. Yes, ma'am.
6  Q. Okay. I think we need a clarification of what
7  Defense counsel meant when he said skipped school.
8     Can you just say what that means in your mind,
9  what's skipping school to you?
10  A. Leaving school campus because you just don't want
11  to be there.
12  Q. And we talked a little bit about some personal
13  medical information, some events in your life.
14     Is there anything about your medical condition
15  that affects your memory, your ability to recall what
16  happened, for example, what happened around April or
17  March, or any time of the school year 2012?
18  A. No.
19  Q. Okay. Do you have any personal knowledge of how
20  the school operates with respect to marking you as
21  excused or unexcused?
22  A. I don't know how they handle it in attendance.
23  Q. So it's possible that some days that you were
24  absent that you may have had permission from your
25  parents, or even a doctor's suggestion, and you would

Page 114

1  have no way of knowing what the school did with that
2  information?
3  A. Yes, ma'am.
4  Q. Are you asking for any money to compensate you
5  for what happened, as far as you know?
6     Are you trying to get rich off this lawsuit?
7  A. It's not about the money. No, I'm not asking for
8  any money. I don't want any money.
9  Q. Okay. You're not trying to -- when you talk
10  about the emotional distress that has accompanied what
11  happened to you in 2012, is it fair to say that you were
12  not seeking financial gain as a result, or financial
13  compensation as a result of the emotional distress that
14  is alleged in the Complaint?
15  A. No, ma'am.
16  Q. Okay. Why did you bring this lawsuit?
17  A. I brought the lawsuit up because somebody needs
18  to make a difference.
19     The schools are stepping on the students, the
20  kids are too afraid to speak out for their rights.
21     The whole point of this is anti-bullying, and yet
22  the school bullied me into trying to do what they
23  wanted.
24     There are so many reasons that I brought this to
25  fruition. Not -- it's not for personal, it's to help

Page 115

1  other people.
2     I don't want money from this. A lot of people
3  told me I should have gotten money for it, or tried to
4  sue the school for all the money. But that wouldn't --
5  it would make it dirty. It would completely undermine
6  everything I'm trying to do. I'm trying to help the
7  school.
8     MS. LITTRELL: Okay. Thanks.
9     That's all I have.
10     MR. JENSEN: I got a few questions regarding
11  some of the changes in your testimony.
12     Start with your declaration here.
13     REDIRECT EXAMINATION
14  BY MR. JENSEN:
15  Q. Did you actually swear an oath for this
16  declaration, or did you just sign your name?
17  A. I don't remember. I'm sorry.
18  Q. All right. And starting with Paragraph 19,
19  again, you claim that Principal Fusco intended to punish
20  you.
21     Tell me everything in your personal knowledge
22  about Principal Fusco's intent to punish you?
23  A. She's reiterated it before, numerous times, that
24  there would be punishment. She never told me what it
25  was, but she assured me that there would be

Page 116

1  consequences.
2     That's how I knew that she intended to punish me
3  and other students.
4  Q. Well, how do you know that she intended to do
5  something and she just wasn't warning you that somebody
6  else might do something?
7     Do you know one way or the other what she meant?
8  A. I know that there would be consequence.
9  Q. Do you know what those consequences were?
10  A. No.
11     But there have been vague threats again and again
12  that something was going to happen.
13  Q. Okay. You've been using that word threats, is
14  threat the right word, or was she just warning you?
15     Did you take it she was trying to intimidate you,
16  or do you think she was just trying to give you friendly
17  advice?
18  A. I kind of felt like she was trying to intimidate
19  me.
20  Q. All right. So other than what you just testified
21  to, do you have any other information that would give
22  you personal knowledge that Principal Fusco intended to
23  punish you?
24  A. No, sir.
25     Oh, wait. Yes, I do. E-mails.



