UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CV-138-FtM-99DNF

_____

AMBER HATCHER, by and through
her next friend, GREGORY HATCHER,

         Plaintiff,

                                  Fort Myers, Florida
vs.                                 March 28, 2013

                                  9:03 a.m.

DESOTO COUNTY SCHOOL DISTRICT
BOARD OF EDUCATION, and ADRIAN CLINE,
as Superintendent of DeSoto County
School District, SHANNON FUSCO, as
DeSoto County High School Principal,
and ERMATINE JONES, as DeSoto County
High School Dean of Students, in their
personal and official capacities,
and their successors in office,

         Defendants.
_____


TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION


    The above-entitled cause was called for hearing before

the Honorable John E. Steele, United States District Court

Judge, sitting at the United States Courthouse in the City

of Fort Myers, Florida, beginning at the hour of 9:03

o'clock, a.m., on the 28th day of March, 2013.


                                 _ _ _

<pre>
1                        A P P E A R A N C E S
2

3    FOR PLAINTIFF:

4                     Carlton Fields, PA
                      4221 West Boy Scout Boulevard
5                     Suite 1000
                      P.O. Box 3239
6                     Tampa, FL  33601-3239
                      (813)2237000
7                     BY:  NANCY J. FAGGIANELLI, ESQ.

8                     Lambda Legal Education and Defense Fund
                      Southern Regional Office
9                     730 Peachtree Street, N.E.
                      Suite 1070
10                    Atlanta, GA  30308-1210
                      BY:  ELIZABETH LYNN LITTRELL, ESQ.
11

12   FOR Defendants:

13                    Unice Salzman, P.A.
                      Suite 201
14                    2570 Coral Landing Boulevard
                      Palm Harbor, FL  34684
15                    (727)723-3772
                      BY:  JEFFREY D. JENSEN, ESQ.
16                         DAVID MICHAEL ROSENBAUM, ESQ.

17
     REPORTED BY:     JEFFREY G. THOMAS, RPR, CRR
18                    Official Federal Court Reporter
                      U.S. Courthouse
19                    2110 First Street, Suite 2-194
                      Fort Myers, FL  33901
20                    (239) 461-2033

21
                              *  *  *
22

23

24

25
</pre>

1                        I N D E X

2      March 28, 2013                        Vol.      Page

3      Preliminary Discussions                 1          4

4      Argument by Ms. Littrell                1          5

5      Response by Mr. Jensen                  1         10

6      Further Argument by Ms. Littrell        1         12

7      Further Argument by Mr. Jensen          1         14

8      Further Argument by Ms. Littrell        1         21

9      Further Argument by Mr. Jensen          1         25

10     Further Argument by Ms. Littrell        1         27

11     Further Argument by Mr. Jensen          1         32

12     Further Argument by Ms. Littrell        1         35

13     Order of Court                          1         37

14     Concluding Discussions                  1         37

15     Certificate of Court Reporter           1         39

16                            * * *

17

18

19

20

21

22

23

24

25

1    THEREUPON, the above-entitled case having been called

2  to order, the following proceedings were held herein,

3  to-wit:

4                          - - -

5        THE COURT:  This is the case of Amber Hatcher, by and

6  through her next best friend, Gregory Hatcher, versus the

7  DeSoto County School District Board of Education and others.

8  It's Case 2:13 Civil 138.

9        Counsel, if you would identify yourselves, please,

10  beginning with counsel for the plaintiff.

11        MS. FAGGIANELLI:  Your Honor, I'm Nancy Faggianelli,

12  with Carlton Fields, on behalf of the plaintiff.

13        MS. LITTRELL:  Your Honor, I'm Elizabeth Littrell

14  with Lambda Legal, on behalf of the plaintiff.

15        THE COURT:  All right.  Thank you.

16        MR. JENSEN:  Jeffrey Jensen on behalf of the School

17  Board, Superintendent Cline, Principal Fusco, and Dean Jones.

18        MR. ROSENBAUM:  David Rosenbaum on behalf of the

19  defendants.

20        THE COURT:  All right.  Counsel, we're here on the

21  plaintiff's motion for a . . . perhaps it's an amended motion

22  for a preliminary injunction.

23        Counsel for plaintiff may proceed.

24        I will let you know I've got a criminal case coming

25  back at 10:00 o'clock, so that's kind of our timeframe.

1          MS. LITTRELL:  Thank you, Your Honor.  I can stay

2     within that timeframe.

3          May it please the Court.  Again, my name is Beth

4     Littrell; and, along with Co-counsel Nancy Faggianelli, I

5     represent Amber Hatcher, the plaintiff in this action, who

6     comes before this Court with a simple request to ensure that

7     she can organize and participate in an expressive event that

8     happens every year, in hundreds if not thousands, of high

9     schools and colleges across the country, that's called Day of

10    Silence.

11         THE COURT:  Tell me what she wants to do when you say

12    organize and participate.

13         MS. LITTRELL:  Well, Day of Silence is an effort to

14    call attention to --

15         THE COURT:  I know what it is.  Tell me what she

16    wants to do.

17         MS. LITTRELL:  She wants to be able to talk with her

18    other peers and convince them, or suggest to them, that Day of

19    Silence is something that is worthy to do, and so that she

20    would be able to have an effective Day of Silence event at the

21    school, so it's not part of the effective Day of Silence, it's

22    not one lone student with an armband.  Just as in Tinker, part

23    of the effect of Day of Silence is to be able to communicate

24    what the Day of Silence -- you know, the underlying messages.

25         So that's one, in terms of organizing.  In terms of

1    what would happen --

2              THE COURT:  So that's pre Day of Silence was what

3    you're describing she wants to do.

