**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF FLORIDA
             FORT MYERS DIVISION


AMBER HATCHER, by and through
her next friend, GREGORY HATCHER,

     Plaintiff,

vs.

DESOTO COUNTY BOARD OF EDUCATION, et al,
     Defendants.
_____/


DEPOSITION OF:   ADRIAN H. CLINE
TAKEN BY:        PLAINTIFF HEREIN
DATE:            OCTOBER 8, 2013
TIME:            10:10 a.m. - 4:26 p.m.
PLACE:           VINCENT M. LUCENTE & ASSOCIATES, INC.
                 10 South Desoto Avenue
                 Arcadia, Florida  34266
REPORTED BY:     Denise Maglich-Stone
                 Court Reporter
                 Notary Public
                 State of Florida at Large
```

**Page 2**

```
 1 A P P E A R A N C E S
 2 Appearing on behalf of the Plaintiff:
 3    NANCY J. FAGGIANELLI, ESQUIRE
      Carlton Fields, P.A.
 4    4221 W. Boy Scout Boulevard, Suite 1000
      Tampa, Florida 33601
 5
 6 Appearing on behalf of the Deponent:
 7    JEFFREY D. JENSEN, ESQUIRE
      Unice Salzman Radel, P.A.
 8    2570 Coral Landings Boulevard, Suite 201
      Palm Harbor, Florida  34684
 9
10 Appearing on behalf of Desoto County:
11    CONNIE L. COLLINS, ESQUIRE
      Eugene L. Waldron, Jr. P.A.
12    124 North Brevard Avenue
      Arcadia, Florida 34266
13
14
15
16
17            I N D E X
18 Direct Examination by Ms. Faggianelli    ...5
19 Cross-Examination by Mr. Jensen          ...175
20
21
22
23
24
25
```

**Page 3**

```
 1           E X H I B I T S
 2 Exhibit No. 1 -              ...48
     70.02 General Powers
 3 Exhibit No. 2 -              ...49
     70.03 Duties and Responsibilities
 4 Exhibit No. 3 -              ...51
     210.03 Student Distribution of Literature
 5 Exhibit No. 4 -              ...64
     The Truth about the Day of Silence
 6 Exhibit No. 5 -              ...65
     FW: FYI - Student Club
 7 Exhibit No. 6 -              ...68
     FW: Students wearing placards today
 8 Exhibit No. 7 -              ...71
     FW: Students wearing placards today
 9 Exhibit No. 8 -              ...73
     FW: Students wearing placards today
10 Exhibit No. 9 -             ...75
     Letter 3/29/12 from A.H.
11 Exhibit No. 10 -            ...85
     Email,3/29/12, from J.O. to M.B.
12 Exhibit No. 11 -            ...87
     Letter 3/2/12 from A.H.
13 Exhibit No. 12 -            ...88
     Email 3/2/12, from A.C. to S.F.
14 Exhibit No. 13 -            ...92
     Email 4/2/12 from F.S. to A.C.
15 Exhibit No. 14 -            ...93
     Letter 4/10/12 From A.H. to A.C.
16 Exhibit No. 15 -            ...98
     Letter 4/12/12 from A.H. to A.C.
17 Exhibit No. 16 -            ...100
     Letter 4/12/12 from A.C. to S.F.
18 Exhibit No. 17 -            ...104
     Letter 2/12/12 from S.F. to A.C.
19 Exhibit No. 18 -            ...108
     Email chain 4/13/12
20 Exhibit No. 19 -            ...110
     Letter 4/13/12 from A.H. to A.C.
21 Exhibit No. 20 -            ...111
     Letter 4/19/12 from Lambda Legal
22 Exhibit No. 21 -            ...118
     Email 4/20/12 from S.F. to teachers
23 Exhibit No. 22 -            ...123
     Email 4/23/12 from S.F. to M.B.
24 Exhibit No. 23 -            ...126
     Affidavit of Timothy Wilder
25 Exhibit No. 24 -            ...129
```

**Page 4**

```
 1 Exhibit No. 25 -            ...131
     Discipline Incident 4/23/13
 2 Exhibit No. 26 -            ...133
     Letter 5/8/12 from Lambda Legal
 3 Exhibit No. 27 -            ...136
     Discipline Incident 4/23/12
 4 Exhibit No. 28 -            ...137
     Discipline Incident 4/23/12
 5 Exhibit No. 29 -            ...138
     Email 5/10/12 from S.F. to A.C.
 6 Exhibit No. 30 -            ...140
     Email 5/10/12 from M.B. to A.C.
 7 Exhibit No. 31 -            ...144
     Letter 2/2/13 from A.H. to A.C.
 8 Exhibit No. 32 -            ...155
     Affidavit of Adrian Cline
 9 Exhibit No. 33 -            ...158
     Affidavit of Shannon Fusco
10 Exhibit No. 34 -            ...161
     Defendant's Answer
11 Exhibit No. 35 -            ...162
     Verified Complaint
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1 WHEREUPON,
2               ADRIAN H. CLINE,
3 having been produced as the deponent and having been first
4 duly sworn, was questioned and testified as follows:
5               DIRECT EXAMINATION
6 BY MS. FAGGIANELLI:
7    Q    Mr. Cline, would you state your full name,
8 please.
9    A    Adrian H. Cline.
10   Q    And are you currently employed?
11   A    I'm retired.
12       Well, I'll -- to digress on that, I have
13 to be retired for one year in the Florida Retirement
14 System. Then when November comes, I can go back to
15 work.
16   Q    So you retired through the drop program?
17   A    No, I wasn't in drop. But it's any
18 retirement. They didn't want double dipper for a
19 year.
20   Q    When did you retire?
21   A    November 19, 2012.
22   Q    And are you represented by counsel today?
23   A    Yes, ma'am.
24   Q    And that would be Mr. Jensen?
25   A    Yes, ma'am; that's correct.

Page 6

1    Q    Are you on any medication that would in
2 any way hinder your ability to understand and answer
3 my questions?
4    A    No, ma'am.
5    Q    If you would, could you give me your
6 educational history starting with high school and
7 moving through college.
8    A    Certainly. Graduated Desoto County High
9 School in 1967. Then United States Air Force. I
10 consider that part of the education, from '68 to
11 '72. During that time I was at North Florida State
12 College while I was in the Air Force, where I
13 received my Associate Degree in 1972.
14       From 1972 until 1973 I was at the
15 University of South Florida in Tampa. I received a
16 Bachelor of Arts in -- excuse me, Bachelor of
17 Science in English Education.
18       And then 1980 until -- sorry, 1979 until
19 1980 I received a Master of Science from Nova
20 University, in Educational Leadership. And my --
21 I've got a number of post graduate hours -- it does
22 not yet add up to a doctorate -- at the University
23 of South Florida and several other universities.
24   Q    Does USF have a campus in this area?
25   A    They have one in Sarasota. That's the

Page 7

1 closest. They used to have a campus in Edison, Ft.
2 Myers, but that's converted to Florida Gulf Coast.
3    Q    And in terms of your work history, can you
4 fill me in in terms of the positions that you have
5 held throughout your work career.
6    A    Air force, '68 to '72. In 1974 I --
7 excuse me, 1973, I worked for one year in Sarasota
8 County as a teacher. Then I came to Desoto in 1974
9 as a teacher until 1978.
10       Then as an Assistant Principal at the high
11 school from 1978 to 1982. Then as Principal at the
12 Desoto County High School from '82 to '88.
13       And then Superintendent of Schools from
14 '88 to 2012.
15   Q    Let's start at the beginning and work
16 forward.
17       What were your job duties and rank in the
18 Air Force?
19   A    My discharge rank was Staff Sergeant. My
20 duties were associated with programming and running
21 a univac 1050-2 computer, which now is displayed in
22 the Smithsonian Institute.
23   Q    I'd say that's rather large.
24   A    Not that same one, but it's a large -- it
25 was not as powerful as a desk top.

Page 8

1    Q    And then you taught in Sarasota County for
2 one year?
3    A    One year in English. And then English in
4 Desoto County.
5    Q    And in Desoto County when you were
6 teaching, you were teaching at the high school?
7    A    Yes, ma'am.
8    Q    And the Superintendent position, is that
9 an elected position?
10   A    Yes, ma'am.
11   Q    And so -- I don't know what the term is --
12 how many times were you elected Superintendent?
13   A    Six.
14   Q    Six times. Did you have opposition all
15 six times?
16   A    Two times. I'm sorry, three.
17   Q    So if I understand correctly, you worked
18 directly at Desoto High School from 1978 to 1988;
19 correct?
20   A    1974.
21   Q    Oh, I'm sorry, that's when you were a
22 teacher. Correct. I'm sorry.
23   A    Yes.
24   Q    So 1974 to 1988 you were at the high
25 school?

Page 9

1    A   Yes, ma'am.
2    Q   Can you just give me some information
3 about the high school itself, how many students it
4 has, what grades?
5    A   It's not a senior high, it's a high. So
6 we're grades 9 through 12. And there has always
7 been about 1,000 to 1,100 students that I can recall
8 at the high school.
9    Q   And in terms of what percentage of
10 students move on to college, approximately what is
11 that?
12    A   Let me give you a little history on that.
13 When we -- I moved in as Assistant Principal at the
14 high school we were about 18 percent. That was in
15 1974 going on to college.
16         Our latest figures show when you factor in
17 college and vocational schools, we're at about 55,
18 60 percent. That would be right out of high school.
19    Q   What if you take out the vocational and
20 just do straight college?
21    A   Straight college, that would include your
22 community colleges, we're at about 45, 46 percent.
23 That's based on my memory at this point.
24    Q   Okay. Let's talk for a few minutes about
25 your training, and specifically whatever training or

Page 10

1 education you have received with regard to student's
2 first amendment rights of expression in the school
3 setting.
4    A   Of course, you had a component on
5 educational law in your master's program, which I
6 certainly participated. I had a better component in
7 the doctoral program at USF in which we focused on
8 constitutional law.
9    Q   What professor did you have for that?
10    A   I don't recall.
11    Q   Do you remember the name of the class?
12    A   No, ma'am, I can't give you the exact
13 name.
14    Q   So at your master's and your doctoral
15 level you had classes regarding educational law or
16 constitutional law impacting or including student's
17 first amendment expression rights?
18    A   Yes, ma'am.
19    Q   What is your understanding of the
20 student's rights to express themselves?
21         MR. JENSEN: Object to form. You can go
22 ahead and answer.
23    A   Okay. Students -- it's a balance. And as
24 I recall the law, in which you have to balance the
25 disruption factor with student's right to express.

Page 11

1         I know you can't just simply assume there
2 is going to be a disruption. You have to have
3 specific factors as far as the disruption is
4 concerned. But students do have the right the
5 express opinions.
6         And we have been consistent in allowing
7 that either before school, after school, during
8 nonclassroom times. And it's worked well for us.
9    Q   You stated that you couldn't assume there
10 would be a disruption, and that there are certain
11 factors.
12         What are those factors?
13         MR. JENSEN: Object to form.
14    A   What I was trying to say was you cannot
15 just conclude that an activity in and of itself just
16 on the surface is going to be disruptive. There has
17 to be some clear evidence there is going to be a
18 disruption.
19         My thinking has always been that students
20 do have the right of expression, but the school has
21 the right to determine and control the areas for
22 that expression, as far as the school campus.
23         That's why we have done before school,
24 after school, noninstructional times. We have not
25 allowed that expression in the form of a protest or

Page 12

1 anything like that to take place in the classroom.
2         In the hallway, parking lot, we don't have
3 a problem -- we have not had a problem with that.
4         So I guess what I'm saying is you can have
5 a topic, which may on the surface be potentially
6 controversial, but unless I have something
7 definitive, I would not disapprove that as long as
8 the student stayed within those timeframes in so far
9 as the expression.
10    Q   Since you have been working for the Desoto
11 County School District, have you received any
12 training with regard to student's first amendment
13 rights at school?
14    A   The doctoral work was while I was in the
15 school district.
16    Q   I'm sorry, my question wasn't clear.
17         Have you received any training from the
18 school district itself, as opposed to the
19 educational training you have already told me about?
20    A   We had -- this was some time ago -- a
21 professor from USF to provide some administrative
22 training on school law. That's as much training as
23 you can get in one day.
24    Q   Who was that professor?
25    A   This goes back. I don't recall the name.

Page 13

1    Q    How long ago was this?
2    A    I'm relying on my memory once again, was
3  in excess of ten years.
4    Q    This was over ten years ago?
5    A    Yes, ma'am.
6    Q    And who --
7    A    Now, the other thing that we do provide is
8  on a yearly basis where we have the greatest changes
9  is an update on educational law as it relates to ESE
10 students. And that's on an annual basis. We do
11 that in Lake Placid, and that's a consortium
12 activity in which attorneys are brought in.
13   Q    So let's go back for a minute to the one
14 that was ten years ago.
15        I don't need to know the names of the
16 individuals, that's not what I'm asking for right
17 now, but just in terms of categories of people,
18 would it be principals, administrations, teachers,
19 who went to this school district training program
20 with the USF professors?
21   A    It was administrative staff.
22   Q    What titles would be included in that?
23   A    It would be Directors, Principals,
24 Assistant Principals, and Deans.
25   Q    Do you happen to know if Ms. Fusco

Page 14

1  attended that school district training over ten
2  years ago?
3    A    She was not in one of those categories ten
4  years ago.
5    Q    All right. Now -- and I take it that you
6  were and you attended it; correct?
7    A    Oh, yes.
8    Q    Okay. Do you have any recollection of
9  what this USF professor said with regard to
10 student's first amendment expression rights in
11 school?
12   A    His emphasis was on Florida school law,
13 since our legislature tends to tinker with that on a
14 yearly basis. And he gave us at that point an
15 update as far as school law changes.
16        Unfortunately, he retired and no longer
17 was available. And our source kind of dried up and
18 that's when we converted to the ESE angle update.
19   Q    So if I understand you correctly, the USF
20 professor was there to basically give training and
21 education with regard to Florida school law as
22 opposed to constitutional law as to first amendment
23 expression?
24   A    That was his prime objective, but there
25 were questions during the course that would relate

Page 15

1  to constitutional law.
2    Q    Okay. And am I correct, this was a USF
3  education professor?
4    A    Yes, ma'am.
5    Q    And then after that training over ten
6  years ago, you mentioned there have been these
7  yearly updates on educational law?
8    A    As related to ESE students.
9    Q    Okay. And that's only as related to ESE
10 students?
11   A    That's correct. But we have found that
12 many laws that even though it's presented as ESE,
13 and there are some very specific to ESE, that we
14 also included some that would pertain to all
15 students, not just ESE.
16   Q    Is there anything in those yearly basis
17 updates that applies particularly to student's first
18 amendment rights of expression in school?
19   A    I do not recall that, no, ma'am.
20   Q    Is there any other, other than what you
21 told me in terms of the education component for your
22 master's and your doctoral degrees and these two
23 training situations we have talked about through the
24 school district, is there any other training that
25 you have received with regard to this issue of first

Page 16

1  amendment expression?
2    A    There was -- as I was thinking after your
3  question -- there was one session that I had
4  attended that I recall specifically in Sarasota.
5        It was one of the commercially produced
6  sessions. And there was one also in Tampa. It
7  was -- I wouldn't say commercially. I think it was
8  either through the Superintendent's Association or
9  the School Board Association.
10   Q    And about when did you go to these
11 sessions?
12   A    Oh my, it was ten-plus years.
13        The other thing that we received on a
14 yearly basis as a Superintendent is the annual
15 update, but it only relates to Florida law. That is
16 not ESE. That's the specific laws that have been
17 passed that would impact education.
18   Q    Okay. To the extent that you are talking
19 about Florida laws, are there any Florida laws that,
20 in your mind, impact this issue with regard to first
21 amendment expression in school?
22        MR. JENSEN: Object to form.
23   A    Not that I recall. And not that that was
24 covered as far as Florida law. My recollection was
25 strictly in the constitutional law area.

Page 17

1  BY MS. FAGGIANELLI:
2      Q   Okay.
3      A   USF and the doctoral -- and I do not have
4  my doctorate, please understand -- we spend a great
5  deal of time on constitutional law.
6      Q   Do you remember any professors who taught
7  that area?
8      A   I'd have to go -- no, I don't. I don't
9  know if I can find my notes.
10     Q   Do you know -- can you give me an estimate
11 of the how long ago you took the classes that you
12 are referring to?
13     A   The classes at USF started in '81. So it
14 was in the early to mid '80's.
15     Q   Let's shift gears for a minute and talk
16 generally about your tenure as Superintendent.
17     A   Uh-huh.
18     Q   As a Superintendent, what were your job
19 duties and responsibilities?
20     A   I don't know if I can answer that in ten
21 words or less. You have a responsibility as far as
22 your CEO working with the School Board to operate
23 the district.
24     Q   Okay. So is it fair to say generally that
25 if the school district were the equivalent of a

Page 18

1  corporation, that the Superintendent acts as the
2  CEO?
3      A   That's correct.
4          MR. JENSEN: Object to the form.
5          Mr. Cline, if you would just wait a second
6  before you answer --
7          THE WITNESS: I'm sorry.
8          MR. JENSEN: So I can slip in the
9  objection.
10         THE WITNESS: Okay.
11 BY MS. FAGGIANELLI:
12     Q   You can answer. He's just objecting to
13 the form of my question.
14     A   And your question was?
15     Q   Is it fair to say that if the school
16 district were considered to be a corporation, that
17 the equivalent in terms of job duties and
18 responsibilities for a supervisor would be that you
19 would be similar to a CEO?
20         MR. JENSEN: Object to form.
21     A   I question the word supervisor, because --
22 BY MS. FAGGIANELLI:
23     Q   I'm sorry, I used the wrong term. I
24 should have said Superintendent. We'll try it one
25 more time.

Page 19

1      A   Okay.
2      Q   If one would consider the school district
3  itself to be like a corporate entity, the
4  Superintendent would be the equivalent, general
5  equivalent of a CEO in terms of his job duties and
6  responsibilities; is that fair?
7          MR. JENSEN: Object to form.
8          THE WITNESS: But I can answer?
9          MR. JENSEN: Yes.
10     A   That's not anything I've concluded. That
11 is a generally accepted concept.
12 BY MS. FAGGIANELLI:
13     Q   I understand. So as the Superintendent,
14 what was your relationship to the School Board?
15     A   You have two types of Superintendent.
16 You have one that is appointed by the
17 School Board, and therefore works for the School
18 Board. You have the other that's elected and has to
19 work with the School Board.
20         So the best relationship is the
21 Superintendent understanding the authority that's
22 outlined in statute. And believe me, I have to
23 frequently, when I was Superintendent, refer to that
24 to make sure I had the authority and balance that
25 with the board's role and their responsibilities. I

Page 20

1  always respected the board's role as a CEO working
2  for a Board of Directors.
3      Q   When you were Superintendent, how often
4  did the board meet?
5      A   Regular meetings were twice a month.
6      Q   Were those both public meetings?
7      A   Yes, ma'am.
8      Q   And did you attend the public meetings?
9      A   Never missed one.
10     Q   What types of reports would you provide to
11 the board?
12     A   Financial reports, check registers,
13 personal summaries. By that I mean recommendations
14 for positions, recommendations for terminations,
15 recommendations for disciplinary action, any grants
16 that required School Board approval. And generally
17 they're very specific, agreements, contracts that
18 required the School Board Chair signature.
19         The School Board also received expulsion
20 recommendations, but those were held in executive
21 session.
22     Q   Now, the executive session for the board,
23 that's public but you are not present? Or is that
24 not --
25     A   I'm always present when the board meets.

Page 21

1  Q  Okay.
2  A  The executive session is not open to
3  public.
4  Q  So you told me they meet twice a month in
5  public?
6  A  Right.
7  Q  And then when do they have these executive
8  sessions?
9  A  As needed. But it can only be for
10 expulsion or if the board is considering contract
11 issues. By contracts, I'm talking about teacher
12 contract.
13 Q  So there is a very limited scope with
14 regard to these executive statutes?
15 A  That's outlined in the statute; yes,
16 ma'am.
17 Q  Other than the types of reports that we
18 talked about, would you give the board general
19 status reports or updates or inform them of events
20 that were happening in the schools?
21 A  I would provide them with updates on what
22 was occurring in the schools, particularly relating
23 to academic achievement. I would provide them with
24 updates in so far as what was occurring in the
25 schools outside of the academic realm.

Page 22

1      I would not give specific reports
2  involving specific individuals unless it was praise
3  for an employee. And I always tried to reserve time
4  to recognize employee's contributions in my reports.
5      It was also during that same timeframe an
6  opportunity for the board to ask me questions
7  relating to the agenda or apart from the agenda.
8  Q  So would your reports be written or oral
9  or both?
10 A  Oral.
11 Q  Oral.
12 A  But -- yes, oral. It was included in the
13 minutes.
14 Q  All right. During your tenure as
15 Superintendent, were there times that issues arose
16 that you went to the board and asked them to tell
17 you the correct interpretation of any school policy?
18 A  I wouldn't use the word correct. I would
19 ask them for clarification on what they would like
20 as far as the school policy.
21      Of course, our attorney was always present
22 so we didn't move into an area that would be
23 inconsistent with the law.
24 Q  Can you remember any specific instances in
25 which you did that?

Page 23

1  A  We talked about immediate things that the
2  legislature frequently tinkers with is the spending
3  authority. By that I mean the amount up to a
4  certain amount that the Superintendent can spend
5  without getting specific board approval. That tends
6  to fluctuate with legislative session.
7      And I wanted to ask them it's -- for
8  example, when I was in office it was 20,000. Then
9  it, I think, moved to a high of 25. And before I
10 left office it had moved to 50.
11      But I did not feel comfortable spending
12 $50,000.00 without board approval, even though the
13 law said you could if the board approved it. So we
14 discussed that. That was probably one of the final
15 ones.
16 Q  Any others that you can remember?
17 A  We talked -- this was an issue that we
18 probably discussed quite a bit that was the class
19 size reduction. It's the law in Florida in which we
20 cannot exceed a certain number of student/teacher
21 ratio in the classroom. And that's specified by
22 grade level.
23      I would explain to them and give them the
24 opportunity for input as to why we were adding
25 staff, or why we were not adding staff.

