1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF FLORIDA
2               FORT MYERS DIVISION

3          CASE NO.:  2:13-cv-138-FtM-38DNF

4

5    AMBER HATCHER, by and through
     her next friend, GREGORY
6    HATCHER,

7          Plaintiff,

8
     vs.
9

10   DESOTO COUNTY BOARD OF
     EDUCATION, ET AL,
11
          Defendant.
12

13

14                    VOLUME I OF II
               DEPOSITION OF SHANNON D. FUSCO
15            Taken on Behalf of the Plaintiff

16
          DATE TAKEN:        October 9, 2013
17
          TIME:              3:34 p.m. - 11:40 p.m.
18
          PLACE:             Sclafani Williams
19                           3200 U.S. 27 South
                             Suite 200
20                           Sebring, FL 33870

21

22

23

24               Stenographically Reported by:
                      Julie Sebring
25               Florida Professional Reporter

1                    A P P E A R A N C E S:

2

3    Counsel for Plaintiff:

4         BETH LITTRELL, ESQUIRE
          Lambda Legal
5         730 Peachtree Street, N.E.
          Suite 1070
6         Atlanta, GA 30308-1210

7

8    Counsel for Defendants:

9         JEFFREY D. JENSEN, ESQUIRE
          Unice Salzman Radel, P.A.
10        2570 Coral Landings Blvd., Suite 201
          Palm Harbor, FL 34684
11

12
     Counsel for Defendant, DeSoto County School Board:
13
          CONNIE L. COLLINS, ESQUIRE
14        Eugene E. Waldron, Jr., P.A.
          124 North Brevard Avenue
15        Arcadia, FL 32466

16

17

18

19

20

21

22

23

24

25

3

I N D E X

WITNESS                                                    PAGE

Called by the Plaintiff:

SHANNON D. FUSCO.....

    DIRECT EXAMINATION BY MS. LITTRELL............   4

INSTRUCTIONS TO DEPONENT......................... 127

ERRATA SHEET.................................... 128

CERTIFICATE OF OATH............................. 129

CERTIFICATE OF REPORTER......................... 130

                              EXHIBITS

PLAINTIFF'S NO. 1...............................  26
(Job Description)

PLAINTIFF'S NO. 2...............................  32
(152.01 General Provisions/Standards/Reporting
Misconduct/Training)

PLAINTIFF'S NO. 3...............................  89
(Policies of the School District of DeSoto County)

PLAINTIFF'S NO. 4...............................  91
(Affidavit of Shannon Fusco)

1                   P R O C E E D I N G S

2          MS. LITTRELL:  So this deposition is underway

3     right now.  My name is Beth Littrell, and I am an

4     attorney for Lambda Legal nonprofit.  We represent

5     Amber Hatcher in this case.

6          For the record, present in the room is Jeff

7     Jensen and Ms. Shannon Fusco.

8          Would you swear the witness?

9          SHANNON D. FUSCO, called as a witness by the

10    Plaintiff, having been first duly sworn, testified as

11    follows:

12          THE WITNESS:  I do.

13                   DIRECT EXAMINATION

14    BY MS. LITTRELL:

15     Q.    Can you state your name for the record and

16    spell it?

17     A.    It is Shannon Fusco, S-h-a-n-n-o-n F-u-s-c-o.

18     Q.    Thanks.

19          Have you ever been deposed before?

20     A.    No, I haven't.

21     Q.    Okay.  So the purpose of a deposition is, as it

22    sounds, part of discovery, so we can search for the

23    truth.  So you are asked to tell the truth, the whole

24    truth, and nothing but the truth, just as if you were

25    under oath in a trial, even though there's no judge

5

1  here.

2       If your attorney objects but does not tell you

3  directly that you're not to answer the question, you are

4  to go ahead and answer the question.

5       Are you -- do you understand sort of these

6  rules of depositions?

7       A.   Yes.

8       Q.   And, of course, the court reporter is taking

9  down everything.  So you have to answer verbally because

10 she can't take down nods and shakes.

11      A.   Okay.

12      Q.   Are you on medication or is there anything that

13 would keep you from having full capacity --

14      A.   No.

15      Q.   -- to tell the truth and answer the questions?

16      A.   No.

17      Q.   Okay.  Great.

18           MS. LITTRELL:  Mr. Jensen, do you want to

19      stipulate to the authenticity of the e-mails that

20      you produced so that we can sort of shortchange some

21      of the document production?

22           MR. JENSEN:  I don't think that's necessary to

23      do that at this point.

24           MS. LITTRELL:  Do you want the middle district

25      -- I looked at the middle district discovery

1       handbook, and that's what the court suggests the

2       parties do to save time.  Those e-mails are

3       self-authenticating that the parties can stipulate

4       to, but you're not --

5            MR. JENSEN:  No, we're not going to do that at

6       this time.

7            MS. LITTRELL:  We only have seven hours, and

8       we're 30 minutes late.  So the purpose of that is

9       just to move us along, but we'll go through the

10       formalities along the way.

11  BY MS. LITTRELL:

12       Q.   So, you know we're here about a lawsuit that

13  Amber Hatcher filed for events that took place in 2012?

14       A.   Yes.

15       Q.   In particular, around the date of silence,

16  which happens on the third Friday of every April.  So in

17  April of 2012, were you the principal of DeSoto County

18  High School?

19       A.   Yes.

20       Q.   And how long had you been principal at that

21  point?

22       A.   Since June, June of the prior year.  So June of

23  '11.

24       Q.   June of 2011.  Okay.  And can you just tell me

25  about your role as the principal of the high school?

1    A.    Well, there's a lot to that.  It would be the

2  administrative head, working directly under the

3  superintendent and under school board, in charge of the

4  day-to-day running of the facilities, the students,

5  curriculum.

6    Q.    Okay.

7    A.    I'm not certain how detailed you want me to

8  get.

9    Q.    No, that's fine.

10         Tell me about your role as -- with respect to

11  school personnel.

12    A.    Well, I do the hiring and observing and

13  releasing of school personnel.  But that is always

14  subject to approval by the superintendent and the school

15  board.  So mine is the initial process.  It would be the

16  day-to-day schedules, management, overseeing.

17    Q.    So would you characterize your role or any

18  principal's role for DeSoto County School District as

19  being the supervisor of the personnel, the faculty, and

20  the staff?  Would you consider yourself a supervisor and

21  they your subordinates?

22    A.    On-site supervisor, yes.

23    Q.    So I'm trying to understand if -- what would

24  happen if an administrator, assistant principal, did not

25  do what you directed them to do?  Did you have the

1  authority to direct their activities?

2      A.    Within a very limited scope for an assistant
3  principal, because as an administrator, they are subject
4  directly to the superintendent more so than to me.
5  Assistant principals are not hired by the principal.
6  They are hired at the district level.

7      Q.    What about the dean, is that the same thing?

8      A.    They fall somewhat in between administrator and
9  teacher.

10     Q.    So if an assistant principal, if you directed
11 an assistant principal to take a certain action, for
12 example, to let's say discipline a student, and they
13 refused to do that, would you have any authority to
14 correct them?  Can they ignore your directives at will?

15     A.    I would have limited authority.  I would have
16 worked with the superintendent on any corrections of
17 another administrator.

18     Q.    So play that out for me.  How exactly would you
19 have approached an assistant principal who refused to
20 follow a directive from you?

21     A.    I would have spoken with them first, after
22 having notified the superintendent and gotten his input
23 on where he wanted me to go.  Did he want me to address
24 it, did he want me to meet with him with the person.  It
25 would depend on how major an action it was.

1    Q.    It sounds like the assistant principals are

2  sort of co-extensive authority with you.  They can take

3  your direction as a suggestion or as a direction, either

4  way.  They don't have to follow what you tell them.  Is

5  that accurate?  And when I say "you," I mean the

6  principal.  I'm trying to understand the authority that

7  you have.

8    A.    If I specifically wanted something done within

9  my school, and most schools, all planning is done as an

10 administrative team.  So I am not usually setting a

11 directive but working with a team.

12   Q.    But if you set -- if you directed -- say, for

13 example, an assistant principal was proselytizing in the

14 hallway with students, Bible open and giving some kind

15 of religious sermon, and you directed that

16 superintendent not to do that, and they continued to

17 read from the Bible and proselytize in front of the

18 school students, are you saying that that --

19   A.    I directed the assistant principal not to do

20 that?

21   Q.    Yes, the assistant principal, in that

22 hypothetical.

23   A.    Yeah, I would have spoken with them, and I

24 would have notified the superintendent immediately.

25   Q.    You had no authority -- is your position that

1  you had no authority to stop the assistant principal

2  from doing what they were doing?

3      A.   I think pretty clearly in a situation like

4  that, that I would.  But I would have always worked with

5  the superintendent because they are administrators.

6      Q.   What would the -- what would the consequence to

7  an administrator, to an assistant principal -- just

8  stick with the assistant principals -- what consequence

9  if they don't follow your directive?  You tell them to

10  stop proselytizing in this example.

11      A.   Well, the district uses a -- I can't think of

12  the name of it -- a graduated discipline policy for

13  teachers and personnel, staff, administrators, that

14  particular -- say it was preaching in the hallways,

15  probably would simply have been a verbal reprimand.  But

16  it is a graduated policy which can be more serious or

17  less serious, depending on the supervisor, which is the

18  superintendent's decision.

19      Q.   Could you write that assistant principal up?

20  Do you have that authority or is that part of --

21      A.   No, I could not.

22      Q.   You could not write them up?

23      A.   Not for an assistant principal.

24      Q.   And is there any consequence to an assistant

25  principal ignoring your request or your direction to

1   them?  Would that get them written up by the

2   superintendent, to your knowledge?

3       A.   I think it would have, depending on what it

4   was.  Whether it was something minor, how I had

5   presented it, a suggestion or this is an absolute we

6   will do this.  Without a specific situation -- and I

7   can't say what the superintendent would or would not do.

8            (Ms. Collins entered the room.)

9       Q.   You don't know whether the superintendent has

10  the authority to --

11      A.   I've never told an assistant principal you will

12  go into room A, B and C, and I want you there from 8:00

13  to 8:10 every morning and had them say no.  So I've

14  never had that situation to respond to.

15      Q.   Okay.  So generally, when you give direction to

16  the administrative staff, they follow those directions?

17      A.   Well, and the directions usually have been made

18  as a group.  As I said, the administrative team works

19  together.  It's not such of a you will do.  Most of

20  those decisions are made as a group.

21      Q.   What about the decision to send the e-mail out

22  on the day of silence that was sent the morning of?  Do

23  you recall that e-mail sent?

24      A.   Yes.  I couldn't tell you exactly what it said,

25  but I know there was an e-mail.

1    Q.   Was that an administrative decision that was

2    made by -- as a team like you're describing now?

3         MR. JENSEN:   I'm going to object to the form on

4         that, unless you can with specificity identify which

5         e-mail.

6    Q.   Do you know which e-mail I'm talking about?

7    A.   Could you clarify specifically which one you're

8    referring to?

9         MS. LITTRELL:   Well, I think even better --

10        before I do that, I want to make sure that we have

11        on the record everybody who is in the room.  We have

12        been joined by --

13        MS. COLLINS:   Connie Collins.

14        MS. LITTRELL:   Connie Collins.  Who represents?

15        MS. COLLINS:   I'm representative of the

16        district.

17        MS. LITTRELL:   The school district.  Thank you.

18   BY MS. LITTRELL:

19   Q.   How many e-mails do you recall sending out

20   regarding day of silence, on the day of silence, which

21   was Friday, April 20, 2012?

22   A.   At this point, I couldn't tell you how many

23   were sent out.

24   Q.   So --

25   A.   I wouldn't think probably but maybe one set of

1   information.  Usually I sent an e-mail to faculty in the

2   morning.  It's pretty common for me to send information.

3   So to send something early in the day giving

4   instructions or discussions or, hey, something is going

5   on is a pretty common occurrence.

6       Q.   So you do or do not recall how many e-mails you

7   sent personally on the day of silence April 20th, 2012?

8       A.   I couldn't tell you.

9       Q.   Was it --

10      A.   I don't recall a reason to send multiple ones.

11      Q.   Do you remember sending any?

12      A.   I know there was an e-mail to the teachers.

13  Whether it was sent that morning, I couldn't tell you

14  exactly the date.

15      Q.   What do you recall about the e-mail that you're

16  referencing now?

17      A.   If you are referring specifically to the one

18  asking the teachers to refer any occasions to the front

19  office --

20      Q.   This is the e-mail that you're recalling?

21      A.   That's what -- I do recall sending that e-mail,

22  and that is my way of simply saying, you know, I don't

23  want teachers out and making decisions that might

24  disrupt the school day or might discipline students

25  unfairly, that it's simply something that an

1  administrator needs to handle.  And that handling could

2  be all kinds of things.

3       But in sending an e-mail to the teachers, I

4  would be saying this is not something I want you to

5  disrupt class and take time out with.  Just let one of

6  us speak with the student.

7       Q.  So are you talking generally this is what you

8  are speculating you would likely have done or is this

9  what you remember doing on the day of silence?

10      A.  If you are referring to the e-mail that

11  specifically says if there is a student -- I don't know

12  what the wording was.

13      Q.  Sure.

14      A.  Working with the day of silence involved with

15  whatever, just simply let an administrator work with

16  that student and not disrupt class.

17      Q.  Do you remember about what time that e-mail

18  that you are referencing was sent?

19      A.  Well, it wouldn't have done any good in the

20  afternoon.  So it would have been morning.

21      Q.  Do you recall sending it in the morning or are

22  you guessing that's what time it must have been sent?

23      A.  I don't recall an exact time.

24      Q.  Okay.  I'm not asking for an exact time, but do

25  you recall some kind of a time frame within which that

1   e-mail was sent?  Was it before --

2       A.   I send upwards of two or three hundred e-mails

3   sent -- in that position, upwards of two or three

4   hundred e-mails every day.  I wouldn't know.

5       Q.   So your testimony is that you do not recall

6   sending an e-mail specifically referencing day of

7   silence?

8       A.   No.

9            MR. JENSEN:  I'm going to lodge an objection.

10       This is the third time she's been asked the

11       question, and she has stated she does not know.  And

12       I'm not going to have her guess.  So my instruction

13       is, if you don't know, don't -- do not guess at what

14       the answer might be.

15   BY MS. LITTRELL:

16       Q.   Can you recall about what time the e-mail that

17   you're referencing was sent?

18       A.   No, I don't know the time.

19       Q.   So is it fair to say that you do not recall

20   sending that e-mail, you're just guessing that you might

21   have?

22       A.   I know that I sent an e-mail to the teachers.

23   Whether it might have been sent the night before or that

24   morning, I do not know.  But I do know there was an

25   e-mail.

```
 1      Q.   So we have narrowed down to morning.  Do you
 2   have any idea whether it was before 11:00 a.m.?
 3           MR. JENSEN:  Okay.  She has already answered
 4      this question like five times.  You have a copy of
 5      the e-mail.  If you want an exact time, show it to
 6      her so it will refresh her memory so we can move on.
 7      I'm not going to have her playing guessing games at
 8      times.
 9   BY MS. LITTRELL:
10      Q.   You can answer the question.  Do you recall
11   whether it was before 11:00 a.m.?
12      A.   I don't recall.
13      Q.   You do not recall.  So it could have been after
14   11:00?
15      A.   I don't recall.
16      Q.   Okay.  Do you or do you not recall sending an
17   e-mail on the day of silence about day of silence?
18      A.   I just stated that I would have sent it either
19   the night before or that morning.
20      Q.   Okay.  So that's one e-mail.  Do you recall
21   sending any other e-mails on the day of silence about
22   the day of silence?
23      A.   To anyone?
24      Q.   Yes.
25      A.   I know I responded to the superintendent's
```

 1  office.   I do not know if it was that day or the next

 2  day.