Nationwide Depositions, Hearings and Trials ● Conference Facilities
Videoconferencing ● Legal Video Services ● Exhibit Scanning
Transcript / Video Synchronization ● 24-7 Online Repository

**1.888.ACR.3335 ● 1.800.862.4206 (FAX)**
info@acrdepos.com ● www.acrdepos.com ● scheduling@acrdepos.com

Page 117

1  Q. Is there an e-mail there that indicates that
2  Principal Fusco intended to punish you?
3  A. There is an e-mail that indicates that they did
4  punish me. It's --
5     It says she was placed in IR for the day as they
6  could not be reached. That is the extent of her
7  discipline.
8     And they disciplined another student and he was
9  sent home for the day.
10  Q. Well, let's talk about you, because the other
11  student is not part of this claim.
12     How do you know you were punished for wearing a
13  t-shirt and you weren't punished for your belligerent
14  behavior towards the dean?
15     MS. LITTRELL: Object to the form of the
16  question.
17  A. Sorry.
18     MS. LITTRELL: No, you're fine.
19  A. I didn't behave belligerently towards the dean.
20  BY MR. JENSEN:
21  Q. But that's what the e-mail says, correct?
22  A. Yes. That doesn't make it true.
23  Q. So how do you know that Principal Fusco was
24  talking about discipline being related to the teacher
25  instead of the belligerent behavior?

Page 118

1  A. Because it says Amber Hatcher was dressed in a
2  shirt protesting the occasion. That's the first thing.
3  That's kind of a pointer that that was one of the things
4  that they wanted to point out.
5  Q. And what else is pointed out in that e-mail?
6  A. They accused that I was -- initially refused to
7  answer and was belligerent.
8     Which if they want to make those allegations go
9  ahead. We will go to court.
10  BY MR. JENSEN:
11  Q. And, for clarification, Principal Fusco wasn't
12  there, correct?
13  A. No, sir.
14  Q. She would only know what was communicated to her
15  by Dean Jones, correct?
16  A. Yes, sir.
17  Q. So how do you know that she intended to punish
18  you when she wasn't there and she only knows what the
19  dean tells her?
20  A. Because she told -- the thing is she's known that
21  there would be punishments the entire time. Someone had
22  to tell the dean to punish.
23     It's -- Ms. Fusco tells the dean to call us down.
24  The dean calls me down I get punished. That's basically
25  how it works. Once again, Ms. Fusco is Ms. Jones' boss.

Page 119

1  Q. Do you know whether or not Dean Jones has
2  discretionary authority to punish a student?
3     MS. LITTRELL: Objection. Speculation.
4     MR. JENSEN: It's not speculative.
5  BY MR. JENSEN:
6  Q. I'm asking if you know, if you know please tell
7  me.
8     If you don't know you actually don't know --
9  A. I actually don't know though.
10  Q. All right.
11  A. That's not something that I'm pertinent to.
12  Q. So we've gotten rid of that as a possibility.
13     Do you have anything else that would justify you
14  executing an affidavit of personal knowledge indicating
15  that Principal Fusco intended to punish you?
16  A. No, sir.
17  Q. All right. And let's talk about Paragraph 40. I
18  think you changed your testimony there.
19     When you say Principal Fusco admitted that you
20  were disciplined because you were dressed in a shirt
21  protesting the occasion, earlier on direct you said it's
22  because she told you that.
23     And then I think on cross your testimony was that
24  you read it in an e-mail?
25     Which is it? Did you read it in an e-mail? Or

Page 120

1  did she come to you and tell you --
2  A. Both.
3  Q. Okay. Is it both now?
4  A. It was both before, because I have seen it in the
5  e-mail, and she did relay the information to me
6  verbally.
7     I just rather cite the e-mail because it's
8  written down.
9  Q. Okay. Just so I'm clear, you personally have
10  knowledge of her coming to you and admitting to you the
11  reason you were disciplined was because of your shirt?
12  A. Yes, sir.
13  Q. All right.
14     And going back to your Verified Complaint, would
15  you agree there is a lot of factual allegations in this
16  Complaint?
17  A. How do you mean factual allegations?
18  Q. Do you know what a fact is?
19  A. Yes.
20  Q. Okay. What is a fact, just so we're clear?
21  A. Something that's true.
22  Q. Okay. And there is a lot of things in this
23  Complaint where you make allegations --
24  A. Yes.
25  Q. -- that something happened, correct?