4              MS. LITTRELL:  That's right.  In terms of organizing.

5              In terms of participating, Day of Silence simply is a

6    day where students, and Amber in this case, would take some

7    form of a vow of silence to herself, where she stays

8    uncharacteristically quiet, where she doesn't talk to her peers

9    like she normally does, where she doesn't giggle in the hall,

10   where her silence, in and of itself, her and other students,

11   calls attention, and in calling attention, she is able to

12   express that anti LGBT, bullying, silences kids who are LGBT or

13   have family members who are.  So it calls attention simply just

14   by being uncharacteristically quiet.

15             THE COURT:  So she wants to do that in the hall.  How

16   about in the classroom?

17             MS. LITTRELL:  In the classroom as well, Your Honor.

18             THE COURT:  So she wants to be able to not respond if

19   called upon?

20             MS. LITTRELL:  No.  In fact, Your Honor, she

21   understands -- and, in an e-mail in the appeal of the decision

22   not to allow her to take part in Day of Silence this year, she

23   sent an e-mail, three times, to the superintendent, in which

24   she clearly sets out that she understood the limits of the

25   First Amendment, and she understood that, if students refuse to

1    respond to a teacher in class, that they could be disciplined.

2           The First Amendment does not protect them in their

3    refusal to answer; and, in that event, we would expect that the

4    teacher and the administration of the school would handle those

5    situations in the same way as any other student who, perhaps,

6    does not bring her homework to class, or fails to respond to

7    the school.

8           So we would just ask that the school respond as it

9    does with other students, not as it did here; which is, if they

10   are silent -- and this is what the principal said.  If someone

11   is silent in class --

12          THE COURT:  I'm sorry.  I want you to tell me

13   everything your client wants to do.

14          MS. LITTRELL:  She'd like to . . . .

15          THE COURT:  We've got her being silent in the halls,

16   and in the classroom except when called upon.

17          MS. LITTRELL:  Right.

18          THE COURT:  Do you want her to be silent anyplace in

19   the school property during that day?  Is that right?

20          MS. LITTRELL:  Yes, Your Honor.

21          THE COURT:  All right.  What else?

22          MS. LITTRELL:  She wants to be able -- and, in the

23   silence, she wants to be able to express herself, in writing,

24   and -- you know, in various forms without speaking.  I guess

25   that goes under the same rubric.  She wants to wear T-shirts or

1   other sign --

2            THE COURT:  Tell me about the writing.  What does she

3   want?

4            MS. LITTRELL:  She wants to be able to respond to

5   students or staff who speak to her.  She would like to be able

6   to answer them, where possible, where feasible, where

7   reasonable, by writing down, on either a dry erase board or her

8   notebook, the answer to that question, as opposed to -- as if

9   she had laryngitis for the day.

10           THE COURT:  All right.  And then you started to say

11  about a T-shirt.

12           MS. LITTRELL:  She would like to be able to wear a

13  T-shirt.  Last year, what she had hopes to be able to do was to

14  come up with a theme, and tell other students that were going

15  to participate, who were interested, to wear the same color of

16  shirt, perhaps; perhaps some suggestions for what the

17  expressions would be, so . . . .

18           Last year, for example, her friend wrote on his hand,

19  because of the interference with her ability to take part.  The

20  T-shirt idea was thwarted, and she was unable to do it.  She

21  made a homemade T-shirt that just said shh, D O S, 2012.  And

22  her friend wrote, on his hand, "Think of the voices you aren't

23  hearing."

24           And so those types of expressive messages on T-shirts

25  that identify the students who are taking part as being a part

1    of Day of Silence, and as a way to get students to start

2    thinking about this issue.  Which is all she wants to do.

3              THE COURT:  And are the expressions anticipated to be

4    either vulgar, or lewd, or anything like that?

5              MS. LITTRELL:  Absolutely not, Your Honor.

6              THE COURT:  What else did does she want to do?

7              MS. LITTRELL:  She would like to, within school

8    policy, be able to put up posters and otherwise publicize what

9    Day of Silence is about.  Again, just as any other student

10   would who might be having a . . . you know, I don't know,

11   selling raffle tickets, or inviting students to a Boy Scouts

12   meeting.

13             So, within whatever the rules of the school are,

14   she'd like to be able to fall within those, and ask if she can

15   put the posters up, and ask if there is an availability for a

16   public address opportunity.  Not to be treated differently,

17   just to be treated as they would every other student, and not

18   to treat her request, because it's based on Day of Silence, or

19   what they may think is a protest, differently than other

20   speech.

21             And that's pretty much it, Your Honor.

22             THE COURT:  So you've got basically being silent,

23   responding in writing, the T-shirt or placard, and posting

24   posters, I guess, within the school policy.

25             MS. LITTRELL:  That's right, Your Honor.  And to the

1   extent that -- one of the things that the organizers of Day of

2   Silence -- again it is a student led protest, but there is an

3   organization that sort of helps to organize it for those

4   students, or give them some . . . some resources.  And one of

5   those resources is sort of a card that they can print out and

6   hand out, that would say something along the lines of, "I'm

7   being silent think of the voices you aren't hearing," and sort

8   of explaining Day of Silence.

9           Of course, she understands, and wants just to be

10  treated like other students, and would be more than willing --

11  and one of the reasons she met with her principal was to find

12  out what the restrictions are, and what she would have to do in

13  all of these efforts.  So, to the extent that she wants to

14  provide any will it, it would be preapproved, if that is what

15  the school district policy is; and she would want to hand that

16  out, in a nondisruptive way, in class.

17          THE COURT:  Anything else, in terms of conduct, that

18  she wants to be able to do?

19          MS. LITTRELL:  No, Your Honor.

20          THE COURT:  Mr. Jensen, is there any part of that

21  that the school district would disallow?