Page 24

1      The issue that came up each year involved
2  transporting students. I would talk to the board in
3  regards to policy clarification, because we had
4  students that lived outside the transport distance,
5  you know, two miles, a mile and-a-half. But they
6  lived -- when I say outside, I mean under that. We
7  had spaces on the bus. And I asked them for
8  elementary students in grades K through 3, if they
9  would object if I allowed those students to ride
10 since we had the space anyway, because I felt they
11 were too young to walk a mile and-a-half.
12 Q  Any other that you recall?
13 A  There would be times when I would be
14 making a recommendation on an administrator, and I
15 would discuss their qualifications with the board
16 and allow them the opportunity to ask me any
17 questions before final action on the recommendation.
18 Q  Okay. You mentioned the board counsel?
19 A  Yes, ma'am.
20 Q  Okay. And in the time that you were
21 Superintendent who was the board counsel?
22 A  There were two.
23 Q  Okay.
24 A  First one was Fletcher Brown, and he was
25 followed by Eugene Waldron.

6 (Pages 21 to 24)

Page 25

1  Q    Did either of those gentlemen ever give
2  you any guidance with regard to student's first
3  amendment expression rights in school?
4            MR. JENSEN: At this point I'm going to
5  lodge an attorney/client objection.
6            If there is a specific issue, I think we
7  should talk about it first so I can decide
8  whether or not it's appropriate to lodge a
9  privilege. Do we need to discuss that? Let me
10  talk to you outside.
11            MS. FAGGIANELLI: Let me just clarify my
12  question. I don't want attorney/client
13  privilege information. What I'm asking is --
14  and I'll just ask the question in another way.
15  BY MS. FAGGIANELLI:
16  Q    We talked previously about the ways in
17  which you received education or training with regard
18  to student's first amendment rights in school.
19  A    Uh-huh.
20  Q    Was there ever a time when either
21  Mr. Brown or Mr. Waldron gave you what you would
22  consider to be training or information on that topic
23  not related to any specific issue at school?
24  A    With Mr. Brown -- this was not a formal
25  training session, please understand that. We

Page 26

1  would -- is that all right for me to answer;
2  correct?
3            MR. JENSEN: Yes.
4  A    We would frequently discuss, mostly on the
5  telephone, broad categories as far as constitutional
6  issues.
7  BY MS. FAGGIANELLI:
8  Q    Can you remember anything that you two
9  talked about or he told you specifically with regard
10  to student's first amendment rights in school?
11  A    We -- there was --
12            MR. JENSEN: Let me interrupt you.
13  A    I'm sorry.
14            MR. JENSEN: If you are going to talk
15  about anything in a specific context involving
16  a case or a particular student, we need to
17  discuss that prior to your answer.
18            If you are just talking about general
19  training or just conversations where you are
20  not seeking that attorney's legal advice, you
21  can answer that.
22  A    When I would -- I always subscribed to a
23  yearly publication on Florida law and federal law.
24  And these would come in on a monthly basis dealing
25  with changes. And then they would outline occasions

Page 27

1  in a very abbreviated form that could impact a
2  school.
3            Sometimes when I saw a particular case I
4  would ask him, Mr. Brown, for clarification. But I
5  maintained that subscription up until the time I
6  left the Superintendent.
7  BY MS. FAGGIANELLI:
8  Q    Is it fair to say, though, that sitting
9  here today you can't remember a specific
10  conversation that you had with Mr. Brown with regard
11  to -- in a context of this discussion, formal
12  training kind of thing, where you discussed
13  student's first amendment rights at school?
14            MR. JENSEN: You can answer that.
15  A    Okay. The situation which those occurred
16  were generally with expulsions.
17            MS. FAGGIANELLI: Okay. All right. Jeff,
18  it may make sense, because I do just want -- I
19  will ask him generally. I'm not going to ask
20  him about the substance of the conversation or
21  the names of the parties involved, but I'm
22  going to ask him questions with regard to when
23  he sought advice, and just get the dates and
24  maybe initials or something like that. I don't
25  know if you want the talk to him ahead of time?

Page 28

1            MR. JENSEN: Well, here's the problem.
2  The court has limited the scope of this
3  deposition to issues involving the School Board
4  and issues involving his entitlement to
5  qualified immunity.
6            I think we are starting to stray away from
7  that area, so I'm going to object not only to
8  the potential for attorney/client
9  communications, but also it's beyond the scope
10  of what the court previously ordered for this
11  deposition.
12            MS. FAGGIANELLI: Well, my understanding
13  of what the court's done is said we can ask
14  anything with regard to the underlying
15  litigation.
16            What we discussed was that yes, there are
17  things we will not ask him today, but to the
18  extent I want to find out whether he had other
19  issues involving students who were trying to
20  exercise their first amendment rights at
21  school, and then he brought that -- he sought
22  advice with regard to that, I'm not going to
23  ask him what his advice is, but I do want to
24  know what prior episodes there were.
25            If there weren't any, then it will be very

Page 29

1 quick questions.
2          MR. JENSEN: Okay. Just for the record --
3          MS. FAGGIANELLI: Okay.
4          MR. JENSEN: -- the court has -- and I'm
5 quoting from the order -- "Therefore the court
6 will allow the deposition of Adrian Cline and
7 Shannon Fusco to go forward limited to
8 inquiring into the claims against district" --
9 I'm sorry -- "against Desoto County Board of
10 Education and the issue of qualified immunity
11 and limiting the deposition so not to inquire
12 into Adrian Cline's and Principal Fusco's
13 personal beliefs."
14          Let me have -- let's take a break so I can
15 discuss these issues with Mr. Cline --
16          MS. FAGGIANELLI: All right.
17          MR. JENSEN: -- and when we'll reconvene
18 and I'll let you know my position on it.
19          MS. FAGGIANELLI: Okay.
20          (A short break was taken.)
21 BY MS. FAGGIANELLI:
22    Q   Let's start this way.
23          In the time that you were Superintendent,
24 other than the Day of Silence activities that we're
25 going to talk about in a little while, were there

Page 30

1 any other instances where a student asked for some
2 type of self-expression at school where that request
3 was denied?
4    A   No, ma'am, not to my knowledge.
5    Q   And conversely, were there times or
6 situations in which students sought to engage in
7 some kind of first amendment speech at school that
8 was permitted?
9    A   Yes, ma'am.
10   Q   Okay. What types of expressions were
11 permitted?
12   A   Now, keep in mind, the ones that came to
13 my office. We had a request to express opinions as
14 far as premarital sex, as far as the use of drugs
15 and alcohol.
16          These were approved as long as they were
17 before school, after school, or during
18 noninstructional times, unless the instruction
19 provided the student with an opportunity to express
20 an opinion.
21   Q   So I take it in terms of premarital sex,
22 this was some type of discussion or statement with
23 regard to why students should not engage in
24 premarital sex?
25   A   There were two sides to --

Page 31

1    Q   Okay. Just tell me what it involved.
2    A   The request came as a result of students
3 who were opposed to premarital sex. But during
4 those times, when this discussion was allowed, there
5 were individuals that also voiced opposite opinions.
6 So it wasn't one-sided.
7    Q   And do you recall approximately when this
8 was?
9    A   Well, my -- I can't recall the exact year,
10 but it was mid 90's, as I remember.
11   Q   And how did this come to your office? Was
12 it something that was denied at the school level?
13 Or was it something that the principal asked for
14 your decision on? How did it get to you?
15          MR. JENSEN: Object to form.
16   A   Generally, as I recall, this was either a
17 telephone call advising me of the intended activity
18 or an Email.
19 BY MS. FAGGIANELLI:
20   Q   Do you recall who the phone call or Email
21 came from?
22   A   I can't at this point, no, ma'am. It
23 would be the principal, but --
24   Q   And then I take it because this was
25 approved, you then made the decision to allow this

Page 32

1 speech with regard to premarital sex?
2          MR. JENSEN: Object to form.
3    A   Yes, ma'am.
4 BY MS. FAGGIANELLI:
5    Q   Okay. And how did you do that? What did
6 you consider? What facts did you have available to
7 make that decision?
8    A   The information provided by the principal
9 as far as the type of activity, as far as when these
10 would occur; before school, after school, during
11 lunch, in the hallways, just this type thing.
12          There was no provision made for this to go
13 into the classroom unless it was associated with the
14 instruction in the classroom.
15   Q   Were there any materials handed out as
16 part of this event?
17   A   As I recall there was, yes, ma'am.
18   Q   Did you see the materials ahead of time?
19   A   Yes, ma'am.
20   Q   And what were they?
21   A   As I recall they were generally just
22 materials with data elements. Even to the extent of
23 the number of teenage pregnancies in Desoto County.
24   Q   Do you keep statistics, such as the
25 percentage of girls or young woman who are in high

Page 33

1  school in Desoto County who become pregnant?
2     A   I don't.
3     Q   Well, do you have --
4     A   -- the health department does.
5     Q   Do you have access to those? Did you have
6  access to those as the Superintendent?
7     A   Yes, ma'am.
8     Q   And what is that percentage?
9     A   The last time I saw the -- it was by
10  ranking, as I recall and Hardy was near the top.
11  And we were, I think, number five in the state.
12  That is a guess at this point.
13     Q   Okay. But that's your best recollection?
14     A   That is a public record, so it's easily
15  accessible on the website.
16     Q   Okay. And then in terms of the materials,
17  just what is the general rule that is applied in
18  Desoto County with regard to what materials will be
19  approved or the standard by which they will either
20  be approved or disapproved? And I'm speaking about
21  the time of your tenure when you were
22  Superintendent.
23     A   My examination generally looked at are we
24  dealing with facts? Data was also a strong element
25  as far as a particular handout.

Page 34

1        If it contained inaccuracies that could be
2  easily detected, then that would be a basis for -- I
3  wouldn't say disapproval, but sending it back for
4  additional clarification.
5        I cannot recall at any point that I
6  totally disapproved something that I received.
7     Q   Now, the second instance you told me about
8  was the use of drugs and alcohol.
9        And do you have recollection of
10  approximately as to when that occurred?
11     A   That is -- that's been relatively recent.
12  That was probably mid-2000's, a little later.
13     Q   And who requested that?
14     A   It was a group of students. They were
15  health students, members of an organization called
16  HOSA, Health Occupation Students of America.
17     Q   And is it fair to say that this discussion
18  about drugs and alcohol was intended to provide
19  information to students with regard to the dangers
20  or risk of drugs and alcohol?
21     A   Yes, ma'am.
22     Q   Okay. And did they pass out materials?
23     A   Yes, ma'am.
24     Q   Okay. And again, it was in the same
25  setting that you have talked about; before and after

Page 35

1  school, in the hallways, not in instructional time?
2     A   There was one other clarification I made
3  is when the instruction was conducive to that. In
4  this case there was with the health class.
5     Q   Okay. So as I understand it sitting here
6  today, the two instances that you can recall of this
7  first amendment issue coming to your level were the
8  one regarding premarital sex, and the use of drugs
9  and alcohol; correct? Other than the Day of Silence
10  we're going to talk about later?
11     A   There was one other. It's the Meet Me At
12  The Flag Pole.
13     Q   And what was that?
14     A   That's a time for students to pray.
15     Q   Who requested that?
16     A   It was a group of students. It was a
17  group of student athletes.
18     Q   Do you remember approximately when this
19  was?
20     A   That's been an ongoing activity. And as I
21  recall it was done the last year when I was
22  Superintendent and it had been going for several
23  years.
24     Q   And can you explain to me what this is,
25  Meet Me At The Flag Pole?

Page 36

1     A   The concept -- and it's a national
2  program -- was for students to meet at the flag pole
3  prior to school starting for the purpose of engaging
4  in prayer.
5     Q   So it's just at that one time of the day
6  prior to school starting?
7     A   That is correct.
8     Q   With regard to any of these activities
9  that we have talked about, the three that we just
10  talked about, were there any types of articles of
11  clothing that were worn, or was there anything on
12  T-shirts or anything like that?
13     A   Not that I recall.
14     Q   Okay. And is there a name of the group or
15  a club that are these student athletes that ask for
16  Meet Me At The Flag Pole?
17     A   Fellowship of Christian Athletes.
18     Q   And then the students who requested the
19  premarital sex discussion, is there a formal group
20  or club they belong to?
21     A   Not to my knowledge.
22     Q   Now, I believe you said that at your level
23  what you were aware of or what came to your desk,
24  you have had these three separate instances with
25  regard to first amendment expression, all of which

Page 37

1 were approved; correct?
2   A   Yes, ma'am.
3   Q   Okay.
4   A   That I recall.
5   Q   That you recall.
6       Now, and that you do not recall any other
7 than the Day of Silence we're going to talk about
8 later, which were disapproved; is that correct?
9   A   Not that came to my desk, no, ma'am.
10   Q   We have thus far talked in this context
11 about the time that you were Superintendent.
12   A   Yes, ma'am.
13   Q   So let's go back to the time when you were
14 Principal or Assistant Principal, you know, at a
15 lower level in terms of having responsibility but
16 still having a lot of responsibility.
17       Do you recall times when any request was
18 made kind of along the lines we talked about for
19 students to make some kind of first amendment
20 statement at school?
21       MR. JENSEN:   Counselor, at this point
22 we're going beyond the scope of the court's
23 order.
24       What happened in the 70's has absolutely
25 no relevance to either the School District's

Page 38

1 liability in this case or Mr. Cline's
2 entitlement to qualified immunity.
3       MS. FAGGIANELLI:   I think you're clearly
4 wrong. Because he has an Email in which he
5 talks about past practice and his past practice
6 knowledge of what's happened in this school
7 district and in this high school is not limited
8 to what he learned as a Superintendent.
9       This is a man who taught at the high
10 school, who was Assistant Principal and
11 Principal of the high school. We don't just
12 have this little snapshot of him. Okay?
13       I can either ask him this now, or I can
14 pull out the Email and ask him every single
15 instance of what past practice is. All right?
16       So I want him to answer my question and
17 I'm going to ask him more questions about his
18 knowledge at the high school.
19       MR. JENSEN:   Well --
20       MS. FAGGIANELLI:   All right?
21       MR. JENSEN:   Go ahead.
22       MS. FAGGIANELLI:   All right.
23 BY MS. FAGGIANELLI:
24   Q   So the time that you were Assistant
25 Principal or Principal at the Desoto County High

Page 39

1 School, any student request to do something that
2 would be described as an exercise of their first
3 amendment speech at school?
4   A   Not that I recall.
5   Q   Anything at any time while you were at the
6 Desoto County High School where a request could be
7 considered a protest?
8       Other than Day of Silence, do you remember
9 any instance where any student asked to express
10 themselves in a context that you might conclude or
11 the county might conclude is a protest?
12   A   Not to my knowledge.
13   Q   How long has there been a procedure or a
14 policy with regard to how materials must be approved
15 if the student wants to bring materials and
16 distribute them at school?
17   A   As I recall as Principal and Assistant
18 Principal, I would receive requests to distribute
19 materials at school. Many of these were approved.
20   Q   Well, there is, in fact, a written policy,
21 isn't there, with regard to getting materials
22 approved?
23   A   Yes, ma'am. Right.
24   Q   Do you know how long that policy has been
25 in place?

Page 40

1   A   As I said, going back to Assistant
2 Principal and Principal, I recall that process we
3 had to follow.
4   Q   Okay. And you remember approving some and
5 disproving others; is that fair to say?
6   A   Yes, ma'am.
7   Q   We talked previously about the types of
8 issues you would look at to determine whether to
9 approve or disapprove. I think you talked about
10 facts and if there were inaccuracies you might send
11 it back.
12   A   Uh-huh.
13   Q   What types of things in your mind would be
14 a basis for disapproval?
15   A   This is on written materials?
16   Q   Yes.
17   A   As Assistant Principal and Principal, I
18 would clearly disapprove for distribution items that
19 were commercial in nature. Meaning they're not
20 associated with the school but they were money
21 raising materials.
22   Q   So if the cheerleaders want to do a car
23 wash to raise money for cheerleading, that was okay
24 or they could distribute that; correct?
25   A   Because the car wash had been approved.

Page 41

1    Q    Right.  Okay.  But if one cheerleader's
2  dad owned a car wash and they just wanted to
3  distribute commercial stuff, that would be
4  disapproved?
5    A    Yes, ma'am.
6    Q    Did you ever have an instance in which
7  someone presented to you materials that fit into the
8  category of being vulgar or inappropriate for
9  school?
10    A    Yes.
11    Q    Okay.  And without going into explicit
12  detail, what types of materials were those?
13    A    It was a brochure for the graduates of the
14  senior class, inviting them to a private party after
15  graduation with the indication of bring your own
16  bible, BYOB.  It wasn't a Bible.
17    Q    Bible or bottle or --
18    A    Bottle was what they -- but they put bring
19  your own Bible.  That was one that was clearly
20  disapproved.
21    Q    Anything else you can recall?
22    A    Other than the commercial.
23    Q    Okay.
24    A    That one just stands out in my memory.
25    Q    In your history with Desoto County High

Page 42

1  School, has there been any problem with bullying at
2  that school?
3    A    There's a problem with bullying at every
4  school.  So yes, ma'am.
5    Q    Have there been instances or complaints
6  that LGBT students, lesbian, gay, bisexual,
7  transgender students have been bullied?
8    A    That I have received directly?
9    Q    Or that you are aware of, either from
10  reading news reports or talking to people?
11    A    Reading the website for the Day of
12  Silence.
13    Q    And the School District has policies with
14  regard to bullying; correct?
15    A    Yes, ma'am, rather detailed.
16    Q    And they're rather detailed and they --
17  what types of punishments are available for
18  bullying?
19    A    Everything from in-school suspension to
20  out of school suspension, depending on if it's
21  repetition it could go to expulsion.  Documentation
22  is the key.
23    Q    Now, you mentioned when I asked you about
24  your knowledge of any bullying of LGBT students at
25  the high school that you read about it on the

Page 43

1  website for Day of Silence?
2    A    Uh-huh.
3    Q    There is no other source of knowledge with
4  regard to that?
5    A    There are other sources, yes, ma'am.  That
6  was the latest one that I read.
7    Q    Okay.
8    A    We established in my office a bullying hot
9  line.  It's a -- it's a local number and students or
10  parents could call in anonymously and leave a
11  message.
12    Q    And who then heard those messages?
13    A    My office staff.
14    Q    Your office staff.  And do they keep track
15  of what messages were received?
16    A    The messages came in in a wave file and
17  they were sent to the specific principal.
18        The problem is that I received more out of
19  county and out of state bully calls than local
20  calls.  So I was sending them to superintendents in
21  Ohio and California, because it got on the web.
22    Q    I see.  So in terms of Desoto County High
23  School, whatever would be received on this bullying
24  hot line --
25    A    Right.

Page 44

1    Q    -- bullying hot line would then be sent to
2  the Principal --
3    A    Uh-huh.
4    Q    -- to deal with?  Do you have any records
5  with regard to what types of bullying was taking
6  place at the high school?
7    A    As I recall, listening to -- because I
8  would generally listen to them.  My office staff
9  would listen to them immediately -- it was more of
10  an elementary/middle school, as I recall.  There
11  were some high school -- in which they were being
12  taunted.
13        They didn't necessarily go into the
14  reason.  Whether it was at a bus stop or at school
15  or out of school.  Sometimes they would give names
16  sometimes they would not, which made it extremely
17  difficult, when you don't have the name of the
18  person bullying or the individual being bullied.
19  But we would still send the wave file to the school.
20    Q    And you are using a term that I'm not
21  familiar with.  A wave file?
22    A    It's on the computer.  It's just a
23  sound -- it's the actual message.
24    Q    Okay.  I get those and I don't even know I
25  get them.

Page 45

1   A   Most answering systems on computers use
2   wave files. We would then expect feedback from the
3   schools as to the disposition. Sometimes, as I
4   said, that was impossible because no names.
5   Q   Okay. When we were talking earlier this
6   morning we were talking about the balance, as you
7   described it. And you said there has to be clear
8   evidence that there will be a disruption. Do you
9   remember saying that?
10  A   Yes, ma'am.
11  Q   Okay. What types of clear evidence would
12  you look at?
13  A   The most frequent was altercations between
14  groups of students off campus. I would get -- every
15  Superintendent's office receives police reports
16  about incidents that occur off campus after school
17  that involves our students.
18      And if you had two factions that came
19  together and actually involved the police or
20  sheriff, that would always be a strong indicator
21  that we have a potential problem with this. But we
22  would also receive a copy of the report.
23  Q   And when you were saying, We, do you mean
24  as Superintendent or do you remember as Principal?
25  A   Superintendent is compelled by law, number

Page 46

1   one, to receive them within, if I recall, 48 hours
2   of the incident and must immediately share it with
3   the specific school.
4   Q   So with regard to the high school -- and
5   by that we're talking about one high school.
6   A   Right.
7   Q   So I don't feel I need to say the whole
8   name every time.
9   A   You don't need to say the name.
10  Q   Okay. With regard to the high school,
11  what types of altercations between groups of
12  students off campus would you get reports of?
13  A   I'm going to have to give you a
14  generalization on this.
15  Q   Okay.
16  A   A student is in the community and is
17  jumped by some other students. Then the police
18  report would be sent to my office. And then that
19  would be provided to the school.
20      It was -- or if a weapon was drawn on a
21  student. Or if there was anything involving an
22  altercation, threats being exchanged back and forth,
23  which required law enforcement's involvement, then
24  we would get a report on that. That's required by
25  Florida law.