 3       Q.   Okay.  Do you recall sending more than one

 4  e-mail to the faculty about day of silence on day of

 5  silence in 2012?

 6       A.   I don't remember sending but the one.

 7       Q.   And do you recall whether the e-mail that you

 8  do recall sending about day of silence on day of silence

 9  in 2012 was a decision that was made by your

10  administrative team or whether that was a decision that

11  you made without consulting the administrative team?

12       A.   That was a decision in talking with the

13  administrative team and the superintendent.  And it was

14  simply if there is anything that needs to be handled,

15  let an administrator deal with it, don't disrupt the

16  classroom.

17       Q.   Can you tell me when you spoke with the

18  administrative team that led to this collective decision

19  that we should send an e-mail out alerting the teachers

20  about day of silence?

21            MR. JENSEN:  Object to form.

22  BY MS. LITTRELL:

23       Q.   Did you understand the question?

24       A.   Repeat that.

25       Q.   Uh-hum.

1        Do you recall when you had the meeting with

2   your administrative team in which you decided to send an

3   e-mail out about day of silence on day of silence?

4       A.   When we had that meeting, no, because we met

5   about three times a day every day formally and

6   informally.  At what point, I don't know.

7       Q.   But it's your testimony that that was a

8   collective decision to send an e-mail to the teachers

9   about day of silence on day of silence?

10       MR. JENSEN:  Object to form.

11       A.   It's my testimony that as an administrative

12   group, whenever we feel that a teacher or a student

13   might overstep bounds or get excited, that we simply

14   remove it from the classroom, and we handle it out of

15   the classroom, administrators do.

16       Q.   So that's just, generally speaking, about how

17   your administration handles things?

18       A.   Right.

19       Q.   I want to know specifically if it was a team

20   decision to send that e-mail or if that was your

21   decision?

22       A.   The team would have discussed it.

23       Q.   Okay.

24       A.   We would have discussed talking to the

25   teachers.  Would we have sat and taken a vote on who

1    determined, it would have been a discussion on do we

2    have somebody who might get upset.  It might be better

3    if we talk to anybody involved.

4        Q.   Okay.  Who was in the discussion that you

5    referenced in your answer just now?

6        A.   Who was the administrative team?

7        Q.   Who was the administrative team that you were

8    conversing with when you discussed day of silence and

9    alerting teachers about day of silence?

10       A.   I couldn't verify, not having attendance

11   records on that day, to know for certain who exactly was

12   there.  Ordinarily, it would have been myself, both

13   assistant principals, and the dean.  But there are often

14   other people who are there.

15       Q.   I'd like you to give me the names of the

16   people --

17       A.   Uh-hum.

18       Q.   -- who were in the meeting in which you

19   discussed alerting the teachers about day of silence.

20       A.   I can't tell you for certain who was there.  It

21   was a year and a half ago.  I don't know who would have

22   been in meetings on specific days.  I know who the

23   general personnel are that could have been there.

24       Q.   So is it true that you do not remember

25   specifically having the discussion that you're

1    referencing now?

2        A.    No, that's not correct.

3        Q.    Okay.  Do you or do you not recall having the

4    discussion specifically about day of silence with your

5    administrative staff?

6        A.    Correct.  I do, yes.

7        Q.    You do recall?

8        A.    Uh-hum.

9        Q.    But you do not recall who was in the room?

10       A.    On that specific time, no.

11       Q.    Do you recall anyone who was in the room when

12   you had that conversation?

13       A.    The conversation would have happened more than

14   once --

15       Q.    Tell me about --

16       A.    -- because we discuss day-to-day everything

17   going on.  So what day prior to we had this discussion,

18   it could have been two days before, three days before.

19   I don't have any way of knowing that.

20       Q.    Okay.  How many times did you discuss with your

21   administrative team the upcoming day of silence?

22       A.    I couldn't begin to tell you.

23       Q.    More than once?

24       A.    It likely came up in multiple conversations

25   after Amber asked.

1    Q.   So I'd like you not to guess or speculate.

2    A.   I can't tell you how many times we did discuss
3    it.

4    Q.   Can you tell me whether it was more than once?

5    A.   I am sure it was more than once.

6    Q.   Do you think that it was more than twice?

7    A.   I don't have any way of knowing back at that
8    point.

9    Q.   So you -- you simply do not recall having more
10   than one conversation about day of silence before the
11   day of silence?

12   A.   It was very likely more than once.  But do I
13   recall a date or a time of specific conversations, no.

14   Q.   I'm not asking specific dates or times right
15   now.  I'm just trying to understand first whether the
16   decision to notify the teachers was made by the team, as
17   you state decisions generally are, or if that was a
18   decision that you made on your own.

19        What's the answer to that question?  Did you
20   make this decision to notify teachers about day of
21   silence yourself or did you make the decision in a
22   group?

23   A.   The team discussed it, and it was something
24   that we felt needed to be handled by administrators.  I
25   cannot tell you that we determined this discussion will

1   be handled in an e-mail.  It was simply that we need to

2   handle this as administrators.

3       Q.   What about the decision to communicate that it

4   needed to be handled by the administration, was that a

5   collective decision?  Did you and your administrative

6   staff talk about making sure that the teachers knew that

7   it was going to be handled?

8       A.   Yes.

9       Q.   Okay.  It was a collective decision?

10      A.   It was in a discussion, yes.

11      Q.   Can you tell me where you get your

12  understanding of your authority as the principal and

13  where you got your understanding of the authority that

14  you had over school personnel?

15      A.   Specifically within the district, it would have

16  come from the superintendent.

17      Q.   Do you ever recall seeing any Florida Statutes

18  that set out what the school principal's job

19  responsibilities and duties were?

20      A.   I would have studied them in school.

21      Q.   Okay.  Would it surprise you to know that

22  Florida law sets out that the principal of the high

23  school has authority over all of the school personnel?

24  Would that surprise you?

25      A.   No.

1    Q.   Help me understand how that can -- how that

2  goes along with your explanation that you didn't have

3  the authority to direct administrators, that that

4  authority went straight to the superintendent and

5  bypassed you?

6    A.   Administrators are not hired by another

7  administrator; they are hired at the district level.

8  That's a pretty consistent policy and standard, whatever

9  is done through most school districts I've been in.

10    Q.   Uh-hum.

11    A.   So since I do not have the authority to hire,

12  nor do I have the authority to fire an administrator

13  under me, there is a limit to how far I can go

14  disciplining them.

15    Q.   Okay.  So is it fair to say that you had the

16  authority to direct their activities, but that you

17  couldn't fire them?

18    A.   Correct.

19    Q.   That comports with my understanding of Florida

20  law as well and is helpful.

21       I'm going to show you what I am marking as

22  Exhibit 1.

23       (Plaintiff's Exhibit No. 1 was marked for

24    identification.)

25    Q.   Do you recognize that document?

1    A.    Not specifically, no.  I never applied for the

2  principal's position; I was transferred into it.  So I

3  would not have to read the actual position description.

4  Have I seen it in passing, in years past, yes.

5    Q.    Does this appear to be a true copy of the

6  school district's principal job description in the

7  school district of DeSoto County?

8    A.    Meaning is this something that was posted or is

9  this something that was adhered to by what I was

10  expected to do?

11    Q.    Meaning is this an accurate reflection or an

12  accurate copy of the school district's job description

13  of the principal as far as you know?

14    A.    I would really have no way of knowing.

15    Q.    Okay.  So is it fair to say that you don't

16  recall seeing this document?

17    A.    Recently, no.

18    Q.    Do you think that you've ever been shown this

19  document?

20    A.    Has it ever been placed in front of me, no.

21  Have I pulled it up when I was scrolling through jobs

22  that were posted or description and seen it, yes.

23    Q.    Okay.  Who describes to you what your job

24  responsibilities, the boundaries of those, the limits of

25  those would be?

1      A.    Superintendent.

2      Q.    The superintendent.  And so who specifically

3   told you about your job responsibilities and duties when

4   you became the principal of DeSoto County High School?

5      A.    Superintendent.

6      Q.    Superintendent Cline?

7      A.    Yes.

8      Q.    Okay.  Do you recall whether he provided you a

9   copy of any documents whatsoever when you were hired as

10   the principal?

11      A.    Was I handed this document, no.

12      Q.    Were you handed any document that laid out the

13   principal's job responsibilities?

14      A.    By him?

15      Q.    Yes.

16      A.    I don't think so.  I mean, the contract that is

17   signed doesn't go through the job description, so...

18      Q.    So tell me how you got the information that

19   helped you know what your job responsibilities and

20   authority over personnel was.

21      A.    From the superintendent's description and

22   discussions.

23      Q.    Okay.  And is that something that happened when

24   you were hired, a one-time thing?

25      A.    I've worked with this superintendent for 24

1    years.

2        Q.    Uh-hum.

3        A.    And with him as an assistant principal as well.

4    So it would not have been a one-time discussion, no.

5        Q.    Okay.  If you'll look at the document that I

6    handed you, on Page 2, and see number 26 where it says

7    "Supervise assigned personnel"?

8        A.    Yes.

9        Q.    Do you agree that it's within your job

10   responsibility or the responsibility of the principal of

11   the high school to supervise the personnel that are

12   assigned to your school?

13       A.    Excepting the other administrators, yes.  I do

14   not supervise them for reevaluations purpose.  I do not

15   handle any of that.

16       Q.    Do you tell the other administrators what to do

17   in any capacity?  Did you, I'm sorry, when you were the

18   principal?

19       A.    Yes.  But, again, the administrative team was

20   working together.  So our decisions -- it never came up

21   that I was having to say you will do this.  Our

22   decisions were made together.

23       Q.    So would you say that you were the boss or sort

24   of a co-chair?

25       A.    I was the leader of the team is the way I would

1  phrase it.

2      Q.   Okay.   And if you look at number 33 on that

3  document that I've handed you that is marked as Exhibit

4  1, do you see that the job description also sets out

5  that the principal supervises the operation and

6  management of all activities --

7      A.   Yes.

8      Q.   -- and functions at the assigned school?

9           And do you agree that that was your

10  responsibility?   It may have been made -- the decisions

11  may have been made as a team, but it was your ultimate

12  responsibility as a principal to supervise the operation

13  and management of all activities at the school?

14           MR. JENSEN:   Object to the form.

15      A.   While reporting to the superintendent, yes.

16      Q.   Okay.   And on the next page, do you see number

17  46?

18      A.   Yes.

19      Q.   Number 46 of the job description for the

20  principal of DeSoto County High School says that, "It's

21  the principal's job to implement the school board

22  policies, state statutes, and federal regulations as

23  they pertain to the assigned school."

24           Did you understand that to be your

25  responsibility?

1      A.    Yes.

2      Q.    And if you'll turn back to the very first page,

3  the knowledge, skills and abilities paragraph.

4      A.    Uh-hum.

5      Q.    It says that one of the -- Amongst the skills

6  and abilities required of the principal of DeSoto County

7  High School is the ability to read, interpret, and

8  enforce the State Board of Education rules, code of

9  ethics, school board policies, and appropriate state and

10 federal statutes.  That second sentence, do you see

11 that?

12     A.    Yes.

13     Q.    Do you agree that that is the responsibility of

14 the principal of the high school?

15     A.    Always working under the superintendent, yes.

16 I report to a boss.

17     Q.    But you do agree that amongst the job

18 responsibilities is the ability to interpret the school

19 board policies?  That's at least what this description

20 says?

21     A.    Yes.

22     Q.    I'm now handing you what I've marked as Exhibit

23 2.  Take a moment to look at that.  And if you would,

24 tell me whether the first three paragraphs look familiar

25 to you.

1          (Plaintiff's Exhibit No. 2 was marked for

2       identification.)

3       A.    Just glancing at this, no, I could not tell you

4    what this came from, at a glance.

5       Q.    Would it surprise you to know that this is from

6    the DeSoto County School District Policy Manual?

7       A.    No, it wouldn't.  I just can't tell that from

8    this page.

9       Q.    Fair enough.

10         And the number, policy numbers 152.01 -- so to

11   the extent that this is the DeSoto County School

12   District Policy Manual -- and I know that you can't

13   attest that that is what this is -- but if it is, do you

14   have any reason to deny that amongst the standards of

15   the school district personnel are these standards under

16   A1 through 5?

17      A.    No.

18      Q.    Was that your understanding of what the DeSoto

19   County School District personnel standards were?

20      A.    As it applies to that an employee shall consult

21   with the next appropriate level of management if there

22   is a question, yes.

23      Q.    I'm sorry.  So are you --

24      A.    I am saying that, yes, these are the standards,

25   always referring back to the management level above you

1  when there is a question.

2      Q.   Where do you get that additional information

3  that you're adding onto this?

4      A.   Right here, where it says, "If there are

5  questions or doubts as to what to do or how to handle a

6  particular situation that relates to this policy, an

7  employee should consult with the next appropriate level

8  of management."  The last sentence in the second

9  paragraph.

10     Q.   Okay.  And so in particular, do you see under

11  one of the standards, the last standard is that the

12  employees shall adhere to the school district policies

13  and regulations?

14     A.   Yes.

15     Q.   Okay.  And so looking back to your authority

16  over school personnel, high school personnel, if a

17  school -- high school personnel did not adhere to the

18  school district policies, that would be -- that would be

19  a violation of the standards of the school district;

20  right?

21     A.   Correct.

22     Q.   So that if they were aware of a school district

23  policy and did not adhere to it, then they would be

24  falling below the standards that are set out here in the

25  school district policy; is that fair to say?

1      A.    Yes.

2      Q.    Okay.  So we've talked about administrators.

3  Tell me who -- what titles you are referencing when you

4  say that they are supervised by the superintendent and

5  not you.  What are the titles of those?

6      A.    The assistant principals.

7      Q.    How many assistant principals are there at the

8  high school?

9      A.    There were two and an administrative assistant,

10  which was a somewhat in limbo title handling

11  administrative duties but without the pay and the full

12  title qualifications yet.

13     Q.    So the titles were assistant principal?

14     A.    Uh-hum.

15     Q.    And tell me again what authority you understood

16  to have over them.

17     A.    I was the team leader.  In other words, the

18  leader of the discussion and the planning.  I did not

19  have authority to hire and fire and very little in

20  disciplining.

21     Q.    Were they free to ignore a directive from you?

22  Yes or no?

23         MR. JENSEN:  You can explain that in any way

24     you need.  You don't have to limit it to a yes or

25     no.

1    A.    I don't know that it ever came up.  Had they,

2  and I had to report to the superintendent, which would

3  have been what I would have to have done, I don't

4  imagine the results would have been positive.

5    Q.    Okay.  So other administrators besides

6  assistant principals, what are the titles of other

7  administrators at the high school?

8    A.    Well, there was an administrative assistant.

9    Q.    Uh-hum.  And does that exhaust the

10  administrative staff?  You, two assistants --

11    A.    The dean is usually included with all

12  administrative planning, but they are not -- they were

13  not at that time paid on an administrative scale.  The

14  position has been in the past, but it was not at the

15  time.

16    Q.    Did you have a different authority over the

17  dean than you did over the assistant principals?

18    A.    Yes.  They fell in between the administrators

19  and the teachers.

20    Q.    Okay.

21    A.    She, I guess.

22    Q.    Is it fair to say that you directed her

23  activities, the dean of students, that is?

24    A.    Within reason.  She was hired as a very

25  competent person.  So I did not have to spend day-to-day

1    direction.