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 121

1  A. Yes.

2  Q. And then there was an allegation that Principal

3  Fusco had personally approved of certain behavior. And

4  I asked you what knowledge you had. And I think some of

5  that got muddied up on your cross so I'm going to ask

6  you again, what personal knowledge do you have that

7  Principal Fusco approved of any of the discipline that

8  was given to you?

9  A. I have intuitive.

10  Q. Well, intuitive doesn't have any place here,

11  ma'am. I'm only asking about facts.

12      MS. LITTRELL: Do you have a question,

13  Mr. Jensen?

14      MR. JENSEN: Yes. I'm --

15      MS. LITTRELL: Don't be argumentative with a

16  16 year old.

17      MR. JENSEN: I'm not --

18  A. Anyway --

19  BY MR. JENSEN:

20  Q. Please go ahead and answer my question.

21  A. Well, it says it in the e-mail.

22  Q. It says in the e-mail that she personally

23  approves that the --

24  A. Not personally, no. But she didn't disapprove

25  it.

Page 122

1  Q. Okay. Anything else that leads you to believe

2  that she approved of it?

3  A. Not other than that, no.

4  Q. Anything else that would lead you to believe that

5  she ratified it?

6  A. No.

7  Q. And with relation to the School Board, what

8  information do you know of that would justify you saying

9  the School Board itself approved of your discipline?

10      MS. LITTRELL: Objection.

11      MR. JENSEN: Well, that's fine.

12  BY MR. JENSEN:

13  Q. But you can go ahead and answer.

14      MS. LITTRELL: Object to the form.

15  A. I don't know.

16  BY MR. JENSEN:

17  Q. Well, you made that allegation.

18      Are you telling me you made that allegation of

19  Verified Complaint without knowing?

20  A. No.

21  Q. Okay. So, again, I'm going to ask you, what

22  information do you know of --

23  A. Because the School Board is above the

24  superintendent, was above the principal, who is above

25  the dean. So the School Board has to know what's going

Page 123

1  on.

2  Q. Okay. How do you know that the School Board knew

3  that you had been disciplined?

4  A. They have to know.

5      MS. LITTRELL: Objection. There is no

6  foundation for that.

7      You're mischaracterizing the testimony, you

8  are mischaracterizing the allegations in the

9  Complaint.

10      MR. JENSEN: Well, I'm going to read it,

11  just for the record.

12      "In imposing, approving, ratifying and

13  enforcing the disciplinary action against Plaintiff,

14  Defendants," which means all Defendants, including

15  the School Board, "were at all times relevant hereto

16  acting under color and authority of state law

17  school."

18  BY MR. JENSEN:

19  Q. School Board, being one of the Defendants,

20  I'm asking you --

21      MS. LITTRELL: Are you testifying or are you

22  reading?

23      You just --

24      MR. JENSEN: Well, I'm reading it --

25      MS. LITTRELL: I want to be clear.

Page 124

1      MR. JENSEN: I'm reading it verbatim. These

2  are Amber Hatcher's words in her Verified Complaint.

3      MS. LITTRELL: Mr. Jensen, just, if you

4  would --

5      MR. JENSEN: If you want to object to the

6  form object to the form. Otherwise, I'm not

7  impressed in hearing your argument. It has no place

8  at this deposition.

9  BY MR. JENSEN:

10  Q. Miss Hatcher, I'm asking you, what information do

11  you know of, facts, and I don't want guesses or

12  speculation, what facts do you know of that would lead

13  you to believe that the School Board approved your

14  discipline?

15  A. I don't have any.

16  Q. All right. What information do you have, if any,

17  that the School Board ratified the decision to

18  discipline you?

19  A. I could just say the same thing I have been

20  saying over and over again, that the School Board

21  basically knows everything.

22      They're the School Board. It's their job. If

23  they don't tell you not to do something they're

24  basically approving it.

25  Q. Okay. Is it your testimony that the School Board


Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

ACCURATE
COURT REPORTING, INC.