22          MR. JENSEN:  Your Honor, everything I have heard,

23  with the exception of putting up posters, and selling raffle

24  tickets, and being able to publicly address the students, is

25  within school policy.  The school policy provides that students

1    have the right to free speech.  The handouts I attached as part

2    of the affidavits specifically says that students have the

3    right to hear, examine, and express divergent points of view,

4    including freedom of speech, written expression and symbolic

5    expression.

6              The school board has no problem with her talking to

7    her peers, no problems with the vow of silence, as long as it

8    doesn't interfere with the classroom, which I'm being presented

9    to here, is not going to be an issue.  No problem with her

10   being able to express herself in writing as long as it doesn't

11   disrupt the educational process.  And I haven't heard anything

12   that indicates that that would.  And the school board has no

13   problem with her wearing a T-shirt.

14             And the rest of what she wants to do, she said she

15   would do within the confines of school policy.  So I don't

16   think we have an issue here, Your Honor.

17             THE COURT:  Well, that's kind of my thought, too.

18   You may, obviously, have an issue as to what happened last

19   year; but in terms of what's going to happen this year, and

20   what the Court can enter an injunction about, it doesn't seem

21   to me like there's much of a dispute.  I don't remember raffle

22   tickets.  You mentioned that.  I don't remember that --

23             MS. LITTRELL:  I used that as a hypothetical, in

24   terms of an analogy.

25             THE COURT:  So there's no raffle tickets involved in

1    this case?

2              MS. LITTRELL:  No, Your Honor.

3              THE COURT:  Okay.  And then, in terms of distributing

4    cards, whatever the policy says as to pre-approval, that's not

5    an issue for the plaintiff?

6              MS. LITTRELL:  That's true, Your Honor.

7              THE COURT:  So it's presumably not an issue for the

8    defendant, either.

9              MR. JENSEN:  No, Your Honor.

10             THE COURT:  All right.

11             MS. LITTRELL:  If I may respond, I wish that

12   Mr. Jensen had been the principal of the school, or the

13   superintendent, because what I have said to you is what Amber

14   said to the principal, and it's what she wrote in an e-mail to

15   the superintendent, exactly these parameters, understanding

16   her -- this student researched the law, provided the law, met

17   with her principal, made her case on why she should be able to

18   do just exactly these things; was told no; appealed that

19   decision; followed up, respectfully, again, with law; contacted

20   a national organization to say I don't know what to do next,

21   I'm trying to do all the right things.

22             A letter was sent to the school and to the school

23   district, which we presume any letter from a law firm that

24   insinuates liability would find its way to the school board.

25   That letter was ignored.  Set out the law, said that if you

1   interfere with this student's speech, that liability will

2   attach.

3           They ignored that letter, and interfered with her

4   speech before, during Day of Silence, and then again this year.

5   She approached the principal again, and said I'd like to take

6   part in the Day of Silence.  Can I do that?  And she said no.

7           Again, a policy is a policy.  And even there, right

8   now, in this litigation, the position is what?  We don't have a

9   policy against free speech.  They said they didn't do anything

10  wrong.  They have a policy, it was followed, no problem.

11          And yet we have all of this evidence in the record

12  where the only principal, the head of the high school, the only

13  high school, said we have an absolute policy against

14  protesting; sent an e-mail out, as sort of a net, cast a net,

15  and said anyone that you suspect of taking part in a protest,

16  anyone who is wearing placards that indicate that they're

17  taking part in a protest, send them to the office to be dealt

18  with.

19          And, of course, Amber was caught up in that threat,

20  with another student, the one that wrote in his hand, that were

21  participating.  They were effective ensuring that.  Instead of

22  a dozen students, there were only four.

23          And we have an admission from the principal saying

24  four students received consequences for protesting -- this is a

25  quote -- "For protesting LGBT Day of Silence."

1          So, notwithstanding the litigation position, we are

2    before this Court, one, because Amber tried, in every way she

3    knew how, and was still thwarted, and told again, and is

4    chilled in her speech.

5          We had communications with opposing counsel, and

6    said, similarly to your position here, your question here.  If

7    you say you don't have any policies, perhaps we don't need to

8    have a hearing.  We can just reduce this, that there are no

9    policies, and she won't be interfered with, and let the Court

10   sign something to ensure that it's enforceable, and we'll just

11   argue about what happened last year.

12         THE COURT:  I don't think the position is the no

13   policies.  As I understand it, what Mr. Jensen is saying

14   everything your client wants to do this year will be permitted,

15   or should be permitted, under the existing policies.

16         Do I understand your position correctly?

17         MR. JENSEN:  That is correct, Your Honor.

18         THE COURT:  And what assurance does the plaintiff

19   have that, unlike last year, the school board, or the

20   principal, whoever it is that has hands-on authority over the

21   students, will allow her to do what you've said is permissible

22   under their policy?

23         MR. JENSEN:  Well, Your Honor, the written policies

24   of the school are plain black and white that she's allowed to

25   do this.  The school board disputes the plaintiff's version of

1    the events here.  She was not disciplined, at all, for her

2    activity with her expression.  She was disciplined because she

3    used profanity towards an administration member.

4              THE COURT:  But I mean that's a dispute I'll resolve

5    in due course.  But what's undisputed are some e-mails from

6    your clients, some of which would appear, to me, to be

7    inconsistent with both the written policies at the time and

8    with what you told me the policies are.

9              It doesn't seem to me, like anything that's been

10   talked about here should have been impeded last year; and it

11   seems to me that it was.

12             Now, the discipline, and what she was disciplined

13   for, is a separate question; but it doesn't seem to me like she

14   needed permission to talk to peers or to engage in the vow of

15   silence; but it seems uncontradicted from your evidence that

16   that's what, indeed, happened.

17             MR. JENSEN:  Your Honor, what was requested is larger

18   than the scope of what's being talked about.