Page 47

1   Q   Okay. So did you -- were you aware of --
2   and I can understand you just get a report and it
3   has names and it may not provide the underlying
4   information.
5   A   Right.
6   Q   But were there instances in which it was
7   made apparent to you, either from police report or
8   from the principal that any of these altercations
9   off campus involved LGBT students?
10  A   I would have no way of knowing that.
11  Q   Okay. What other types of things would be
12  clear evidence that there would be a disruption if
13  someone was requesting to express themselves at
14  school?
15  A   It is very important that an administrator
16  keep a finger on the pulse of the students. And
17  many times when I was Principal or Assistant
18  Principal, I would pick up on potential problems by
19  student chatter, is what I called it.
20      And that would just -- it would not
21  involve any disciplinary action but it would just
22  simply make us aware of the potential for something
23  occurring. I say that only because if we heard
24  student chatter on something then we would -- it
25  would just be something that would draw our

Page 48

1   attention. It would certainly not be the basis for
2   approving or disapproving something in and of
3   itself.
4   Q   Okay.
5   A   But frequently it led to other things.
6   Q   Okay. So with regard to the student
7   chatter at the time that you were Assistant
8   Principal and Principal, did you hear or were
9   informed of student chatter with regard to LGBT
10  students?
11  A   No, ma'am.
12  Q   How about in your status as School
13  Superintendent, were you aware of or did you
14  personally hear any student chatter with regard to
15  LGBT students?
16  A   No, ma'am, that I recall.
17      MS. FAGGIANELLI: All right. We talked
18  previously generally about some duties and
19  responsibilities. And I thought I would just
20  mark some exhibits and have you look at them.
21      (Exhibit No. 1 was marked for
22      identification.)
23  BY MS. FAGGIANELLI:
24  Q   Mr. Cline, have you seen this statement of
25  the Superintendent's general powers?

Page 49

1      A   Yes, ma'am.
2      Q   And is this a fair description of your
3  general powers when you were Superintendent?
4      A   Yes, ma'am, but emphasis on the word
5  general.
6      Q   I understand.  We'll have one that's a
7  little more --
8      A   Yeah.
9      Q   -- expounding in a minute.
10         (Exhibit No. 2 was marked for
11             identification.)
12  BY MS. FAGGIANELLI:
13     Q   Mr. Cline, Exhibit 2 is a Composite
14  Exhibit, and it has two parts; one is 70.03, Duties
15  and Responsibilities.  And the last page is 71.01,
16  District-Wide Professional Staff Under Supervision
17  of District Superintendent.
18         Have you seen these before?
19     A   Yes, ma'am.
20     Q   And is it your understanding that these
21  outline the duties and responsibilities of the
22  Superintendent?
23     A   Yes, ma'am, but I would, on 70.03, draw
24  two Roman numeral -- I'm sorry, V.  The
25  Superintendent shall perform such other duties as

Page 50

1  may be assigned to him or her by law or the State
2  Board of Education, that was referenced in here
3  1999.  The State Board adds to it every year.
4      Q   Okay.  If you would, turn to, it's O.  It
5  says there, "The Superintendent shall also require
6  that all laws and rules of the State Board and
7  supplementary rules of School Board be followed.
8  The Superintendent shall report to the School Board
9  any violation he or she is unable to correct under
10  this provision."
11         Do you see that?
12     A   Yes, ma'am.
13     Q   And is that a correct statement of one of
14  your duties as Superintendent?
15     A   Yes, ma'am.
16     Q   In your tenure as Superintendent, did
17  there ever come a time that you had to report to the
18  School Board a violation that you were unable to
19  correct?
20     A   Not that I recall.
21         I need to amend that.
22     Q   Okay.
23     A   Every year we get an audit report from the
24  Auditor General's office.  This report covers
25  finances, as well as selected areas of operations.

Page 51

1         As an example of operations, they can
2  decide to pull the human resource management
3  development plan or the teacher assessment, anything
4  required by the State for implementation and check
5  to see if that is in full compliance.
6         I would, at times, even though we did not
7  have significant issues, there was an issue with the
8  teacher assessment document that I had to report to
9  the Board that we are out of compliance in one
10  section.
11     Q   Okay.  That's the only time you recall?
12     A   That's the one that sticks in my memory at
13  this point.  But keep in mind this audit report
14  comes in yearly.  So as Superintendent I had 24 of
15  them, and I'm sure there's some more citations.
16     Q   All right.  In terms of compliance with
17  the School Board policy with regard to student's
18  exercise of first amendment rights, did there ever
19  come a time that you had to report or you did report
20  to the School Board that there was a violation that
21  you were unable to correct?
22     A   Not to my knowledge.
23         (Exhibit No. 3 was marked for
24             identification.)
25  BY MS. FAGGIANELLI:

Page 52

1      Q   Do you recognize Exhibit 3 as the Policy
2  on Student Distribution of Literature and Materials?
3      A   Yes, ma'am.
4      Q   And in paragraph A it says, "Approval for
5  distribution of materials shall be granted unless
6  the Principal determines that the material is lewd
7  or obscene, promotes disruption of the orderly
8  operation of the school, contains statement which
9  may be libelous or slanderous, contains statements
10  which invade personal rights of privacy, may cause
11  embarrassment or ridicule to students or others
12  and/or advocates violence or illegal activity."
13         Is that consistent with your understanding
14  of the Review of Literature and Materials by you and
15  by those working under you when you were
16  Superintendent?
17     A   Yes, ma'am.
18     Q   And then in paragraph B it says that,
19  "Approval shall be granted or denied within a
20  reasonable time of submittal."
21         And in paragraph C it says, "Material
22  shall only be distributed prior to the beginning of
23  the school day, during the student's school lunch
24  period, during class change time or following the
25  end of the student's school day."

Page 53

1        Is that correct?
2     A    Yes, ma'am.
3     Q    And this says, "Distribution location
4  shall be designated by the Principal."  Correct?
5     A    Yes, ma'am.
6     Q    "Distribution shall be permitted prior to
7  the beginning of the student attendance day
8  following the end of the student attendance day and
9  during the student's school lunch period."  Correct?
10    A    Yes, ma'am.
11    Q    And that's consistent with what you told
12  me previously about having materials distributed or
13  speech in nonclassroom time, other than if it is
14  something that is part of the educational process;
15  correct?
16    A    Yes, ma'am.
17    Q    Okay.  And then D, distribution shall be
18  conducted in an orderly manner and shall not disrupt
19  school operation; correct?
20    A    Yes, ma'am.
21    Q    Now, is there anything, other than what we
22  talked about with regard to disruption, that would
23  be different with regard to this policy in terms of
24  an evaluation of what might be disruptive?
25    A    I feel this policy pretty well covers it.

Page 54

1     Q    Okay.  And then in paragraph E it says,
2  "Students who distribute material without prior
3  approval at times or location other than authorized
4  herein may be disciplined in accordance with
5  procedures as stated in the student conduct and
6  discipline code."  Is that correct?
7     A    Yes, ma'am.
8     Q    Do you remember any instances where
9  students were punished in any way?  Or I should say
10  disciplined in any way for distributing materials
11  without prior approval?
12    A    Not that reached my desk.
13        Keep in mind, the only issues that reached
14  my desk would be suspensions or recommendation for
15  expulsion.
16    Q    Okay.  And in the time when you were
17  Principal or Assistant Principal, were you aware of
18  any instances where students were disciplined for
19  distributing material without prior approval or at
20  the wrong times or locations?
21    A    We're going back a long time.
22    Q    Well, if you don't recall you can just say
23  you do not recall.
24    A    I do not recall.
25    Q    We have not spoken yet directly about Day

Page 55

1  of Silence, and so I want to now focus on that
2  issue.
3        When is the first time that you heard of
4  the Day of Silence?
5     A    The first time I heard of the Day of
6  Silence was in 2011.
7     Q    Can you give me the context for that?
8     A    I think I can give you the date, too.
9  April 15 is the obvious date.  I think that was the
10  date.
11    Q    Had you paid your taxes then?
12    A    I was working on my taxes.
13        This was a report from the high school
14  that the high school had been approached on the Day
15  of Silence, but according to the report, as I
16  recall, there was not enough organization to make
17  them feel comfortable with the implementation or the
18  approval on this.
19        I do not recall the specific or what the
20  date was in 2011 for the Day of Silence.
21    Q    And when you say, Not enough to make them
22  feel comfortable with the implementation, who are
23  you referring to when you say them?
24    A    Administration.
25    Q    At the high school?

Page 56

1     A    Yes, ma'am.
2     Q    And that would be?
3     A    There was a -- the Principal was Mike
4  Steele.
5     Q    Who was the Assistant Principal?
6     A    Ms.Fusco.  I do recall that was received
7  as an FYI.
8     Q    Do you recall the time when Ms.Fusco sent
9  something to you about Day of Silence and said
10  something along the lines of, I'd like to get the
11  final -- I'm sending this to you because I'd like to
12  get the final word on this?
13    A    I don't know if those exact words were
14  used.  But in 2012 I received a communication asking
15  my position regarding the Day of Silence protest.
16    Q    And can you tell me your thought process
17  when you received this communication asking what the
18  position was?
19    A    Meaning how I arrived at my answer?
20    Q    Yes.
21    A    When I received the communication there
22  was also, as I recall, a link to a website.  Either
23  that or I just searched the web for it.  I read the
24  general rules for the Day of Silence.
25        I had no problem with before school, after

Page 57

1  school, lunch, hallways. I did have a problem with
2  the classroom, and that was my basis for
3  disapproval.
4      Q   Did you express to anyone your position
5  that this would be okay before and after school and
6  during lunch and in the hallways?
7      A   That was the basis for my -- you refer to
8  my past practices statement. And I've made that
9  clear that my issue was the classroom.
10     Q   And where did you make that clear and to
11 whom?
12     A   Ms. Fusco. She was the one asking me for
13 permission.
14     Q   Did you make that clear to her in an Email
15 or an oral conversation?
16     A   Based on it was an oral conversation.
17 Based on the attachment that was sent to me when it
18 specified classrooms where the website specified
19 classrooms.
20     Q   Just --
21     A   But that was my basis.
22     Q   Just to make sure I understand this
23 correctly, you had a telephone conversation with
24 Principal Fusco in 2012 in which you told her that
25 you had no problem with a Day of Silence before

Page 58

1  school, after school, at lunch, or in the hallways?
2      A   That would be consistent with our policy.
3  What I told --
4      Q   Sir, please. I just want to make sure you
5  had that conversation with Ms. Fusco? You have told
6  me it was oral.
7      A   I did.
8      Q   And you told her that you didn't have a
9  problem with these categories as we talked about
10 before, before school, after school, hallways,
11 lunch, but you had a problem if it was going to take
12 place during the classroom?
13     A   I think the way I approached it was I have
14 a problem with the classroom. Because the other
15 sections are noted in the policy. Classroom is not
16 noted in the policy.
17         And the reason for my phone call was to
18 get clarification, are we talking protest in the
19 classroom?
20         And according to the site and the
21 information that Ms.Fusco had, it would involve the
22 classroom. But that's all I talked about was the
23 classroom.
24     Q   Did you suggest to her that perhaps she
25 talk to the student and say, We can't do this in the

Page 59

1  classroom, but if you want to do it at other times
2  during the day we can approve that?
3      A   I don't think I said that, no. I did ask
4  her to clarify my position to the student.
5      Q   And when you said you asked her to clarify
6  your position, what exactly was the position you
7  wanted clarified to the students?
8      A   The past practice issue as it related to
9  the classroom.
10     Q   So if I understand correctly, the line in
11 the sand for you was that in the past the only time
12 any first amendment speech was allowed in the
13 classroom was if it related to some educational
14 discussion in the classroom; correct?
15         MR. JENSEN: Object to form.
16     A   That was the reason for denial.
17 BY MS. FAGGIANELLI:
18     Q   Okay.
19     A   I would not want someone getting up and
20 giving a speech in the middle of an algebra class.
21 That would be disruptive.
22     Q   All right. And in your mind it would be
23 disruptive for a student to be silent in class
24 except when called upon by the teacher?
25     A   Yes.

Page 60

1      Q   Well, isn't that what students are
2  supposed to do?
3      A   No. You need to get into a classroom.
4  Students now are engaged in small group discussions.
5  With the Common Core standards in the State of
6  Florida it requires a -- it's not just a sage on the
7  stage any more. The teacher is not the fountain of
8  all wisdom. It requires discussion on what this
9  means, opinions, and conclusions.
10         So just responding to the teacher is a
11 very shallow basis. It's not practical in a small
12 group discussion to be passing notes back and forth
13 when your assignment is to develop a particular
14 position or to explain a particular problem.
15     Q   Is that true in every subject?
16     A   That's true in the common core subjects.
17 That would be your math, your English, your science.
18     Q   And when was Common Core adopted in Desoto
19 County?
20     A   Common Core has been adopted by no county.
21 Common Core was adopted by the State of Florida.
22     Q   And in what school year did you begin with
23 Common Core?
24     A   Common Core starts this year as far as
25 actual implementation, but you had a feeder of at

Page 61

1 least two years to make a conversion to Common Core.
2 But if you look at FCAT, which is what we
3 have used up to this point, it required, and if you
4 looked at the state benchmarks, it required students
5 to engage in discussions, points of view, developing
6 team outcomes.
7    Q    So was it your understanding that
8 Principal Fusco went back to the student and said,
9 You can do this, but not in the classroom, or did
10 she say this has been disapproved?
11    A    It was disapproved based on the classroom.
12    Q    I understand that.  But there are multiple
13 options here.
14    And my question really is one of you were
15 the Superintendent, Principal Fusco was the
16 Principal.  You are the adults in the room.
17    You have a minor student who says, I would
18 like to participate in the event.  When you look on
19 the event's website and you get letters from various
20 people who indicate that there are various ways in
21 which you can participate.
22    Did any of the adults in the room to your
23 knowledge ever tell a student, we don't have a
24 problem as long as you don't do this in the
25 classroom?

Page 62

1    MR. JENSEN:  Object to form.
2    A    The only thing I can do is base it on what
3 I discussed.  And it was my understanding that that
4 had been carried back to the student.
5    I cannot attest factually that that was
6 specifically covered.  Because I believe that's the
7 basis why it was approved this year, the
8 stipulations that I had talked about last year.
9    MS. FAGGIANELLI:  All right.  Let's look
10 at some documents.  Do you want to break for
11 lunch?  I saw you just looked at your watch.
12 It's five to twelve.
13    MR. JENSEN:  I'm fine with going straight
14 through.
15    MS. FAGGIANELLI:  Well, I don't think I
16 can go straight to the end without eating, so
17 either now or later.
18    MR. JENSEN:  Whatever everybody else wants
19 the do.
20    THE WITNESS:  I would prefer to keep
21 going.
22    MS. FAGGIANELLI:  Well, I can go until
23 one, then we can break for lunch.
24    (Lunch recess was taken from 12:00 p.m. to
25    12:40 p.m.)

Page 63

1 BY MS. FAGGIANELLI:
2    Q    Mr. Cline, before we look at the documents
3 I just want to ask you a couple questions that I
4 didn't ask you earlier.
5    One is, have you ever testified before in
6 a deposition or in a court?
7    A    Yes, ma'am.
8    Q    Okay.  And can you tell me the
9 circumstances under which you have testified before?
10    A    In court was a federal court in Ft. Myers
11 and it involved a dispute, a case, as far as the
12 manner in which the school districts were divided.
13 There was the indication that it was preventing
14 African Americans from running successfully for
15 office.
16    Q    And what did you testify about?
17    A    The testimony related to the involvement
18 of African American students in the schools in so
19 far as clubs, organizations.
20    Q    And were you a fact witness or were you a
21 support witness?
22    A    I think I was a fact witness.
23    Q    All right.  So you were not paid and you
24 didn't consult?
25    A    Oh, no, no, no.

Page 64

1    Q    So you were a fact witness?
2    A    Yes, ma'am.
3    Q    In your official capacity?
4    A    Yes, ma'am.
5    Q    Any other times you have testified in
6 court or in a deposition?
7    A    That was the only time I can recall in
8 court.  And there was a deposition with that.  I
9 can't recall another deposition.  If it's there I'm
10 not recalling.
11    Q    Okay.  Have you ever been a party to a
12 lawsuit before?
13    A    No, ma'am.
14    (Exhibit No. 4 was marked for
15    identification.)
16 BY MS. FAGGIANELLI:
17    Q    If you look at what I've marked as Exhibit
18 4, let me ask you first, have you ever seen this
19 document before?
20    A    I do not recall seeing this document, no,
21 ma'am.
22    Q    Okay.  The number -- letters and numbers
23 at the bottom in the legal trade we call these Bates
24 Stamps.  And what our office did, just for
25 background information for you, so where it says

Page 65

1  Desoto/Cline/FUSCO/JONES, this indicates that this
2  document was produced by the School District or by
3  the defendants here.
4         But to your knowledge, you have not seen
5  this before?
6     A   No, ma'am, to my knowledge.
7         Keep in mind that this case started after
8  I left office.
9         (Exhibit No. 5 was marked for
10              identification.)
11  BY MS. FAGGIANELLI:
12     Q   Please look at Exhibit 5 and tell me if
13  you have seen that document before.
14     A   No, ma'am. I have no recollection of this
15  document.
16     Q   Now, you see at the top it says, FW:
17  FYI-Student Club?
18     A   Yes, ma'am.
19     Q   And then underneath it it says, Steele
20  Mike. And you referred to a Mike Steele previously.
21     A   He was Principal.
22     Q   Of the high school; right?
23     A   Yes, ma'am.
24     Q   And this indicates it was sent on Tuesday,
25  March 1, 2011, on 10:56 in the morning?

Page 66

1     A   Yes, ma'am.
2     Q   And it's addressed to you?
3     A   That is correct.
4     Q   You have no recollection of this document?
5     A   Out of the hundred or 200,000 Emails that
6  I have in that county office, I do not recall this
7  one.
8     Q   Okay. This indicates that Mr. Steele is
9  informing you that he received word that a student
10  is going to ask about starting a club listed below.
11  He says, "My initial response was going to be a
12  'NO', but in reading the information below I thought
13  I would bring you into the loop." Correct?
14     A   That's what it says.
15     Q   And what is the club that they're talking
16  about starting?
17     A   Since I do not recall this information I
18  don't know.
19     Q   You can just read below. Did you read the
20  Email?
21     A   I see that, but I thought you were asking
22  me personally.
23     Q   Okay, I'm sorry. So the Email that is
24  forwarded by Mr. Steele to you, is one from Mary
25  Corso to Mike Steele; correct?

Page 67

1     A   Correct.
2     Q   And it's dated March 1, 2011, as well?
3     A   Yes.
4     Q   It says, "I asked my student, J████
5  J█████ if she spoke to you yet regarding the
6  G.S.A. club (Gay/Lesbian). She said not yet but she
7  is ready with a backup plan in case her proposal is
8  denied. It is called The Equal Access Act and it
9  protects those clubs from being prohibited in
10  school." Do you see that?
11     A   I see.
12     Q   Do you recall any discussion or thought
13  process that you may have had with regard to whether
14  to approve this GSA club at the high school?
15     A   No. But then again, approval of clubs
16  wouldn't come to me. That goes through the student
17  counsel at the high school.
18     Q   Do you have any recollection of responding
19  to this Email --
20     A   No, ma'am.
21     Q   -- from Mr. Steele?
22         Do you know if a GSA was ever organized at
23  the high school?
24     A   Not to my knowledge at the time I left in
25  November.

Page 68

1     Q   And you left in November 2012?
2     A   Yes, ma'am.
3     Q   Okay. Did you run for reelection?
4     A   I did. I got the boot.
5         (Exhibit No. 6 was marked for
6              identification.)
7  BY MS. FAGGIANELLI:
8     Q   Please take a minute and look at Exhibit
9  6, and please tell me when you have read it.
10     A   Yell, I recall this.
11     Q   All right. And just some background
12  information. You see in the two lines at the top
13  the Email that says, "Lewis, Jan." Who is Jan
14  Lewis?
15     A   She was my secretary.
16     Q   And in what timeframe was she your
17  secretary?
18     A   Still there.
19     Q   And who was Melba Barnwell?
20     A   She is the executive assistant.
21     Q   And what does Ms.Barnwell do as -- what
22  did she do as your executive assistant?
23     A   She handled a large number of my
24  documents. She also worked with people that came in
25  to the office that could not necessarily see

Page 69

1 everyone in a timely manner. So many times she was
2 able to assist these individuals and they did not
3 have to wait to see me.
4     Q    And what is Ms. Barnwell's educational
5 background?
6     A    High school graduate.
7     Q    And has she worked -- how long had she
8 worked in this executive assistant position?
9     A    14 years.
10    Q    What did she do before that?
11    A    If I recall, she worked with United
12 Telephone in their offices.
13    Q    Did you hire her to become your executive
14 assistant?
15    A    Yes, ma'am.
16    Q    And then on the next line that we've
17 talked about Mike Steele and Shannon Fusco. At this
18 point in time Mike Steele was the Principal and
19 Shannon Fusco was Assistant Principal?
20    A    I think I referred to this earlier, yes,
21 ma'am.
22    Q    Okay. Now, if you look at the Email
23 that's being forwarded, the one from Shannon Fusco
24 to DHS teachers, and it's -- the subject is,
25 Students wearing placards today.