2         Q.   Who was her supervisor?

3         A.   I would have been her direct supervisor.

4         Q.   So if she -- if you asked her to do something

5    and she refused, would you have had the authority to

6    discipline her?

7         A.   Yes.  As I would have as a teacher, any

8    discipline, however, before I carried it out, had to go

9    through the superintendent.  I did not carry out any

10   discipline on a teacher without his knowledge and

11   approval.

12        Q.   Does that include verbal reprimands?

13        A.   Other than something very minor.  Simply

14   stopping someone in the hallway and saying I need you to

15   get to this more quickly than you have been, that I

16   certainly could have said.  Something that would have

17   been considered discipline in the understanding of the

18   manual, I would never have done without his knowledge

19   and approval.

20        Q.   So tell me how long you were the principal of

21   the high school.

22        A.   For a year and a half.

23        Q.   And so in that year and a half, did you ever

24   have a reason to verbally reprimand a faculty member or

25   somebody who would be your subordinate?  So that would

1    include the dean.

2        A.   Yes.

3        Q.   And is it your testimony that every time you

4    verbally reprimanded a subordinate that you went through

5    the superintendent first?

6        A.   Yes, because that's part of progressive

7    discipline.  Verbal discipline is the first step in

8    progressive discipline.  There's a -- it requires

9    written documentation, even though it is verbal

10   discipline.  Simply stopping someone and saying I need

11   you to be a little quicker, no, I did not go through the

12   superintendent for that.  Verbal discipline as it refers

13   to the progressive disciplinary manual, yes, I went

14   through the superintendent.

15       Q.   Did -- in the year and a half that you were the

16   principal, did you have any subordinate -- by that I

17   mean dean or faculty members -- refuse to follow a

18   directive that you gave them?

19       A.   Only one.

20       Q.   Tell me about that, please.

21       A.   It was a teacher who was disciplined.

22       Q.   What did you tell that teacher to do?

23       A.   There were multiple items that were

24   accumulation starting before I was principal with other

25   principals documenting and going through her

1   termination.

2     Q.   What did you specifically tell this teacher to

3   do that the teacher didn't do?

4       MR. JENSEN:   Okay.   At this point in time, I've

5       got to interrupt and say that the scope of this

6       deposition is only regarding her entitlement to

7       qualified immunity and the school board's liability

8       for this incident with Ms. Hatcher.   This is neither

9       one of those.   And if there's going to be a problem

10      about that, we're not discussing that incident.

11      MS. LITTRELL:   I have the -- for the record, I

12      have the ability to inquire into the scope of

13      Ms. Fusco's authority as the principal.   As you

14      know, there is a municipal liability case.   If you

15      think that I have exceeded that by asking about the

16      scope of her authority, do you want to terminate the

17      deposition?

18      MR. JENSEN:   Well, that's up to you.   I'm just

19      going to point out she's not going to be answering

20      questions about the discipline of a specific teacher

21      in an incident completely unrelated to this.   You

22      can ask her about her authority in general, but I'm

23      not going to have her answering questions about the

24      discipline of a specific teacher unrelated to this

25      incident.

1          MS. LITTRELL:  So, again, is this an objection

2     based on privilege?

3          MR. JENSEN:  It is an objection because the

4     Court has ordered this deposition being narrowed.

5     I'll read from Page 2 of the Court's order.

6          MS. LITTRELL:  You can read to the -- excuse

7     me, Mr. Jensen.  We have a very limited time.  If

8     you want to terminate the deposition because --

9     based on going outside the scope or relevancy, we

10     can do that, contact the judge, and bring this

11     motion before him.  As you know, if you lose, you

12     will be compelled to pay attorney's fees and time

13     and costs.

14          I feel very confident that I'm within the scope

15     by finding out what the principal's authority was

16     over school personnel.  She has answered in very

17     general terms, and I need to have the opportunity to

18     find out specifically what her authority and what

19     her understanding of that authority is.

20          It goes to municipal liability, it goes to

21     qualified immunity.  It goes to all of the issues

22     here.

23          MR. JENSEN:  I disagree.  It has nothing to do

24     with this incident.  I'm not going to have her

25     answer those questions.  You can move on to a

1    different topic or you can leave.  That's where

2    we're standing on this.  I'm not having her go

3    outside of the Court's order.

4  BY MS. LITTRELL:

5    Q.   Ms. Fusco, the incident that you are

6  referencing with respect to disciplining a teacher for

7  failing to follow a directive that you gave him or her,

8  was it a him or her?

9    MR. JENSEN:  I'll let you answer that.

10   A.   She, her.

11   Q.   And what was the directive that you gave to

12 this teacher that she failed to follow?

13   MR. JENSEN:  Okay.  At this point, I need to

14   confer with Ms. Fusco to determine whether it is

15   inside or outside of the scope of the Court's order.

16   MS. LITTRELL:  Bear in mind, if we need to get

17   in touch with the judge, that we should do so

18   promptly.

19   (Recess from 4:22 p.m. until 4:35 p.m.)

20   MR. JENSEN:  It's our position that the scope

21   of inquiry about specific teacher's discipline

22   unrelated to this event is beyond the scope of what

23   the Court ordered in document 80.  I won't prohibit

24   you from asking general questions about her

25   authority, but I'm not going to have specific

1     discussions about specific incidents involving

2     teachers unrelated to this incident.

3          You can move on or do whatever you want to do

4     outside of that, or we can try to call the

5     magistrate and see if we can get a ruling on this --

6     on this at this point.  What would you like to do?

7          MS. LITTRELL:  I'm going to ask the witness a

8     specific question, and then you can instruct her not

9     to answer if you wish or we can move on.

10          MR. JENSEN:  I've already done that.

11          MS. LITTRELL:  We're going to certify the

12     question if we need to.  So let me ask the question.

13   BY MS. LITTRELL:

14     Q.   Ms. Fusco, you testified that you were the

15   principal for a year and a half at the high school;

16   right?

17     A.   Yes.

18     Q.   Okay.  And in attempting to ferret out your

19   understanding of the extent of your authority over your

20   subordinates, I asked you whether in the year and a half

21   that you were principal if you had ever had a teacher

22   not follow a directive from you and that teacher have an

23   employment consequence.

24          Do you recall this -- these assertions, these

25   questions?

1   A.   Yes.

2   Q.   Okay.  And so now I'm trying to understand what

3   it is that a teacher could fail to do in terms of not

4   following a direction that you gave them that would

5   result in a consequence.  And you told me that it only

6   happened one time; is that right?  Do you still stand by

7   that?  Only once in a year and a half did a subordinate

8   not follow a direction that you gave them?

9        MR. JENSEN:  You can answer that one.

10   A.   I said there was one person that I went through

11   the discipline policy procedure with.

12   Q.   So is it your testimony that a subordinate

13   failed to follow a directive from you and received a

14   consequence?

15   A.   Yes.

16   Q.   Tell me about the -- tell me about the extent

17   of your interactions with the superintendent,

18   Superintendent Cline, when you were the principal as

19   that relates to your day-to-day activities.  How often

20   did you go to the superintendent for approval to do

21   something at the high school?

22   A.   His -- he or his office -- and by his office, I

23   mean his secretaries -- were notified of any unusually

24   upset parent, serious disciplinary incident, teacher

25   infraction, ambulance ride, anything that might cause a

1  parent to call, have a consequent of having a parent to

2  call the county office. And that happens very, very

3  frequently in a small county with an elected

4  superintendent. So they were notified either by me or

5  my secretary or an assistant principal of any of those

6  types of things.

7       General conversations with him, they weren't

8  formal. Just general conversations with him about the

9  day-to-day running of the school would have happened

10  once or twice a day, usually by phone.

11  Q.  And how -- what sort of things did you seek his

12  approval for?

13  A.  He wanted oversight on anything out of the

14  ordinary. And I realize that's a very broad term.

15  Q.  Uh-hum.

16  A.  Anything that would have involved something

17  that might catch someone's notice, something that was a

18  major change to facilities.

19  Q.  Can you describe what you mean by that, change

20  to facilities?

21  A.  I can give you a couple of specific examples.

22  Q.  That would be fine.

23  A.  I changed the pictures down the main hallway.

24  He had to approve it before I changed them. I moved an

25  office of someone in the building who was an out of -- a

1  nurse who came in out of district personnel, moved her

2  office from one way to another.  He disapproved it, and

3  it had to remain where it was.

4      A teacher who got upset over my changing the

5  passes that went to the library, I would get a call, and

6  they would have to be rechanged back the way the teacher

7  wanted them.

8      They're not all negative examples.  If there

9  was a parent who was upset over the way a child was

10  being graded, the actions that had been taken in any

11  sort of event at school, why they didn't play at the

12  football game, and the coach was overly zealous in

13  talking to them.  Those were all things I would get a

14  call on.

15      Q.   So he would call you more often than you would

16  call him?  That was just the way that you phrased that,

17  you would get a call.

18      A.   It probably was about equal because I knew the

19  type of things that he was going to require input.  So I

20  would attempt to reach him first prior to having him

21  call me.  But he would also call.  So it was probably

22  about equal.

23      Q.   Would you describe Superintendent Cline as a

24  superintendent who was involved in the daily activities

25  of the high school?

```
 1        A.    Yes.

 2        Q.    Very involved?

 3        A.    Yes.

 4        Q.    Is it fair to say that he micromanaged the

 5   activities at the high school, or in particular, did you

 6   feel micromanaged by the superintendent?

 7             MR. JENSEN:   Object to form.

 8        Q.    Do you understand the question?

 9        A.    I would say that he was an intense manager of

10   the high school.

11        Q.    Okay.   Would you describe him as hands-on

12   manager of the high school?

13        A.    Verbal would be more the word than hands on.

14        Q.    Okay.   And can you describe what you mean by

15   that?

16        A.    He simply was involved in every event that

17   occurred, more so than with other schools in the

18   district, and probably much more than is general with a

19   superintendent.   But it's a very small county.

20        Q.    How many superintendents have you worked with

21   since you've been involved in schools?

22        A.    Him there, the one following him, briefly, one

23   in Charlotte County when I was there for two years.   I

24   don't think they changed while I was there.   I think it

25   was just one while I was there.   And, of course, the one
```

1   currently here.

2      Q.   Is that four superintendents that you've worked
3   with?

4      A.   Yes.

5      Q.   Okay.  And was he, you know, an intense
6   manager, as you have described him, because you asked
7   him to --

8      A.   He was an intense manager of every principal of
9   the high school.  He started as the principal of the
10  high school.  So everyone following him.

11     Q.   So it was more top down involvement as opposed
12  to you seeking his input or his approval for everything?

13     A.   It was more directed from his end, yes, than it
14  was from mine.

15     Q.   Did you seek his approval for student
16  discipline that occurred on a daily basis?

17     A.   If it were something that was a parent that had
18  called to his office or that we knew would have, if it
19  was something that would have involved a new, unusual
20  activity, if it was something that I knew he would be
21  calling me, I would ordinarily call him first.

22     Q.   Okay.

23     A.   It wasn't always to seek his input on the
24  discipline as it was to say this is the scenario, I want
25  to make sure you're aware of it in case you get a call.

1     Q.    So more putting him on notice, making him aware

2    of something --

3     A.    Yes.

4     Q.    -- that you knew he would want to be aware of?

5     A.    Yes.

6     Q.    Okay.  So with respect to student discipline,

7    if a student were disrespectful to a teacher and was

8    sent to the dean's office, I know there's a lot of

9    factually intensive things you would need to know, but

10   in general, if a student was just disrespectful one day

11   and was sent out of the class, what sort of discipline

12   might be handed down?

13    A.    Well, there's a discipline guide which is

14   followed, which says, as does every discipline guide

15   I've ever seen, that the dean or the administration has

16   the final decision of whether to move up or down within

17   the guide, to go with something lighter or more

18   intensive a punishment.

19    Q.    So in a situation with that, where a student is

20   disrespectful to a teacher, teacher, you know, sent him

21   to the dean to be dealt with, is that something that

22   would ordinarily require the involvement of the

23   superintendent?

24    A.    Not ordinarily, no.

25    Q.    Okay.  And what would the circumstances be that

1   would make it a situation in which the superintendent

2   would become involved?

3       A.   A student who had an influential parent within

4   the community.

5       Q.   Okay.

6       A.   A student whose parent made it a habit of going

7   to the superintendent first before coming to the high

8   school.   And there were multiple of each of those.

9       Q.   Okay.   Any other situations in which the

10  discipline of a student would require the involvement of

11  a superintendent?

12      A.   Discipline or simply disruptive student coming

13  out of class?

14      Q.   We had been talking about disruptive students.

15  But moving to discipline, can you tell me about the --

16      A.   In general, the things that might require his

17  attention, those two would apply to any situation.

18      Q.   Uh-hum.

19      A.   If there were an altercation in which a student

20  was injured.

21      Q.   Uh-hum.

22      A.   If there were an ESE student who might have

23  ramifications with an IEP or a 504 plan, student with a

24  504 plan, students who were committing multiple

25  infractions and might be a candidate for being referred

1   to an alternative school because that referral had to go

2   through the superintendent.  So as we approached, he

3   kept tabs on those numbers.

4       Q.   Uh-hum.

5       A.   Every out-of-school suspension was documented

6   through his office anyway, so he was aware of it.

7       Q.   And these are the disciplinary situations that

8   you say required his attention.  What are the situations

9   in which his approval of whatever the discipline

10  decision was that was made, you know, on the ground at

11  the time and at the high school?

12      A.   I don't know that it was so much an approval as

13  it was, if I knew he would have a question, I would

14  simply have called and talked with him.  He would not

15  always step in.  Sometimes he would, sometimes he would

16  not.

17      Q.   Uh-hum.  Did he ever override a discipline

18  decision?

19      A.   Yes.

20      Q.   How often did that happen?

21      A.   Probably maybe once every two or three months.

22  And that's an estimate.

23      Q.   Uh-hum.  Sure.

24           And so how often did you put him on notice of a

25  disciplinary action that you thought he should be aware

1  of?

2      A.    Simply putting him on notice?

3      Q.    Uh-hum.

4      A.    Probably once a week.

5      Q.    Okay.  But only once every two or three months,

6  on average, would he step in and override a decision?

7      A.    Correct.

8      Q.    And how would you undo a decision, a discipline

9  decision, that had already been made?  I guess let me

10  back up a little bit.

11          When he overrode a decision, was it in the

12  moment before any discipline had been handed out?  Did

13  you get on the phone and say here's what I'm about to

14  do, is it okay?

15     A.    If possible, that was the scenario to --

16  because once he overrode me, I had to override people

17  down beneath me, and it was not a good scenario with the

18  student.  So when possible, yes, we would speak before

19  the punishment, whatever it was, what was carried out.

20  That wasn't always possible.

21          So if he overrode something after the fact, it

22  was generally handled the same way as if I, or another

23  assistant principal, had to override something.  We

24  would simply work with the student and with the parents

25  and say we'd like to call you back in, we'd like to work

1  with the student, we would like to offer this in the

2  best interest of education.

3      Q.   What were the sorts of scenarios that he would

4  override a discipline decision by the principal?

5      A.   As you say suspension of a student whose

6  grandfather was a long-time dean in the community, the

7  grandchildren decisions were overridden several times.

8      Q.   Any other sorts of situations?

9      A.   That is a specific example I can think of.

10  They would have been similar types of things.

11      Q.   Was it ever the situation that he looked at the

12  actions that the student was alleged to have done?

13      A.   Certainly he looked at the actions with those

14  as well, but would he have simply looked at the actions

15  and made a decision to change something, not without

16  having been questioned on it.  I'm not aware of anything

17  -- it always occurred after a parent had come to him and

18  questioned a decision.