1.888.ACR.3335 • 1.800.862.4206 (FAX)

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 125

1  knows everything that happens at the school no matter
2  how minute?
3    A. Not that.
4      But do you really think something like this would
5  be considered minute, something that's been a month in
6  the making, and has students advocating for it over and
7  over again, things that have been happening year after
8  year after year and getting shut down each time?
9    Q. Again, I'm asking you, do you know of anything,
10  any facts that would lead you to believe that the School
11  Board itself ratified the decision to discipline you?
12    A. No, sir.
13    Q. Have you seen an affidavit from the chairman of
14  the School Board indicating that they were not even
15  aware this happened until a Complaint was filed?
16    A. I have never seen that.
17    Q. And, again, we'll talk about Paragraph 80.
18  "Defendant Fusco's discretionary decision to punish
19  Plaintiff, and otherwise interfere with her instructive
20  time and her efforts to participate in expressive
21  activity on April 20th, 2012 was not subject to approval
22  by the School Board."
23      So that would be an indication right here that
24  the School Board doesn't approve of everything that she
25  does, correct?

Page 126

1      MS. LITTRELL: Objection. Confusing.
2      MR. JENSEN: They are her words. They
3  shouldn't be confusing.
4    A. Sorry, could you ask the question again?
5  BY MR. JENSEN:
6    Q. This would be an indication here, since you swore
7  to this in your Verified Affidavit, the School Board
8  doesn't have anything to do with Ms. Fusco's
9  discretionary decision to punish you, correct?
10      It's not subject to School Board's approval?
11      MS. LITTRELL: Objection to form.
12    A. Well, I didn't know that before though.  Like
13  I -- I knew it but I didn't understand it.
14      And now that you had me thinking about it then I
15  could consider that, yeah.
16  BY MR. JENSEN:
17    Q. Okay. And, again, do you have any information,
18  any facts that would lead you to believe that the
19  decision to discipline you was Ms. Fusco's and not Dean
20  Jones?
21    A. No, sir.
22    Q. Why did you execute an affidavit in this Verified
23  Complaint saying that it happened if you didn't know?
24    A. I had my lawyers go over it and write it up, and
25  I trusted what they trusted. I'm trusting my lawyers in

Page 127

1  this.
2      This might be a question that you would like to
3  ask them.
4    Q. Well, let me ask you this, your lawyer wasn't
5  with you when this all happened, correct?
6    A. Correct.
7    Q. That information would have to come from you or
8  not at all, correct?
9    A. Yes.
10    Q. And, again, you're the only person that would
11  know this, not your lawyer, why did you execute an
12  affidavit saying --
13      MS. LITTRELL: Object to the form.
14  BY MR. JENSEN:
15    Q. -- Ms. Fusco's discretion to punish you if you
16  didn't know about it?
17    A. I don't feel like I should be the one to answer
18  that. So I'm just going to leave it as an I don't know
19  as for now, because I don't feel I'm qualified to answer
20  that.
21      MR. JENSEN: All right. That's all I have.
22      MS. LITTRELL: I got some questions,
23  redirect [sic].
24
25

Page 128

1  RECROSS-EXAMINATION
2  BY MS. LITTRELL:
3    Q. We talked about -- you talked to Mr. Jensen about
4  what information you had that -- the discipline you
5  received on Day of Silence came from Principal Fusco.
6      Did the fact that school officials called your
7  father and threaten you through him, that you would get
8  in trouble if you came to school, did that give you an
9  indication that the principal of the school was aware of
10  and intended to punish you for your participation?
11    A. Yes.
12      MR. JENSEN: Object to form.
13  BY MS. LITTRELL:
14    Q. Has the discipline that you encountered on Day of
15  Silence, 2012, has that been reversed by the School
16  Board to your knowledge?
17      Has anyone come to you from the School Board and
18  said that they are going to reverse the discipline and
19  clear your record?
20    A. No, ma'am.
21    Q. Do you think it's fair to say that when the
22  principal of the school communicates to you that if you
23  do something you'll get in trouble, and calls your home
24  and tells your parents that if you do something you'll
25  get in trouble, and sends an e-mail to the school that



Nationwide Depositions, Hearings and Trials ● Conference Facilities
Videoconferencing ● Legal Video Services ● Exhibit Scanning
Transcript / Video Synchronization ● 24-7 Online Repository
**1.888.ACR.3335 ● 1.800.862.4206 (FAX)**
info@acrdepos.com ● www.acrdepos.com ● scheduling@acrdepos.com