19             In the NBC report, plaintiff admitted that she not

20   only wanted to do what she wanted to do, she was trying to get

21   the administration to go along with her.  She asked for the

22   superintendent and the principal to personally participate in

23   this event.  Now, the school administer definitely has the

24   right to determine what school employees will and will not

25   participate in.

1        The plaintiff has a constitutional right to express

2    herself how she chooses.  She doesn't have a constitutional

3    right to receive the school board's blessing and participation

4    in her plans, unless she can show that the school does similar

5    things for similar students.  And that issue has not been

6    brought up.

7        The plaintiff had said, in her letter to the

8    administrator, we want to put up posters, and we're going to do

9    so whether you approve it or not.

10        Now, under the school's policies for distribution of

11    literature, she has to, at least at a minimum, present the

12    stuff to the administration for approval.  We have no evidence

13    that she actually brought any posters to the administration,

14    said this is what I want to hang on the wall.  And I think it's

15    questionable whether or not she has a right to post posters on

16    public hallways unless that similar things have been approved

17    in the past.  And that issue has not been fleshed out today.

18        So she's asking for -- she asks for more than the

19    confines of what she's requesting today.  The school has no

20    problems with her doing what she's requesting.

21        THE COURT:  I guess my problem is, assuming what you

22    told me is correct, and that she asked for more than she's

23    asking for today, that will be resolved as the case goes along.

24    But assuming, for today's purposes, that's true.  The principal

25    still not only denied the additional thing she asked, but

1    denied her the more basic things that she's asking for today.

2         And I guess my question is, how does the plaintiff

3    rest assured that, if she asks for just what she does here, in

4    court, you get a transcript of what counsel said and say all

5    right, this is the parameters; that the principal, this time

6    around, is going to say okay, you can wear the T-shirt, and

7    you're not going to get pulled out of class.

8         MR. JENSEN:  Well, Your Honor, that's also a matter

9    that's disputed.  Miss Hatcher claims that she was denied the

10   right to do any of these things, and she was told by the

11   principal she couldn't.

12        The superintendent's affidavit says he didn't tell

13   the principal to deviate from the written school policies.  And

14   the principal's affidavit says, in the absence of any

15   instructions to the contrary, I'm following school policies.

16        She was denied --

17        THE COURT:  And the school principal did things that

18   were exactly contrary to what you've said should have been

19   allowed.  Now, she may be saying no one told me to do this, but

20   I'm doing it; so, I mean, are you going to go, after this

21   hearing, to go talk to the school principal, and say listen,

22   this is what I told the judge she can do, I want her to do it?

23        MR. JENSEN:  All the principal did was put out an

24   e-mail to the staff saying if you see any disruptions in the

25   hallways, you see any disruptive activity, report it to the

1    administration, and we'll dealing with it.  Which means the

2    administration is monitoring what is going on.  It doesn't say

3    you're automatically subject to discipline.

4            THE COURT:  That's not my memory as to what that

5    e-mail said.  But I still get back to . . . assuming you're

6    correct -- and, actually, I think you are correct, and I think

7    plaintiff's counsel is correct too . . . which, you know, kind

8    of leads me to the point where I don't think you have a dispute

9    as to what's being said, today, in terms of what the student

10   can do April 19th, or whenever it is.

11           My only issue is . . . .  How are we all going to be

12   assured that, you know, in the boots-on-the-ground place, so to

13   speak, the principal knows that it's the official position of

14   the defendants that the plaintiff can do this, as limited by

15   what she said today?

16           MR. JENSEN:  Well, one thing that she can take to

17   heart is the fact that Superintendent Cline is no longer

18   superintendent of the school.  He left office before the suit

19   was ever filed.  So he has no control over her activity

20   whatsoever.

21           THE COURT:  But you said he didn't have any control,

22   either, before.  So he's -- at least one view of the facts is

23   he's not the problem.

24           MR. JENSEN:  And the principal is no longer the

25   principal of the school at this current time, either.  She's

1   been removed from her post for reasons unrelated to this case,

2   as evidenced by the NBC story as well.  So she's not in control

3   of what Ms. Hatcher can and cannot do at the school either.

4        THE COURT:  Let me kind of cut to the chase, I guess.

5   If the Court were to enter a preliminary injunction saying

6   exactly what you've said, what both of you have said can be

7   done, anyone take exception to that?

8        MR. JENSEN:  Yes, Your Honor.  The preliminary

9   injunction that was put in as an exhibit to the motion --

10       THE COURT:  That's not the one I'm going to use.

11  That's way too broad.  You know, that gives immunity for

12  misconduct before it happens.  So that's not going to happen.

13  But what I'm saying is, a preliminary injunction that says

14  these are the things she can do, and both sides agree they are

15  within the school policy, including getting pre-approval for

16  distribution of literature and, whatever the poster regulations

17  are, following the poster regulations.

18       MR. JENSEN:  My position would be it would be

19  inappropriate because, since both sides agree, there is no case

20  for controversy before this Court, so it shouldn't have

21  jurisdiction to enter such a preliminary injunction, because

22  there's no dispute before the Court.  Both sides agree that she

23  has the right to do this, and that's what's codified in the

24  policy as it stands.

25       THE COURT:  And if that doesn't happen, in addition

1   to having the amended complaint with a new set of counts, what?

2   I will have assumed you lied to me?

3          MR. JENSEN:  I'm sorry, Your Honor, I don't

4   understand the question.

5          THE COURT:  If what you say doesn't happen, and if,

6   indeed, I don't issue a preliminary injunction, and if the new

7   principal says what was good enough last year is good enough

8   now, don't -- no T-shirts, no Day of Silence, no nothing, I'm

9   left with the position of you apparently lied to me; and maybe

10  I can hold you in contempt, but I can't do anything with the

11  school people because I haven't issued an injunction.  Is that

12  what you're telling me?