Page 70

1         Can you read out loud for me what that
2 Email says?
3     A    It says, "Teachers, we have a group of
4 students today wearing signs of a National Day of
5 Silence for an organization. As this is a
6 nationally recognized group and these students did
7 not follow proper channels required for any group to
8 have a day here, they have been told to remove their
9 advertisements. If they ask, please explain that
10 any group who wishes to be represented at school has
11 to follow the proper channels of filling out
12 activity permission forms which must be approved.
13 Thank you, and have a good weekend."
14    Q    Now, the activity permission forms, are
15 those available at the office at the high school?
16    A    When I was Principal and Assistant
17 Principal, yes, ma'am.
18    Q    Okay. And that is the form that would be
19 required to be filled out to comply with this
20 section 21003, Student Distribution of Literature
21 and Materials policy?
22    A    That form is -- it can be used for that,
23 but it's also used to get it on the calendar.
24    Q    Okay.
25    A    Or that's what it was used. That was when

Page 71

1 I was there as Principal.
2     Q    All right. Then under the FYI to
3 Ms. Barnwell and Ms.Lewis, it says "FYI, Mr. Diehl
4 and I have spoken to several students personally and
5 notified the teachers of this group demonstrating
6 today. I believe it is a gay/lesbian organization.
7 I didn't list the name in the Email to the teachers
8 because I couldn't remember the full name, and the
9 name is not important. Any group follows the same
10 rules."
11        And it is signed by Shannon Fusco;
12 correct?
13    A    That's correct.
14    Q    Who is Mr. Diehl?
15    A    If I remember, he -- I think he was the
16 Dean for a certain period of time, a limited period
17 of time at the high school, Dean of Students in
18 charge of discipline. He is no longer in the
19 district, I don't think.
20    Q    Okay.
21        (Exhibit No. 7 was marked for
22        identification.)
23 BY MS. FAGGIANELLI:
24    Q    This appears to be the same Email, but one
25 that has been forwarded to you by your executive

Page 72

1 assistant; is that correct?
2     A    That's correct.
3     Q    And was this her standard practice to
4 forward Emails to you in this type of format with an
5 FYI?
6     A    Most of the time. But not all Emails.
7 Anything that she felt I needed to know about she
8 would send to me. Whether it was a parent
9 discussion or teacher discussion or any other
10 employee that came to the office.
11    Q    At this time in 2011 did you have any
12 understanding as to whether these students were
13 being silent at the same time they were wearing
14 signs?
15    A    No, ma'am.
16    Q    And if I understand correctly, at this
17 point in time your understanding based on these
18 Emails was that the students were told that they
19 couldn't wear signs or have advertisements or pass
20 things out because they did not comply with the
21 policy that required pre-approval --
22    A    Uh-huh.
23    Q    -- for signs or placards or anything like
24 that; is that true?
25        MR. JENSEN: Object to form.

Page 73

1    A    That is correct.
2         (Exhibit No. 8 was marked for
3              identification.)
4    BY MS. FAGGIANELLI:
5    Q    What I did, rather than show you the
6  individual Emails as they went along I thought I'd
7  just show you the one that was forwarded to you that
8  has the entire chain. Take a look at what's been
9  marked as Exhibit 8, which appears to be an Email
10 addressed to you from your executive assistant with
11 an FYI. Do you recall receiving this Email?
12   A    Yes, ma'am.
13   Q    Do you want to take a minute to read it.
14   A    Yes, ma'am.
15   Q    So this Email indicates that Ms. Fusco and
16 John -- would that be John Diehl?
17   A    Yes, ma'am.
18   Q    Talked to less than two dozen students; is
19 that right?
20   A    That's what it says.
21   Q    She then also indicates, "There were more,
22 but the message would have spread. It was within
23 the Gothic group. None of the students I talked to
24 gave me any trouble." Correct?
25   A    Uh-huh. Yes, ma'am.

Page 74

1    Q    Now, in terms of this event on April 15,
2  2011, do you have any other knowledge of what
3  transpired than what was in the Emails that have
4  been provided to you?
5    A    No, ma'am.
6    Q    Did you have any conversations with
7  Mr. Steele or Mr. Diehl or Ms. Fusco about that?
8    A    No, ma'am. Generally, with FYI, I take it
9  that what that means it's just for information
10 purposes and I am letting them handle it.
11   Q    And what was your understanding as to the
12 reason why the students were told that they had to
13 remove any placards or signs?
14        MR. JENSEN: Object to form.
15        MS. FAGGIANELLI: And can you tell me what
16 that's based on?
17        MR. JENSEN: He's already said he has no
18 knowledge of any of this stuff other than
19 what's in the Emails. So if it's not in an
20 Email you're asking him to guess.
21        MS. FAGGIANELLI: I'm asking what his
22 understanding is. Okay, fine.
23        MR. JENSEN: He has already testified he
24 has no understanding beyond what's in those
25 Emails. So at this point I don't want him

Page 75

1  speculating.
2  BY MS. FAGGIANELLI:
3    Q    Based on your reading of these Emails in
4  your capacity as Superintendent of Schools, what was
5  your understanding as to the reason for the students
6  being told they had to remove placards or signs?
7         MR. JENSEN: Mr. Cline, don't guess at
8  anything. If you don't know, you can say you
9  don't know. If you know, provide an answer.
10 But don't guess at anything.
11   A    It would be a guess at this point.
12 BY MS. FAGGIANELLI:
13   Q    Well, what does the Email itself say was
14 the basis for them not allowing this event?
15   A    The Email indicates that they did not
16 follow the procedure as far as completing the
17 request form to get the activity approved and on the
18 calendar.
19   Q    Thank you.
20        (Exhibit No. 9 was marked for
21              identification.)
22 BY MS. FAGGIANELLI:
23   Q    Take a look at that and tell me if you
24 have seen it before.
25   A    Yes, ma'am.

Page 76

1    Q    Okay. And this is document dated
2  Thursday, March 29, 2012; correct?
3    A    That's correct.
4    Q    And it is addressed to Ms.Fusco, and it is
5  from Amber Hatcher; correct?
6    A    That's correct.
7    Q    Did you read this at the time that you
8  received it in March 2012?
9         MR. JENSEN: Object to form.
10   A    I can't attest to exactly when I received
11 it, but I did receive it and I did read it, yes,
12 ma'am.
13 BY MS. FAGGIANELLI:
14   Q    Okay. So it was sometime in the timeframe
15 of March to April 2012; correct?
16   A    Yes. I have the feeling it may have been
17 April, but again, I can't be certain.
18   Q    Now, this letter indicates some facts
19 about the National Day of Silence, and then in the
20 last paragraph on the front page it addresses an
21 issue that we have talked about today.
22        Do you see where it starts, it's the third
23 or fourth sentence, it says, Many schools allow, do
24 you see that?
25   A    I see that.

Page 77

1    Q    Can you read for me what that rest of that
2  paragraph says?
3    A    "Many students allow -- excuse me -- many
4  schools allow student's participation throughout the
5  day. Some schools ask students to speak as they
6  normally would during class and remain silent during
7  breaks and at lunch. There is no single way to
8  participate, and students are encouraged to take
9  part in the way that is most positive and uplifting
10  for their school. How positive and uplifting would
11  a day of peaceful protesting -- or protestation
12  against students anti-LGBT bullying be?"
13    Q    So when you read this, did you understand
14  that another -- an option for you as the
15  Superintendent would be to allow participation in
16  Day of Silence before school, during lunch, and
17  after school?
18    A    That's what this says. So -- but I think
19  when I looked at the website I got the impression as
20  far as the day about speaking directly -- unless
21  you're spoken to directly by a teacher, I did not
22  view it as being flexible.
23    Q    Would you go back and look at what was
24  marked as Exhibit 4.
25    A    Yes. It's the document I just saw today.

Page 78

1    Q    And if you turn to paragraph number 4,
2  it's on the second page.
3    A    Uh-huh.
4    Q    This is essentially the same statement.
5  "Many schools allow students participation
6  throughout the day. Some schools ask students to
7  speak as they normally would during class and remain
8  silent during breaks and at lunch. There is no
9  single way to participate, and students are
10  encouraged to take part in any way that is the most
11  positive and uplifting for their school."
12        Do you see that?
13    A    I saw it.
14    Q    So your testimony is that you recall going
15  out on a website in 2012, and based on that
16  understanding that the only way the Day of Silence
17  could be held at your school was if students were
18  silent in class?
19    A    Yes, ma'am.
20    Q    Can you identify what website that was?
21    A    It's in Amber Hatcher's communications.
22    Q    Is it in this? I guess it's not in this
23  Email right here, it's in another one?
24    A    Here's one right here. It's the last,
25  just before sincerely.

Page 79

1    Q    Www.dayofsilence.org?
2    A    That's sound right.
3    Q    So in 2012, did you discuss with anyone
4  the concept of having a Day of Silence but requiring
5  the students to speak during school -- I'm sorry,
6  not during school but during class?
7    A    My conversation was with Ms. Fusco. But I
8  have to put this in context. This was not a time
9  consuming issue with me. I had the school
10  administration working on it and I let them do their
11  jobs. I don't micromanage. Certainly not this type
12  of school activity. That's why I have them there.
13        So you're looking -- when you say I
14  visited the website, I looked at it for a couple of
15  minutes, and that was the impression I walked away
16  with.
17    Q    All right. Did you look at the letter
18  that -- this ACLU form letter that's attached to
19  part of Exhibit 9?
20    A    I did not look at that, no.
21    Q    Because again in this ACLU letter, which
22  is the third page of Exhibit 9, it says, If you are
23  unwilling to accommodate the students' desire to
24  remain silent during classroom instruction, we hope
25  that you will nonetheless support them in a peaceful

Page 80

1  expression of their beliefs. (For example, through
2  T-shirts or the speaking cards or other materials
3  about the Day of Silence) during the non-curricular
4  portions of the school day."
5        So again, that's something that you didn't
6  notice or see?
7    A    I interpreted it and walked away leaving
8  the website as it was a Day of Silence. I spoke to
9  the administration regarding my concerns, then I
10  moved to the next topic.
11    Q    Now, when you say you spoke to
12  administration, that was just Principal Fusco?
13    A    She is the Principal. Generally I speak
14  with the head of the school.
15    Q    How often did you speak with her about
16  this topic in 2012?
17    A    I want to put this in context. Maybe
18  twice and maybe a two or three-minute conversation.
19    Q    And can you give me the gist of the
20  conversations, as best you can?
21    A    I think I have. It was my issue with the
22  use of instructional time for the Day of Silence.
23    Q    Now, would you have an issue with the use
24  of instructional time if the student is in a
25  classroom and they're watching a movie?

Page 81

1        MR. JENSEN: Object to form.
2  BY MS. FAGGIANELLI:
3    Q    And they don't have discussion about the
4  movie?
5    A    I would conclude that the movie has some
6  relevance to the class.
7    Q    I'm assuming it does.  If on --
8    A    So yes, I would object.
9    Q    If on the Day of Silence in 2012 the
10 Plaintiff here was in a class and they were watching
11 a film, students were all quiet, they're supposed to
12 be quiet while they're watching the film, how would
13 her being silent be disruptive?
14   A    It would not be disruptive.
15   Q    Okay.  Under what --
16   A    But does she have a film in every class
17 that day?
18   Q    No.
19   A    Okay.  That was a question for her.
20   Q    All right.  I guess I would like it if you
21 could tell me the parameters that you used to
22 determine what is disruptive in a classroom when a
23 student is silent.
24   A    I have covered this.  I feel like I'm in a
25 remedial class right now.

Page 82

1    Q    This is the group class setting; correct?
2    A    It is a class.  You never refer to a class
3  as a group.  You refer to a class as individual
4  students in that classroom.
5        If I'm showing a film then there is going
6  to be something to follow that film.  It's not just
7  for entertainment.  I'm talking about me as a
8  teacher.  I would expect students to be quiet to
9  listen and then be prepared for discussion on the
10 film.
11   Q    Now, in your view is there any
12 accommodation that a school or school district
13 should make with regard to a student request to not
14 speak in a class for one day of the 180-day school
15 year?
16       MR. JENSEN: Object to form.
17   A    No, there should not be.  A protest or an
18 activity should not be more important than the
19 instruction taking place in the class.  It's one day
20 combined with many other days.
21       Do you realize how much the state takes
22 for testing time out of that 180 days?  Almost two
23 weeks.  So there is more than just one day out of
24 180.  It's one day with all the other days out of
25 the 180.  We have to draw the line some place.

Page 83

1        And I feel we make adequate provisions as
2  far as before school, after school, the
3  noninstructional times.
4    Q    But you did not provide the Plaintiff here
5  with an option for before school, after school, or
6  noninstructional times; correct?
7    A    I provided the administration with my
8  views on it, yes.  I did not talk to the students.
9    Q    Does the Superintendent never respond
10 directly to a student?
11   A    Oh, in an Email?  I do not respond to
12 students via Email.
13   Q    So if I --
14   A    I don't even meet with the student by
15 myself.  I have my executive assistant come in, if I
16 do meet with a student.
17   Q    So if I understand your testimony, in 2012
18 as in 2011, we're dealing with a situation where you
19 were okay, or you would have been okay with this had
20 it -- this being the Day of Silence -- had it been
21 before school, during lunch, and after school if
22 they'd been silent and if they'd done whatever they
23 needed to do to premove a placard or sign; is that
24 correct?
25   A    In '12.  I wasn't asked for it 2011.

Page 84

1    Q    I know, but we talked about what your
2  opinion was.
3    A    I was just giving an FYI.
4        My opinion is yes.  If that was presented
5  to me where instructional time was not in any
6  infringed upon, then I would have not objected to
7  it.  I would have approved it.
8    Q    Okay.  Is there either state law or a
9  district policy as to the maximum number of days
10 that a student can be absent in a school year?
11   A    I'd have to go back and check.  We have to
12 offer 150 hours of instruction.  The State took a
13 very firm view on it about seven years ago.
14       And then they backed off of it.  135 of
15 those hours the student had to be in attendance in
16 the classroom.  So you had a 50-hour leeway.  The
17 exception to that was you could take a course test
18 and your entire grade would depend on passing that
19 test if you fell below the 135 hours.
20   Q    So it's conceivable that a student could
21 miss 30 to 40 days of school, correct, and still
22 pass the class?
23   A    No, that's too high.  30 or 40, I mean --
24   Q    Well, we have 180 days to begin with.
25   A    You have 150 hours.  You have 15 hours

Page 85

1  that you can miss.
2      Q    What if a student has measles or mumps, or
3  some other legitimate disease while the testing is
4  ongoing? Is there a way to make up for that?
5      A    Sure. The law provides for a doctor's
6  note.
7      Q    Okay.
8      A    Because it would not be fair for the
9  student to have to take one exam.
10             (Exhibit No. 10 was marked for
11             identification.)
12  BY MS. FAGGIANELLI:
13     Q    Just to give you a little bit of an
14  explanation here on 10. Do you see the name Connie
15  Collins at the top?
16     A    Yes.
17     Q    My understanding of this is that this is
18  now these Emails appeared when you all produced
19  them. It's not -- do you see what I mean? You
20  produced them in this version. It's not that this
21  was an Email that was directly sent to you; correct?
22             MS. COLLINS: Correct.
23  BY MS. FAGGIANELLI:
24     Q    So at this point I would just ignore that
25  above the dark line there, the Connie Collins.

Page 86

1      A    I understand.
2      Q    Who is Jami Olive?
3      A    She was the secretary to the Principal,
4  and she -- at that time she was secretary to the
5  Principal.
6      Q    And this is an Email from the secretary of
7  the Principal, who would be Ms. Fusco's secretary;
8  correct?
9      A    That's correct.
10     Q    On March 29, to your assistant,
11  Ms. Barnwell; correct?
12     A    Yes, ma'am.
13     Q    The subject is Day of Silence, and it
14  says, "I'm sending over through interoffice mail a
15  letter from a student regarding a National Day of
16  Silence. Ms. Fusco has stated that last year it was
17  stopped due to it being a form of protest and we do
18  not allow any forms of protest on campus. She would
19  just like for you to pass the information along to
20  Mr. Cline, in hopes of receiving an official word on
21  the subject. Thank you, Jami Olive."
22     Do you recall being sent this Email or
23  being asked to pass along the official word on the
24  subject?
25     A    This was the document received. It's

Page 87

1  referring to this document.
2      Q    I understand, but you have to refer to
3  that by the exhibit number.
4      A    9.
5      Q    Okay.
6      A    And I did acknowledge I had received that.
7      Q    And then you then passed along the
8  official word on the subject to Ms. Fusco?
9             MR. JENSEN: Object to form.
10     A    There are Emails. Yes, I did.
11             (Exhibit No. 11 was marked for
12             identification.)
13  BY MS. FAGGIANELLI:
14     Q    I believe Exhibit 11 is forwarding of
15  Exhibit 9 to you; is that correct?
16     A    Yes, ma'am.
17     Q    So this is the Email that you received,
18  and you received that on April 2; correct?
19     A    Are you talking about this Exhibit 9?
20     Q    Exhibit 11?
21     A    I'm confused.
22     Q    Exhibit 11 shows that this was addressed
23  to you on April 2?
24     A    Yes, ma'am.
25     Q    And it has attached to it the same

Page 88

1  document that I think is Exhibit 9, which is the
2  letter?
3      A    Yes, ma'am, that's correct.
4      Q    So you actually received this and got
5  notice on April 2?
6      A    To the best -- yes, ma'am. April 2 our
7  office received it for sure. And I believe I
8  indicated on Exhibit 9 in the deposition that I
9  thought I received this the first part of April even
10  though it was dated March 29.
11             (Exhibit No. 12 was marked for
12             identification.)
13  BY MS. FAGGIANELLI:
14     Q    Could you identify Exhibit 12, please.
15     A    Exhibit 12 is a response to Ms. Fusco
16  requesting official word regarding the Day of
17  Silence.
18     Q    And what is your response to her?
19     A    "It is inconsistent with the district's
20  past practice to approve student protest on any of
21  our campuses. The attached is disapproved."
22     Q    You use the word protest?
23     A    Uh-huh.
24     Q    Is there anything about the use of that
25  word that's distinctive here? If this has not been

Page 89

1  characterized as a protest, would your decision have
2  been the same?
3      A   No. My decision on this was strictly
4  involving instructional time we have had protests in
5  the form of petitions, signings by students on
6  actions taken by administration before but it's
7  during those same block; before school and
8  noninstructional times.
9      Q   This doesn't --
10     A   If I remember, on the Day of Silence they
11  kind of downplayed the word protest, the website.
12     Q   Well, it's to protest bullying. So it's
13  to protest a bad thing, so it's supposed to be a
14  positive experience. But --
15     A   Uh-huh.
16     Q   -- this Email does not say anything about
17  the times at which anything could happen. It just
18  says the district has a past practice. It's
19  inconsistent with the district's past practice to
20  approve student protest on any of our campuses.
21         Now, if this was not characterized as a
22  protest, would your decision have been the same?
23         MR. JENSEN: Objection; asked and
24  answered. You can answer it again.
25     A   Okay. My answer would have been the same,

Page 90

1  yes, ma'am.
2  BY MS. FAGGIANELLI:
3      Q   Okay. You mentioned other protests,
4  signing of petitions?
5      A   Uh-huh.
6      Q   What types of protests have been on the
7  high school campus?
8      A   Now, in the -- you know, protest has a lot
9  of definitions to it. But we have had students to
10  protest through the petition route certain rules as
11  implemented at high school or middle school, whether
12  it be dress code or otherwise, where they get into
13  signing the petitions, asking for something to be
14  changed.
15     Q   And what is the process that a student
16  would follow in order to be able to do that? Let's
17  say that I wanted to change the dress code and allow
18  girls to wear flip flops or something.
19         What would I, as a student, do to get
20  permission to circulate a petition or set it up and
21  have people sign it?
22     A   Communicate with the school Principal.
23     Q   And what should the Principal tell me?
24     A   The Principal is going to indicate whether
25  yes or no.

Page 91

1      Q   On what basis?
2      A   Give me the --
3      Q   I just did. I want to change the --
4      A   Flip flops.
5      Q   -- flip flops, everybody can wear flip
6  flops.
7      A   No problem.
8      Q   What would I be allowed to do?
9      A   Really that's a -- Principal's handle
10  that, not the Superintendent. They set up and
11  establish the parameters as far as when it can be
12  done, on what day or days it can be done. The
13  petition itself. But that's really a Principal's
14  job.
15     Q   So that issue --
16     A   That does not reach my desk.
17     Q   As Superintendent it doesn't come to you?
18     A   No. Most of what we're talking about
19  doesn't come to me.
20     Q   Have you had any other things that you
21  would characterize as a protest, you know, any
22  school disruption, any riot? Even that sounds bad.
23  But not to that level, if you know what I mean.
24     A   Right. No riot. Biggest issue we
25  sometimes had is disagreements in the cafeteria that

Page 92

1  turns into a fight.
2      Q   Food fight?
3      A   Not food fight.
4      Q   Just a fight?
5      A   Right. But no, ma'am.
6      Q   Okay.
7      A   And I say no in regards to particularly
8  instructional time. But a riot or something like
9  that, no, we have not had a riot.
10         (Exhibit No. 13 was marked for
11                 identification.)
12  BY MS. FAGGIANELLI:
13     Q   So Exhibit 13 appears to be a copy of the
14  text of Exhibit 12, where you say it's inconsistent
15  with past practice.
16     A   Yes, ma'am.
17     Q   And that's -- then it's replied to where
18  you sent that to Ms. Fusco. And then Ms. Fusco
19  replies to you on April 2, and says, "Thank you, I
20  turned it down last year for the same reason."
21         Do you see that?
22     A   I see it.
23     Q   Now, do you see now that that, "I turned
24  it down for the same reason," that that reason for
25  turning it down in 2011 is different than the reason

Page 93

1  she gave previously for turning it down?
2      MR. JENSEN: Object to the form.
3      A    The reason that I understood in 2011 was
4  the scheduling of the event.
5  BY MS. FAGGIANELLI:
6      Q    Well, the student failure to comply
7  with --
8      A    The process.
9      Q    -- the process; correct?
10     A    Uh-huh.
11     Q    And in this instance in 2012 it's not for
12 the failure to go through the process; correct?
13     A    There was never a process issue on it, to
14 my knowledge.
15     Q    Right. So in -- okay.
16          (Exhibit No. 14 was marked for
17          identification.)
18 BY MS. FAGGIANELLI:
19     Q    Can you identify what's been marked as
20 Exhibit 14.
21     A    This is this message from Amber Hatch.
22     Q    And it was an Email that she sent directly
23 to you?
24     A    Yes, ma'am, most of it from the website.
25     Q    Right. And it looks like this was sent to

Page 94

1  you on April 10; correct?
2      A    That is correct.
3      Q    And you have responded to Principal Fusco
4  on April 2?
5      A    That is correct.
6      Q    So this is a little bit more than a week
7  afterward.
8          Did you read this letter when you received
9  it?
10     A    Yes, ma'am.
11     Q    And in this letter, Ms. Hatcher refers to
12 the student rights and responsibilities and Desoto
13 County; correct?
14     A    Uh-huh. Yes, ma'am.
15     Q    Then do you see the paragraph that starts,
16 This does not mean, it's the third paragraph?
17     A    Yes, ma'am.
18     Q    And in this she talks about limits on free
19 speech at school; correct?
20     A    Uh-huh.
21     Q    She says, "If a teacher tells a student to
22 answer a question during class, the student
23 generally doesn't have a constitutional right to
24 refuse to answer." Correct?
25     A    Yes, ma'am.