19      Q.   Okay.  So did you feel you needed the

20  superintendent's approval before making a discipline

21  decision?

22      A.   In general, no.  But I didn't make most of the

23  discipline decisions.  The dean handles most of the

24  discipline.

25      Q.   Okay.  So tell me about that, the way that

1   discipline was handled generally.

2       A.   Okay.   Well, there's a dean.   There was only

3   one at the high school.   She was pretty busy.

4       Q.   And who was that in 2012?

5       A.   Tammy Jones.

6       Q.   Tammy Jones?

7       A.   Uh-hum.

8       Q.   Go ahead.

9       A.   All discipline referrals came to her.

10      Q.   Okay.

11      A.   If she needed an administrator to work with her

12  or was overwhelmed by numbers and needed someone to work

13  with her or felt like she needed a decision above hers,

14  she worked with one of the assistant principals, or

15  both.   One was primary.   But she could have worked with

16  either of them.   Only on very rare, infrequent occasions

17  would it have then come to me above them.   And generally

18  only because a parent had gone to the superintendent,

19  and it was working its way back down the chain.

20      Q.   So how did you find out about discipline that

21  had been handed out?   Was it in the aggregate?   Did you

22  get a report?

23      A.   The minor incidents, no, I would not have had

24  any day-to-day knowledge of anything minor.   Although I

25  walked through the internal suspension room fairly

1  regularly, simply talking to students and seeing who was

2  there.  And I was in the cafeteria with the dean.  So

3  discussions might have been held.  But most day-to-day

4  handling of discipline, I was not involved in at all.

5      Q.   You say minor incidents.  Give me examples

6  of --

7      A.   Anything up to a fight or someone who has had

8  multiple infractions that were being considered for an

9  alternative placement, maybe.  I mean, anything under

10  that would have really not have been brought to my

11  attention regularly.  What I did get was a copy on every

12  out-of-school suspension.  If a parent came in and was

13  upset, I was notified.

14      Q.   And did you ever override a decision of the

15  dean of students after she had made a decision?

16      A.   I don't recall overriding any after she had.

17  There were times that she certainly would have come to

18  me and said I'm thinking about going here, what do you

19  think, or she would have come even more often to one of

20  the assistant principals and had that discussion.  And

21  we might have counseled differently because we might

22  have been aware of something else that was going on in

23  the works with the family or guidance or something else.

24      Q.   But so do you recall a time in which, in the

25  year and a half that you were the principal, that you

1    reversed a discipline decision that the dean had made?

2        A.    I don't recall a specific time, no.

3        Q.    And so, I'm sorry, I may have missed this.  If

4    you answered it, I apologize.

5              How were you -- other than in passing, or if it

6    was a major infraction, how were you made aware of the

7    discipline decisions that went on every day?

8        A.    Other than major ones?

9        Q.    Uh-hum.

10       A.    I wasn't.  There was a chain of command that

11   handled that, and I didn't need to step in.

12       Q.    So you didn't get sort of aggregate reports, we

13   had six students suspended this week and --

14       A.    No.  Again, when we had administrative

15   meetings, we might be discussing different things that

16   were going on.  But did I get a regular report, no.

17       Q.    Okay.  I want to loop back and finish up with

18   understanding your interaction with the superintendent

19   generally.

20       A.    Uh-hum.

21       Q.    So how frequent would you say that you

22   communicated with the superintendent on a daily basis,

23   generally?

24       A.    Him directly --

25       Q.    Uh-hum.

1      A.    -- or through secretaries?

2      Q.    Him directly.

3      A.    On an average, probably once a day, but it

4  might be five times in one day and then nothing for

5  several days.

6      Q.    Okay.

7      A.    So, on average, probably once a day.

8      Q.    And who generally instituted that

9  communication?  Was it usually you going to him?

10      A.    It could have been either way.

11      Q.    Okay.  Was it about equal, then, would you say,

12  or --

13      A.    Probably the phone calls would have been more

14  on his end because a lot of communication took place

15  through our secretaries.

16      Q.    How many secretaries did Superintendent Cline

17  have?

18      A.    He used two directly in his office and then

19  another student secretary who was there part time.

20      Q.    What are the names of those secretaries that

21  were there in 2012 or 2013?

22      A.    Melba Barnwell.

23      Q.    Uh-hum.

24      A.    Jan Lewis.  I think her actual title was board

25  secretary, but she worked as the superintendent's

1    secretary.  And there were a couple of students.  I

2    don't remember offhand who they were.

3        Q.   Okay.  If you sent -- if you communicated with

4    Melba or Jan -- is Jan a male or a female?

5        A.   Female.

6        Q.   Okay.  How did you -- did you have any

7    assurance that the message would get through?

8        A.   Yes.

9        Q.   How did you know that?

10       A.   He didn't miss many messages.

11       Q.   Okay.

12       A.   They were communicated.

13       Q.   Okay.  And so if you talked with the

14   superintendent once a day, how often would you say that

15   you communicated with the secretaries -- through the

16   secretaries to him?  Was it more often than once a day?

17       A.   I would have communicated directly to him.  My

18   secretary might have communicated with his secretary

19   more frequently than that.

20       Q.   And tell me the ways in which you communicated

21   with the superintendent.

22       A.   Either by phone or by e-mail.

23       Q.   Any other means?  Did you ever text or --

24       A.   No, didn't text with him.

25       Q.   Okay.  How often did you meet with him?

1      A.     Formally, all administrators had a monthly

2   meeting that we met specifically with him over a list of

3   items.  And then every two weeks all administrators met

4   with him in a group meeting.  And then quarterly there

5   was a meeting over the school improvement plans with

6   him.  Those were the formal meetings.

7      Q.     Okay.  How would you describe working with

8   Superintendent Cline?

9      A.     In what aspect?

10     Q.     Did you enjoy working with him?

11     A.     Usually.

12     Q.     Were you -- did you have a professional

13  relationship, a friendly relationship, animosity-based?

14     A.     It was a professional relationship.

15     Q.     Okay.  Did you agree with the way that he

16  supervised the high school, your activities in

17  particular?

18     A.     Not always.

19     Q.     Would you say that you got along with him?

20     A.     Generally so, yes, uh-hum.

21     Q.     What would you say that he did or didn't do

22  that you disagreed with?

23     A.     That could be just a day-to-day difference in

24  policy as to what, you know, what set of texts he wanted

25  to go with, or what curriculum we wanted to work with,

1  or how much money we wanted to pull from different areas

2  to move into different accounts, it could be a

3  disagreement.  I could express my opinion, but he made

4  the final decision.

5       Q.   Okay.  And how often did you go directly to the

6  board for approval of something?

7       A.   Never.

8       Q.   So we talked earlier, and you agreed that the

9  dean of students was -- you were her direct supervisor?

10      A.   Correct.

11      Q.   How often did you meet with her?

12      A.   Formally or informally?

13      Q.   Both.

14      A.   Formally, she met with the administrators when

15 we met as a team, which was two to three times a week.

16      Q.   Uh-hum.

17      A.   Informally, I mean, we were out on bus duty and

18 in the cafeteria together and at every sporting event

19 together.  So there was a great deal of informal

20 conversation.

21      Q.   But formally you say two to three times a week

22 that you met as what?

23      A.   An administrative team.

24      Q.   Okay.

25      A.   She would have met with us.

1    Q.   Tell me who would be the other administrators

2   in those.

3    A.   The assistant principals, the administrative

4   assistant, and very often academic coaches might have

5   been with us as well.  Not always but very often.

6    Q.   Academic coaches?

7    A.   Schools have reading coaches, math coaches,

8   science coaches, and they are in charge of a lot of

9   testing and curriculum.

10   Q.   Okay.  What are the names of the assistant

11  principals that were in the team in 2012?

12   A.   Karen Pella and Paul Curtis.

13   Q.   And the name of the administrative assistant?

14   A.   Amanda Irby (phonetic).

15   Q.   And did those meetings take place on a

16  particular day?  Was it Tuesdays and Thursdays or was

17  it --

18   A.   They did.  I don't remember exactly what it

19  was.  And subject to any given emergency on a high

20  school campus, they might be moved around.

21   Q.   Okay.  How often did the dean of students seek

22  your advice, or did she?

23   A.   She would have gone to the assistant principals

24  prior to coming to me about a discipline issue.

25   Q.   Uh-hum.

1    A.    So other than in the meetings and general

2  discussions, not generally.  She would have gone to an

3  assistant principal.

4    Q.    And then is it, in terms of the chain of

5  command, I've heard you mention that.  Can you tell me

6  what the chain of command is at the high school?

7    A.    For whom?  Anybody or --

8    Q.    Yes.  Starting with the teachers.

9    A.    Okay.  Well, the teachers fall directly under

10  administration.

11    Q.    So teachers -- draw me a direct line.

12  Assistant principal.

13    A.    Well, it varies, depending on what you're

14  referring to.  If you're talking about curriculum, or if

15  you're talking about discipline, student discipline, or

16  if you're talking about teacher discipline, or, you

17  know, leave days out, all of that, the chain of command

18  is going to be different.

19         In a very broad generality, the teachers would

20  have, curriculum-wise, gone to a department chair or a

21  coach first.

22    Q.    Uh-hum.  And then from there?

23    A.    Discipline-wise, they would have gone --

24    Q.    If you would -- I'm sorry.  I'm just trying to

25  get the full chain of command.

1          So curriculum-wise, they would go to the

2   department --

3      A.   Chair or the academic coach.

4      Q.   And then is there something above that or does

5   it end there?

6      A.   No.  From there, they could have gone to an

7   assistant principal.

8      Q.   And then from there, does it end there or --

9      A.   From there it would have gone to me.

10     Q.   And then from there, in terms of curriculum,

11  does it go higher than that?

12     A.   Assistant directors at the county level.

13     Q.   So that's curriculum?

14     A.   Uh-hum.

15     Q.   Discipline?

16     A.   They would have gone to the dean.

17     Q.   And then who is above the dean?

18     A.   The assistant principal.

19     Q.   Who is above the assistant principal?

20     A.   I would have been.

21     Q.   What other types of chain of command decisions

22  were there?

23     A.   Days of leave off.  I don't know how interested

24  you are in all of that.

25     Q.   Like employee --

1      A.   Yes, personnel issues.

2      Q.   Personnel issues?

3      A.   Yes.

4      Q.   Just for fun, the teachers have --

5      A.   Whatever secretary handled that, they would

6   have gone there first.

7      Q.   And if they didn't like that decision, who

8   would they go to?

9      A.   Assistant principal.

10     Q.   And then to you?

11     A.   Yes.

12     Q.   Tell me about the levels of discipline.  Tell

13  me what sorts of options the dean of students -- or I

14  guess I'm backing up a little bit.

15          Can you tell me who has authority to discipline

16  a student?  You said normally it goes to the dean of

17  students who has authority.

18     A.   A teacher has authority within their classroom,

19  obviously and are expected to handle what would be

20  considered level one offenses.  Rolling your eyes, I

21  don't want to do this, putting my head down on my desk,

22  general talkativeness, argumentativeness, things that a

23  teacher is expended to handle within the classroom.

24  Beyond that, it would go to the dean.

25     Q.   Does that make it level two automatically if it

1  goes to the dean?

2      A.    Well, it's a pretty vague terminology, but the

3  school refers to level one as things which simply needed

4  to be handled within the classroom.  I don't know that

5  it's official terminology of any sort.

6      Q.    So -- but does that mean that you couldn't

7  discipline a student directly?  Did you send -- if a

8  teacher grabs you and says John Smith is out of control,

9  you know, can you do something, would you -- did you

10  have the authority to discipline that student if you

11  either saw an infraction or were --

12      A.    Certainly I had the authority.  That wasn't

13  what I spent my time doing.

14      Q.    Did the assistant principals also have

15  authority if they saw something --

16      A.    Yes.

17      Q.    -- or if they were told?

18          Did anybody else have -- you said the teachers

19  within the classroom.  I guess there was probably nobody

20  else in a high school that would have the authority.  Am

21  I missing anybody who would have the authority to

22  discipline a student?

23      A.    Well, any adult who is a school board employee

24  that would have seen a student misbehaving on campus

25  would have had the authority to ask them to stop and

```
 1   refer them to the proper location, yes.
 2       Q.   Would they have the authority to send them to
 3   the intervention room or --
 4       A.   Yes.
 5       Q.   -- suspend them?
 6       A.   Any school board employee would have had that
 7   authority.  Not to discipline them but to send them to
 8   the dean's office for whatever might go further from
 9   there, yes.
10       Q.   But for the assistant principal and the
11   principal themselves, did you have to send it through
12   the dean or could you --
13       A.   No.  It wouldn't have to have been sent, that
14   infraction.
15       Q.   And if the students were disciplined by any of
16   the people, can we say in the administrative staff or
17   the dean of students, and they disagreed with their
18   punishment, they didn't think it was fair, what were
19   their options?
20       A.   With a dean or with an assistant principal?
21       Q.   With a dean?
22       A.   They could have spoken with the assistant
23   principal.
24       Q.   And how would they do that at the time?
25       A.   Simply ask or a parent request.
```

1    Q.   So I guess we should -- if you would, give me

2    some -- what the options were to -- in terms of

3    disciplining a student.   What were the options on the

4    table that the dean or the administrative staff could

5    choose from?

6    A.   Well, if it was appropriate, we would generally

7    have tried to have handled it simply with talking to a

8    student, and whether that might be a conference with a

9    student and a teacher or between the two students,

10   including guidance maybe, outside counselors if they

11   were involved, that was always the first option that was

12   used, if it was appropriate, and it was not an

13   infraction that would put someone else in danger.

14   Q.   Okay.

15   A.   If that had already been done or it wasn't

16   appropriate, in-school suspension was generally the next

17   one.   And it could have been for a period, for a lunch

18   period, for a full day, or for multiple days.

19   Q.   In-school suspension, is that the same -- talk

20   to me or describe to me what the IR Room --

21   A.   Same thing.

22   Q.   -- is that called the intervention?

23   A.   That's the same thing.

24   Q.   And that could be for -- what would you say the

25   minimum length of time that a student would be put in

1   in-school suspension as punishment?

2     A.   Generally, the minimum length might simply be

3   the period of the class in which they were having the

4   difficulty.

5     Q.   And it could be up to how long in-school

6   suspension?

7     A.   Two, three, four days.

8     Q.   And then what are the other options?

9     A.   From there, disciplinary, it would go to

10   out-of-school suspension.

11     Q.   And that could be for as few as --

12     A.   One day up to 10 days, unless it was something

13   that was an expulsion hearing, in which case the student

14   would have been held out.

15     Q.   Okay.  What about detention, do they do that

16   anymore?

17     A.   Yes and no.  Generally, that's handled more on

18   a teacher level.  We didn't have the personnel available

19   to do much detention after hours.

20     Q.   Okay.

21     A.   I guess you could consider ISS during lunch

22   maybe as a detention because it wasn't a period, but...

23     Q.   Okay.  And what's the difference between

24   out-of-school suspension and in-school suspension?

25     A.   Other than one is out and one's in?

1    Q.   Yeah.

2    A.   That's pretty much the difference.

3    Q.   Do students generally get to choose whether

4    they are going to be in-school suspended or out of

5    school?  Do they get to go home if they don't want to go

6    in the intervention room?

7    A.   Only in that their choice is in their behavior

8    choice.  I mean, if they choose to behave

9    inappropriately enough that they can't be kept within

10   the school, then they've made the choice that they will

11   then be suspended out of school.