Page 129

1 says if you see anybody doing this send them to the
2 office, do you think -- and then in fact you do the
3 thing the principal told you you would get in trouble
4 for, do you think that it's fair to say that that's the
5 indication that you rely on when you make a claim or an
6 allegation of fact that the principal was behind the
7 discipline?
8 A. Yes, ma'am.
9 Q. Okay. Have you been to law school?
10 A. No.
11 Q. Do you know what the elements of a claim are?
12 A. No, ma'am.
13 Q. Okay. Talking about the verification that you
14 signed, and can you -- there is -- there has been some
15 testimony from Mr. Jensen that this is an Affidavit --
16 MS. JENSEN: Object to form.
17 BY MS. LITTRELL:
18 Q. Can you read, starting with the word says here on
19 the verification that you signed, just read the rest of
20 that.
21 A. Says that, "She has read the foregoing Complaint
22 and is familiar with its contents which are true to the
23 best of her information and belief."
24 Q. Is that a factual statement?
25 Is that a true statement --

Page 130

1 A. Yes.
2 Q. -- that everything in there, as far as you know,
3 was true?
4 A. Yes.
5 Q. As far as you know?
6 A. Yes.
7 Q. And the things that you don't know were based on
8 your belief, your understanding?
9 A. And trust from my lawyers. I trust that they
10 would do what was right.
11 Q. But as to what's signed right here, you read it
12 and you are familiar with it; is that right?
13 A. Yes, ma'am.
14 Q. And that everything in there was true to the best
15 of your information and belief, is that -- is that
16 accurate?
17 A. Yes, ma'am.
18 Q. So that if you don't know what 42 U.S.C. 1983
19 Section -- 1983 means, that it's -- the information
20 there is true to the best of your information --
21 A. Yes.
22 Q. -- and otherwise in terms of who ratifies what in
23 the hierarchy of the School District, the information
24 that's in the Complaint is true to the best of your
25 belief and otherwise to the best of your information?

Page 131

1 A. That is true.
2 Q. Is that right? Okay.
3 Did you personally draft, did you write this up this
4 Complaint?
5 A. No.
6 MS. LITTRELL: Okay. All right. That's all
7 I have.
8 MR. JENSEN: Okay. Just one more question.
9 BY MR. JENSEN:
10 Q. Okay. You had the ability to tell your attorney
11 if you saw something in here that you didn't know and
12 you had no facts to support, you had the ability to say
13 I can't execute this the way it is because I don't know
14 this. You had that ability, correct?
15 A. I didn't know that that was the proper standard.
16 Q. You did have the ability to say I'm not going to
17 sign off on this thing that says it's true when I don't
18 know one way or the other?
19 MS. LITTRELL: Objection as to form.
20 BY MR. JENSEN:
21 Q. Did you have that ability?
22 A. I had the ability to sign it thinking that
23 everything in there is true because it has to be.
24 Lawyers drafted it up and stuff.
25 I mean, if I don't know it then it's probably

Page 132

1 something that they'll be able to prove anyway.
2 Q. But we've established --
3 A. Yeah.
4 Q. -- that some of the things in here you don't know
5 are true, correct?
6 A. Yes, sir.
7 Q. But you verified that they were not knowing that;
8 is that correct?
9 A. Yes.
10 MS. LITTRELL: Objection. Form of the
11 question.
12 BY MR. JENSEN:
13 Q. You can answer it, ma'am.
14 A. Yes, sir.
15 MR. JENSEN: Okay. Read or waive?
16 You have the right to read this transcript
17 when it's typed up, or you can trust the court
18 reporter took everything down accurately. It's --
19 MS. LITTRELL: She'll read.
20 MR. JENSEN: Okay. I'll order.
21 MS. LITTRELL: And can you -- I don't know
22 local practice here, but will you send the transcript
23 and she can have it signed in front of any notary
24 or --
25 (Brief discussion held off the record.)