13         MR. JENSEN:  Well, Your Honor, if, for some reason,

14  the school tells Miss Hatcher she can't do this again this

15  year, she also has the ability to file an emergency motion

16  before the Court.

17         MS. LITTRELL:  They already have, Your Honor.  They

18  have already told her -- they've already thwarted her ability

19  to --

20         THE COURT:  Let him finish.

21         MS. LITTRELL:  Thank you, Your Honor.

22         MR. JENSEN:  She has that ability.  She also has the

23  ability to amend the complaint to bring additional damage

24  complaints against the school.  I don't think the school -- I

25  don't think they'd do it anyway; and they are certainly not

1    going to do it when there is a case pending on this activity

2    already.

3                THE COURT:  Go ahead.

4                MS. LITTRELL:  Thank you, Your Honor.

5                A couple of things to call the Court's attention.

6                One, we are claiming that there is an unwritten

7    policy; so, notwithstanding that, in the student's code of

8    conduct there are these rights and responsibilities, that are

9    not codified in any policy, that says you have free speech

10   rights.

11               There is clearly an unwritten policy and/or past

12   practice that allows -- the school believes, the school

13   district is using, to interfere with free speech.  And we

14   invited co-counsel to stipulate or agree to a -- you know, a

15   joint consent order for just these parameters.  And we're still

16   before this Court because they're unwilling -- she just wants

17   to take part in what she finds to be a very important event for

18   her, personally, because she's affected by it, and her friends

19   are, and she's trying to do the right thing.

20               What does she have to do, who does she have to sue,

21   in order to ensure that she can participate in the Day of

22   Silence.  And sort of assurances from counsel that they don't

23   have any intentions of interfering, that there's a free speech

24   policy -- they say they didn't do anything wrong last year.  So

25   if we leave the status quo, there is nothing to ensure that she

1   can take part this year.

2            I take issue with some of the mischaracterizations of

3   the evidence.  I don't know if the Court wants me to respond,

4   or would allow me the opportunity to respond to some of the

5   earlier things.  I think the Court is focused on maybe the same

6   thing that Amber Hatcher is, ensuring that her rights are

7   protected.

8            And in terms of a preliminary injunction, if I might,

9   Your Honor, this Court, in a case, the Yulee case, which was a

10  case involving a gay-straight alliance that the school said

11  could not meet on campus.  The preliminary injunction there was

12  rather broad.  And that's the same sort of relief that we're

13  asking, that they can participate in this within the confines

14  of the Constitution, that they can express --

15           THE COURT:  Here is my problem with that.  First of

16  all, the draft that you submitted in terms of the proposed

17  preliminary injunction . . . way too broad.

18           MS. LITTRELL:  Fair enough.

19           THE COURT:  I understand, perhaps it's just to give

20  me some thoughts; but that's not going to happen.

21           My memory in the 11th Circuit is there's pretty firm

22  case law that says a court may not issue a preliminary

23  injunction directing the parties to simply follow the law.  The

24  theory being you don't need that.  They have to do that anyhow.

25           So, to the extent that you want me to the issue

1   orders compelling the school board to not violate someone's

2   First Amendment rights, if that's all it is, I don't think I

3   can do that, because I don't think it's needed.  And I think,

4   if they do violate civil rights this year, again, as I

5   suggested, I suspect we'll see an amended complaint, with extra

6   counts.

7           So I guess I'm -- and I don't buy the Court doesn't

8   have jurisdiction.  I think it's clear that we have

9   jurisdiction in this case.  But I take the comment to be that

10  he's not really saying much different than what I'm saying;

11  that is, the Court has no authority to issue a preliminary

12  injunction that merely says I want everyone to follow the law.

13          MS. LITTRELL:  Can the Court issue an injunction that

14  enjoins them, restrains them, from interfering with students

15  that seek to participate in Day of Silence?  To enjoin them

16  from interfering with their constitutionally protected

17  expression with respect to Day of Silence?

18          We're broadly -- they have this unwritten policy that

19  they put in writing.  There's an absolute policy against

20  protesting.  The superintendent said it's our past practice not

21  to allow this.  And so I would ask the Court whether that --

22          THE COURT:  Are you talking about e-mails that are in

23  there?

24          MS. LITTRELL:  Yes, Your Honor.  And also the

25  communications that are . . . plaintiff claims to place, that

1    this was all based on a policy not allowing protest.

2            So, you know, she is concerned with Day of Silence.

3    It's April 19th.  You know, but more broadly, we claim that

4    there is this unwritten policy that they claim, or their

5    representatives -- high-ranking representatives claim is a

6    policy.  And so we just ask the Court's assistance in

7    restraining them from enforcing any such policy or practice.

8            And again, you know, the juris prudence is clear that

9    a policy doesn't have to just be what's in writing; it can be

10   the actions of a decision maker without meaningful -- an

11   opportunity for meaningful review and all of the other things.

12           This happened last year, and we fear it will happen

13   again this year.  And part of the point of injunctive relief,

14   especially when it comes to constitutional rights, is to make

15   sure that students don't have to come in -- or any citizen

16   doesn't have to one, be chilled, and two, sort of -- you

17   know -- exercise their rights at their peril, which is what

18   they're suggesting now.

19           THE COURT:  It sounds like you're not really

20   challenging the written policy, which, as I recall, simply says

21   you all have the right to First Amendment rights.  But it's

22   the . . . what you've perceived to be the unwritten policy that

23   you're challenging.

24           MS. LITTRELL:  Exactly.  That was invoked as the

25   justification.  And, you know, it's not just what happened on

1    that day.  Her rights were interfered with in the sense that

2    she was unable to organize and have an effective Day of

3    Silence.  Her parents were called, and sort of created conflict

4    within the home based on this unwritten policy, suggesting that

5    they keep her home from school.  Her rights were chilled, and

6    interfered with.