Page 95

1      Q    "Students who want to remain silence
2  during class are less likely to encounter problems
3  if the seek permission from their teachers
4  beforehand." Correct?
5      A    Correct.
6      Q    And then it talks about things like
7  outside of the classroom in areas like hallways and
8  cafeterias students have a much broader right to
9  free speech; correct?
10     A    Yes, ma'am.
11     Q    Then she goes on to say that allowing us
12 to participate will do no harm, and that her goal is
13 to make students aware of bullying and trying to
14 stop it; do you see that?
15     A    Yes, ma'am.
16     Q    And that's a worthwhile goal; isn't it?
17     A    Absolutely.
18     Q    Then in the last paragraph she says,
19 "Honestly, we aren't asking for much. All that we
20 desire is the cooperation of administration and to
21 be allowed to put up posters. Many of the students
22 who plan to participate will do so whether
23 administration approves or not. I just want to save
24 myself and my peers from disciplinary action and
25 help our school. Thank you for your time."

Page 96

1          What was your response to Ms. Hatcher's
2  Email of April 10?
3      A    As I've indicated, I don't respond to
4  students through Email. But I did respond to send
5  it to Ms. Fusco to meet with Amber to explain the
6  position that I had regarding this.
7      Q    Okay.
8      A    Because if I could point out a sentence
9  you did not. "Be sure that personal expression
10 speech, written or symbolic, do not infringe on the
11 rights of others. We also have the right to
12 assemble peacefully on school grounds as long as we
13 assemble -- do as not to disrupt the educational
14 process."
15         That stuck with me because of the silence
16 issue.
17     Q    Okay.
18     A    I viewed that as a disruption of the
19 educational process.
20     Q    So is it your understanding, or was it
21 your understanding that Principal Fusco was going to
22 talk to Amber Hatcher and tell her you cannot do
23 this during class, but we will work with you and you
24 can do it before school, in the hallways, at
25 lunchtime, and after school?

Page 97

1      MR. JENSEN:  Object to form.
2      A    When I spoke with Ms. Fusco regarding the
3  instructional issue, that was the only issue I
4  talked about because the other is covered by policy.
5      And I indicated clearly that I have a
6  problem with the classroom.  It was my understanding
7  that she did meet with Amber and did cover that
8  point.
9  BY MS. FAGGIANELLI:
10     Q    Well, based on your discussion with
11  Ms. Fusco, did you have any understanding as to
12  whether any activity on the Day of Silence was going
13  to go forward in 2012?
14     A    No.  In its present format with the
15  silence in the classroom, it was disapproved.
16     Q    That's what she was talking about doing in
17  her Email, correct, was being silent in the
18  classroom; correct?
19     A    Correct.
20     Q    All right.  Did anyone, to your knowledge,
21  in administration tell Ms. Hatcher that this was
22  permissible outside of the classroom?
23     MR. JENSEN:  Object to form.
24     A    It was my conclusion, yes, based on the
25  fact that that is all I discussed was the classroom

Page 98

1  and the use of time from the classroom.
2          (Exhibit No. 15 was marked for
3              identification.)
4  BY MS. FAGGIANELLI:
5      Q    Could you identify what's been marked as
6  Exhibit 15.
7      A    It's a message from Amber.
8      Q    This is essentially she is just forwarding
9  the same Email she originally sent on April 10.  Now
10  she's forwarding it to you again on April 12;
11  correct?
12     A    Yes, ma'am.
13     Q    Did you do anything after receiving this
14  Email?  I understand that you did not reply to
15  Ms. Hatcher, but did you do anything else after
16  receiving this Email?
17     A    I advised Ms. Fusco, same as I did the
18  first time.
19     Q    Did you call her?
20     A    Telephoned her, yes, ma'am.
21     Q    What did you say to her?
22     A    Again, I would not approve this,
23  without -- with the component, or because of the
24  silence during the instructional time.  The policy
25  already allows the use of the noninstructional time.

Page 99

1      Q    Did you tell her that?
2      A    Yeah, I'm sure it was covered.  Because,
3  as I outlined this morning, we have had other issues
4  where that was a factor in the decision; before
5  school, after school, noninstructional times.
6      Q    Why is it that your Email to her, which is
7  part of Exhibit 13, doesn't say, It is inconsistent
8  with the district's past practice to not allow first
9  amendment expression during instructional time, if
10  that is what you meant?
11     A    Because I didn't put it down.
12     Q    Okay.  That's what you meant, but that's
13  not what you said?
14     A    I said that what we had talked about in so
15  far as the use of the way it was presented would
16  include the use of instructional time for silence.
17     And that would be inconsistent with past
18  practice because we have never in any of those that
19  I outlined to you this morning allowed that to go
20  into the instructional time, whether it was silence,
21  whether it's prayer, the alcohol, the -- unless it
22  was relevant to the instruction in a specific
23  classroom.
24     Q    Based on your conversation with Ms. Fusco,
25  did it appear to you that she understood that the

Page 100

1  issue was instructional time and not that there is
2  no protest allowed on campus?
3      A    Any protest involving the use of
4  instructional time was what we discussed.
5      Q    Okay.
6          (Exhibit No. 16 was marked for
7              identification.)
8  BY MS. FAGGIANELLI:
9      Q    Can you identify what's been marked as
10  Exhibit 16?
11     A    This is an April 12 communication to Ms.
12  Fusco, in which I have again indicated no to the
13  protest proposal.
14     Q    Now, is there anywhere in Exhibit 16 that
15  it refers to instructional time?
16     A    Nope.
17     Q    Is there anywhere in here that says, This
18  would be permitted in noninstructional time?
19     A    Nope.
20     Q    What does it say?
21     A    Well, for those that can't read in the
22  room --
23     Q    Well, I can read.  What it says is --
24     A    Well, I understand.
25     Q    Well, let me --

Page 101

1    MR. JENSEN: Let's not have an argument.
2    A    I'm tired of her asking me to read stuff.
3  BY MS. FAGGIANELLI:
4    Q    I will withdraw that question and I will
5  read it for you. It says --
6    A    Fine. I don't need it, though. Please
7  don't do it for my sake.
8    Q    I want to do it for record's sake, because
9  the judge is going to read this transcript.
10        "It is inconsistent with the district's
11  past practice to approve student protest on any of
12  our campuses. The attached is disapproved.
13        I did not refer to a specific policy,
14  since this is classified as a protest as evidenced
15  by the submitted documents. I will not approve the
16  activity on our campuses. This past practice
17  position needs to be discussed with Ms. Hatcher on
18  April 13, 2012." Correct?
19    A    Uh-huh.
20    Q    Okay. This talks about protest. It's
21  classified as a protest, it will be disapproved.
22        Yet it's your testimony that it's
23  classification as a protest had absolutely nothing
24  to do with its disapproval.
25        MR. JENSEN: Mr. Cline, she didn't ask a

Page 102

1    question. She's just commenting now.
2        THE WITNESS: Okay.
3  BY MS. FAGGIANELLI:
4    Q    Is that your testimony? Correct?
5        MR. JENSEN: Do you want him to read back?
6  She can read back the testimony, if you --
7        MS. FAGGIANELLI: I don't want it.
8        MR. JENSEN: Okay.
9  BY MS. FAGGIANELLI:
10    Q    That's your testimony. The fact that
11  this -- not withstanding what these documents say,
12  the fact that this was classified as a protest had
13  nothing to do with your decision to disapprove it?
14    A    You got it.
15    Q    Okay. So why then did you say in two
16  Emails that this was a protest and it was
17  disapproved?
18    A    Because, as you read, since this is
19  classified as a protest as evidenced by the
20  submitted documents which included the Day of
21  Silence, and silence in the instruction -- during
22  the instructional period, that's why I disapproved
23  it.
24    Q    But Mr. Cline, didn't it also include the
25  text that I had read to you twice from two different

Page 103

1  pieces of information about the various ways that
2  schools can participate?
3    A    Did you read Amber's? Did she indicate
4  that?
5    Q    Let's go back. I thought you were tired
6  of me reading the same thing to you over and over.
7    A    No, you can just refer me to the
8  paragraph. Okay? I learned to read long ago.
9    Q    All right. Exhibit 12. Look at the last
10  page of this exhibit.
11    A    This is copied from the website.
12    Q    Look at the last page, the last two pages
13  of this exhibit, with the ACLU attached --
14    A    And I told you that I went through that
15  very quickly. And what I saw on the website was
16  protest extending into the instructional period.
17  That was the impression that I had. And no one
18  corrected me on that. No one being high school
19  administration. Because they were under the
20  impression it was also going into the classroom.
21        THE WITNESS: Do you need a break?
22        MS. FAGGIANELLI: No.
23        MR. JENSEN: Actually, I think I need one.
24        THE WITNESS: I think she does, too.
25        MS. FAGGIANELLI: I don't need a break.

Page 104

1        THE WITNESS: We do.
2            (A short break was taken.
3        Ms. Collins left the deposition for a
4        previously scheduled appointment.)
5            (Exhibit No. 17 was marked for
6            identification.)
7  BY MS. FAGGIANELLI:
8    Q    Can you identify what's been marked as
9  Exhibit 17?
10    A    It is the communication from Ms. Fusco in
11  regards to National Day of Silence proposal
12  presented by Amber Hatcher, dated April 12.
13    Q    All right. In this Email she says that
14  she has, "Addressed this issue with Ms. Hatcher
15  immediately after you responded to my Email. She
16  has come to me twice since with documentation on why
17  it should be allowed, and I have each time told her
18  no and what the ramifications would be if a protest
19  occurred." Correct?
20    A    That's what it says.
21    Q    "I don't think she plans to disobey, but
22  she was insistent that she could convince you
23  otherwise and was making an appointment." Correct?
24    A    That's correct.
25    Q    "I will clarify the matter with her again

Vincent M. Lucente & Associates                                    800.282.8275

Page 105

1  tomorrow morning." Correct?
2     A   Yes, ma'am.
3     Q   Are you aware of any attempt that
4  Ms. Hatcher made to make an appointment with you?
5     A   She called my office, yes.
6     Q   Okay. And what happened? She called your
7  office to make an appointment?
8     A   Make an appointment.
9     Q   Was she given an appointment?
10    A   No.
11    Q   Do you recall when she called?
12    A   No, ma'am. It's during this timeframe.
13    Q   Would she have spoken to your executive
14 assistant or secretary?
15    A   Either one. If one was tied up the other
16 one would have taken the call.
17    Q   And she was told she could not have an
18 appointment?
19    A   That's correct. She was referred back to
20 her school principal.
21    Q   Now, in your conversation with Ms. Fusco,
22 did you all discuss at all what the ramifications
23 would be if the student did this without approval?
24    A   Uh-uh. Never. It wasn't any kind of
25 ramification or discipline discussed.

Page 106

1     Q   For a student who -- just in general, and
2  not with this -- but the general rules in the school
3  district for a student who participates in a protest
4  or a demonstration or something like this without
5  approval, what type discipline is warranted?
6     A   There is a range. It can be anything from
7  a simple reprimand by the administrator, it could go
8  up to suspension, depending on circumstances.
9     Q   And is it the school principal who would
10 make the initial determination as to what the
11 discipline would be?
12    A   Dean.
13    Q   And then is there a review process or a
14 chain of command?
15    A   If the parent wants to go due process on a
16 suspension they have that prerogative. It's
17 outlined on the suspension form.
18    Q   Is an in-school suspension treated the
19 same as just a suspension? Does it qualify as a
20 suspension?
21    A   It's not one that reaches my desk. I get
22 the out-of-school suspensions.
23    Q   But in terms of at the Principal and the
24 disciplinary level?
25    A   It is an option.

Page 107

1     Q   Okay. And when you said -- the reason I
2  asked is when you said due process that a parent
3  could use in the event of a suspension, would that
4  be the -- would that apply also for an in-school
5  suspension?
6     A   Correct.
7     Q   Okay.
8     A   That would start with the Dean and then
9  work its way up. Dean, it could go to Assistant
10 Principal or Principal. If I still did not feel
11 confident, my office, Superintendent. And if they
12 did not feel comfortable with that, School Board.
13    Q   Now, with regard to the issue of your
14 student's permanent record, would it show a
15 suspension?
16    A   When I was -- I can't speak now, but by
17 suspension, in-school suspension?
18    Q   Yes.
19    A   No. Those files are -- were purged at the
20 end of the year. That's the whole point of
21 in-school suspension is to prevent a formal
22 suspension from occurring.
23    Q   This Email that's Exhibit 17, it appears
24 that it's really an informational Email from Ms.
25 Fusco to you. Did you respond in any way to this

Page 108

1  Email?
2     A   No, ma'am, I did not. I viewed this as
3  simply an update on what I requested.
4     Q   Who is Karen Pella?
5     A   Karen Pella is Assistant Principal.
6        (Exhibit No. 18 was marked for
7         identification.)
8  BY MS. FAGGIANELLI:
9     Q   Rather than go through three Emails, let's
10 deal with the one that you marked. I had just asked
11 you who Karen Pella is.
12    A   Yes, ma'am.
13    Q   And this appears -- Exhibit 18 appears to
14 be an Email sent by your Executive Assistant,
15 Ms.Barnwell, to Karen Pella; correct?
16    A   Yes.
17    Q   I'm sorry, it's from Karen Pella to your
18 Executive Assistant. It says, "Sorry I didn't get
19 back to you sooner. She is absent today."
20    A   You're on April 13 at 8:10. Melba
21 Barnwell wrote this?
22    Q   Right.
23    A   Okay. Then the only thing Pella responded
24 to is, Sorry I didn't get back to you sooner.
25    Q   Okay. If we go down further, the way this

Page 109

1 follows is this is the Email that you sent to
2 Shannon Fusco on April 12?
3    A   Yes, ma'am.
4    Q   Then it appears that your assistant
5 forwarded it to Karen Pella?
6    A   Uh-huh.
7    Q   And said, "Shannon may have already sent
8 this to you, but wanted to be sure.  Please let me
9 know once you have met with Amber."
10   A   Uh-huh.
11   Q   Then I guess Ms. Barnwell goes by Mel?
12   A   That's the way -- I didn't know that.
13   Q   Then the response from Ms. Pella was,
14 "Sorry I didn't get back with you sooner.  She is
15 absent today."  Correct?
16   A   Yes, ma'am.
17   Q   And would this be an example of what you
18 were discussing about how Ms.Barnwell sometimes
19 would do these types of things for you?
20   A   That's correct.  What she would try to do
21 is get all the information if she felt something
22 needed to be added before it came in.
23   Q   All right.
24   A   Because I need to reiterate once again how
25 quickly these move across the desk at times.

Page 110

1    Q   Okay.  I know some people have their
2 Emails set up so that incoming and outgoing Emails
3 are copied on their Assistant's or Executive
4 Assistant's.  Do you do that?
5    A   I did not do that.  But I was good about
6 sending copies to them.  I would sometimes either cc
7 them.
8    Q   All right.  So you would try to keep her
9 up to speed?
10   A   Yes, ma'am.  And Jan.
11       (Exhibit No. 19 was marked for
12       identification.)
13 BY MS. FAGGIANELLI:
14   Q   Can you identify what's been marked as
15 Exhibit 19, please.
16   A   This is from Amber Hatcher, dated April
17 13.  And it's a request for the National Day of
18 Silence.
19   Q   Okay.  Did you do anything after receiving
20 this Email?
21   A   As I did with the first two, called the
22 Principal to make certain that this was clarified
23 with Amber.  Generally those conversations lasted
24 less than a minute.
25   Q   What is your best recollection of that

Page 111

1 less than a minute telephone call with Principal
2 Fusco?
3    A   It was I have received another
4 communication from Amber regarding the National Day
5 of Silence.  Please communicate with her regarding
6 my reasons for disapproval.
7    Q   And your reason for disapproval was what
8 we had talked about before, just that it occurred --
9    A   During instructional time.
10   Q   -- during instructional time?
11   A   Yes, ma'am.
12       (Exhibit No. 20 was marked for
13       identification.)
14 BY MS. FAGGIANELLI:
15   Q   Please look at what's been marked as
16 Exhibit 20.
17   A   Yes, ma'am, I recall this.
18   Q   This is a letter that was sent to you by
19 Lambda Legal; is that correct?
20   A   It was received as a fax.
21   Q   And this advises you that Lambda Legal was
22 advised by several students who seek to participate
23 in Day of Silence activities; correct?
24   A   Yes, ma'am, correct.
25   Q   And it says that, "Students have been

Page 112

1 informed they may not distribute materials, wear
2 T-shirts, or otherwise participate in the National
3 Day of Silence."  Correct?
4    A   That's correct.  This was the day before
5 the national day.  It was received about 6:30 in the
6 evening.
7    Q   And this letter says, "With respect to any
8 justifications to sensor the pro-gay speech -- I'm
9 on the second page -- " -- at issue here based on
10 'distraction' or 'disruption' the Supreme Court has
11 allowed restrictions on student speech only where
12 school officials have reasonably concluded the
13 speech will materially and substantially disrupt the
14 work and discipline of the school."  Do you see
15 that?
16   A   I see.
17   Q   Now, is that statement consistent with
18 your understanding?
19       MR. JENSEN:  Object to form.
20   A   It is consistent as far as my
21 interpretation have reasonably concluded the speech
22 will materially and substantially disrupt the work
23 as far as my referencing the classroom.
24   Q   Okay.  And this letter says in the last
25 paragraph, "Hopefully ,the information contained

Page 113

1  herein will lead to immediate resolution of those
2  issues, so no further action will be necessary to
3  ensure that students may participate in Friday's Day
4  of Silence activities without further discrimination
5  or censorship. However, please be advised we
6  closely monitoring the situation to ensure these
7  student's rights are not further violated and we
8  will be discussing with them the possibility of a
9  remedial efforts which may include a federal
10 lawsuit." Do you see that?
11     A   I see it.
12     Q   What action, if any, did you take after
13 you received this letter?
14     A   I did read this letter carefully. And I
15 felt, number one, that my position as far as the use
16 of classroom time was supported, as far as the Day
17 of Silence.
18        The next morning -- now, I did not read
19 this until that evening because it came in so late.
20 And the only reason I was able to read it was
21 because we have a fax machine that converts it to
22 PDF and sends it to us through Email. Otherwise you
23 have to be at that machine to get it. I made sure
24 that Ms. Fusco had received this and sent her my
25 copy, if I'm not mistaken that evening.

Page 114

1        The next morning I contacted -- I asked my
2  Administrative Assistant -- Executive Assistant,
3  Melba, that I wanted to speak with Ms. Fusco on the
4  telephone. And at that point I indicated to Melba,
5  I said the Lambda Legal communication that I
6  received last night -- because I was not at this
7  point aware of anything dealing with T-shirts or
8  that was part of this protest.
9        When she got Ms. Fusco on the telephone my
10 indication was let's make sure that we do not let
11 this situation get out of control. Now, the reason
12 I said that, and I explained it to Ms. Fusco, I do
13 not want students disciplined or suspended for
14 T-shirts, for the posters. I said the only issue I
15 have is the classroom. But I do not want
16 disciplinary action taken when it -- if it involves
17 these other issues. And she understood my position
18 on that.
19        So basically I was not wanting anyone to
20 potentially overreact here and take disciplinary
21 action on the student. Because as I indicated
22 earlier, we had not talked about disciplinary
23 action. But when I read this I said, Well, there is
24 that possibility if this is the feeling going at
25 this point. I wish I had received this three or

Page 115

1  four days earlier. But I think the conversation was
2  very clear.
3      Q   Didn't Amber's Emails to you include
4  wearing T-shirts? We just want to wear T-shirts?
5      A   But my communications with Ms. Fusco --
6  she was using boiler plate from the website. And I
7  was asking Ms. Fusco -- or in my discussion we had
8  not talked about T-shirts or anything like this.
9        So I felt, Oh, my goodness. Neither
10 should we. These are other issues that generally I
11 don't get involved with. But my feeling was after
12 reading the Lambda Legal paper of April 19, I don't
13 want this to escalate on any of these students
14 participating in before school, after school,
15 hallways, lunch, for wearing a T-shirt. I think
16 that was going too far.
17        And that rang the bell if -- keep in mind,
18 I was reading boilerplate. This is what you can get
19 from the website. But if that was planned I didn't
20 want any action taken on those students for a
21 T-shirt violation or a poster or anything like that.
22     Q   Shouldn't Ms. Fusco just told Ms. Hatcher
23 you can do this but you cannot be silent during
24 instructional time?
25        MR. JENSEN: Object to form.

Page 116

1      A   I am not sure she didn't.
2  BY MS. FAGGIANELLI:
3      Q   Well, we have not seen one piece of paper
4  yet today that says that this is permissible at all
5  in other than instructional time?
6        MR. JENSEN: Object to form. And if you
7  will read your client's deposition, she
8  testified along those lines.
9  BY MS. FAGGIANELLI:
10     Q   Well, I'm just saying --
11     A   There was a document. It's called, School
12 Board Policy.
13     Q   Okay. Please show me the document that --
14 the document that I'm referring to is the missing
15 document, which is the document from you to Ms.
16 Fusco --
17     A   No.
18     Q   -- or from Ms. Fusco to Amber Hatcher in
19 response to her Email that simply says, Yes, our
20 past practice is that we allow these types of first
21 amendment expression activity before school, at
22 lunch, in the hallways, and after school. And if
23 you want to do this, these are your parameters.
24        There is no document like that; is there?
25     A   There is.