12   Q.   Okay.

13   A.   Were they asked which one would you prefer, no.

14   Q.   What about corporal punishment?

15   A.   It's on the books in DeSoto County.  It hasn't

16   been used, at the high school at least, in a number of

17   years.  I couldn't say about the middle school and

18   elementary school.

19   Q.   So if a student violated a policy, the -- would

20   they face a consequence, one of those that you laid out?

21   If a student, I guess -- just to rephrase, if a student

22   violated a policy, and there were a consequence to

23   violating that policy, would it be one of the options

24   that you laid out?

25   A.   Yes.

1    Q.   Okay.  Were students free to violate policies

2  without a consequence if an administrator knew about it?

3    A.   I wouldn't say without a consequence.  Again,

4  the first one would have been trying to work with a

5  student in a situation, keeping them in school, keeping

6  them in the classroom.  So that is a consequence, but it

7  was hopefully more positive than disciplinary.

8    Q.   Okay.  And when is a parental notification

9  required?  When do you let the parent know that a

10  student has been disciplined?

11    A.   If a student has been given, officially,

12  in-school suspension or out-of-school suspension, there

13  is a long form that is noted, and it is written on that

14  form.

15    Q.   So for either in-school suspension or

16  out-of-school suspension, there's a form?

17    A.   Yes.

18    Q.   You said a long form?

19    A.   Well, it's a disciplinary form, for -- any

20  infraction is written on the same discipline form.  It's

21  actually computer-generated now.  It goes on that form.

22         And out-of-school suspension, a letter is

23  mailed home to the parents.

24    Q.   Okay.

25    A.   Since it went to the computer, in-school

1   suspension, I don't think is notified in any format.

2       Q.   Okay.  And is something --

3       A.   Although talking with the parents would very

4   often have been part of what was involved.  So they

5   might well have been notified.

6       Q.   Okay.  And is the student given a copy of that

7   discipline form, whatever is filled out, if it's -- if

8   something happens -- I guess let me back up.  This other

9   page of my notes, so I will recall from memory.

10          One of the things that could happen is working

11  it out with the students, either a verbal reprimand or

12  an attempt to mediate, let's say?

13      A.   Right.

14      Q.   Does that get put into the computer?

15      A.   It comes in, yes, electronically to the dean.

16  I'm trying to think if it's printed from there or if it

17  stays electronics.  It isn't that long ago that it went

18  from triplicate to electronic.  I think it stays

19  electronic if it's an in-school.  In-school suspension,

20  I think it stays on that electronic form.  I don't think

21  a copy is printed out from there.

22      Q.   Okay.  So the student doesn't have to sign

23  anything?

24      A.   I'm trying to remember.  I suppose it could be

25  printed out and signed.

1    Q.    But standard operating procedure, if that's a
2   fair term, when a student gets into trouble and gets a
3   consequence for that, are they given something in
4   writing that tells them what they did?
5    A.    I think it was usually printed out and they
6   would have been given a copy.  Even if I -- the
7   discipline question came to me, I would not have been
8   the one handling the paperwork.  That would have gone
9   back to the dean.  So I wouldn't have handled any of
10  that.
11   Q.    Okay.  And so as the principal that directs the
12  activities of the high school, did you have procedures
13  or policies around what to do when a student was
14  disciplined?
15   A.    Yes, but that's a very broad question.
16   Q.    Okay.  Did you direct the dean, did you have
17  policies that told the dean what to do when a student
18  was disciplined?  I don't mean choosing between
19  discipline options, I mean putting it into the computer,
20  printing it or not, getting the student to sign it or
21  not, notifying the parents or not, all of those
22  policies?
23   A.    I wouldn't have ever -- I don't know that I've
24  ever seen a written procedure for what the dean goes
25  through.

1    Q.   So what the dean of students does in terms of

2  paperwork is a matter of practice, not policy?

3    A.   Correct.  Yes.

4    Q.   Okay.  Can you testify as to what her practice

5  was with respect to --

6    A.   She would have received a notification from a

7  teacher.  She would have called the student in.

8  Depending on the severity, it might have been immediate

9  or it might not have.  If there were 23 students with

10  tardies and one large fight with seven students, the

11  tardies would not have been dealt with immediately.

12         From there, she would have worked with the

13  student.  If she felt bringing in a parent or guidance

14  or anything else was necessary, she would have done

15  that.  If it was something where a student was going to

16  be sent home or it was something where repeat offenses,

17  then she probably would have gotten the parent on the

18  phone immediately, if she could have.

19    Q.   Okay.  And then in terms of notating that in

20  the computer, this long form, did you create the long

21  form or did that predate your principalship?

22    A.   No, I didn't create any of the formats that

23  were used.

24    Q.   Okay.  Do you -- if there's no policy, do you

25  know what the practice was for the dean of students or

 1  either the assistant principal when a student was

 2  disciplined, what they did next in terms of documenting

 3  it?

 4     A.    Well, they would have gone through the

 5  discipline -- they would have met with the student.

 6     Q.    Okay.

 7     A.    And then I believe she printed one of the

 8  formats off.  And in all occasions, if there was any

 9  punishment other than maybe just talking with a

10  student --

11     Q.    Uh-hum.

12     A.    -- sometimes just talking with a student,

13  that's not necessarily even documented.  Just talking

14  and working things out.

15     Q.    Uh-hum.

16     A.    So if the student was placed in ISS, and it

17  went further from than that with OSS, then the form

18  would have gone to the file.

19     Q.    Is it your policy that discipline gets

20  documented in real time or as soon as possible

21  thereafter, or is it any time within the next month

22  or --

23          MR. JENSEN:  Object to form.

24          If you would, just give me a second or two

25     before you answer so I can lodge an objection.

1          THE WITNESS:  Are you done?

2          MR. JENSEN:  Yeah.

3          MS. LITTRELL:  I'm happy to rephrase.

4     BY MS. LITTRELL:

5          Q.    When was the documentation of the discipline

6     supposed to be entered into the computer?

7          A.    It would have been done as soon as possible.

8     But talking to students would have taken precedence over

9     filling out the paperwork.

10          Q.    Okay.  In the year and a half that you were the

11     principal, how many times did you have occasion to call

12     a student's parents before that student violated a

13     school rule or policy?

14          A.    I called parents somewhat regularly over

15     multiple types of things.  If I was concerned about

16     actions that might have negative ramifications on a

17     student's education, then -- and it wouldn't necessarily

18     have been me always.  I might have asked somebody else

19     to do the calling.  How often did I actually call?

20          Q.    And, again, the question is prior to the

21     student doing anything wrong.

22          A.    Prior to -- in a year, probably three or four

23     times at the most.

24          Q.    What sorts of incidents led you to call a

25     parent before a student did anything wrong?

1    A.    If I had seen a student getting into a crowd

2    that I knew the parents didn't agree with, and it was

3    starting to affect grades or starting to affect, you

4    know, behaviors in class or mood, I might call a parent

5    and say I'm concerned, I don't want this going in the

6    direction, I'd like you to be involved.  That would be

7    most likely.

8        Q.    Uh-hum.  If you saw grades falling or a change

9    in behavior or a change in moods, those were the things

10   that you mentioned, that might prompt you?

11       A.    That type of thing.

12       Q.    Do you ever remember calling a parent when none

13   of those things happened to put the parent on notice?

14       A.    Well, I called parents rather frequently.  I

15   couldn't give you a specific example of when I did and

16   didn't.  I probably called several times but --

17       Q.    I guess the question is:  Can you recall a

18   specific time which you called a parent when the student

19   did not have a drop in grades, a change in behavior, or

20   an effect to their mood?

21       A.    If they had brought up things in a discussion

22   in school, maybe they had come to me and asked, you

23   know, about ideas that were unusual, that I felt a

24   parent maybe needed to be notified about.

25       Q.    Are you remembering a specific thing or are you

1  thinking this might be the kind of thing?

2      A.    I'm not thinking of a specific at the moment.

3      Q.    Okay.  You said that you called parents often.

4  So did you have a typical day in which -- just a typical

5  day as a principal?  I guess that's the first question,

6  and then I'll try to figure out where the calling of the

7  parents happened, if it was at the beginning of the day,

8  the end of the day.

9          But if you would describe to me what you did on

10 a typical day when you were the principal?

11     A.    I don't know that I could tell you there's a

12 typical day as a principal.  It would start about 6:00

13 a.m. actually with subs calling in, and about 7:30 at

14 the school meeting with either a formal or informal

15 meetings.

16     Q.    Uh-hum.

17     A.    I would have spent at least two to three hours

18 going through classrooms or in the hallways.

19     Q.    Was that monitoring what was going on?

20     A.    It would have been doing teacher observation,

21 just walking through seeing what was going on, walking

22 up and down the halls talking to people, being on the

23 phone with all kinds of -- everything from vendors to

24 parents to, you know, curriculum that I was planning.

25          I probably had a meeting scheduled with at

1   least one person from the district office that may have

2   gone for an hour or two.

3       Q.   Uh-hum.

4       A.   I probably would have met with a sports coach

5   at least one time over something during the day.

6   Cafeteria, after noon, I would have been there till

7   about 7:00 every evening.   Sports events.

8       Q.   And so in the times that you took out to call

9   students' parents, tell me more about that, because it

10  sounds like if discipline was cabined off to some extent

11  largely the responsibility of the dean of students --

12      A.   Uh-hum.

13      Q.   -- why would you have occasion to call

14  students' parents?

15      A.   Very often because they called me.   And if they

16  called me directly, I would usually have responded

17  directly.   Some of the things I would have asked someone

18  underneath me to call, but very often I would have

19  responded back directly.   And frequently they called me

20  simply because I worked in that school for 24 years in

21  multiple capacities, and I had already assisted them

22  with something else, and they simply came to me.   It's a

23  very small town.

24      Q.   It sounds like you returned a lot of phone

25  calls.

1      A.   Yes.

2      Q.   But earlier you testified that, you know, if

3   you saw a student hanging out with the wrong crowd, then

4   you would pick up the phone and call a parent?  Is that

5   what you --

6      A.   I think I said maybe two or three, four times a

7   year I might have called a parent prior to something

8   erupting simply saying we're concerned.

9      Q.   Okay.  Did you say -- I skipped over this.  So

10  let's make sure I understand your history with DeSoto

11  County.

12     A.   Uh-hum.

13     Q.   Can you tell me -- you were there for 24 years?

14     A.   Pretty much, yes.

15     Q.   Okay.  So when did you first start working for

16  the school district?

17     A.   '88.

18     Q.   Okay.  And what was that position?

19     A.   It was a teacher.

20     Q.   And then what was your next position?

21     A.   Somewhere in the seven-, eight-year range, I

22  moved to staffing specialist.

23     Q.   What did that position entail?

24     A.   Overseeing all the paperwork and documentation

25  of exceptional education students.

```
 1    Q.    Okay.  And how long were you doing that?

 2    A.    That was seven or eight years as well.

 3    Q.    Was that in addition to being a teacher or --

 4    A.    It overlapped for two years, and then it was a

 5  stand-alone position.

 6    Q.    Okay.  And then what was your next position?

 7    A.    From there, I spent two years in Charlotte

 8  County as a staffing specialist over two high schools.

 9    Q.    Why did you decide to leave DeSoto County and

10  go to Charlotte County?

11    A.    I had completed my administrative degree and

12  was going into administration, and felt like I needed

13  more outside experience.

14    Q.    Was there anything that happened at DeSoto

15  County School District that made you want to leave?

16    A.    No.

17    Q.    Was it your decision or --

18    A.    Yes.

19    Q.    And you were in Charlotte County for two years?

20    A.    Uh-hum.

21    Q.    Then what was your next position?

22    A.    Then I came back to the high school as the

23  assistant principal.

24    Q.    Do you remember what year that was?

25    A.    It was two years before the '11-12.  So is that
```

1    '09/10 maybe?

2        Q.    2010 or 2009?

3        A.    I think '09-10 was the first year.

4        Q.    And you were the high school -- the assistant

5    principal until you became the principal?

6        A.    Correct.

7        Q.    Did you have to interview for the assistant

8    principal position?

9        A.    Yes.

10       Q.    Did you have to interview for the principal

11   position?

12       A.    No.  I was transferred into the position.

13       Q.    Did you have to apply for it?

14       A.    I honestly don't remember whether I had to go

15   in and actually key in an application or not.  I don't

16   think I did, but --

17       Q.    What happened to the principal before you?

18       A.    I believe he was released.

19       Q.    What does that mean, "released"?

20       A.    Well, we're all under annual contract.  So he

21   wasn't rehired.  Which would be the correct term, he was

22   not rehired.

23       Q.    Is there a difference between not rehired and

24   the principal choosing to leave?

25       A.    Yeah.  I mean, if you're not rehired, then the

1    superintendent has made the choice for you, yes.

2        Q.    Twenty-four years.

3        A.    And I think my years may be off a couple in

4    there.  That doesn't seem to add up to 24 or 25.

5        Q.    It seems like a quarter of a century; right?

6        A.    Oh, my God, that's a long time.

7        Q.    Where did you grow up?

8        A.    I'm from Georgia.

9        Q.    So how did you find your way to DeSoto County?

10       A.    Marriage.

11       Q.    And would that have been in 1988 or before?

12       A.    It was.

13       Q.    Okay.  So you earlier mentioned that teachers

14   had the authority to discipline students that were

15   disruptive in their class.

16       A.    Uh-hum.

17       Q.    What kind of behavior would elevate that to

18   sending the student to the dean of students?

19       A.    A direct refusal to do something.

20       Q.    Uh-hum.

21       A.    Multiple corrections for the same type of

22   thing.  You know, sit down and be quiet, sit down and be

23   quiet, that type of thing.  Tardies went straight to the

24   dean's office after the third one.

25       Q.    Is there a difference between direct refusal to

78

1    do something -- what was the other way you phrased it?

2    Multiple infractions?  What I mean by that is the

3    example you gave seemed like the same thing, sit down

4    and be quite, and then the student not sitting down and

5    not being quiet.  Is there a difference in -- give me an

6    example of a direct refusal as opposed to not sitting

7    down and not sitting down when they're told.

8        A.    Asking someone to put up a book, we're taking a

9    test.

10       Q.    So sort of a flat-out no?

11       A.    Anything that I'm not going to do what I've

12   been told to do.

13       Q.    I see.  That's helpful.

14       A.    It would be total defiance of authority.

15       Q.    Okay.  So this in-school suspension, I'd like

16   to discover a little bit more about that.  What is

17   the -- are there any other options besides putting the

18   student into the intervention room that qualifies as

19   in-school suspension?

20       A.    Not unless they were sitting directly in the

21   dean's office, but...

22       Q.    How often did that happen?

23       A.    I really couldn't -- not having been in the

24   dean's office, I really wouldn't know.

25       Q.    Okay.  Tell me about this intervention room.

1   How big is it, are lots of students put in there at the

2   same time, or is that sort of an idea of a room?

3       A.   There's a para who monitors the room.   There

4   could be up to, I don't know, there are probably 20 to

5   25 desks.   It's a little smaller than a classroom.

6       Q.   Uh-hum.   And are students, all students who are

7   disciplined with in-school suspension on a given day put

8   in the same room or are there separate intervention

9   rooms?

10      A.   No, there's only one.

11      Q.   What happens in that intervention room?

12      A.   They're sitting quietly, hopefully doing work.

13      Q.   What do you mean "hopefully doing work."   How

14  would they have work to do?

15      A.   The teachers would send it.   They would be

16  notified that the student was in ISS for the day.   So

17  they would send the work.

18      Q.   I see.   I think I recall reading in the

19  policies that that was part of the policy of the school

20  is that when a student was in the intervention room,

21  there was an alternative education opportunity for them.