Nationwide Depositions, Hearings and Trials ● Conference Facilities
Videoconferencing ● Legal Video Services ● Exhibit Scanning
Transcript / Video Synchronization ● 24-7 Online Repository

**1.888.ACR.3335 ● 1.800.862.4206 (FAX)**

info@acrdepos.com ● www.acrdepos.com ● scheduling@acrdepos.com

## Page 133

1  THE COURT REPORTER: I'll have my office do
2  the read through your office? Is that all right?
3  MS. LITTRELL: Yes.
4  THE COURT REPORTER: Did you want a copy?
5  MS. LITTRELL: Yes, please.
6  (Deposition concluded at 4:44 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 134

1  CERTIFICATE OF OATH
2
3  STATE OF FLORIDA    )
4  COUNTY OF SARASOTA  )
5
6
7  I, ROBIN ROBERTS, RPR, CSR, Notary Public,
8  State of Florida, certify that Amber Hatcher personally
9  appeared before me on June 25th, 2013 and was duly
10 sworn.
11  Signed this 7th day of July, 2013.
12
13
14
15
16
17
18
19
20
21            ROBIN ROBERTS, RPR, CSR
22            Notary Public - State of
23            Florida
24            My Commission No. DD515535
25            Expires: May 12, 2014

## Page 135

1  CERTIFICATE OF REPORTER
2
3
   STATE OF FLORIDA
4
   COUNTY OF SARASOTA
5
6      I, ROBIN ROBERTS, RPR, CSR, Court Reporter
7  and Notary Public, HEREBY CERTIFY THAT I was authorized
8  to and did stenographically report the deposition of
9  Amber Hatcher; that a review of the transcript was
10 requested; and that the foregoing transcript, Pages 4
11 through 133, is a true and accurate record of my
12 stenographic notes.
13      I FURTHER CERTIFY that I am not a relative,
14 employee, attorney, or counsel of any of the parties,
15 nor am I a relative or employee of any of the parties'
16 attorneys or counsel connected with the action, nor am I
17 financially interested in the action.
18      DATED this 7th day of July, 2013.
19
20
21
22
23
24            ROBIN ROBERTS, RPR, CSR
25            CERTIFIED COURT REPORTER

## Page 136

1  ERRATA SHEET
2
   IN RE:  Amber Hatcher, by and through her next friend,
3          Gregory Hatcher vs. DeSoto School District
          Board of Education, et al
4
   CASE NO: 2:13-cv-138-Ftm-38DNF
5
   DEPONENT: Amber Hatcher
6
   PAGE    LINE            CORRECTION
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
   Under penalties of perjury, I declare that I have read
20 the foregoing document and that the facts stated are
21 true.
22
23 _____
24
25 Date            Amber Hatcher



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com

Page 137

1     July 7, 2013
2 Amber Hatcher
  C/O Elizabeth Littrell, Esquire
3 Lambda Legal Education and Defense Fund
  Southern Regional Office
4 730 Peachtree Street, N.E.
  Suite 1070
5 Atlanta, Georgia 30308
  (404) 897-1880
6
7 Re: 6/25/13 deposition of Amber Hatcher
8 Dear Madam:
9   This letter is to advise that the transcript for
  the above-referenced deposition has been completed and
10 is available for review.  Please contact our office at
  1-888-227-3335 to make arrangements for read and sign,
11 or sign below to waive review of this transcript.
12   It is suggested that the review of this transcript
  be completed within 30 days of your receipt of this
13 letter, as considered reasonable under Federal Rule*;
  however, there is no Florida Statute to this regard.
14
   The original of this transcript has been forwarded
15 to the ordering party and your errata, once received,
  will be forwarded to all ordering parties.
16
17 Sincerely,
18 Robin Roberts, CSR, RPR
19
  cc:  Jeffrey Jensen, Esquire
20
  WAIVER:
21
   I, _____, hereby waive the reading &
22 signing of my deposition transcript.
23         _____
   Amber Hatcher    Date
24
  *Federal Civil Procedure Rule 30(e)/Florida Civil
25 Procedure Rule 1.310(e).



Nationwide Depositions, Hearings and Trials • Conference Facilities
Videoconferencing • Legal Video Services • Exhibit Scanning
Transcript / Video Synchronization • 24-7 Online Repository

**1.888.ACR.3335 • 1.800.862.4206 (FAX)**

info@acrdepos.com • www.acrdepos.com • scheduling@acrdepos.com