7            She was called out of class twice, the day before, to

8    tell her that she would be in trouble the next day.  And so

9    these -- this pattern of threats -- you know, all of these show

10   that this unwritten policy is invoked . . . was invoked, and

11   could be again, unless enjoined, in a variety of ways that

12   interfere with her speech and cause her harm.  So . . . .

13           THE COURT:  All right.  Let me hear from Mr. Jensen

14   as to the last points.

15           MR. JENSEN:  As far as the practice goes, under 1983,

16   a practice is an official policy if it is so repeated that it

17   takes on the force of law.

18           The practice that's referred to, the e-mail from

19   Cline, he said I did not refer to a specific policy.  This past

20   practice position needs to be discussed with Miss Hatcher.

21           It's vague as to exactly what this past practice of a

22   superintendent, who is no longer the superintendent of the

23   school, was.  We don't know the confines of what it was that he

24   was basing these decisions on.

25           I think the . . . .  The allegation, at this point,

1   has not been fleshed out enough to -- the Court can judge one

2   way or another whether this past practice is unconstitutional.

3   Obviously, if there is a protest going on, on campus, which

4   disrupts the educational process, the school can address that.

5           And we don't know exactly all of what was included in

6   Miss Hatcher's request, other than what was stated in her

7   e-mail, the fact that she wanted to put up posters, which we

8   don't know what the posters would have said, and that she

9   wanted the school administration to participate in the protest.

10  And the superintendent denied that request.

11          There's no record that -- whatsoever, of evidence --

12  and actually, the evidence is to the contrary -- as to what she

13  was going to be prevented to do on her own.  And again, she can

14  do whatever she wants to do.  That's not an issue with my

15  client.  And it's consistent with what the policies are.

16          THE COURT:  What was the basis for her being called

17  out of class?  I know the first time, the day before, was . . .

18  I think that was when the -- calling the parents?

19          MS. LITTRELL:  That's right.  She was called out of

20  class, and they called her parents a number of times.

21          THE COURT:  So I know about the first one.  What was

22  the reason she was called out of class the second time?

23          MR. JENSEN:  As far as I can tell, she was -- and we

24  haven't completely fleshed this out yet, but she was called out

25  of class to pick up a bus pass.  She was not called out of

1    class to contact the dean of students about her activities

2    related to the Day of Silence.

3              She went to the dean of students for an unknown

4    reason.  The Dean asked her why were you there, and then she

5    started uttering profanities regarding her T-shirt.  And when

6    the dean asked her to step in her office, she refused to do so.

7              THE COURT:  And the bus passes, would that normally

8    be handled by that particular dean?

9              MR. JENSEN:  It was supposed -- bus passes are

10   handled by the . . . person that's in the office right next

11   door to the Dean.  When the dean showed up, there was a bunch

12   of students in the hallway.  She said who needs to see me, and

13   why, and that's when Miss Hatcher brought up the T-shirt issue.

14             THE COURT:  But it's your position that . . . still,

15   if she does what she said is going to do this year, she

16   wouldn't be called out of class for any of those related

17   activities.

18             MR. JENSEN:  Nothing that's been relayed today as

19   what she wants to do would be addressed by the school at all.

20   It's all permissible underneath the policy.

21             MS. LITTRELL:  It wasn't last year.  And nothing has

22   changed is their position.  Everything was fine last year, they

23   followed policy, and yet all of these things happened.  And

24   yet -- the principal sent the first two sentences of the

25   e-mail, the day after, to the superintendent.

1          And bear in mind this idea that the superintendent

2    really didn't do anything wrong, or -- you know, he's the chief

3    executive officer, he's the head honcho of the entire school

4    district; and do not only does he admit that it's a practice,

5    he says it's a past practice, so we can infer that this

6    happened before.

7          And this e-mail says that four students received

8    consequences from protesting LGBT Day of Silence.  Second

9    sentence.  Amber Hatcher wore a shirt, a T-shirt, expressing

10   Day of Silence -- I can't remember the exact language, but it's

11   essentially an admission.

12         The other student received a consequence.  He also

13   got the exact same consequence that Amber Hatcher did.  He was

14   given a choice between in-school suspension and out-of-school

15   suspension.  Which, of course, sequesters him, on the one day

16   that he seeks to be around his peers, and to have his

17   expression, or lack of expression, communicated.

18         So they were successful in ensuring that these two

19   students were unable to do that, and they were punished in

20   exactly the same way.

21         There is a docket entry, Number 18, that defendants

22   filed with the Court, that says Amber was -- Amber Hatcher was

23   sent to the dean's office for failing to follow a teacher's

24   rules.  Now we have an affidavit from the teacher that says I

25   didn't send her out.  She was called out.

1    We have an e-mail that says if you see any student

2  who is being silent in class, refusing to answer a question

3  based on their protesting, so based on their communicating or

4  their expressive efforts, then send them to the office.  So

5  telling teachers to look out for that activity.

6    And two other students -- which, of course, they

7  ignore, the principal says, to the superintendent, two other

8  students were asked to comply by removing their placards.  And

9  that's all that happened.

10    The superintendent receives this e-mail, who is the

11  CEO or COO of the school district, and he doesn't respond.  He

12  doesn't correct that.  He doesn't say we have school district

13  policies that allow for free speech.  Why did you make them

14  take their placards off?  There is no question.  There is no

15  follow-up.  There is no reprimand.

16    We can infer that there is ratification of an

17  unwritten policy that says yeah, you did good.  You thwarted

18  that Day of Silence nonsense, and anyone who was -- any student

19  who was bold enough to try, anyway, to express themselves, and

20  take part in this, you took care of that too.  You sent two

21  students into the sequestration room, or sent them out of

22  school, which was, you know, exactly what happened to both of

23  these students.