Amber Hatcher v. Desoto County Board of Education                        Deposition of Adrian Cline

Page 117

1    MR. JENSEN:  Wait a second.  I have to
2  address the record for the assertion that there
3  is a missing document that hasn't been
4  produced.
5    MS. FAGGIANELLI:  I'm not saying there is
6  a missing document that hasn't been produced.
7    I'm saying there is no document that sets
8  that out to Ms. Hatcher in response to her
9  request.
10 BY MS. FAGGIANELLI:
11   Q   And show me what you were going to show me
12 about the policy.
13   A   It's one of the first things you showed
14 me.
15    MR. JENSEN:  I don't think that particular
16 policy, if you are looking for, was produced.
17   A   There is a policy about before school,
18 after school, that was covered this morning.
19 BY MS. FAGGIANELLI:
20   Q   Well, this is with regard to distribution
21 of materials.  It doesn't say anything about being
22 silent.
23   A   Why would we be concerned about them being
24 silent before they're in school?
25   Q   Why would you be that concerned about them

Page 118

1  being silent for one day in class?
2    A   I've answered that question.
3    So there is a piece of paper outlining
4  that.  And we were covering what was not covered by
5  School Board policy.
6    Q   All right.  So to get back to this, after
7  receiving Exhibit 19 you called Ms. Fusco; is it 19
8  or 20?
9    A   20.
10   Q   Here it is.  Which is the letter from
11 Lambda Legal.  You called Ms. Fusco?
12   A   The next morning.
13   Q   And the next morning would have been the
14 Day of Silence itself, correct; April 20?
15   A   That is correct.
16   Q   And your instructions to her were simply
17 don't let this get out of control.  I don't want
18 people to get disciplined for posters and T-shirts.
19 The only thing I'm concerned about is what happens
20 in the classroom in instructional time?
21   A   That is correct.
22   Q   And what did she respond to you?
23   A   She agreed.
24    (Exhibit No. 21 was marked for
25     identification.)

Page 119

1  BY MS. FAGGIANELLI:
2    Q   Have you ever seen this document before,
3  Exhibit 21?
4    A   Yes, ma'am.
5    Q   When did you see it for the first time?
6    A   April 20, I believe.
7    Q   Okay.  And this is an Email from Shannon
8  Fusco to the high school teachers and staff;
9  correct?
10   A   That's correct.
11   Q   And the subject line is, protesting, the
12 importance is, high.
13    Would you read what Ms. Fusco was telling
14 the teachers here?
15   A   No, I don't want to read it.
16   Q   Well, I'll read it.
17   A   Good.
18   Q   "Teachers, please know that we have a
19 group of students today who have an intention of
20 protesting.  The district has an absolute policy
21 against protesting on the school campuses."
22    Is that consistent in any way with what
23 you just described your conversation with Ms. Fusco
24 was?
25   A   I --

Page 120

1    MR. JENSEN:  Let me just pose an objection
2  for the record.  She did not read the entire
3  letter.  I think you have to take the entire
4  Email into context before you ask that
5  question.
6  BY MS. FAGGIANELLI:
7    Q   Go ahead.  You can answer.
8    A   Taken in the context of the total Email,
9  it is consistent.
10   Q   Okay.  What part of this Email is
11 consistent with your conversation?
12   A   If a student refuses to participate in
13 class by taking part in a silent protest, that is
14 considered a disruption.  Again, please notify the
15 administration and we will handle it.
16   Q   Okay.  What --
17   A   That has consistently been my position.
18   Q   And what's your understanding as to how it
19 would be handled?
20   A   The administration would simply be
21 notified.
22   Q   And what would the administration do once
23 they're notified?
24   A   They would determine whether it's a
25 situation that required discipline or not require

30 (Pages 117 to 120)

Vincent M. Lucente & Associates                                        800.282.8275

Amber Hatcher v. Desoto County Board of Education                                    Deposition of Adrian Cline

Page 121

1  discipline.
2      Q    And what about the middle paragraph that
3  says, "If you have students who are wearing placards
4  in protest of an issue or disrupting the hallways or
5  classrooms, please notify the Dean or administration
6  and we will handle it."
7      A    They would make a decision as the whether
8  or not that was indeed a disruption. There is no
9  indication in the communication that discipline
10  action will be taken.
11      Q    "We will handle it."
12          Are they going to give them a reward.
13          MR. JENSEN:  Objection. At this point
14      that's argumentative.
15      A    And sarcasm.
16          What we typically mean by we will handle
17  it, we avoid disciplinary action far more than we
18  take disciplinary action on a student.
19          As an example, dress code violations.
20  What the teacher may see as a dress code violation,
21  they're sent to the Dean's office. It's not viewed
22  as a dress code violation and they're returned to
23  the classroom with no disciplinary action taken.
24      Q    You were the Superintendent of Schools for
25  how many years?

Page 122

1      A    As previously indicated, 24.
2      Q    24. All right. This is a statement, and
3  I want you to tell me if it is an accurate statement
4  of the School's District policy.
5          The district has an absolute policy
6  against protesting on school campuses.
7      A    That is not consistent with our past
8  practice, that one sentence. But taken in total
9  context I think what she was attempting to do was to
10  make certain that no disciplinary action or students
11  were not consistently being sent to the office for
12  these infractions without administration being
13  notified so they could make the decision on whether
14  or not it was a disruption.
15      Q    The second paragraph has a disjunctive or
16  instead of an and; do you see that?
17      A    Uh-huh.
18      Q    "If you have students who are wearing
19  placards in protest of an issue, please notify the
20  Dean or administration, and we will handle it."
21          So this sentence says if you have a
22  student who was wearing a placard, notify us.
23          How is that consistent with your
24  conversation that you didn't want these students to
25  get in trouble for wearing a T-shirt, or having some

Page 123

1  statement on their shirt or having a piece of paper
2  attached to it that says Day of Silence?
3      A    Handling it doesn't mean absolute
4  disciplinary action.
5      Q    Why handle it at all? What's to handle?
6      A    If a teacher perceives it as being a
7  disruption in the classroom, administration would
8  make the final call if it indeed is a disruption in
9  the classroom.
10      Q    Do you have any information as to how and
11  when Ms. Hatcher was sent to the office on the Day
12  of Silence?
13      A    Other than knowing she was sent to the
14  office.
15          (Exhibit No. 22 was marked for
16              identification.)
17  BY MS. FAGGIANELLI:
18      Q    Have you seen this Email before?
19      A    Yes, ma'am.
20      Q    Okay. Exhibit 22 is ad Email from Shannon
21  Fusco to Melba Barnwell, dated April 23, 2012, and
22  its subject is Friday's protest.
23          And it reads, "Melba, on Friday only two
24  students received any consequences from protesting
25  for LGBT Day of Silence. Amber Hatcher was dressed

Page 124

1  in a shirt protesting the occasion. When her
2  teacher sent her up to the office she was
3  belligerent to the Dean. She initially refused to
4  answer, then refused to step into IR. She was
5  talked to and at did finally give the phone numbers
6  of her parents. She was placed in IR for the day as
7  they could not be reached. That is the extent of
8  her discipline. The other student -- who I'll just
9  refer to as RM -- was refusing to talk in class and
10  was sent home for the day on the consent of his
11  grandmother, LH. Two other students were asked to
12  comply with removing their protest tags and answer
13  questions. They both did so."
14          Is that what the Email says?
15      A    Uh-huh.
16      Q    Okay. First of all, why would two
17  students be asked to comply with removing their
18  protest tags?
19      A    I don't have any information on that.
20      Q    Is that consistent with your instructions
21  to --
22      A    If it was causing a disruption, but I
23  don't know if it was or not.
24      Q    And who would be the judge of that, the
25  teachers in the classroom?

Vincent M. Lucente & Associates                                              800.282.8275

Amber Hatcher v. Desoto County Board of Education                    Deposition of Adrian Cline

Page 125

1   A    The teacher would be initially and then
2 the administration would be notified.
3   Q    But the Email from Ms. Fusco that we
4 looked at to the teachers, which is Exhibit 21,
5 says, "If you have students who are wearing a
6 placard in protest of an issue or disrupting the
7 hallways or classrooms, please notify the Dean or
8 administration and we will handle it."
9        So the Email instructs the teachers if you
10 have a student who is wearing a placard, contact us.
11 Correct?
12   A    That's correct.
13   Q    So if they then contacted administration,
14 and administration brings that student to the
15 office, the student was then told to remove their
16 placard or their protest badge or whatever you want
17 to call it?
18   A    It doesn't say they were taken to the
19 office.
20   Q    Okay.  Do you have any information about
21 those two other students who were asked to comply
22 with removing their protest tags and answer
23 questions?
24   A    Second time, no.
25   Q    This Email indicates that Amber Hatcher

Page 126

1 was dressed in a shirt protesting the occasion.
2 When her teacher sent her up to the office she was
3 belligerent to the Dean; correct?
4   A    That's what it says.
5   Q    Have you seen the affidavit that was filed
6 with the court of the teacher that Amber had in
7 third period when she was sent to the office?
8   A    I don't recall the affidavit.
9        (Exhibit No. 23 was marked for
10        identification.)
11 BY MS. FAGGIANELLI:
12   Q    Take a minute and look at that.
13   A    Yes, ma'am.
14   Q    Have you looked at this affidavit?
15   A    Yes, ma'am.
16   Q    This affidavit is of Timothy Wilder.  Do
17 you know Mr. Wilder?
18   A    I know he's a teacher.
19   Q    Okay.  And it reflects in here that he was
20 Amber Hatcher's third period teacher on April 20?
21   A    Right.
22   Q    And she was participating in what he
23 understood to be a Day of Silence activity while in
24 his class.
25        And in paragraph 4 he says, "I did not

Page 127

1 sent Ms. Hatcher out of my class on April 20, 2012,
2 nor did I take any action to address her behavior
3 related to her Day of Silence activity.  I taught my
4 class in the same manner as usual that day.
5 However, I did not call on Ms. Hatcher to
6 participate."
7        Paragraph 5, "Ms. Hatcher was called out
8 of my class during third period on April 23, 2012."
9 I don't know why it says April 23 there.
10        "I do not know the reason why she was
11 called out of class."
12        Now, I will have understood this to mean
13 that she was not called out of the class on the Day
14 of Silence.  Have I misread this?
15   A    No.  That's his testimony as to what's in
16 the affidavit.
17   Q    And April 23?
18   A    That was his recollection.
19        (Ms. Collins rejoins deposition.)
20 BY MS. FAGGIANELLI:
21   Q    Do you have any information as to why
22 Amber was called out of class on the Day of Silence?
23   A    This doesn't say she was.
24   Q    I take it you don't have any other
25 information?

Page 128

1   A    For that day, Day of Silence, or April 23?
2   Q    Okay.
3   A    Let me back up on April 20.
4        When we placed a call to Ms. Fusco, we
5 being my office, the question was asked, and I think
6 I hit on this much earlier, how were things
7 progressing?  It crossed my mind that this was the
8 Day of Silence.  I had spoken with her that morning
9 wanting to know what the situation was.
10        According to the communication -- or what
11 I was told and a statement was received, that Amber
12 was called to the office apparently, but the Dean
13 had no reason to understand why she was in the
14 office and they got into an exchange.
15   Q    I'm sorry, you started this -- you
16 prefaced this with was it a call that you made to
17 the school to check --
18   A    To Ms. Fusco to see how things were
19 progressing.
20   Q    And about what time of the day was that;
21 do you know?
22   A    Around 11:30, noon.
23   Q    And what did she report to you?
24   A    Just what I indicated, that Amber had
25 gotten into an altercation with the Dean after she

Page 129

1  reported to the Dean's office.  But the Dean,
2  apparently, did not call her to the office.
3     Q    Did you talk to Ms. Fusco about any
4  discipline or consequences for Ms. Hatcher?
5     A    The only place she was put in in-school
6  suspension.  At that point it was still kind of an
7  ongoing situation.
8     Q    Even at this point, did you not have a
9  conversation with Ms. Fusco to just say in plain
10  English, These people can do this outside of class
11  time?
12     A    I felt that had been covered.
13            (Exhibit No. 24 was marked for
14               identification.)
15     Q    Okay.  This is appears to be a forwarding
16  of an Email to you.
17     A    This is on April 23.
18     Q    On April 23 at 1:47 p.m.  Do you see that
19  if you look at 22 and 24 together --
20     A    Uh-huh.
21     Q    So 22 was the Email from Ms. Fusco to
22  Ms. Barnwell, and then Ms. Barnwell sent it to you
23  later that afternoon; correct?
24     A    Yes.
25     Q    Okay.  What is a form that's called a

Page 130

1  discipline incident?
2     A    They're called by different names as far
3  as it's a discipline report.  It's a report issued
4  either by a teacher, administration, for a student
5  as far as student behavior.
6     Q    Are there any rules or policies regarding
7  amendments to discipline incident reports?
8     A    Reports are amended.  Don't construe that
9  with eliminating any reports because discipline
10  issues tend to unfold as far as the specifics over
11  time.
12        So you can have the initial report and
13  then you can have an amended report adding something
14  to it, and another amended report adding additional
15  details based on interviews.  Because depending on
16  the particular action, you have to interview staff,
17  students, and to get their reports.  So you could
18  have an amendment added.  It doesn't erase anything,
19  it just adds to it.
20     Q    And how should that be connoted in the
21  document itself?  Should it say amendment blank
22  days, further inquiry?
23     A    Generally you can tell, as you can with
24  the progression of these documents, if you run the
25  discipline report from the system it's going to

Page 131

1  print out several reports.  And you will see you can
2  denote by time or whatever date that additional
3  information has been added.
4            (Exhibit No. 25 was marked for
5               identification.)
6  BY MS. FAGGIANELLI:
7     Q    Please look at what's been marked as
8  Exhibit 25.  Have you seen this document before?
9     A    Yes, ma'am.
10     Q    And when did you see this document?
11     A    This was, I believe, on the 23rd.  That
12  week, anyway.
13     Q    And how is it that you came to look at the
14  discipline incident report?
15     A    It was sent to me.
16     Q    By whom?
17     A    I guess by Ms. Fusco.
18     Q    Okay.
19     A    Keep in mind it's an on-line system that
20  we have.  And it would follow-up with this April 23
21  communication on Amber and the RM student.
22     Q    And there is this legend right after the
23  text that says, "This report was generated on Monday
24  April 23, 2012 at 1:51 p.m."
25        Now, does that legend, does that mean that

Page 132

1  it was simply accessed and printed out or does it --
2     A    You have to talk to --
3     Q    You don't know?
4     A    -- IT.  I would assume that was -- if we
5  go by typical language, that was the time and date
6  this report was printed, but that's merely an
7  assumption.
8     Q    All right.  So this has an incident date
9  of Monday April 23, 2012 at 1:23 p.m.  And it says,
10  "Type is RB."
11        What does -- does RB stand for something
12  in particular?
13     A    I don't know.
14     Q    Okay.  "Refusal to follow directions."
15        And the incident notes, "Student refused
16  to follow class rules when given by teacher.
17  Student was then sent to Dean's office where she
18  continued to be insubordinate and willful
19  disobedient."
20        Now, Mr. Wilder's affidavit, which is
21  Exhibit 23, says, "I did not send Ms. Hatcher out of
22  my class on April 20, nor did I take any action to
23  address her behavior related to her Day of Silence
24  activity."  Correct?
25     A    I believe that said April 23, didn't it?

Page 133

1    Q   Well, paragraph 4.
2    A   Sorry, number 5 was 23.
3    Q   Right, paragraph 4.  Okay.  So is it the
4  Dean or the Principal who is responsible for
5  preparing these discipline incidents?
6    A   Typically it's the -- it can be done a
7  number of ways.   A teacher can input the discipline
8  from their classroom.  An administrator can input
9  starting with Dean.
10   Q   Is there a way to tell who has done it in
11  a particular case?
12   A   I can't answer.  I don't know.
13   Q   You don't know.
14       Is that something that an IT would know?
15   A   I don't know.  I don't know that program
16  that well.
17       (Exhibit No. 26 was marked for
18           identification.)
19  BY MS. FAGGIANELLI:
20   Q   I'm showing you what's been marked as
21  Exhibit 26, and it's a letter from Lambda Legal
22  dated December 2012.  Did you receive this?
23   A   Yes, ma'am.
24   Q   This is a public records request, correct?
25   A   Yes, ma'am.

Page 134

1    Q   And I assume that you get public records
2  requests as a matter of course; is that right?
3    A   Yes, ma'am.
4    Q   And what is your policy of practice?  What
5  do you do when you receive one?  Did you give it to
6  someone for them to --
7    A   Uh-huh.
8    Q   -- comply with it?
9    A   Uh-huh.
10   Q   Just tell me what you do.
11   A   It would depend on what they're requesting
12  and from what division or school.
13   Q   Okay.  So we'll be more specific.
14       With regard to this request, what did you
15  do to move forward in response to the public records
16  request?
17   A   I provided what -- and I'm talking about
18  my office -- with what information that we had.  And
19  then I am sure we sent it to also -- well, Shannon
20  Fusco received a copy, so she also received it.
21   Q   Do you have an IT person who when you get
22  public records requests runs a search for Emails?
23   A   We did it ourselves.
24   Q   Who does that?
25   A   It can be either Melba or Jan or I can do

Page 135

1  it.  I saw a number of these to Ms.Collins on
2  discovery that came from Melba.
3    Q   How do you decide on the search terms?
4    A   You use as many words as you can that
5  might be relevant to it.  So Hatcher, Lambda, or
6  dates.
7    Q   Do you run those terms individually or
8  together?  How do you --
9    A   You can run them together.
10   Q   Do you recall what you did?
11   A   No.
12   Q   Do you recall who actually ran the
13  searches for this?
14   A   I think it was as -- I did some and, as I
15  indicated just a moment ago, you have given me some
16  from Melba in this packet.  And I think I saw some
17  from Jan, also, in this packet.
18   Q   Well, there have been two public records
19  requests thus far, and one was probably after, post
20  dated your departure?
21   A   Well, I wouldn't have gotten that one.
22  That's why you have so many repeats on this.
23   Q   Uh-huh.
24   A   Because Melba was looking, Jan was
25  looking, I was looking.  So you have a lot of

Page 136

1  repeats.  And Ms. Fusco and her staff were looking.
2       (Exhibit No. 27 was marked for
3           identification.)
4  BY MS. FAGGIANELLI:
5    Q   Exhibit 27 is another version of the
6  discipline incident report, which is -- the first
7  one we looked at is Exhibit 25.  And this one
8  indicates -- Exhibit 27 indicates it was generated
9  on Wednesday May 9, 2012, at 11:50 a.m. which is the
10  day after the public records act request of May 8,
11  2012; correct?
12   A   Yes.
13   Q   Do you see any changes between these two?
14   A   If there is, I'm overlooking it.
15   Q   The same goes for me.  I think they're the
16  same.  The only thing that appears to be different
17  is that the report was generated on April 9?
18   A   And that would indicate that that line is
19  just when it's printed.
20   Q   Okay.  And then let me just ask you on
21  this form, when it says, Referred by, what is that
22  supposed to mean?
23   A   That would be whether it's a classroom
24  teacher or administrator who was writing the
25  referral on this student.

Page 137

1    Q   Okay.
2         (Exhibit No. 28 was marked for
3              identification.)
4    BY MS. FAGGIANELLI:
5    Q   Now, if we can compare Exhibit 25 to
6    Exhibit 28, it appears to me there is an addition
7    in --
8    A   This is a different student. This is
9    R███ M█████.
10   Q   I gave you the wrong one. I'm sorry.
11   I've done this twice now. That was one I meant to
12   skip. So compare 28 to 25, and those are both Amber
13   Hatcher; correct?
14   A   That's correct.
15   Q   And the one on the 28th says, "This report
16   was generated on Wednesday May 9, 2012 at 2:38 p.m."
17        And that's Exhibit 28?
18   A   There is an amendment to it.
19   Q   There is. And the amendment says,
20   "Student informed me she did not have to follow
21   school rules. She became strongly argumentive and
22   was instructed at that time to step into my office
23   from the hall. She continued to argue. She was
24   placed in IR for insubordination."
25        Do you see that?

Page 138

1    A   I see it.
2         (Exhibit No. 29 was marked for
3              identification.)
4    BY MS. FAGGIANELLI:
5    Q   Exhibit 29 appears to be an Email from
6    Shannon Fusco to you, on Thursday May 10, 9:49 a.m.
7    This is two days after the public records request.
8         She says, "Mr. Cline, I've attached the
9    scan for Amber. I have dated as an amendment
10   clarifying why Amber was placed in IR. The total
11   cause was for belligerence in the hallway, not being
12   disruptive in the classroom. Her poor behavior
13   began at the Dean's office. I put this as an
14   amendment so as not to change the initial form, just
15   the clarify. Please let me know if there is
16   anything else."
17   A   Uh-huh.
18   Q   All right. Now, if we turn to the second
19   page, there is delineated here. And the answer
20   notes, "An amendment to 4-23 form."
21        Do you see that?
22   A   Uh-huh. Yes, ma'am.
23   Q   Now, but do you also see that there is a
24   part of the prior incident report that has been
25   deleted? If you look at 28?