22          Can you describe more about that?

23      A.   Well, the teachers would have been notified in

24  the morning.   There would have been a general list that

25  had been sent out probably from the para who was

1  handling ISS.

2       Q.   Para is an abbreviation for --

3       A.   Paraprofessional.

4       Q.   Like a teacher?

5       A.   Used to be a teacher's aide.

6       Q.   I see.  Thank you.

7            And so the para takes an inventory of who is in

8  the intervention room and then types up a list?

9       A.   Uh-hum.

10      Q.   Is that right?  Am I getting that wrong?

11      A.   No.  She would have sent out a list to the

12  faculty and staff, these following students are in ISS

13  for the day, please send work.

14      Q.   I see.  And that way, the teachers are on

15  notice that the student isn't just skipping school?

16      A.   Correct.

17      Q.   They're in intervention, to send --

18      A.   Correct.

19      Q.   And is that how the -- I guessed that what

20  happens is the para takes a look and takes an inventory.

21  Is that actually how it happens or does it actually go

22  from the dean, or whoever puts them in the intervention

23  room, to then generate the list, or do you know?

24      A.   Usually the list would have been put together

25  by the dean's secretary based off the long forms that

1  she did the day before and the count of who was in there

2  for however many days.

3  Q.   What is the name of the dean's secretary in

4  2012?

5  A.   Linda Howell.

6  Q.   And how would a student who is placed in the

7  intervention room who didn't agree with the discipline

8  decision, didn't think they should have been put into

9  in-school suspension, how would that student appeal

10 that?

11 A.   Well, there's a process form through the county

12 if you want to make an official appeal.  Ordinarily they

13 would have just simply talked with the dean.  Usually

14 they were placed there for disciplinary action, and

15 there wasn't much discussion.  But if they or the parent

16 wish to discuss it, then they can certainly talk with

17 the dean.

18 Q.   But if the dean made the decision to put them

19 in in-school suspension, so now they're in the

20 intervention room, what are their options to appeal that

21 decision?

22 A.   Again, they could talk with the dean afterward

23 if she wasn't busy, or they might talk with an assistant

24 principal or a parent might.

25 Q.   It sounds like this is something that would

1    happen at the end of the day.

2        A.    Well, since cell phones aren't allowed to be

3    used during the day, unless they had been given

4    permission to call a parent.

5        Q.    Cell phones during the day, are students

6    allowed to use cell phones in the intervention room?

7        A.    No.    They are not allowed to use them in the

8    school.

9        Q.    Are they allowed to leave the intervention

10   room?

11       A.    Not without supervision.

12       Q.    Are they allowed to go home if they chose?

13   Would that be a violation of another school rule if they

14   just --

15       A.    Students can't check themselves out.    A parent

16   has to check them out, or a guardian.

17       Q.    Okay.    But if a student was in the intervention

18   room and asked to go to the bathroom, for example, and

19   just left school, would that be a violation of school

20   policy?

21       A.    That would be out of area, yes.

22       Q.    And if a student used their cell phone when

23   they were in the intervention room, would that be a

24   violation of school policy as well?

25       A.    It would be electronics policy, yes, which is

1  in the student disciplinary code.

2      Q.   How's everybody doing?  Are you doing okay?

3      A.   Uh-hum.

4      Q.   Let's talk about the school's policy with

5  respect to free speech.  What do you understand the

6  school's policy with respect to free speech to be?

7      A.   There is a district school board manual.

8  Schools don't have individual policies.

9      Q.   Okay.

10     A.   And it is, I believe, a pretty general

11  statement of first amendment rights.

12     Q.   Can you describe your understanding of that

13  general statement?

14     A.   I don't know specific to that statement that,

15  you know, students have a right to express their

16  opinions.

17     Q.   Uh-hum.

18     A.   If they are not disrupting classroom procedure,

19  interfering with the rights of anyone else's education

20  in the classroom.

21     Q.   Uh-hum.

22     A.   It's a pretty vague statement.

23     Q.   So if the vague statement comes from the

24  district manual, who interprets and applies that policy

25  at the school?

1      A.    All personnel.

2      Q.    So teachers can interpret that policy and would

3  apply it according to their understanding of what it

4  means; is that right?

5      A.    They should apply it according to a district

6  understanding, but --

7      Q.    Where does that district understanding come

8  from?

9      A.    There's not a specific training that they're

10  given on it.

11      Q.    And are there like interpretive guidance policy

12  manuals, statements, or anything like that?

13      A.    Not really.  More of an individual, this

14  situation has come up, what might be the best way to

15  handle it?

16      Q.    And if a student disagrees with the teacher's

17  interpretation of the free speech policy, what options

18  would the student have?  Where would they go?

19      A.    Probably they would have gone to an assistant

20  principal as a first.  Depending on if they have another

21  teacher they knew well, though, or the parent could very

22  well have called the superintendent first off.  I don't

23  know that there's -- every student would do that

24  differently.

25      Q.    Uh-hum.  But what is the chain of command?  So

1  a teacher -- we -- you said, and I would agree that the

2  first amendment policy, the free speech policy is

3  general and has some vagueness.

4      A.    Chain of command would be the assistant

5  superintendent, parents tended to go directly to the --

6  I mean, excuse me, assistant principal.  Parents tended

7  to go directly to the superintendent.

8      Q.    Okay.  And so do you have any role in

9  interpreting policy?

10     A.    Well, if they would go through the assistant

11 superintendent, then they might come to me after that.

12     Q.    Okay.  I handed you Exhibit 1, which is the job

13 description.  Did we talk about that in the job

14 description, that it's the principal's job

15 responsibility to interpret school board policy?  Do you

16 recall that?

17     A.    I think there's something along those lines in

18 here.  Did we talk about specifically, I don't remember.

19     Q.    Okay.

20     A.    I believe it came from Exhibit 2, what you're

21 referring to.

22     Q.    Yeah.

23         MS. LITTRELL:  Can we take a little break and

24     have you make a copy -- two copies of this, if you

25     don't mind?

1        (Recess from 5:44 p.m. until 5:53 p.m.)

2        (Plaintiff's Exhibit No. 3 was marked for

3     identification.)

4   BY MS. LITTRELL:

5     Q.    So I'm going to hand you what I've marked here

6   as Exhibit 3, Ms. Fusco.  And can you take a look at the

7   front page and tell me what it appears to be?

8     A.    It is the current policies of the district of

9   DeSoto County.

10    Q.    Okay.  Do you have any reason to believe that

11  the current district policies are different now than

12  they were in 2012?

13    A.    Yes, very much so.  I don't know if this

14  particular one is different, but multiple district

15  policies have been changed.

16    Q.    Okay.  Do me a favor and look at -- what I have

17  here is the index for the current DeSoto County High

18  School policies, and the table of contents.  And I'd

19  like you to point out where the student free speech

20  policy is located.

21    A.    I don't see something that specifically says

22  free speech.

23    Q.    You do not see anything in the index?

24    A.    I haven't seen it yet.

25    Q.    Keep looking.  Let me know if you find

1  anything.

2     A.    I don't see something that specifically says

3  free speech.

4     Q.    Okay.  So in the current school district

5  policies, at least with respect to the 15 pages of

6  indexed list of information, there's nothing about the

7  free speech policy that you can see; is that right?

8           MR. JENSEN:  Object to form.

9     A.    I don't see anything in the quick glance.

10    Q.    Okay.  Well, take your time, and let's make

11  sure that you haven't missed anything.  When you say

12  "quick glance," I want to make sure if there is a

13  reference to the free speech policy, that we put it on

14  the record.

15    A.    I don't see it.  But I don't know what -- when

16  this policy was enacted either.  I don't -- I don't see

17  a specific reference.

18    Q.    Do you recall there being a free speech policy

19  in 2012 when you were the principal at the high school

20  that was brought to your attention by a superintendent

21  or by any of the school board members?

22    A.    Free speech policy under that title?

23    Q.    Right.

24    A.    No.

25    Q.    Let me show you now what is marked Exhibit 4,

1   which is your affidavit that was filed with the court.

2   And if you'll turn to the very last page, an exhibit to

3   your affidavit is attached.

4          (Plaintiff's Exhibit No. 4 was marked for

5       identification.)

6      A.   Right.  Yes, this is part of the student

7   handbook.

8      Q.   Okay.  Are you on the very last page?  We may

9   have different last pages.

10     A.   Okay.

11     Q.   Okay.  This is what was referenced in your

12  affidavit as the free speech policy.  And if you want to

13  look at your affidavit, you will see in paragraph seven

14  the reference -- the assertion that this is the school

15  board policy with respect to students' rights.

16     A.   Uh-hum.

17     Q.   Is that an accurate reflection of the truth?

18     A.   The policy manual is about 400 pages, and there

19  is reference somewhere to this.

20     Q.   Okay.  But you see in paragraph seven of your

21  affidavit it says Section 210.00 provides the students

22  have their right to express their opinions?

23     A.   Uh-hum.

24     Q.   Okay.  And so then the exhibit that was

25  attached to your affidavit is what I'm referencing as

1    the last page.  That's the policy that you referenced,

2    210.03.  Do you see there at the top the heading?

3        A.    Distribution of literature and materials.

4        Q.    Okay.  And so when you look at this policy, it

5    appears to be about, as it says, the distribution of

6    literature and materials; right?

7        A.    Uh-hum.

8        Q.    And then all the subsections starting with

9    Subsection A, approval for distribution of materials

10   shall be granted unless the principal determines that

11   the material is lewd or obscene, et cetera, that

12   references distribution of material; right?

13       A.    Yes.

14       Q.    Okay.  And subsection B, would you say that

15   that references distribution of material?

16       A.    Yes.

17       Q.    What about Section C?

18       A.    Yes.

19       Q.    Subsection D, does that reference distribution

20   of material only?

21       A.    Yes.

22       Q.    And Subsection E as well?

23       A.    Uh-hum.  Yes.

24       Q.    And then Subsection F, does that also reference

25   distribution of material?

1     A.    Yes.

2     Q.    Okay.  So while we have your affidavit in front

3  of you -- actually, strike that.  We'll come back to the

4  affidavit.

5          It's marked Exhibit 4; is that right?  Okay.

6          MS. LITTRELL:  Do you need a copy?

7          MR. JENSEN:  No.

8  BY MS. LITTRELL:

9     Q.    Talk to me about what training you were

10 provided as the principal of DeSoto County High School

11 specifically with respect to students' first amendment

12 right, first amendment being freedom of speech in this

13 instance.

14         Do you recall any specific guidance that you

15 were given in the year and a half you were principal?

16    A.    There was no specific training for me as

17 principal, no.

18    Q.    Do you recall whether you were given any

19 documents that helped you figure out the limits and

20 boundaries of students' right to free speech?

21    A.    No.

22    Q.    Any in-service training of any sort that

23 focused specifically on students' right that would have

24 included freedom of speech that you can recall?

25    A.    No.

1    Q.    And that's as to when you were principal.   Do

2  you recall when you were assistant principal ever being

3  given documents specifically in reference to students'

4  free speech rights?

5    A.    Documents are online.   Was I handed something

6  in document, no.

7    Q.    What was the first part of your answer?

8    A.    Our board of documents are online.

9    Q.    So what does that mean?   Does that mean there

10  are documents that you were pointed to that were

11  available online that would help you understand?

12    A.    I was never pointed to them, no.

13    Q.    When you were assistant principal, did you ever

14  have an in-service training that focused on students'

15  rights that would have included students' free speech

16  rights?

17    A.    No.

18    Q.    That you can recall.

19          How about when you were a teacher at DeSoto

20  County High School, do you remember any specific

21  documents that you were provided --

22    A.    No.

23    Q.    -- relevant to free speech?

24    A.    No.

25    Q.    And any in-service training that you can

1   recall?

2       A.   Not that I can recall.

3       Q.   What did Superintendent Cline do or say to you

4   specifically that would have helped you understand the

5   limits of students' rights to free speech in school?

6       A.   Specific to this occasion?

7       Q.   No ma'am.  Specific to being a principal and

8   being provided some guidance with respect to students'

9   free speech rights?

10      A.   Nothing directly.

11      Q.   Prior to day of silence 2012, prior to Amber

12  Hatcher approaching you about the event that brings us

13  all here, do you ever recall denying students the right

14  to organize an expressive event?

15           MR. JENSEN:   Object to form.

16      A.   I did not directly deny any students their

17  right to have an event, no.

18      Q.   Did you have any occasion as the principal of

19  DeSoto County High School to interpret the free speech

20  policy?  Did the students ever -- by that I mean, did a

21  student ever come to you and say can I do this, and you

22  -- with respect to say something, wear something,

23  protest something, where you were called on to give a

24  yes or no answer?

25      A.   Did you say prior to this event?

1       Q.    Yes.

2       A.    Specific to a protest, no.  To ask could they

3   wear a T-shirt or sell a T-shirt for a club or an event,

4   yes, that conversation I had.

5       Q.    I guess I'm trying to figure out if you ever

6   had an occasion to sort of wrestle with the

7   interpretation of the free speech policy?

8       A.    I did not, no.  I referred to the

9   superintendent.

10      Q.    So when did you refer to the superintendent

11  with respect to the free speech policy?

12      A.    Any question you asked me about, T-shirts or

13  asking if they could have an event, anything was simply

14  referred to him.

15      Q.    And how many times do you recall in the year

16  and a half you were principal referring questions that

17  had something to do with free speech to the

18  superintendent?

19          MR. JENSEN:  Object to form.

20      A.    I specifically don't recall in the year and a

21  half prior to that referring to him.

22      Q.    But is it your testimony that if a student had

23  come to you and requested the right to do something that

24  would have required you to interpret the free speech

25  policy, that question would have been kicked up to the

1    superintendent?

2        A.    Yes.

3        Q.    So now let's talk about what happened in 2012.

4    Tell me how many conversations did you have with Amber

5    Hatcher specifically about day of silence.

6        A.    Prior to?

7        Q.    Ever.

8        A.    That would have been multiple, because we

9    worked on a lot of things afterward with some

10   presentations she wanted to make.

11       Q.    Okay.

12       A.    So I can't give you a number.  I don't know.

13       Q.    Okay.  So let's limit the time period to April

14   20, 2012, which was the day of silence in 2012.  Do you

15   recall how many conversations you had with Amber

16   specifically about day of silence?

17       A.    Specifically, with nothing else included, two

18   to three.

19       Q.    What does that mean with nothing else included?

20       A.    She and I talked very frequently, probably on a

21   daily basis.  Had I stopped her in the hall to ask her

22   about something, she might have said, did you hear from

23   the superintendent, and I replied, no, and the

24   conversation was about something else.

25       Q.    Are you including that interaction --

1       A.   You asked me specifically just about this

2   conversation.

3       Q.   I don't mean exclusively when I say

4   specifically.  I don't mean that that's all you talked

5   about.  What I mean is any time you had conversation

6   with Amber in which day of silence was mentioned by

7   either one of you.  How many times did that happen?

8       A.   Probably three to six.

9       Q.   And you said that you talked to Amber on a

10  daily basis.  Do you recall when you first encountered

11  Amber, she would have been a freshman; right?  So that

12  would have been her first year at the high school?

13      A.   I met her prior to that.

14      Q.   Prior to the first conversation about day of

15  silence?

16      A.   You asked when I first encountered her, when I

17  first met her.

18      Q.   Okay.  What was your answer?

19      A.   I met her before she was a freshman.

20      Q.   How did you meet her?

21      A.   I taught her mother.  So somewhere around town.

22  I knew who she was.

23      Q.   And so you say that you talked to her just

24  about every day, is that right, in the school year

25  2012 -- 2011-2012?