24    You wrote them up for the exact same thing.  Which

25  didn't have anything to do with disrespect, the rule that they

1    were alleged to have violated.  And you made the other students

2    take their expression off.  Good work.

3          So I think it's just incredulous to -- it's just not

4    believable to think that the school principal said if you do

5    this -- and she said it on a number -- she told the

6    superintendent, in an e-mail, I have told her, twice, no, and

7    what the ramifications will be.  I will tell her again

8    tomorrow.

9          There's no response to that that says make sure you

10   tell her we have a free speech policy, make sure you tell her

11   that she can do these things.  And the e-mail sets out,

12   clearly, the same thing we are talking about now, that the

13   principal said no to.  This is disapproved.  You may not do

14   this.

15         I think the evidence is overwhelming.  There is a

16   mountain of evidence over here that says there's an unwritten

17   policy that was invoked successfully to ensure that Amber and

18   other students could not participate in an expressive activity.

19         They say they didn't do anything wrong.  The policies

20   are fine.  And unless this Court enters an order, that's going

21   to happen again.  There is no assurance that it won't happen

22   again.  Nothing has changed, other than the superintendent and

23   the principal who are acting pursuant to what the evidence

24   shows is a policy, and appears to be what the defendant's

25   position is now:  They didn't do anything wrong.

1          She was just -- she just started -- this person, this

2     young woman, who sent e-mails articulating all of the reasons

3     the -- where they mention about the posters, that was sort of

4     in a conclusion that said honestly, we're not asking much.  We

5     just want to ensure that students stop bullying.  Students want

6     to put up posters and do other things.  They just don't want to

7     get in trouble.  Some students are going to take part anyway.

8     We just want to make sure that they are not going to get in

9     trouble.

10          There is no threat that students -- there will be

11    marauding students putting up posters, and there is no evidence

12    that anyone tried to put up a poster and was kept from doing

13    so.  She said I understand, and here is what I want to do; and

14    they said no, it's against policy.  What's she to do?

15          THE COURT:  You started saying something, and either

16    you didn't finish or I lost track of what it was, in terms of

17    what she had requested for this year, and what the response

18    was.

19          MS. LITTRELL:  Well, she approached her principal and

20    said am I going to be able to take part in Day of Silence this

21    year?  And the principal said no.  You know the policies.  And

22    that was the end of the discussion.

23          THE COURT:  And it was after that that the litigation

24    started.

25          MS. LITTRELL:  And litigation started after that,

1   Your Honor.  Instead of going through the same futile exercise

2   and still getting into trouble, she seeks assistance from the

3   Court.

4           THE COURT:  Mr. Jensen -- or, I'm sorry, is it

5   Mr. Rosenbaum?

6           MR. ROSENBAUM:  Yes.

7           THE COURT:  I haven't heard from you.  You may not

8   have anything else to add, but let me give you the chance, if

9   you wish.  Or are you two just a tag team?

10          MR. ROSENBAUM:  We're just a tag team.

11          THE COURT:  I didn't know if there was separate

12  representation or not.

13          Mr. Jensen, anything further?

14          MR. JENSEN:  I just wanted to touch on a few things

15  that were said.

16          Plaintiff is now trying to bring claims on behalf of

17  parties that are not parties to this litigation.  There is no

18  evidence of exactly why anyone else was disciplined.  The

19  plaintiff is making a claim that these students were told to

20  remove the placards.  There is no evidence of that.

21          MS. LITTRELL:  It's an e-mail from the principal to

22  the superintendent.

23          MR. JENSEN:  There is no evidence that these students

24  were disciplined, exactly why they were disciplined.  If

25  Miss Hatcher was disciplined for the -- wearing a T-shirt, that

1    would have been Exhibit A to their motion.  But there is no

2    discipline whatsoever.  She was not disciplined for it, which

3    is why it's not before -- that evidence is not before the

4    Court.

5              There's no dispute that she can do what she wants to

6    do as far as what she's asking; and I don't think it would be

7    appropriate to enter an injunction, against my client, saying

8    you have to follow your policies, and you have to follow the

9    law.  That's a given.

10             We don't know the . . . it's not before the Court, in

11   record evidence, of everything Miss Hatcher asked for.

12   Obviously, the superintendent is not going to approve a request

13   that says I'm going to hang up posters whether you approve them

14   or not.  He's not going to give a blessing to that.  At the

15   minimum, she has to provide those posters for approval by the

16   school.  That, in itself, is a reason why that request was

17   denied.

18             MS. LITTRELL:  That's what she tried to do when she

19   met with the principal.

20             THE COURT:  Hang on a second.

21             MR. JENSEN:  There is no evidence that my client did

22   not follow the law back then, and there is no evidence they are

23   not going to follow the law now.  I did my best to try to get

24   discovery in this case beforehand, so we could have everything

25   fleshed out; and the plaintiff has resisted that because, if

1    everything was on the table, they wouldn't be able to maintain

2    a cause of action.

3           Miss Hatcher is the only one that's saying she was

4    sent to the dean's office for wearing a shirt.  The dean says I

5    didn't know why she was there.  I asked.  She said this.  And

6    then she started issuing profanity, and then she was

7    disciplined for that.

8           There's no evidence she was hindered, in any way,

9    from the expression of her constitutional free speech.  My

10   client didn't do that, and they are not intending on doing that

11   today.

12          THE COURT:  Would I be correct to assume that your

13   client would oppose any employees taking conduct that was

14   contrary to the official written policy?

15          MR. JENSEN:  I would imagine the school board would

16   have a problem with one of their employees not following the

17   school board's policies.