Page 139

1    A   It's been a modification to it, yes.
2    Q   Well, yes. Because the --
3    A   It's stating the same thing.
4    Q   The portion of the IR on Exhibit 28 that
5    says, "She became strongly argumentive and was
6    instructed at that time to step into my office from
7    the hall. And she continued to argue. She was
8    placed in IR for insubordination."
9         That part is gone, is it not?
10   A   It's gone but replaced by very similar
11   text here.
12   Q   And the amendment on May 10, is, "Amber
13   came to the front office as having been identified
14   as taking part in protest. She was silent and
15   wearing a placard. When the Dean began to speak to
16   her asking why she was at the office she became very
17   defensive and loud in the hallway and was asked to
18   step into the office. She refused to go and so was
19   placed in IR. She refused this placement."
20        And then I think it goes on to say an
21   attempt to notify the parent was made, and that's
22   been there throughout.
23   A   Uh-huh.
24   Q   What is this difference between allowing
25   your parent to check you out? You can either have a

Page 140

1    suspension or your parent can check you out?
2    A   That's what they were offering to her.
3    Q   Well, what is that process? You call the
4    parent and you say, I'm either going to have to sit
5    here in school because I have an in-school
6    suspension or you can come pick me up?
7    A   That's what they offered her, yes.
8    Q   And if your parent's not available or at
9    work, you basically just stay in an in-school
10   suspension?
11   A   Correct.
12   Q   Okay. Did anyone tell Amber that she
13   could participate in the Day of Silence after
14   school?
15   A   I don't know. I didn't --
16        (Exhibit No. 30 was marked for
17             identification.)
18   BY MS. FAGGIANELLI:
19   Q   Could you identify what's been marked as
20   Exhibit 30.
21   A   These are statements that were forwarded
22   to Ms.Barnwell and others, regarding the statements
23   on Amber Hatcher for the -- it says incident on
24   April 23. April 22. But it appears from the
25   communications here that this definitely refers to

Page 141

1 the National Day of Silence.
2     Q    Okay. And this Email and attached
3 document were sent to you by your executive
4 assistant on May 10, 2012; correct?
5     A    Correct.
6     Q    Did you read this when you received it?
7     A    Yes, ma'am.
8     Q    At this point in time what was your
9 interest with regard to the details of Amber
10 Hatcher's suspension or discipline?
11    A    I just -- this revolved around my initial
12 communication on April 20 as to how things were
13 going. And then I got these reports as far as these
14 two students.
15         And from that I received a copy of the
16 discipline report. And I'd have to look and see if
17 it was the amended report or the initial report. It
18 appears I received the amended report from that
19 communication. But this is information that
20 basically summarized what occurred as far as Amber
21 being in the Dean's office.
22    Q    Do you have an understanding as to why
23 there were these interviews occurring on May 10,
24 2012?
25    A    I don't think the interviews were

Page 142

1 conducted on May 10. I think that's when these were
2 written up. That's the way I interpreted it on May
3 10 as to the incident that occurred on April 20.
4     Q    So did you instruct Ms. Fusco or someone
5 else --
6     A    No, no, no, no.
7     Q    -- to interview?
8     A    No.
9     Q    Do you have any knowledge about this
10 process other than just seeing the document?
11    A    We -- I received the document.
12    Q    But you were not involved at all in terms
13 of this?
14    A    No.
15    Q    These interviews or this investigation?
16    A    Uh-uh. This may have been, but that was
17 on April 20, as far as what occurred with Amber in
18 the Dean's office.
19    Q    So as best you can tell, this reference to
20 the incident on April 23 is really an incident on
21 April 20; correct?
22    A    From reading it it appears to be on the
23 National Day of Silence.
24    Q    Okay. After mid-May did you have any
25 other discussion with anyone or any correspondence

Page 143

1 involving the Day of Silence until the end of 2012
2 that you can recall?
3     A    I don't recall any additional
4 communications.
5     Q    So from your position as Superintendent,
6 this issue flared up and it's over and you've moved
7 on to --
8     A    Moved on.
9     Q    -- all your other job responsibilities.
10        Now, as Superintendent, do your teachers
11 or administers ask your opinion with regard to
12 setting up clubs at school?
13    A    No. That doesn't go through my office. I
14 indicated earlier a new club has to go through the
15 school level administration and school counsel.
16 They have to have a charter.
17    Q    And is there a policy with regard to
18 whether teachers can sign a petition to have a
19 policy or a practice, whether a teacher should sign
20 a petition to start a club at school?
21    A    I've never known a teacher to sign a
22 petition for that reason, but if they wanted to they
23 could, I suppose.
24    Q    Were you aware at the end of 2012 that
25 there was a petition effort to start a gay and

Page 144

1 lesbian anti-bullying club at the high school?
2     A    No, ma'am, but that wouldn't be unusual.
3     Q    Who was R████ B████, if you know?
4     A    I don't know R████ B████.
5     Q    Okay. And who was Byron Jones; if you
6 know?
7     A    I know Byron Jones. He is our choral
8 teacher. Excellent teacher.
9     Q    Okay.
10        (Exhibit No. 31 was marked for
11         identification --4)
12 BY MS. FAGGIANELLI:
13    Q    Can you identify what's been marked as
14 Exhibit 31?
15    A    It's a letter from Amber, dated April 10
16 of 2012, and it's summarizing the student rights and
17 responsibilities that's posted on the district
18 website. And it's talking about expressing free
19 speech.
20    Q    Did you understood this to be another
21 request by Ms. Hatcher to get permission to
22 participate in the Day of Silence at this time in
23 2013?
24    A    Yes, ma'am.
25    Q    What, if anything, did you do in response

Amber Hatcher v. Desoto County Board of Education                    Deposition of Adrian Cline

Page 145

1  to this Email?
2      A   Ditto.  Contacted Ms --
3      Q   Contacted Ms. Fusco?
4      A   Yes, ma'am.
5      Q   And by that you called Ms. Fusco?
6      A   Yes, ma'am.
7      Q   And what did you discuss?
8      A   To meet with Amber.  See -- and that was
9  to clarify.  Unfortunately, Ms. Fusco informed me
10  that peaceful protest are against district policy.
11  And you -- and that you denied permission for us to
12  participate at DHS.  It was the same issues again.
13  The involvement of the classroom was the reason for
14  the denial.
15      Q   So, you know, by this time you have had
16  the history of 2012, where you testified you told
17  Ms. Fusco you didn't want this to get blown out of
18  proportion, you didn't want students disciplined for
19  just wearing a T-shirt; correct?
20      A   That was in April 20.  Yes, ma'am.
21      Q   So that was 2012?
22      A   Right.
23      Q   Now we're 2012, we're rolling along, and
24  Ms. Hatcher sends, kind of just forwards the prior
25  Email about -- to open the subject again about the

Page 146

1  Day of Silence; correct.
2      So you talked to Ms. Fusco about this.  Do
3  you say to her these are the parameters of what
4  would be allowed?  Will you talk to Amber Hatcher or
5  whoever else wants to do this, and let me know what
6  they can and can't do?
7      MR. JENSEN:  Are we talking about 2013?
8      MS. FAGGIANELLI:  2013.
9      MR. JENSEN:  I don't think he was in
10  office in 2013.
11      MS. FAGGIANELLI:  He's gone.
12      THE WITNESS:  I left in November of '12.
13      MS. FAGGIANELLI:  I know but -- oh.
14      THE WITNESS:  I wasn't involved in that
15  conversation.
16      MS. FAGGIANELLI:  So -- I'm sorry.  I
17  misunderstood.
18      THE WITNESS:  What you have here is --
19  see, this was forwarded for legal discovery on
20  this date, but it was written on this date.
21      MS. FAGGIANELLI:  So this is not -- this
22  is not a separate Email involving 2013?  This
23  is a --
24      MR. JENSEN:  It's what it says it is.  I
25  can have him -- I don't know exactly.

Page 147

1      MS. FAGGIANELLI:  Well, one of you
2  produced this document.  I'm just asking you to
3  tell me if that's what the heading at the top
4  says.
5      MR. JENSEN:  I don't understand these
6  notations.  I'm sorry.  You know as much about
7  it as I do.
8      MS. FAGGIANELLI:  How can I know as much
9  about it when I didn't produce it?
10      MR. JENSEN:  Because all I can tell you is
11  this is what it is, looking at the four corners
12  of the document.
13      MS. FAGGIANELLI:  Can I have my copy back.
14      A   Yes, ma'am.  See the date that it was sent
15  to me?
16  BY MS. FAGGIANELLI:
17      Q   But you see this?
18      A   Uh-huh.
19      Q   And it may very well be that you did not
20  receive this if you were not in office then?
21      A   Yeah.  I don't know -- this came from
22  Amber but this is legal discovery.  I don't know
23  if --
24      Q   But it says the same thing up here; do you
25  see it?

Page 148

1      A   Yeah, I see it.  Yeah.
2      Q   All right.  Well, let's go back to this
3  document.
4      A   What number is it?
5      Q   Number 31.
6      A   Okay.
7      Q   So on February 2, 2013, you were no longer
8  Superintendent; correct?
9      A   That's correct.
10      Q   All right.  So this discussion that we
11  just had about this document where we talked about
12  you received it, Exhibit 31, that you received this
13  and you talked to Ms. Fusco, this did not happen?
14      A   It did.  Because it was sent to me, this
15  document, on April 10.
16      Q   But it's 2012.  We have already talked
17  about the 2012.
18      A   I'm just telling you what's here.  I don't
19  know how this got up here, but this down here was
20  sent to me.  I don't know.
21      Q   Okay.
22      A   I don't know.
23      Q   All right.
24      A   If she sent it to me on February 2, 2013,
25  she sent it to a dead mailbox.

Vincent M. Lucente & Associates                                    800.282.8275

Page 149

1        MS. FAGGIANELLI: Mr. Jensen, who handled
2  this document production? Was it your
3  associate?
4        MR. JENSEN: Mr. Rosenbaum handled that.
5        MS. FAGGIANELLI: Okay. And you can't
6  tell me --
7        MR. JENSEN: I can't tell you anything
8  about it that's not on the four corners of the
9  document.
10       MS. FAGGIANELLI: Wonderful.
11 BY MS. FAGGIANELLI:
12  Q  Mr. Cline, do you know who Rich Bose is;
13 B-O-S-E?
14  A  Does not ring a bell. No, ma'am.
15  Q  Are you aware of the fact that Ms. Fusco
16 was removed from her position as Principal of Desoto
17 County High School?
18  A  I read it in the newspaper. Yes, ma'am.
19  Q  Okay. Did you follow that in the news at
20 all?
21  A  Not that closely, no, ma'am.
22  Q  Did you go to any School Board meetings or
23 anything?
24  A  No, ma'am.
25  Q  Are you aware of any of the allegations

Page 151

1  Day of Silence was held in 2013?
2   A  As I indicated earlier, I referred to that
3  that it was handled in accordance with no
4  involvement of instructional time. I cannot -- I'm
5  just going on what I was told.
6   Q  Okay. Are you aware that a gay/straight
7  alliance has been formed at the high school?
8   A  No, ma'am.
9   Q  In terms of the talking to people about
10 what happened at the high school on National Day of
11 Silence, were you informed there were any issues or
12 problems?
13  A  I was not told that. I didn't seek people
14 out on this, it was just done in passing.
15  Q  We talked today about the potential
16 disruption concerning the instructional time. And
17 you expressed to me on multiple occasions that the
18 issue that you had with that is that students are
19 expected to talk in class. Not just respond to the
20 teacher but to talk to each other in group settings.
21     Other than what you have told me, is there
22 any other issue with regard to disruption that
23 played into your evaluation of the issues here?
24  A  No, ma'am.
25  Q  Okay. After you received the letter from

Page 150

1  against Ms. Fusco?
2   A  What I'm aware of is only what's in the
3  newspaper.
4   Q  So the entire time of your tenure as
5  Superintendent, there were no issues that you are
6  aware of?
7   A  No issues?
8   Q  That would be related to her removal from
9  office?
10  A  Not to my knowledge, no, ma'am.
11  Q  Okay. And are you aware that there was a
12 Day of Silence participation in 2013 at the high
13 school?
14  A  I was told that, yes, ma'am.
15  Q  Who told you that?
16  A  Oh, one of the employees, I believe.
17  Q  Who would that be?
18  A  I don't recall the name.
19  Q  Well, tell me the circumstances under
20 which you were having this discussion?
21  A  We were not discussing that. It was just
22 that that came out as far as things that were new at
23 the high school. It wasn't transferred in a
24 negative way.
25  Q  And what is your understanding of how the

Page 152

1  Lambda Legal in April 2012 -- it's Exhibit 20 -- did
2  you contact anyone on the School Board with regard
3  to that issue?
4   A  No, ma'am.
5   Q  And this letter at the end talks about the
6  possibility of remedial efforts which may include a
7  federal lawsuit.
8      Do you get letters -- did you as your term
9  of School Superintendent, did you get many letters
10 that threatened a federal lawsuit?
11  A  The only lawsuits we have got that would
12 anywhere approached a federal level was ESE.
13  Q  And how many of those did you receive in
14 your tenure? Probably a lot, I would guess?
15  A  It's -- I could not make a guess.
16  Q  More than ten?
17  A  No.
18  Q  Okay. Fewer than ten.
19  A  That's why we had that workshop every
20 year.
21  Q  So in your tenure as Superintendent you
22 received fewer than ten letters threatening
23 possibility of the federal lawsuit?
24  A  Oh, wait a minute. I thought you meant
25 actual suits.

Page 153

1    Q    No, no.
2    A    No. Those are like bill boards
3    advertising lawyers. I get students threatening me
4    with lawsuits.
5    Q    So your routine practice as Superintendent
6    was if you got a letter threatening a federal
7    lawsuit, you would pay attention to it yourself and
8    you would deal with it, but you would not pass it
9    forward?
10    A    That's not what caught my attention.
11    My attention was -- and that was the April
12    19 letter -- was their wanting me to take action
13    before or by April 20, and were some of the points
14    they were specifying. I didn't -- I made that
15    decision before I reached the threat of a federal
16    lawsuit.
17    Q    Okay.
18    A    If I reacted every time I was threatened
19    to be sued as Superintendent, I would be under a
20    rock all the time.
21    Q    Well, and my question really is in terms
22    of what you, as Superintendent, did versus what you
23    would go to the board with.
24    So you as the Superintendent and
25    essentially the CEO, when you would get a letter

Page 154

1    threatening a lawsuit, such as Exhibit 20, you would
2    deal with it rather than send it to the board to
3    deal with; correct?
4    MR. JENSEN: Object to the form.
5    A    I would have to.
6    BY MS. FAGGIANELLI:
7    Q    Okay.
8    A    I would have no time to send it to the
9    board when I get it at 6:30 in the evening before
10    the day of event.
11    Q    Well, I'm not talking about this letter in
12    particular.
13    A    Oh, okay. I thought you were referencing
14    that letter.
15    Q    I am, but in terms of your general
16    practice is you handle it, correct? You don't send
17    it to the board and say, What do you want me to do
18    with it?
19    A    Oh, no, I don't do that. I would more
20    likely send it to the board attorney.
21    Q    Okay. All right. With regard to this
22    letter, Exhibit 20, did you send it to the board
23    attorney, or did you send it to the board? Did you
24    include it in report to them?
25    A    I do not recall.

Page 155

1    Q    If you had done any of that, would we have
2    found the paperwork that would document it?
3    MR. JENSEN: Object to form.
4    A    I would think so.
5    BY MS. FAGGIANELLI:
6    Q    Okay. If you were to send or forward a
7    letter like this to the board at that time, would
8    you have a paper record of it or an electronic
9    record of the contact with the board?
10    A    I would think so, yes, ma'am.
11    Q    Okay.
12    A    The only thing we may have done is make a
13    copy and put it in the packets, but I can't recall.
14    Q    If you put it in a packet, you testified
15    earlier that all of your reports to the board were
16    in public; correct?
17    A    Yeah, but we included information in
18    written form just for them to read.
19    Q    Okay. But you did not seek from them
20    their advice or opinion or conclusion as to how to
21    deal with this issue; correct?
22    A    No, ma'am.
23    (Exhibit No. 32 was marked for
24    identification.)
25

Page 156

1    BY MS. FAGGIANELLI:
2    Q    Okay. Mr. Cline, I've had marked as
3    Exhibit 32 a copy of an affidavit that was filed in
4    this lawsuit that purports to be your affidavit; is
5    this your affidavit?
6    A    Yes, ma'am.
7    Q    Attached to this affidavit is a document
8    that said, Student's rights and responsibilities, do
9    you have that?
10    A    Yes, ma'am.
11    Q    Is that what you were referring to before
12    with regard to a policy, or is it something else?
13    A    No. I think what I was referring to was
14    the distribution of written materials.
15    Q    Now, in your affidavit in paragraph 5 you
16    say, "I did not instruct Ms. Fusco or any other
17    employee to deviate from established school policy,
18    which is codified in the student's rights and
19    responsibilities section, 210.03 of the School Board
20    policy manual."
21    A    Correct.
22    Q    Is that what's attached?
23    A    Yes, ma'am.
24    Q    Okay. Well, number 1, under, Students
25    have the right to, it says number 1, "Be informed of

Amber Hatcher v. Desoto County Board of Education                                    Deposition of Adrian Cline

---

Page 157

1  all school rules and the consequences of breaking
2  those rules."
3      A   Uh-huh.
4      Q   Now, in this regard it was your
5  understanding that Ms. Fusco had informed the
6  Plaintiff here that she could participate in Day of
7  Silence, do what she wanted to do, at all times
8  other than during class?
9      A   Yes. But I talked about the reasons I
10  denied it. And it was classroom, the use of
11  classroom time.
12     Q   Okay. And to your knowledge, I think you
13  said that you assumed that Ms. Fusco might have said
14  this to Ms.Hatcher, but to your knowledge, did
15  anyone in administration at the high school ever
16  inform Ms.Hatcher that she could participate in Day
17  of Silence before school, in the hallways, at lunch,
18  and after school, but not during class time?
19     A   That was my understanding. But to tell
20  you that I witnessed that, no, I did not.
21     Q   Okay. Do you know if Ms. Fusco ever told
22  Amber Hatcher expressly what the consequences would
23  be if she participated in Day of Silence without
24  approval?
25         MR. JENSEN: Object to form.

---

Page 158

1      A   I cannot positively. I know what we
2  discussed. But I was not there for the
3  conversation. But I like to think I have enough
4  trust in the administrative staff to go with what
5  they tell me.
6  BY MS. FAGGIANELLI:
7      Q   Have you ever been given a copy of Ms.
8  Fusco's affidavit?
9      A   Uh-uh.
10         (Exhibit No. 33 was marked for
11              identification.)
12  BY MS. FAGGIANELLI:
13     Q   Take a minute to read it and then let me
14  know when you're ready for my question.
15     A   Yes, ma'am.
16     Q   Do you see in paragraph 9, where Ms. Fusco
17  says, "I forwarded her request to the School
18  Superintendent, who did not approve the activity.
19  The School Superintendent did not provide me any
20  instruction or guidelines as to what acts would be
21  permitted or not permitted."
22         Is that consistent with your recollection?
23     A   The -- my recollection was a clear
24  indication of what not -- would not be permitted.
25     Q   And that was?

---

Page 159

1      A   Instructional time.
2      Q   Instructional time.
3         Now, the district has policies with regard
4  to student first amendment rights; correct?
5         And do any of those policies reflect that
6  there is no first amendment expressive activity
7  permitted during instructional time?
8         MR. JENSEN: Object to form.
9      A   I don't think the policy states that
10  specifically, no, ma'am. But in reading the opinion
11  from the Lambda communication, the free speech that
12  would prove disruptive or prove -- have a negative
13  impact on the instruction would be reason not to
14  allow that speech at that time. And so I felt that
15  I was correct in making that decision.
16     Q   Does that talk about a material
17  disruption?
18     A   It just said disruption, if I remember,
19  but we can pull it back up.
20     Q   It's 20.
21     A   Um, where school officials have reason to
22  concluded -- it's on the second page -- that the
23  speech will materially and substantially disrupt the
24  work and discipline of the school. I applied that
25  to the classroom.

---

Page 160

1      Q   Okay.
2      A   Specifically.
3      Q   And in your application of that to the
4  classroom, you concluded that the mere fact of being
5  silent unless called upon by a teacher would
6  materially and substantially disrupt the work --
7      A   Yes, ma'am.
8      Q   -- of the school.
9         I'm going to shift gears a little bit, if
10  you want to take a quick break.
11         ( A short break was taken.)
12  BY MS. FAGGIANELLI:
13     Q   Mr. Cline, based on your testimony thus
14  far that you had not brought these issues with
15  regard to Day of Silence to the School Board, is it
16  also fair to say that you had not informed them of
17  your interpretation of the policy limiting first
18  amendment expression to noninstructional times at
19  school?
20         MR. JENSEN: Object to form.
21  BY MS. FAGGIANELLI:
22     Q   Is that correct?
23     A   (Nodding head affirmatively.)
24     Q   And that is true because that is something
25  that you understand is within the ambit of your job

---

Vincent M. Lucente & Associates                                                        800.282.8275

Page 161

1  duties and responsibilities; correct?
2          MR. JENSEN: Object to form.
3      A  Yes, ma'am.
4  BY MS. FAGGIANELLI:
5      Q  And in that regard, it's hard for me to
6  even envision someone who would be more qualified
7  than you to make that determination, because you
8  have been a teacher, Assistant Principal, Principal,
9  and then School Superintendent for 24 years in this
10  district; correct?
11     A  38 when you put all those together.
12     Q  Okay. 24 as Superintendent, 38
13  altogether; correct?
14     A  Uh-huh.
15     Q  Have you seen the answer that was filed on
16  your behalf in this lawsuit?
17     A  Are you talking about this affidavit?
18     Q  No. It's actually a legal document called
19  an answer.
20          (Exhibit No. 34 was marked for
21              identification.)
22  BY MS. FAGGIANELLI:
23     Q  There it is. Have you ever seen that
24  before?
25     A  I don't recall in this final form.

Page 162

1      Q  Okay.
2          (Exhibit No. 35 was marked for
3              identification.)
4  BY MS. FAGGIANELLI:
5      Q  I've had marked as an exhibit a copy of
6  the answer that was filed on your behalf in this
7  lawsuit, which is Exhibit 34, and a copy of the
8  Verified Complaint, which is Exhibit 35.
9          Have you ever seen the Verified Complaint?
10     A  I don't recall in final form.
11     Q  Would you look at the Verified Compliant,
12  which is Exhibit 35.
13     A  Look at what section?
14     Q  Paragraph 5, on page 2, and just read that
15  to yourself, if you would.
16     A  Yes.
17     Q  Is there anything in that paragraph that's
18  incorrect?
19          MR. JENSEN: At this point I have to
20  object to form. You're asking for him to make
21  legal conclusions.
22  BY MS. FAGGIANELLI:
23     Q  You can answer.
24     A  And your question was?
25     Q  Is there anything in paragraph 5 that to

Page 163

1  your mind is incorrect?
2      A  I can't see anything.
3      Q  Okay. Well, is it your understanding that
4  as Superintendent of the school district you had
5  delegated the authority and responsibility for the
6  administration and management of the schools?
7          MR. JENSEN: Object to form.
8      A  Yes.
9          MR. JENSEN: You're asking him for a legal
10  conclusion.
11     A  I can answer?
12          MR. JENSEN: You can answer if you know
13  the answer.
14     A  Would you repeat the question.
15  BY MS. FAGGIANELLI:
16     Q  I'm just reading from five.
17     A  I'm sorry, I flipped the page.
18     Q  It says that, "Defendant, Adrian Cline, is
19  or was at the time of the events giving rise to this
20  action the Superintendent of Desoto County School
21  District who has been delegated the authority and
22  responsibility for the administration and management
23  of the schools."
24          And I was just stopping there to take it
25  in pieces.