1      A.    Yes.

2      Q.    Do you talk to all of your students every day?

3      A.    As I stand in the hallway and they come past

4  and talking to might be hi, yes.

5      Q.    Is that what you mean in terms of talking to

6  Amber, in the same way?

7      A.    Yes.  Yeah.

8      Q.    Was there any -- did you talk to Amber more

9  than you talked to other students?  Was she more

10  talkative?  Did you have a friendlier relationship with

11  her because you taught her mother?  Was she sort of on

12  the same level as most other students?

13      A.    She fell in the middle of the range.

14      Q.    Okay.  Tell me about the first conversation or

15  communication that you recall having with Amber about

16  day of silence.

17      A.    I believe the first one was in the media center

18  when she approached me and said that she was considering

19  asking permission for, you know, looking to do a day of

20  silence.

21      Q.    And what was your response?  Do you recall?

22      A.    I couldn't tell you exactly the response.

23      Q.    Uh-hum.

24      A.    I asked her for some information and told her I

25  would have to refer it to the superintendent.

1    Q.   Okay.  Did she hand you anything at that time?

2    A.   She showed me some papers she had.  She did not

3   give me anything for approval.

4    Q.   And do you recall about how long before the

5   event itself that took place?  Was it the same week, was

6   it six months?  Give me a timetable.

7    A.   No more than two months out.

8    Q.   Okay.  So she talked to you about getting

9   permission to do a day of silence, and you said to her?

10   A.   I will refer that to the superintendent.  I do

11   not make that decision here.

12   Q.   Did you also ask for more information?

13   A.   I don't remember.

14   Q.   So what were you going to refer to the

15   superintendent?  If she had -- how did you have enough

16   information to then ask the superintendent for guidance?

17   A.   She defined it as an event --

18   Q.   Uh-hum.

19   A.   -- of a type which had not been held in the

20   school before.

21   Q.   Uh-hum.

22   A.   And I believe she also referenced Lambda Legal

23   at the time, and I think she had Googled the website and

24   looked for some information.  And so I said, you know, I

25   will refer it to the superintendent.  If you have

1  information other than that, then you can get things

2  together in case he has questions.

3      Q.   Did you then go to the superintendent?

4      A.   I called him.

5      Q.   And what did you say to him?

6      A.   I said that I have a student who wishes to hold

7  an event, which is a day of silence, in conjunction with

8  LGBT.  That was what she had told me.  And the student

9  would like to talk with him.

10     Q.   What did he say to you?

11     A.   He said if this is a protest, that there's past

12 precedence, talk with the student further.

13     Q.   Does that mean there was past precedence, is

14 that all he said?  It doesn't sound like a full

15 sentence.

16     A.   I couldn't tell you what his exact words were a

17 year and a half ago.

18     Q.   What did you understand his response to be?

19 Yes, that's fine, no, she can't, I need more

20 information, what did he say to you?

21     A.   I wouldn't speculate as to whether he was

22 leaning one way or the other.  He said if it's a

23 protest, we have past precedence of not having that.  I

24 would like you to talk with her further.

25     Q.   What did you take that to mean, talk with her

1 further?

2      A.    I took it to mean see exactly what she means to

3 do and tell her that he would make the decision.  At

4 this point, it didn't sound like he was leaning toward

5 it.  And that was an opinion only.

6      Q.    What happens next?  Did you go talk to Amber,

7 did she come talk to you, did you ignore it?

8      A.    Well, I went back to her and answered her that

9 he had gotten back to me.

10      Q.    So your conversation with Superintendent Cline

11 was by telephone?

12      A.    I don't recall.  That time of year, he's at the

13 high school frequently.  It was either by telephone or

14 in person.

15      Q.    Okay.  And the next conversation about the day

16 of silence, who was that with?

17      A.    I would have responded to her to tell her that

18 I had reached the superintendent.

19      Q.    You would have or you recall?

20      A.    I did.

21      Q.    Okay.  And was that a conversation that was

22 verbal or was it written?

23      A.    It was verbal.

24      Q.    Do you remember how long between when you

25 talked to the superintendent and you talked to Amber the

1  second time?

2     A.   No more than a day or two.

3     Q.   Okay.  What did you say to Amber?

4     A.   That I had called to ask him.  Based on the

5  brief amount of information she had explained and that

6  it didn't sound like it was an event that he would be

7  approving.  But that those decisions were his.

8     Q.   Did you give her direction to do anything

9  further?

10    A.   She asked me if she could contact the

11 superintendent.

12    Q.   What did you say?

13    A.   I told her she could.  I didn't know if he

14 would grant her audience or not.

15         COURT REPORTER:  If he would what?  I'm sorry.

16    A.   If he would speak with her or not.

17    Q.   I like the way you said it at first, grant her

18 an audience.

19         Okay.  Did you talk to -- when is the next

20 conversation you had with either Amber or Superintendent

21 Cline about day of silence?  By conversation, I mean

22 communication of any sort.

23    A.   She would have told me -- she told me that she

24 had sent him -- I don't know if she e-mailed it or faxed

25 it to him, she had communicated with him.

1    Q.   What else did she say?  Was she waiting on a

2    response or did she ask you for anything else, ask for

3    your help?

4    A.   I don't remember specifically.  I really don't

5    remember.

6    Q.   What you do recall is that she informed you

7    that she had sent an e-mail?

8    A.   Yes, yeah.

9    Q.   Do you recall whether she said she sent

10   multiple e-mails in that conversation or whether she

11   said she sent an e-mail?

12   A.   That time she had just contacted him.  So it

13   was an e-mail, or fax, or whatever it was.

14   Q.   Did she show you the e-mail or copy you on it

15   or give you a copy at that time?

16   A.   I don't think she did at that time.

17   Q.   Okay.  So the three conversations that you had

18   that you've talked about so far that you can recall were

19   conversations at school face-to-face with Amber?

20   A.   Yes.

21   Q.   First in the media room, the second time is

22   after you had spoken with Superintendent Cline, you went

23   back and had a conversation.  Do you recall where that

24   was?

25   A.   No.

1    Q.    Okay.  At school, though, do you think?

2    A.    Yes.

3    Q.    Hallway or somewhere?

4    A.    Somewhere at school.

5    Q.    Do you recall whether you went to her and

6   pulled her out of class in that second conversation or

7   whether she came to your office?

8    A.    I don't recall.

9    Q.    You just don't recall.  Okay.

10        What happened next in terms of communication?

11   The last you heard, Amber told you she had sent

12   communication of some sort, e-mail or fax, to the

13   superintendent.  Then what was the next thing that

14   happened relevant to the day of silence?

15    A.    She saw me in the student commons.

16    Q.    Do you recall when that was in relation to when

17   she had just said -- was it the next day, was it a week

18   later?

19    A.    No, it would have been within a week or two.

20    Q.    Okay.  And she saw you in the commons and said

21   what to you?

22    A.    Simply was talking about what the day of

23   silence was.  And again asked if I had heard from the

24   superintendent.  I said no.

25    Q.    Did you give her any advice about getting an

1   answer from him?

2        A.      She did tell me she had communicated with him,

3   and he had not responded.  And I don't remember exactly

4   what I told her, but it would have been that, you know,

5   that's his decision, and he'll respond in his time.

6        Q.      How would Amber have gotten the impression that

7   the superintendent denied permission?  Do you know?  Did

8   you say to Amber that the superintendent --

9        A.      In a later conversation, yes.

10       Q.      So what's the -- and then had you talked to

11  Superintendent Cline between that first conversation you

12  had with him where he said this is against past

13  precedence?

14       A.      He called me back after he received her

15  communication.

16       Q.      Okay.  And would that have been after you

17  talked to Amber those other intervening times?

18       A.      Well, she would have come to me first.

19       Q.      Uh-hum.

20       A.      I notified him.  I talked to her.  She

21  communicated with him.  He communicated back with me.

22       Q.      Okay.  And did he call you or did you call him?

23       A.      I don't know.

24       Q.      You remember having a phone conversation?

25       A.      Yeah.

1    Q.    And what do you remember from that

2   conversation?  What was the substance?

3       A.    He was disapproving the event.

4       Q.    Is that -- can you recall anymore than that?

5   Did he say anything further?  Did he just say that event

6   is disapproved or what did he say?

7       A.    Speak with Amber and make it clear that she

8   understands I've disapproved.

9       Q.    Okay.  What did you take that to mean?  If

10  that's all he said, speak with Amber, this is

11  disapproved, make sure it's clear to her that this is

12  disapproved, how did you take that information?

13          MR. JENSEN:  Object to form.

14      A.    To speak with her and make sure that she

15  understood that there couldn't be any sort of an

16  organized event or disruption of classrooms.

17      Q.    Okay.  Is that what Superintendent Cline said

18  to you or is that your interpretation of the phrase that

19  you said that he said, which is make sure she knows that

20  this is a disapproved event?

21      A.    He said I will not approve this event.

22      Q.    And you -- so that's the second time that you

23  talked to Cline.  And so do you recall when that was?

24  It would have been after she had sent him the e-mails?

25      A.    Uh-hum.

1    Q.    And before the day of silence?

2    A.    Correct.

3    Q.    Okay.  And then what did you do?

4    A.    I spoke with her and said the event was

5  disapproved.

6    Q.    Do you remember where that conversation took

7  place?

8    A.    No, I don't.

9    Q.    Do you know if it was on the phone or

10  face-to-face?

11   A.    All conversations were face-to-face.

12   Q.    Do you recall whether you pulled her out of

13  class or she came to your office or you saw her in the

14  hall?  Do you recall any circumstances surrounding it?

15   A.    I don't.

16   Q.    What did you say to her?

17   A.    The event was disapproved.

18   Q.    What did she say to you?

19   A.    That she felt that she had the right to hold

20  the event, and that she would be sending the

21  superintendent another request, along with some legal

22  information.

23   Q.    What did you say to her?

24   A.    She had the right to do that.

25   Q.    What's the next communication that you had

1   about the day of silence, or was that the last one?

2       A.   I don't remember having another communication

3   with her.

4       Q.   Okay.  Do you recall having another

5   conversation with Superintendent Cline after that last

6   phone call?

7       A.   I don't recall having another specific

8   conversation with him about the event.

9       Q.   Do you recall talking to anyone else about day

10  of silence before day of silence?

11      A.   Well, when she first brought it up and made the

12  request, the administrative team was aware that the

13  request had been made of the superintendent.

14      Q.   Tell me about what -- anything that you can

15  remember from that administrative team meeting in which

16  day of silence was mentioned.

17      A.   It wouldn't have been much of a discussion.

18  It's simply I would have had a list of items I was going

19  down in the meeting, and this student has made this

20  request of the superintendent, and he has denied it.

21      Q.   Do you remember if you mentioned the student by

22  name or just a student?

23      A.   No, I don't.

24      Q.   How many of those meetings in which day of

25  silence was mentioned do you recall having?

1       A.      Administrative meetings?

2       Q.      Yes.

3       A.      I don't remember discussing it except that I

4  had sent a reference to the superintendent.  And then in

5  discussion of our earlier referenced conversation on if

6  a teacher is dealing with a student or working with a

7  student, that we need to talk with them as

8  administrators.

9       Q.      So you remember having that one conversation.

10  Do you think there was an administrative team setting,

11  do you think there might have been another one?

12      A.      I don't remember another one, no.

13      Q.      And do you recall when that meeting would have

14  taken place?  Would it have been the week of, two weeks

15  before?

16      A.      Between the time she made the request and the

17  event.

18      Q.      So the first request you said was within two

19  months?

20      A.      Uh-hum.

21      Q.      Can you narrow that at all?  Do you think it

22  was actually two months out?

23      A.      Honestly, I don't remember.

24      Q.      Do you think it's realistic that if you had

25  said something two months out in the administrative team

1  setting about the day of silence that they would have

2  remembered it without another reminder two months later?

3  It seems like that would have had to happen somewhere

4  within some temporal proximity.

5          MR. JENSEN:  Object to form.

6          MS. LITTRELL:  Sure.

7          THE WITNESS:  I don't know if they would have

8      remembered or not.

9  BY MS. LITTRELL:

10     Q.    So that meeting could have taken place two

11  months before day of silence; is that right?

12     A.    It could have.

13     Q.    Do you remember talking to anyone else besides

14  your administrative team, and you've testified earlier

15  that you don't recall who was in that meeting?

16     A.    Uh-hum.

17     Q.    But it likely would have been the two assistant

18  principals, if they were there on the day of the

19  meeting, dean of students; is that right?

20     A.    Yes.

21     Q.    And it could have been some of the other

22  administrative personnel that you mentioned?

23     A.    Correct.

24     Q.    But you don't recall exactly who was in that

25  meeting when you talked about day of silence?

1    A.    No, I don't.

2    Q.    And the superintendent's decision not to

3  approve it?

4    A.    No.

5    Q.    Do you remember talking to anyone else about

6  day of silence before day of silence?  Any teachers?

7    A.    Amber had asked questions of other students and

8  teachers.  Did I have teachers ask me what is a day of

9  silence?  Yes, I did have questions asked of me and the

10  other assistant principals.  It wasn't a question about

11  permission or not permission, just students asked

12  questions.

13    Q.    Are you saying that students asked questions of

14  you or students asked questions of the teachers, and

15  then the teachers talked to you about it?

16    A.    Amber was the only student I talked directly

17  with about.  She talked to other teachers.  I don't know

18  if other students were talking to other teachers or not.

19    Q.    Did you say that teachers had spoken to you

20  about the day of silence?

21    A.    Some simply asked what is it.

22    Q.    What do you recall answering?

23    A.    That it's not something I have a great deal of

24  information about.  It's an event that Amber Hatcher has

25  asked me about.  And it goes hand-in-hand with the LGBT

1    community, and that's about all I know.

2        Q.   And did you also tell whatever teachers asked

3    you about it that it was disapproved by the

4    superintendent?

5        A.   I don't recall when they asked me the

6    questions.

7        Q.   You don't recall saying that it had been

8    disapproved to a teacher personally?

9        A.   No.

10       Q.   Do you recall talking to anybody else about day

11   of silence before day of silence?  Friends, did you have

12   conversations about this thing going on at school?

13       A.   I don't remember having any conversations about

14   it.

15       Q.   Did it feel like it was a controversial

16   subject?

17            MR. JENSEN:  Object to form.  Actually, now you

18       are starting to ask her opinions, which that

19       protective order covers.

20   BY MS. LITTRELL:

21       Q.   Did you feel that day of silence was a

22   controversial event?

23            MR. JENSEN:  Don't answer that question.

24       That's covered by the protective order.

25            MS. LITTRELL:  It's clearly not covered by the

1    protective order.

2        MR. JENSEN:  What she feels is just another way

3    of asking her what her opinion is.  And she is not

4    going to be talking her personal opinions.  The

5    Court has made that clear.

6  BY MS. LITTRELL:

7    Q.  Why did you decide to go to Superintendent

8  Cline about the request to take part in day of silence?

9    A.  It was a new event that had not been held on

10  the campus previously.

11    Q.  And so is it your testimony that it had nothing

12  to do with the subject matter of the planned event,

13  planned protest?

14    A.  I spoke with him about any new event, so...

15    Q.  Did you have any sense that this was going to

16  get bigger?

17        MR. JENSEN:  Object to form.

18    A.  Amber brought up, after the first conversation,

19  that she would not cease in her request.

20    Q.  Did she bring up anything about the law?

21    A.  She did.  And I referred her to the

22  superintendent's office.

23    Q.  Did you go to legal counsel at all?

24    A.  I did not.  I referred her to the

25  superintendent's office.