18          Now, if it would help, if I may make a suggestion, my

19   client probably doesn't oppose an order saying that what

20   defendant is requesting is constitutionally permissible, which

21   is something different from an injunction, if that guidance

22   would satisfy plaintiff.  But I don't think an actual force of

23   an injunction against the school board would be appropriate in

24   this case.  Especially not on a preliminary matter based upon

25   the record evidence as it exists today.

1          THE COURT:  That may be helpful.

2          MR. JENSEN:  I'm sorry, Your Honor?

3          THE COURT:  That may be helpful.  To the extent that

4     principles and those kinds of people need to understand what's

5     permitted and what's not.  Okay.

6          MS. LITTRELL:  The relief that this Court ordered in

7     the Yulee case said that . . . that the injunction was to

8     restrain policies that prevented a gay-straight alliance for

9     advocating on behalf of LGBT people; and, further, that they

10    don't retaliate against the students; and thirdly, to inform

11    the staff to provide a copy of this order to ensure that it

12    doesn't happen again.

13         We suggest that if you substituted instead of

14    advocate on behalf of LGBT people against anti LGBT policies,

15    so enjoin them from enforcing their policies, to allow students

16    the ability to advocate against LGBT bullying, and the other

17    goals . . . in Yulee it said of the GSA, here it would say of

18    the Day of Silence.

19         Simple as that, that makes clear what the students

20    can do on April 19th; to not retaliate against the plaintiff or

21    other students in this action, but plaintiff is the only party

22    before the Court; and to inform the staff of this Court's

23    order.

24         You know, if there was -- like I said to opposing

25    counsel before, when the initial motions to continue discovery,

1   so that -- which, of course, would interfere with my

2   plaintiff's -- our plaintiff's ability to organize again, and

3   to take part in Day of Silence again . . . .

4        You know, if there's not a policy that's in place, if

5   these were just bad actors, as they seem to be claiming, then

6   maybe we don't need to bother the Court, and we can stipulate

7   to it, as long as it's in an order from the Court that allows

8   us to ensure that, if these -- if what happened last year

9   happened against this year, that the Court can restrain that.

10       So an agreement that she files a breach of agreement

11  after the fact is not going to assist her to ensure that this

12  happens.  This is a one-time annual event.  She shouldn't have

13  to wait until next year to try again.  It happens that she's a

14  sophomore; but other students who want to participate may be

15  seniors, and will lose that ability.

16       The superintendent, by state law, is vested with the

17  authority to direct his personnel.  Last year, that

18  superintendent directed them in a way that allowed his

19  principal, and condoned and ratified the actions that happened

20  here.

21       State law also vests final decision making, final

22  policy making authority, in the superintendent, to ensure that

23  the rules of this school board are executed.  The

24  superintendent did that, last year, in a way that interfered

25  and codified that there's a policy against protesting that

1    affected the Day of Silence.

2              I think the evidence that there's this unwritten

3    policy or past practice is clear, and so an ensurance that they

4    have to follow the law is appropriate in the language the Court

5    finds will enjoin them from enforcing these policies.

6              And again, this is not a -- she's here because she

7    wants to take part in a Day of Silence.  She did everything

8    right last year:  Meeting with the principal, appealing,

9    researching the law.  They even got a letter about liability.

10   And they still interfered.  So we think it's clear that she

11   needs assistance of the Court now.

12             If they're willing to stipulate, sign a consent

13   order, I think we can agree certainly that, as long as she can

14   participate, and the Constitution is followed, everybody will

15   be happy.

16             THE COURT:  All right.  Thank you.

17             MS. LITTRELL:  Thank you, Your Honor.

18             THE COURT:  In terms of the possibility of a consent

19   order, if the two of you can work that out, fine.  Do it before

20   I get my order out.  Otherwise, it's going to be moot.  I'm not

21   going to wait for you, but I'd encourage you to work it out if

22   you can.  It has the advantage of the two of you agreeing, as

23   opposed to both of you being stuck with what I say.

24             MS. LITTRELL:  Thank you, Your Honor.  And April 19th

25   is when Day of Silence takes place; and Amber would like to be

1    able to, as she was not, start the organizing of it.  So time

2    is of the essence.  Without getting into trouble.

3              Fair enough?

4              THE COURT:  Time is of the essence for you.  I

5    understand your point.

6              MS. LITTRELL:  Fair enough.  Thank you.

7              MR. JENSEN:  Thank you, Judge.

8              THE COURT:  One other question.  I know there's a

9    motion, perhaps more than one motion, to dismiss pending.  I

10   don't know if it's ripe yet.  Can someone refresh your memory

11   as to if there's been responses filed, or when they're due?

12             MS. LITTRELL:  Your Honor, there's lots of motions

13   that the other side has filed instead of just agreeing that the

14   policies are fine.  One of those is a motion to dismiss on

15   behalf of the principal.  Our response is due Monday,

16   April 1st.  The other is on behalf of the school board, and our

17   response is due Thursday.

18             Is that right?

19             THE COURT:  Thursday next week?

20             MS. LITTRELL:  Yes, sir.  This coming week.

21             THE COURT:  Today is Thursday.

22             MS. LITTRELL:  One week from today.

23             THE COURT:  All right.  Thank you both.  I'll get an

24   order out as soon as I can.

25                   -- -- -- -- -- -- -- --

1    (Thereupon, at 9:50 o'clock a.m., the above-entitled

2    matter was concluded.)

3                    -- -- -- -- -- -- -- --

4                         CERTIFICATE

5    I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

6  ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

7  THE ABOVE-ENTITLED MATTER.

8

9    Dated this 4th day of October, 2013.

10

11                         _/s/ Jeffrey G. Thomas___
                           JEFFREY G. THOMAS, RPR
12

13

14

15

16

17

18

19

20

21

22

23

24

25