Page 164

1      A  Sure, yes.
2      Q  Is that an accurate statement of your
3  responsibility?
4          MR. JENSEN: For clarification, delegated
5  by whom?
6      A  I'm elected.
7  BY MS. FAGGIANELLI:
8      Q  Okay. So in that sense it might be
9  inaccurate because you are --
10     A  I don't --
11     Q  -- elected or delegated?
12     A  -- this position doesn't work for the
13  School Board.
14     Q  Okay. So in this instance, because you
15  are elected, the School Board has not delegated
16  authorities to you, you have your own authority?
17     A  As specified in the Florida statutes
18  citation.
19     Q  Okay.
20     A  My responsibilities are outlined in
21  Florida statute.
22     Q  Correct. As Superintendent, did you also
23  serve as Secretary and Executive Officer of the
24  Desoto County Board of Education?
25     A  Yes, ma'am.

41 (Pages 161 to 164)

Page 165

1   Q   Okay. Would you turn to paragraph 22.
2  Please read that. And you're welcome to look at the
3  attached exhibits and tell me if this is a correct
4  statement in paragraph 22.
5         MR. JENSEN: I'll object to form. You're
6  asking him to comment on things that are not
7  within his personal knowledge.
8         MS. FAGGIANELLI: So it's your position
9  that an Email they was sent to him is not
10  within his personal knowledge?
11        MR. JENSEN: It's also asking what she
12  wanted and her subjective intents. He would
13  have no knowledge of that. Or for that matter
14  he has no knowledge who sent it.
15        MS. FAGGIANELLI: Have you looked at the
16  exhibits in this complaint?
17        MR. JENSEN: I don't know who sent that.
18  Nobody knows who was behind that key board when
19  it was sent.
20        MS. FAGGIANELLI: So I take it that's the
21  basis for your denial, is that you have an
22  Email that was sent using the same Email
23  addresses over and over again, and based on
24  that you deny --
25        MR. JENSEN: I don't have to answer you

Page 166

1  why I admit or deny allegations. I do what I
2  believe is in my client's best interests.
3  BY MS. FAGGIANELLI:
4   Q   So the question to you is still pending.
5  He can object as much as he wants.
6   A   Would you repeat the question.
7        (The court reporter read back the previous
8              question.)
9   A   To the best of my knowledge.
10  BY MS. FAGGIANELLI:
11   Q   Please turn to paragraph 39. Is that
12  statement correct?
13        MR. JENSEN: Object to form.
14        MS. FAGGIANELLI: On what basis?
15        MR. JENSEN: Something he has no personal
16  knowledge about.
17  BY MS. FAGGIANELLI:
18   Q   You can answer.
19   A   It appears to be correct.
20        MS. FAGGIANELLI: Thank you. While we're
21  speaking about answers, I thought I would just
22  inform you as a professional courtesy that the
23  school district has never filed an answer in
24  this case. It's now long overdue, if you want
25  to just file it.

Page 167

1         MR. JENSEN: I'll be happy to do so.
2  Thank you for pointing out the oversight.
3         MS. FAGGIANELLI: I know it's hard in
4  those cases where you have multiple parties.
5  BY MS. FAGGIANELLI:
6   Q   Mr. Cline, have you ever been provided
7  with a copy of the transcript of the hearing on the
8  preliminary injunction motion in this case?
9   A   I believe I have a copy of that, yes.
10   Q   And you believe you have read that. Now
11  that -- I think that we just received that recently.
12   A   No. Then I'm thinking of something else.
13  They tend to run together.
14   Q   Have you spoken with Ms. Fusco at all
15  about Day of Silence after the last conversation I
16  think that you testified about? And since the
17  time -- let's do it this way.
18         Since the time of this lawsuit was filed,
19  have you spoken to Ms. Fusco?
20   A   There was just one brief communication on
21  the deposition schedule. That was the result of we
22  were both at that retirement celebration at the same
23  time.
24   Q   But you have not spoken to her with regard
25  to any of the details --

Page 168

1   A   Oh, no, no.
2   Q   -- of this litigation?
3   A   No, no.
4   Q   Have you spoken to anyone else, excluding
5  your lawyer?
6   A   No, ma'am.
7   Q   Do you have any understanding as to
8  whether you have any insurance coverage should a
9  judgment be entered against you in this case?
10   A   I don't think so.
11   Q   And do you have a policy?
12   A   No, ma'am.
13   Q   An umbrella policy or anything like that?
14   A   I don't think so. I don't know.
15   Q   Has the School Board informed you that
16  they have a policy that might cover you?
17   A   Yes. Yes, ma'am.
18   Q   Okay. What has the School Board told you
19  about that?
20   A   Other than there is a policy, that's it.
21   Q   To your knowledge is the policy paying for
22  your attorneys' fees?
23   A   To my knowledge, yes.
24   Q   You know, we talked earlier today about
25  the past practice of not allowing first amendment

Page 169

1 speech or nonspeech during instructional time, and
2 you told me about the other groups, the teen
3 pregnancy, or what was it?
4     A   We had teen pregnancy, we had alcohol and
5 drugs, and we had school prayer.
6     Q   Right.  And so those were examples of
7 times where speech was allowed but it was
8 conditioned on the fact that it would not be
9 permitted in instructional times unless it was
10 connected to education?
11     A   That's correct.
12     Q   Like the health class or something;
13 correct?
14     A   Uh-huh.
15     Q   Okay.  And that was the case for each and
16 every one of those?
17     A   As I recall, yes, ma'am.
18     Q   All right.  And you were involved in the
19 determination with regard to those?
20     A   Those were while I was Principal or
21 Assistant Principal at the high school.
22     Q   And did you allow those as Principal or
23 Assistant Principal, or did they go up the chain to
24 the supervisor?
25     A   Typically they don't go up the chain.

Page 170

1 That's part of the Principal's -- administration's
2 responsibility.
3     Q   Okay.  So is it fair to say that without
4 Amber Hatcher sending you Emails about Day of
5 Silence, this may very well not have gone up the
6 chain either?  It would have just been decided at
7 the Principal level?
8     A   It could have been decided at the
9 Principal level, yes.
10     Q   And then what avenues are available for
11 reviews of decisions that the Superintendent makes?
12     A   School board.
13     Q   And how is that employed?
14     A   There you can either schedule a time to
15 appear before the board at one of its regular
16 meetings, or you can come to a regularly scheduled
17 meeting and there is an opportunity for public
18 presentation on non-agenda items at the end.
19     Q   Is that the kind of thing where you get
20 three minutes or --
21     A   It's limited, I think, to about ten, but
22 the chair is generally pretty liberal with it.
23     Q   And in the 24 years that you have been the
24 Superintendent, how many times has someone tried to
25 have a decision that you have made reviewed by

Page 171

1 either getting on the board's agenda or making a
2 public presentation at that board meeting?
3     A   I'm just making a guess here, maybe five.
4     Q   Do you recall generally what those may
5 have involved?
6     A   I can recall some specifics.  The State
7 was attempting to extend the school year by two
8 weeks.  And I had spoken with the board in regards
9 to it and then moved forward with communicating with
10 parents.  And there was a rather large backlash on
11 that.
12     Q   So you were communicating with parents
13 that you were trying to extend the school year?
14     A   Right.  The State was wanting the school
15 year extended -- it was a voluntary program -- for
16 two additional weeks.
17     Q   And so that decision, then parents
18 communicated with the School Board and said we don't
19 want to do this?
20     A   Correct.  But it became a moot point
21 because the State withdrew the funds.
22     Q   Any other --
23     A   After all the scars.
24     Q   I can tell you, as a parent I wouldn't
25 mind having two more weeks --

Page 172

1     A   Unfortunately, those parents never came
2 out.
3     Q   I guess that's the problem.
4         Any other things you can recall that were
5 taken to the board level?
6     A   Dress code issues.  I remember one time
7 that we had specifically said no chains.  And we had
8 some students wearing some rather large pocket watch
9 chains.  And the decision we felt that came under
10 that dress code rule.  Because if you took that
11 chain off it could be used as a very deadly weapon.
12 And we had several parents that tried to overturn
13 that.
14     Q   And were they successful?
15     A   No, ma'am.
16     Q   In the five times in 24 years --
17     A   That was just a guess now I said five.
18     Q   Okay.  Approximately five.  Somewhere
19 around there.
20         Do you recall an instance where a decision
21 that you made was brought to the board level and was
22 reversed?
23     A   Yeah.  It was on the school calendar.  And
24 the idea was to start the year earlier, much like
25 districts are doing now.  So we would end semester

Page 173

1  at Christmas, instead of coming back and then having
2  two weeks and then the end of the semester.  We felt
3  that these two weeks were wasted.
4          Colleges end at during the winter break
5  and we felt it was a good idea.  We did have
6  discussion groups, community groups.  They also felt
7  it was a good idea.
8          When it went to the board, there was a
9  backlash from the community, and the board asked me
10  to go back and come up with another option.
11     Q    Now, just so I understand, and I know this
12  is pretty technical, but when you said it went
13  before the board, were any of these things
14  recommendations that you were going to the board
15  for --
16     A    Uh-huh.
17     Q    -- or was it a decision that you made that
18  someone then took it above your head to the board
19  and said, The Superintendent made this decision and
20  I don't like it?
21     A    The dress code was a decision I made.
22     Q    Okay.  But in terms of extending the
23  school year, was that a recommendation?
24     A    It was a recommendation.
25     Q    And --

Page 174

1     A    The school calendar was recommendation.
2     Q    So the dress code was an instance where
3  you made a decision --
4     A    Uh-huh.
5     Q    -- and said no large pocket watch chains?
6     A    Right.
7     Q    And then that was taken to the School
8  Board about they agreed with you?
9     A    They agreed with me.  Yes, ma'am.
10     Q    Other than those times when you have just
11  made a recommendation to the board, have you had a
12  situation in which one of your decisions has been
13  essentially appealed to the board and the board has
14  disagreed with you?
15     A    Other than the dress code, there was an
16  issue with the recommendation of an administer.  I
17  choose not to recommend that administrator.  And
18  the -- no, that wouldn't apply because the board
19  sided with me, so it's a moot point.  But we did
20  have a backlash of staff that wanted to keep the
21  administrator.
22          MS. FAGGIANELLI:  All right.  Well, I'm
23     going to say the words you have wanted to hear.
24     I'm finished.  Thank you.
25          THE WITNESS:  Thank you.

Page 175

1          MR. JENSEN:  Doesn't mean you're done,
2     though.  It just means you have to sit -- but I
3     don't have a lot.
4               CROSS-EXAMINATION
5  BY MR. JENSEN:
6     Q    We've used the initials ESE a few times
7  during this deposition.
8     A    Yes, sir.
9     Q    But some people who read this transcript
10  may not understand that that stands for.  Could you
11  explain that, please.
12     A    Yes.  ESE stands for Exceptional Student
13  Education.  And it covers students that have
14  documented learning issues that can either be
15  associated with physical issues that require
16  accommodations, it can also refer to mental issues
17  that require accommodations.  It can also refer to
18  gifted students that require accommodations.
19     Q    All right.  Now, does the School Board
20  have published policy manual?
21     A    Yes, sir.  It is posted on the district
22  website.
23     Q    And is that policy manual visible for all
24  employees of the School Board?
25     A    Yes, sir.  It's available to the entire

Page 176

1  community.
2     Q    And are employees expected to follow the
3  procedures in that policy manual?
4     A    Yes, sir.
5     Q    Are they trained to follow the procedures
6  in that policy manual?
7     A    The administrative staff, when any policy
8  is changed, we have a discussion on the policy with
9  instructions if it particularly pertains to
10  employees under their control when they discuss that
11  with the employees.
12     Q    The policies that include student
13  expression and first amendment rights, do those
14  policies require that students come to you and ask
15  for your approval before they do any of this stuff
16  on noninstructional time.
17          MS. FAGGIANELLI:  Object to the form.
18     A    No, sir, I do not have students or staff
19  to come to me with those kind of issues.
20  BY MR. JENSEN:
21     Q    Okay.  So a student wants to have a
22  discussion with another student outside of class,
23  they're free to do so without your permission?
24     A    That is correct.
25     Q    Do you have any training on corporate law?

Page 177

1    A    No, sir.
2    Q    Okay.
3    A    Other than what was included in the
4  master's, but most of that was educational law.
5    Q    You were asked to compare your position to
6  a CEO in a corporation.
7         Are you familiar with corporate bylaws and
8  what a particular CEO would have authority to do and
9  not do?
10   A    I have recently seen a CEO and what the
11 individual is allowed to do and not to do, but
12 that's just an isolated example.
13   Q    You wouldn't hold yourself out as an
14 expert in corporate law?
15   A    Oh, my goodness, no.
16   Q    During classroom discussions, do students
17 learn from each other when they speak?
18   A    Yes, sir.
19        In fact, I was reading a very good essay
20 two days ago. And it talked about the issue of the
21 teacher in the class being a source of information.
22 Which is great, but that doesn't necessarily equate
23 to good teaching and good learning.
24        Because the second limb is the ability of
25 the teacher to find the right means to instruct that

Page 178

1  student. And the research indicates, and this is
2  the whole concept with FCAT and Common Core, is for
3  students to learn from each other. You develop your
4  communication skills, you develop your team building
5  skills, which are absolutely essential as far as the
6  work place in this century.
7         This extends beyond the classroom in that
8  students communicate with each other electronically
9  and develop specific projects. We utilize one
10 class. I don't know if you're familiar with the
11 Kahn Academy. It is an outstanding -- K-A-H-N --
12 outstanding program. It's free and on-line.
13        And this individual instructs in specific
14 mathematic concepts, provides 10 to 15 minutes of
15 instruction. We had one class that we allowed, we
16 want you to go on to Kahn at night. And these
17 students all had Internet access. They listened to
18 the instruction and then they came to class and
19 applied that instruction. And the teacher
20 functioned as a facilitator moving from group to
21 group.
22        So that interaction is essential if the
23 students are going to perform on FCAT. If the
24 students are going to perform on whatever the State
25 decides as far as the Common Core assessment, the

Page 179

1  SAT, the ACT. It is all an application and you only
2  learn that through group exchanges.
3    Q    All right. And what is your opinion as to
4  whether or not when a student refuses to communicate
5  in a classroom, whether you are not only robbing
6  your own educational opportunity but the educational
7  opportunities of the students around them?
8         MS. FAGGIANELLI: Object to the form.
9    A    To extend that, if a student in a group --
10 and when I talked about that second branch as far as
11 how a student learns, a good teacher will form these
12 groups based on student learning styles. So if you
13 have a group that learns best by drawing or
14 outlining a particular concept, then you have those
15 people feeding each other. And each group member is
16 assigned essential task in order for that group to
17 succeed. So therefore, a group member that does not
18 participate really limits what the group can
19 accomplish.
20   Q    And which, in your opinion, can be
21 accomplished in the shortest period of time, verbal
22 communication or written communication?
23   A    Verbal. There has been a great deal I've
24 read on that. As a society we have become too
25 dependent, and there is a lot of educational writing

Page 180

1  on this, to electronic texting, which we all do,
2  Email, which we are all slaves to, and we're moving
3  away from the art of communicating verbally.
4         And there needs to be a balance. Some
5  things you can communicate better orally. Other
6  things you communicate better in writing. I
7  typically communicate something very short and to
8  the point. If I see it's going to be extended, then
9  I will either meet with the individual or just pick
10 up the phone and talk to the individual rather than
11 spend a great deal of time typing out an Email.
12        The other thing I try not to let an Email
13 go over one page. There is quite a bit of data
14 accumulated that people do not like Emails that go
15 beyond one page, they don't read it.
16        I've had one person in one office Email me
17 in the next office. Step to the door. Talk to me.
18   Q    You were asked about the Verified
19 Complaint and the Answer to that complaint.
20   A    These documents?
21   Q    Yes. Do you know the factual reason why
22 one allegation may be denied and then never
23 admitted?
24        MS. FAGGIANELLI: Object to the form.
25

Amber Hatcher v. Desoto County Board of Education                    Deposition of Adrian Cline

Page 181

1   BY MR. JENSEN:
2        Q   You can answer.
3        A   You need to rephrase the question.
4        Q   Do you know why the attorney who executed
5   the Answer answered one way or another?
6        A   It was my understanding that --
7        Q   Don't reveal any attorney/client
8   communications.
9             Do you just have independent knowledge one
10  way or another?
11       A   Yes, I have knowledge as to how those
12  answers were arrived.
13            MR. JENSEN:  Okay.  That's all the
14       questions I have.
15            MS. FAGGIANELLI:  I have one very quick
16       follow-up.
17            REDIRECT EXAMINATION
18  BY MS. FAGGIANELLI:
19       Q   Mr. Cline, is it your understanding that
20  in 2011/12 school year that every day in every class
21  students are talking and being facilitated by the
22  teacher in a group?
23       A   No.
24       Q   Okay.  How many days out of a standard
25  school week day, five days, is it your understanding

Page 182

1   that the teacher actually teaches on what we might
2   consider the old fashion way versus the Common Core
3   we're going to have the teacher facilitate and
4   students are going to do things in groups?
5        A   The best way to answer that is to look at
6   the data on the teachers.  Those teaches that are
7   the sage on the stage with the type testing that
8   students are taking right now are going to score
9   much lower.
10            The teachers that I've described as far as
11  communicating through groups and encouraging group
12  communication, their scores are much higher.
13            I say that because when we look at our
14  professional -- when we looked at our professional
15  development we always looked at the test scores to
16  see not that this teacher needs to be removed or
17  replaced, this teacher needs some professional
18  development.
19            So it's hard for me to say how often that
20  occurs.  But generally the lower test scores, which
21  is a battle for us, is an indication that we have
22  teaching that's not as effective as it could be with
23  the assessment that they have to take.
24       Q   I understand that.  And I think what
25  you're saying is that for the 2011/2012 school year,

Page 183

1   we really can't say how many days of the week --
2        A   No.
3        Q   -- for any particular teacher there is
4   this group communication among students where the
5   teacher is a facilitator?
6        A   It would be difficult for me.  It would
7   not be difficult for a Principal who has access to
8   the lesson plans, because lesson plans are turned in
9   weekly.  So reviewing the lesson plans, you would
10  know how much group time is either there or is not
11  there.
12            MS. FAGGIANELLI:  That's all I have.
13       Thank you.
14            MR. JENSEN:  We're done.  He'll read.
15            (THEREUPON, the rights of the deponent to read and/or
16  waiving that right were explained to the deponent, and said
17  deponent wished to read and sign the deposition, and the
18  taking of this deposition was concluded at 4:26 p.m.)
19                 - - - - -
20
21
22
23
24
25

Page 184

1            CERTIFICATE OF OATH
2
3   STATE OF FLORIDA      )
4   COUNTY OF DESOTO      )
5
6
7        I the undersigned authority certify that ADRIAN H. CLINE
8   personally appeared before me and was duly sworn.
9
10       Witness my hand and official seal this 22nd day of
11  October, 2013.
12
13
14       Denise Maglich-Stone
15            Denise Maglich-Stone
            Notary Public
16            State of Florida at Large
17
18
19
20
21
22
23
24
25

Vincent M. Lucente & Associates                              800.282.8275

Page 185

1          CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA          )
4   COUNTY OF DESOTO          )
5
6          I, DENISE MAGLICH-STONE, certify that I was
7   authorized to and did stenographically report the foregoing
8   deposition of ADRIAN H. CLINE and that a review of the
9   transcript was requested, and the foregoing transcript,
10  pages 1-183, is a true record of the testimony given by the
11  deponent.
12         I further certify that I am not a relative,
13  employee, attorney, or counsel of any of the parties, nor am
14  I a relative or employee of any of the parties' attorney or
15  counsel connected with the action, nor am I financially
16  interested in the action.
17
18
19
20
            _Denise Maglich-Stone_
21
22  DENISE MAGLICH-STONE, Court Reporter
    Notary Public
    State Of Florida at Large
23
24
25

Page 186

1   PLEASE ATTACH TO THE DEPOSITION OF ADRIAN H. CLINE IN THE
2   CASE OF
3   AMBER HATCHER  VS  DESOTO COUNTY BOARD OF EDUCATION  et al
4                ERRATA SHEET
5   Instructions:
6   Please read the transcript of your deposition and make note
    of any errors in transcription on this page.  Do not mark on
7   the transcript itself.  Please sign and date this sheet in
    the presence of a witness.  Thank you.
8
9   Page      Line      Error of Amendment        Reason
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  Under penalties of perjury, I hereby declare that I have
    read the foregoing document and that the facts stated in it
21  are true.
22  Signature of
    Deponent:_____
23  Date:_____
    Witness:_____
24
25

Page 187

1
2                LUCENTE & ASSOCIATES, INC.
                    1800 Second Street
                    Sarasota, Florida 34236
3                    (800) 282-8275
4
5   October 22, 2013
6   Mr. Jeffrey D. Jensen, Esq.
    Unice Salzman Radel P.A.
7   2470 Coral Landings Boulevard, Suite 201
    Palm Harbor, Florida 34684
8
9   Re: AMBER HATCHER  vs. DESOTO COUNTY BOARD OF EDUCATION
10  Dear Mr. Jensen:
11  Enclosed is your copy of the deposition of MR. ADRIAN CLINE,
    taken on October 8, 2013, in the above-styled case.  Please
12  have your client read your copy of their deposition and note
    any corrections on the errata sheet provided.  Please have
13  them sign the errata sheet before a witness.
14  Please retain a copy of the errata sheet and mail the
    original errata sheet within 30 days, to Ms. Faggianelli,
15  Esq., to be included with the original transcript.  Failure
    to do so may be considered a waiver of the right to read and
16  sign.
17  Please contact our office if there are any questions you may
    have.  Thank you for your prompt and careful attention to
18  this matter.
19
20              Sincerely,
21
22              Denise Maglich-Stone
                Court Reporter
23
24  cc: Ms. Faggianelli, Esq.
25