1    Q.   Did you do any research about the law and her

2    right to take part in day of silence?

3    A.   Once I referred it to my supervisor, it was his

4    decision.

5    Q.   Okay.  And what was his decision as it was

6    communicated to you?

7    A.   This was not an approved event.

8    Q.   So was it your understanding that if students

9    took part in an unapproved event, that they would be

10   violating the superintendent's directive?

11   A.   Yes.

12   Q.   Do you recall any other conversations about day

13   of silence prior to the day of silence itself on April

14   20th?

15   A.   Within the school realm?

16   Q.   Uh-hum.  Yes.

17   A.   No.

18   Q.   What about outside the school realm?

19   A.   Were there personal conversations?  No.  It was

20   a school issue.

21   Q.   You talked to me about the communications that

22   you had with Superintendent Cline.  Are there any other

23   conversations that you had with him by telephone or in

24   person that you didn't mention?

25   A.   Regarding this?

1    Q.    Regarding day of silence and Amber Hatcher.

2    A.    No.

3    Q.    Prior to -- okay.

4          We've already established that you never texted

5    him.

6    A.    Correct.

7    Q.    So all communication would either be by phone,

8    in person or by e-mail; is that right?

9    A.    Correct.

10   Q.    Do you remember any e-mail communication with

11   Superintendent Cline about day of silence?

12   A.    Yes.

13   Q.    And other than the e-mails and these two

14   conversations, that exhausts all of the communication

15   about day of silence with Superintendent Cline; right?

16   There's either e-mails or conversations?

17   A.    Prior to the event, yes.

18   Q.    Okay.  Returning to your affidavit, Exhibit 4.

19   You say that Ms. Hatcher did not provide any printed

20   materials.  Do you see that in paragraph eight?

21   A.    It says she did not provide any printed

22   materials for me to approve.

23   Q.    Did she provide you any printed materials?

24   A.    She showed me some information at the first

25   meeting.

1    Q.    Okay.  Did she give you any materials?

2    A.    I don't remember if she gave them to me at the

3    time or showed them to me there.  It was the meeting in

4    the media center.

5    Q.    Might she have given you materials or

6    documents?

7    A.    She might have given me information on

8    materials.

9    Q.    What would you have done with those information

10   or materials?

11   A.    I would have looked over them.

12   Q.    Do you recall looking over materials that Amber

13   gave you?

14   A.    I recall looking at them with her in the media

15   center.  I don't recall looking at them afterward.

16   Q.    Okay.  So you wouldn't recall doing anything

17   with them afterwards then; right?

18   A.    No.

19   Q.    Did you say anything to Amber after any of

20   those conversations about the free speech policy?

21   A.    My references were always to the

22   superintendent.  I have referred this request to the

23   superintendent, he will respond.

24   Q.    Okay.  So then I guess the answer would be no?

25   A.    No.  The answer would be no.

1    Q.    So you said that you didn't talk to anyone else

2    or that you can't recall talking to anyone else about

3    day of silence other than the conversations that you've

4    recounted to me?

5    A.    Correct.

6    Q.    Do you recall talking to Amber's parents?

7    A.    Yes.

8    Q.    About day of silence?

9    A.    Yes.

10   Q.    Tell me about that conversation.

11   A.    I called, and I think I spoke with her father.

12   Q.    Did you teach him, by the way?

13   A.    No, I did not.

14   Q.    Do you recall what you said in that

15   conversation?

16   A.    I called after Amber had been denied by the

17   superintendent and had come back to say that she wasn't

18   going to back down.

19   Q.    Uh-hum.

20   A.    I had just made sure Amber had received a

21   $10,000 scholarship which has some specific behavioral

22   criteria.  I didn't want to see her losing it because --

23   not because we were documenting but because the

24   scholarship was checking.  And I was concerned that she

25   would -- I really didn't know what she might do.  I was

1    concerned that she might do something that would

2    jeopardize her scholarship.

3         Q.   Do you know whether her scholarship was

4    revoked?

5         A.   No, I don't.  As far as I know, she still has

6    it.

7         Q.   Can you tell me more about that scholarship?

8         A.   It's the Ronald McDonald Scholarship.  There

9    are two each year.

10        Q.   Is it academically based?

11        A.   It is financially, academically, and about a

12   dozen criteria.

13        Q.   Would you describe Amber as bright?

14        A.   Oh, yes.

15        Q.   Would you describe her as generally

16   well-behaved?

17        A.   More so than not, yes.

18        Q.   She was a teenager?

19        A.   She was a teenager.

20        Q.   So in that conversation that you had with

21   Mr. Hatcher, tell me everything you recall saying.

22        A.   I called him and simply said that Amber had

23   asked to have an event on the DeSoto County campus, and

24   that it had been denied by the superintendent, but that

25   Amber had expressed that she wasn't sure she could

1  refrain from doing anything.

2      Q.   Do you remember saying anything else to him?

3  Do you recall suggesting --

4      A.   I talked to him about -- you know, we talked

5  about several things, about grades and other related

6  topics.  And I asked him if he had any ideas that he

7  would suggest.  You know, did they have a good rapport,

8  could he talk with her, did he feel like it would be a

9  good idea to speak with her, did he feel like they

10  wanted her to do whatever was her own choice?

11         He responded that they had raised Amber to be

12  very independent, and that they would support whatever

13  she did.

14      Q.   Did you say to him that if she took part in the

15  day of silence that she could get into trouble?

16      A.   I told him that if she had violated the school

17  rules or caused a disruption in the classroom, that

18  certainly could be.

19      Q.   What did you mean by that in terms of violating

20  school rules?

21      A.   If she disrupted class and did not obey a

22  teacher's directions or...

23      Q.   So in the conversation you had with him, was it

24  about day of silence or was it about disrupting class?

25         MR. JENSEN:   Object to form.

1    A.    I believe the two were tied together.  It was

2  about that she wished to go ahead with this, and she

3  used the word protest off and on.  She wished to go

4  ahead with this protest, even though it had been denied.

5  I was concerned that she would step over the boundaries

6  and do something that would be against the disciplinary

7  code.

8    Q.    Did you describe to Mr. Hatcher what those

9  boundaries were?

10    A.    No.

11    Q.    Did you talk to anyone else about day of

12  silence?  Did you talk to Mrs. Hatcher?  I'm sorry.  Ms.

13  Wade, Cheryl, her mother.

14    A.    I don't recall whether we had a conversation

15  about it or not.

16    Q.    Does that mean you might have?

17    A.    I don't recall.

18    Q.    Okay.  Do you know whether any of your other

19  administrative staff might have had a conversation with

20  Amber's mother?

21    A.    I don't know of any conversation.

22    Q.    Did you direct anyone else --

23    A.    No.

24    Q.    -- in your staff to call?

25    A.    I did not contact her, and I didn't direct

1   anybody else to contact her.

2       Q.   Is it your understanding that the

3   superintendent has the authority to interpret the school

4   policies?

5       A.   It is my understanding that the superintendent

6   interprets to me what he wishes my actions to be.

7       Q.   If the superintendent directed you to do

8   something that you felt was unlawful, do you feel like

9   you have the obligation to follow that direction?

10      A.   No.

11      Q.   Okay.  Are you aware of or were you party to

12  any conversations between Superintendent Cline and Amber

13  Hatcher?

14      A.   No.

15      Q.   Are you aware of or were you a party to any

16  conversations between Superintendent Cline and anyone

17  else about day of silence?

18      A.   No.

19      Q.   Okay.  Did you have any conversations with any

20  other students about day of silence?

21      A.   None that I can recall prior to the event.

22      Q.   Prior to the event.  Okay.

23           Had there been an occasion in your years at

24  DeSoto County School District for a request for a

25  protest to have taken place?  Did anyone -- did any

1   student ever request to engage in a protest before?

2       A.   Did they request of me as principal?

3       Q.   Yes.

4       A.   No.

5       Q.   Did they request of you as a school district

6   employee?

7       A.   None that I can remember, no.

8       Q.   So when Superintendent Cline talked about past

9   precedence of not allowing protests, did you have any

10  personal knowledge of that past practice or that

11  precedence of not allowing the activity?

12      A.   Not personal knowledge, no.

13      Q.   Did you ask him any -- for any details about

14  that --

15      A.   I did not.

16      Q.   -- practice.

17           Did you challenge him on his decision at all?

18      A.   I simply clarified that Amber had told me she

19  did not wish to back down, and that's all I said.

20      Q.   Did he say anything in response to that?

21      A.   Explain to her that this is disapproved.

22      Q.   Okay.  Did you take that to mean that if Amber

23  did what she had told you she was going to do and what

24  she had told Superintendent Cline that she was going to

25  do, that she could get into trouble?

1           MR. JENSEN: Object to form.

2      A.   Amber was never very specific about what she or

3   others might want to do.

4      Q.   Uh-hum.

5      A.   I was never given a proposed plan or anything

6   of any sort.

7      Q.   Uh-hum.

8      A.   So I understood that if she violated the

9   student code of conduct, that she would be disciplined.

10     Q.   But why did you have to go to the

11  superintendent for that? Isn't that already a given, if

12  a student violates the code of conduct, that they'll get

13  into trouble; right?

14     A.   Yes.

15     Q.   So why did you have to go to the superintendent

16  to get that information? It sounds like there had to

17  have been some additional information that the

18  superintendent gave you.

19          MR. JENSEN: Object to form.

20     A.   I went to the superintendent to clarify whether

21  she did or did not have permission for the event.

22     Q.   Did you understand the superintendent's

23  assertion that it was against past practice or past

24  precedence not to allow this? Did you presume that that

25  meant that this sort of thing had happened before?

1      A.    I didn't make a presumption.

2      Q.    Is it fair to make that inference if someone

3   says we have a past practice, that it's happened before?

4            MR. JENSEN:  Object to form.

5      A.    He said no.  I relayed the message.

6      Q.    Okay.  Did Superintendent Cline ever mention

7   the free speech policy to you?

8      A.    Can you clarify?

9      Q.    In those conversations, did he ever say -- did

10  he ever direct you to students' rights to --

11     A.    No.

12     Q.    -- examine and speak freely?

13     A.    No.

14     Q.    Did he ever refer you to the distribution of

15  literature and materials?

16     A.    No.

17     Q.    Did you take any action the week of day of

18  silence other than talking to Amber and calling her

19  parents?  Did you have a conversation with your

20  administrative staff about what to do on day of silence?

21           MR. JENSEN:  Object to form.

22     A.    I stated earlier, I don't remember the date of

23  the meeting when we had that conversation.

24     Q.    But there was only one?

25     A.    It could have happened during that week.  I

1  don't know.

2      Q.    So tell me everything that you recall saying or

3  -- with your administrative staff as it relates to the

4  upcoming day of silence and the directions that you had

5  been given from the superintendent.

6      A.    That the superintendent had disapproved the

7  event.

8      Q.    And what did that mean in terms of what you

9  wanted the administration to do?

10     A.    I didn't have anything from Amber specifically

11 that she was going to do.  So I didn't give a specific

12 instruction.  The student has made a request; it has

13 been denied.

14     Q.    So did you say, and here's how we should

15 respond if students take part in any case?

16     A.    The team would have had the conversation about

17 if there is an event with a student or a teacher, that

18 they come to the front office.  It didn't go further

19 than that in discussion.

20     Q.    So the discussion -- or did the discussion

21 include that students should be sent to the dean of

22 students if they take part in this disapproved event?

23         MR. JENSEN:  Object to form.

24     A.    It would not have necessarily included the

25 dean.  The discussion was that if there was a question,

1   it should be handled by an administrator.

2       Q.   What further guidance did you provide, or did

3   anyone else in the room provide, about what to do when

4   the administration was notified?

5       A.   What kind of guidance did I provide to them?

6       Q.   Yes.

7       A.   That we'd simply be talking to students.

8       Q.   Okay.  Talking to students about what?

9       A.   The fact that the event had been denied.

10      Q.   Okay.  Did that conversation limit what school

11  administrators were to do?  In other words, did you say

12  just talk to students and send them back to class?

13      A.   No, because I didn't have an event to limit or

14  behavior to limit.

15      Q.   So if there wasn't any behavior to limit, what

16  was the conversation about with respect to day of

17  silence?

18      A.   That Amber had requested being able to have a

19  day of silence as an event.  There would be other

20  students involved.  The superintendent had disapproved

21  the event.

22      Q.   And that's the extent of it?  It sounds like

23  there was also something about administrators being

24  notified.

25      A.   I said that if a teacher had a question, that

1    the student should come to an administrator.

2        Q.    Okay.   Was there any conversation about

3    discipline in that conversation you had with your

4    administrators?

5        A.    No, there was not.

6        Q.    Was there any conversation about asking

7    students to remove protest tags or signs or placards or

8    anything?

9        A.    Again, Amber had not given me specifics of what

10   they might be doing.

11       Q.    So in that conversation are you saying you did

12   not have conversation about what to do if students were

13   wearing signs or placards?

14       A.    I really don't recall what the general

15   conversation was.   It dealt simply with student

16   involvement with an event and, you know, if something

17   came up, that we would talk with the students at that

18   point and take it from there.

19       Q.    But you don't recall saying that students

20   should be asked to remove their protest signs?

21       A.    I don't recall that conversation at an

22   administrative meeting, no.

23            MS. LITTRELL:   Is everyone doing okay?

24            MR. JENSEN:   Why don't we take a break?

25            (Recess from 6:54 p.m. until 7:35 p.m.)

126

1              (Proceedings continued in Volume II.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS

2

3        The original of the Errata Sheet has been

4    delivered to Mr. Jensen, Counsel for Defendants.

5

6        When the Errata Sheet has been completed by the

7    deponent and signed, a copy thereof should be delivered

8    to each party of record and the ORIGINAL delivered to

9    Ms. Littrell, Counsel for Plaintiff, to whom the

10   original deposition transcript was delivered.

11

12              INSTRUCTIONS TO DEPONENT

13

14       After reading this volume of your deposition,

15   indicate any corrections or changes to your testimony

16   and the reasons therefor on the Errata Sheet supplied to

17   you and sign it.  DO NOT make marks or notations on the

18   transcript volume itself.

19

20   *** REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

21   COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF HIGHLANDS

 5

 6          I, the undersigned authority, hereby certify

 7   that the witness named herein personally appeared before

 8   me and was duly sworn.

 9

10          WITNESS my hand and official seal this 9th day

11   of October, 2013.

12

13

14

15

16

17

18

19

20

21   JULIE SEBRING, FPR

22   NOTARY PUBLIC - STATE OF FLORIDA

23   MY COMMISSION NO.  EE182179

24   EXPIRES:  April 29, 2016

25   SCLAFANI WILLIAMS COURT REPORTERS, INC.
```

1         REPORTER'S DEPOSITION CERTIFICATE

2

3   STATE OF FLORIDA

4   COUNTY OF HIGHLANDS

5

6         I, JULIE SEBRING, Florida Professional Reporter,

7   and Notary Public in and for the State of Florida at

8   large, hereby certify that the witness appeared before

9   me for the taking of the foregoing deposition, and that

10  I was authorized to and did stenographically and

11  electronically report the deposition, and that the

12  transcript is a true and complete record of my

13  stenographic notes and recordings thereof.

14        I FURTHER CERTIFY that I am neither an attorney,

15  nor counsel for the parties to this cause, nor a

16  relative or employee of any attorney or party connected

17  with this litigation, nor am I financially interested in

18  the outcome of this action.

19        DATED THIS 18th day of October, 2013, at Sebring,

20  Highlands County, Florida.

21

22

23

24  JULIE SEBRING, FPR
    SCLAFANI WILLIAMS COURT REPORTERS, INC.
25