131

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-cv-138-FtM-38DNF

AMBER HATCHER, by and through
her next friend, GREGORY
HATCHER,

    Plaintiff,

vs.

DESOTO COUNTY BOARD OF
EDUCATION, ET AL,

    Defendant.

VOLUME II OF II
DEPOSITION OF SHANNON D. FUSCO
Taken on Behalf of the Plaintiff

DATE TAKEN:          October 9, 2013

TIME:             3:34 p.m. - 11:40 p.m.

PLACE:           Sclafani Williams
                   3200 U.S. 27 South
                   Suite 200
                   Sebring, FL 33870

Stenographically Reported by:
Julie Sebring
Florida Professional Reporter

1                    A P P E A R A N C E S:

2

3    Counsel for Plaintiff:

4        BETH LITTRELL, ESQUIRE
         Lambda Legal
5        730 Peachtree Street, N.E.
         Suite 1070
6        Atlanta, GA 30308-1210

7

8    Counsel for Defendants:

9        JEFFREY D. JENSEN, ESQUIRE
         Unice Salzman Radel, P.A.
10       2570 Coral Landings Blvd., Suite 201
         Palm Harbor, FL 34684
11

12
     Counsel for Defendant, DeSoto County School Board:
13
         CONNIE L. COLLINS, ESQUIRE
14       Eugene E. Waldron, Jr., P.A.
         124 North Brevard Avenue
15       Arcadia, FL 32466

16

17

18

19

20

21

22

23

24

25

1                            I   N   D   E   X
     WITNESS                                              PAGE
2
     Called by the Plaintiff:
3
     SHANNON D. FUSCO.....
4
          DIRECT EXAMINATION CONTINUED BY MS. LITTRELL.. 136
5
          CROSS-EXAMINATION BY MR. JENSEN............... 295
6
     INSTRUCTIONS TO DEPONENT.......................... 299
7
     ERRATA SHEET...................................... 300
8
     CERTIFICATE OF OATH............................... 301
9
     CERTIFICATE OF REPORTER.......................... 302
10
                              EXHIBITS
11
     PLAINTIFF'S NO. 5................................. 136
12   (Information about Amber Hatcher attacher to Joens
     E-mail)
13
     PLAINTIFF'S NO. 6................................. 137
14   (E-mail)

15   PLAINTIFF'S NO. 7................................. 156
     (Correspondence)
16
     PLAINTIFF'S NO. 8................................. 164
17   (E-mail)

18   PLAINTIFF'S NO. 9................................. 166
     (E-mail)
19
     PLAINTIFF'S NO. 10............................... 167
20   (E-mail)

21   PLAINTIFF'S NO. 11............................... 169
     (E-mail)
22
     PLAINTIFF'S NO. 12............................... 176
23   (E-mail)

24   PLAINTIFF'S NO. 13............................... 177
     (E-mail)
25

134

1                          EXHIBITS
                           Continued
2

PLAINTIFF'S NO. 14................................ 178
3   (E-mail)

4   PLAINTIFF'S NO. 15................................ 183
    (E-mail)
5

    PLAINTIFF'S NO. 16................................ 185
6   (E-mail)

7   PLAINTIFF'S NO. 17................................ 192
    (E-mail)
8

    PLAINTIFF'S NO. 18................................ 200
9   (Multi-Page District Document)

10  PLAINTIFF'S NO. 19................................ 231
    (E-mail)
11

    PLAINTIFF'S NO. 20................................ 244
12  (6B-1.0006 Principles of Professional Conduct for the
    Education Profession in Florida)
13

    PLAINTIFF'S NO. 21................................ 244
14  (Oath of Loyalty)

15  PLAINTIFF'S NO. 22................................ 249
    (Discipline Incident)
16

    PLAINTIFF'S NO. 24................................ 258
17  (E-mail)

18  PLAINTIFF'S NO. 25................................ 259
    (Correspondence)
19

    PLAINTIFF'S NO. 26................................ 260
20  (Discipline Incident)

21  PLAINTIFF'S NO. 27................................ 263
    (Discipline Incident)
22

    PLAINTIFF'S NO. 28................................ 264
23  (Discipline Incident)

24  PLAINTIFF'S NO. 29................................ 266
    (Student Discipline - Summary)
25

1                              EXHIBITS
                              Continued
2
     PLAINTIFF'S NO. 30.............................. 267
3    (Discipline Incident)

4    PLAINTIFF'S NO. 31.............................. 268
     (Discipline Incident)
5
     PLAINTIFF'S NO. 32.............................. 269
6    (E-mail)

7    PLAINTIFF'S NO. 33.............................. 271
     (E-mail)
8
     PLAINTIFF'S NO. 34.............................. 272
9    (Student Discipline Records/Incidents at this School)

10   PLAINTIFF'S NO. 35.............................. 274
     (E-mail)
11
     PLAINTIFF'S NO. 36.............................. 275
12   (E-mail)

13   PLAINTIFF'S NO. 37.............................. 277
     (Document)
14
     PLAINTIFF'S NO. 38.............................. 279
15   (Minutes)

16   PLAINTIFF'S NO. 39.............................. 280
     (Defendant's, Shannon Fusco, Dispositive Motion to
17   Dismiss)

18   PLAINTIFF'S NO. 40.............................. 285
     (Code of Conduct)
19

20   (Exhibit No. 23 was inadvertently skipped, but is
     duplicative of Exhibit No. 22.)
21

22                        CERTIFIED QUESTION

23                        PAGE 294, LINE 20

24

25

1                      P R O C E E D I N G S

2              (Proceedings continued from Volume I.)

3                   DIRECT EXAMINATION CONTINUED

4    BY MS. LITTRELL:

5         Q.    Pronounce your name for me.

6         A.    Fusco.

7         Q.    Fusco.   Thank you.

8              I don't know if we need to -- well, let's have

9    this as an exhibit.   I would like to understand it more

10   than anything.

11             (Plaintiff's Exhibit No. 5 was marked for

12        identification.)

13        Q.    Can you help me understand what this might be?

14   It was produced in response to a request for documents

15   from the school district about day of silence or Amber

16   Hatcher.

17        A.    I wouldn't have the foggiest notion what this

18   is.

19        Q.    So this isn't something that you see on your

20   screen or that you have printed out as a matter of

21   course in the course of business?

22        A.    No.   I don't have any idea what this is.

23        Q.    Okay.

24        A.    It's a screen shot?

25        Q.    That's a guess, just for the record.

1           And Exhibit 5 is a document that has a heading

2    that says Information about Amber Hatcher attacher to

3    Joens, J-o-e-n-s, e-mail.  Over on the side there's an

4    editing time, a number of words.  But you can't help us

5    decipher it?

6        A.    I don't have a clue.

7        Q.    That's fine.  We are now moving on to Exhibit

8    No. 6, which I'm going to hand to you.  Take a look at

9    that, if you would.

10          MR. JENSEN:  Just before you look at it, if you

11       could just pass it over to me, please.

12          MS. LITTRELL:  I brought you a courtesy copy.

13          MR. JENSEN:  That's all right.  I don't want to

14       get a whole bunch of stuff all over.  I got most of

15       them from yesterday's depo.

16          (Plaintiff's Exhibit No. 6 was marked for

17           identification.)

18    BY MS. LITTRELL:

19       Q.    So take a look at this and describe what it is.

20    For example, if it's an e-mail, let me know if that's

21    what it is.

22       A.    This was sent when I was assistant principal.

23    So it looks like maybe the year before.

24       Q.    So it's an e-mail from you to Melba Barnwell;

25    is that right?

1    A.    This one is, yes.

2    Q.    By "this one" you mean that this is an e-mail

3  that has the e-mail chain attached to it.  So there's a

4  couple of e-mails attached to it?

5    A.    Right.

6    Q.    Okay.  And we'll go through those.  The last

7  e-mail is -- was dated Friday, October 15th, 2011.  Do

8  you see that?

9    A.    Uh-hum.  Yes.

10    Q.    And the subject is students wearing packards,

11  p-a-c-k-a-r-d, today?  Do you recall sending this e-mail

12  the year before when you were assistant principal?

13    A.    Vaguely, yes.

14    Q.    Is there any reason -- is this an accurate

15  reflection of an e-mail that was sent from your e-mail

16  address?  Does this appear to be a true copy of an

17  e-mail that you sent?

18    A.    Yes.

19    Q.    Is that your signature, Shannon D. Fusco,

20  excuse me if I pronounced it wrong, assistant principal?

21    A.    Yes.

22    Q.    So earlier in your testimony you said that you

23  did not recall there -- having to interpret the free

24  speech policy.  Do you recall that testimony?

25    A.    Correct.

1    Q.    Looking at this e-mail, it appears that

2  students got into trouble for attempting to take part in

3  some kind of expressive event.  Would you agree?

4         MR. JENSEN:  Object to form.

5    A.    I think it says that nobody got into trouble,

6  but there was an event, yes.

7    Q.    Okay.  So let's sort of go back and look at the

8  e-mail that it's attached to.  That was from Melba to

9  you; is that right?

10   A.    Yes.

11   Q.    Underneath that.

12         And then underneath that is an e-mail from you

13 to Jan Lewis, who you've testified is a secretary --

14   A.    Uh-hum.

15   Q.    -- of the superintendent.  And Melba Barnwell,

16 who is also a secretary for Superintendent Cline.  It

17 also has Mike Steel copied.

18   A.    Yes.

19   Q.    And who is he?

20   A.    The principal.

21   Q.    He was the principal at the time?

22   A.    Yes.

23   Q.    And then underneath that, what appears to have

24 started this e-mail chain, can you look at that, the

25 first e-mail.

1    A.    Yes.

2    Q.    Describe what that is.

3    A.    That was an e-mail that I sent to the teachers

4  at the principal's direction.

5    Q.    Okay.  And that e-mail was sent Friday, April

6  15th?

7    A.    Yes.

8    Q.    2011.

9         And as it turns out, that was -- do you have

10  any reason to believe that I am incorrect if I told you

11  that this was national day of silence 2011, that April

12  15th was the third Friday in April, which is when this

13  event takes place?

14    A.    Yes.

15    Q.    Okay.  Can you describe the substance of this

16  e-mail?

17    A.    I was directed by the principal to send out an

18  information to the teachers that they were going to be

19  wearing placards and that they had been told to remove

20  them.  So I sent the e-mail.

21    Q.    Does that seem to you to be in contradiction to

22  the free speech policy that you referenced in your

23  affidavit?

24         MR. JENSEN:  Object to form.

25         MS. LITTRELL:  Sure.

1    BY MS. LITTRELL:

2        Q.   Why don't we take a look at the affidavit and

3    make sure we're talking about the same thing.  So we'll

4    turn back to Exhibit 4.

5            If you'll actually -- I'm going to turn your

6    attention to Page 2, paragraph six of your affidavit.

7    Before we do that, can you turn to the last page and

8    verify for me that that's your signature?

9        A.   Yes.

10       Q.   Do you recall drafting or taking part in the

11   drafting of this affidavit?

12       A.   Yes.

13       Q.   Does this appear to be something that you

14   signed --

15       A.   Yes.

16       Q.   -- and allowed to be filed?

17           On paragraph six you testified in this

18   affidavit that it's the policy of the DeSoto County

19   School District that students have a right to hear,

20   examine and express divergent points of view, including

21   freedom of speech, written expression and symbolic

22   expressions.

23           And so explain to me how that policy fits with

24   this e-mail.

25           MR. JENSEN:   Object to form.

1    A.    This testimony is -- is there a date on here?

2          MR. JENSEN:   It would be on a notary stamp.

3    A.    This testimony is recent as far as

4    understanding a policy after we've got into this case.

5    Q.    Uh-hum.

6    A.    This is two and a half, three years ago, as a

7    new assistant principal.

8    Q.    Okay.

9    A.    Following directions from the principal.

10   Q.    Sure.   But if the same policy were in place

11   that you reference in your affidavit, that students have

12   the right to freedom of speech, and there is an e-mail

13   that went out to all the teachers that says that

14   students have to remove their advertisements or their

15   placards, do those seem to be inconsistent?

16         MR. JENSEN:   Object to form.

17   A.    As principal, I did not send out any such

18   e-mail.

19   Q.    I understand.   But you did send out this

20   e-mail; right?

21   A.    Following the direction of the principal at the

22   time.

23   Q.    But regardless of whose direction you were

24   following, does this e-mail, is it in compliance with

25   the free speech policy that you have described in

1  paragraph six, if it were the same policy that were in

2  place at the time you sent this?

3       MR. JENSEN:  Object to form.

4   A.   It seems that there's a difference in the

5  request as to what's being asked to do, be done.

6   Q.   Let me put it another way.

7   A.   I'm not certain I'm understanding exactly what

8  you're asking me.

9   Q.   Sure.  If students -- if it's the policy of the

10  school district that students have a right to freedom of

11  speech, how is it that they can be made to remove a sign

12  expressing a point of view?

13       MR. JENSEN:  Object to form.

14   A.   I don't set that policy.  Again, as a new

15  assistant principal, I was told to send this out, and

16  that's what we got.

17   Q.   Okay.  Do you -- so when you were assistant

18  principal, was it the practice, as far as you knew, for

19  the principal to interpret the free speech policy?

20       MR. JENSEN:  Object to form.

21   A.   I couldn't state to his practices.

22   Q.   Was it the practice of the assistant principal

23  to do what you were told to do by the principal?

24   A.   Within reason, yes.

25   Q.   Because you just testified that the reason that

1   you sent this was because you were directed to do so.

2       A.    Uh-hum.

3       Q.    Okay.  And requiring students to remove their

4   advertisements that is in support of a national day of

5   silence would be contrary to a free speech policy; is

6   that accurate?

7           MR. JENSEN:  Object to form.

8       A.    I could go back through and re-read detail by

9   detail.  It certainly could fall within there.

10      Q.    It could fall within the free speech policy?

11      A.    I believe written speech is part of free

12  speech.  It could.

13      Q.    Okay.  Well, as the principal, we've already

14  gone through that you have the responsibility to

15  interpret policy.  And so you have a free speech policy

16  that says students have the right to examine and express

17  divergent points of view.  You testified to that in your

18  affidavit.

19          And yet in 2011 when students attempted to take

20  part by wearing signs in support of a national day of

21  silence, they were told that they couldn't?

22          MR. JENSEN:  Object to form.  And also please

23      don't mischaracterize the evidence.  It doesn't say

24      in there that they were wearing it in support of it.

25      It doesn't say anything about what was written on

1        the placards.

2        Q.    We have a limited amount of time.  So I was

3    going to let the record speak for itself, or the

4    document speak for itself.  But since we've got some

5    difference of opinion about what the e-mail actually

6    says, do you mind reading the first sentence into the

7    record?

8        A.    This one on the back page?

9        Q.    Yeah, the very first e-mail that was sent from

10   you to the teachers.

11       A.    "We have a group of students today wearing

12   signs of a national day of silence for an organization."

13       Q.    Okay.  And so what part of that is contradicted

14   by what I said earlier, that students who were wearing

15   signs in support of a national day of silence?

16            MR. JENSEN:  Object to form.

17       A.    What part of it is contradictory?  I'm not

18   following the question.

19       Q.    Your lawyer objected and said that was

20   mischaracterizing the evidence.  I'm trying to

21   understand how that's the case.  We can move on, though.

22   Like I said, the document speaks for itself.

23            So, apparently there was a group of students

24   wearing signs in support of national day of silence;

25   right?

1        MR. JENSEN:  Object to form.

2      A.    Yes.

3      Q.    And you sent an e-mail out that said they have

4  to remove their advertisements; is that right?

5      A.    Yes.

6      Q.    Do you recall the conversation that you had

7  with your principal that led to the sending of this

8  e-mail?

9      A.    Word for word, no.

10      Q.    No, that's okay.  The substance of the

11  conversation, anything that you can remember.

12      A.    There were two assistant principals.  The

13  principal said that I have been in communication with

14  the superintendent.  I need you to have the students

15  remove the placards.

16      Q.    Was that the first that you had heard about the

17  placards or the signs was when your principal brought it

18  to your attention?

19      A.    I really don't recall.

20      Q.    So you don't recall seeing students wearing

21  signs or having a conversation with any administrators

22  prior to being told by your principal to send this

23  e-mail out?

24      A.    I had not had any conversations with any

25  students.

147

1    Q.    Okay.   How about with Superintendent Cline?

2    A.    As the assistant principal, I didn't have those

3    conversations with him at the time.

4    Q.    Do you recall having conversations with other

5    administrators other than the principal prior to him

6    telling you to send this e-mail out?   Do you remember

7    any conversation that you had or were party to?

8    A.    I don't remember any.

9    Q.    Does that mean that they could have taken

10   place?

11          MR. JENSEN:   Object to form.

12   A.    I don't remember.

13   Q.    Do you recall your principal directing you to

14   send this e-mail?

15   A.    Yes.

16   Q.    Did he draft it and give it to you to send or

17   did you draft it based on a conversation with him?

18   A.    His directions would have been notify the

19   teachers that students are not to have the placards on.

20   Q.    Okay.   You say would have been.   Does that mean

21   that you don't recall him saying that?

22   A.    I don't recall his exact words.

23   Q.    But the essence of what you just said is

24   accurate?

25   A.    Yes.

1    Q.   Okay.  And then it looks like you responded to

2  the e-mail that you sent because the next e-mail up the

3  chain, which was sent three minutes later.  Do you see

4  that?  At 10:59?

5    A.   Uh-hum.

6    Q.   Starts with FYI?

7    A.   Right.

8    Q.   And you sent that to the superintendent's

9  secretaries.  Do you know -- if you weren't in

10  conversation or communication with the superintendent

11  about these signs or about the national day of silence,

12  you were just following what your principal said --

13    A.   Uh-hum.

14    Q.   -- can you tell why you sent this to the

15  superintendent?

16    A.   Probably I had been asked to respond to me and

17  let the superintendent's office know what you had done.

18    Q.   You said probably.  Does that mean that you

19  don't recall?

20    A.   No, I don't recall specifically.

21    Q.   Is it fair to say if you don't recall, that you

22  may have taken the initiative without direction to send

23  this?

24        MR. JENSEN:  Objection to the form.

25    A.   To the superintendent's secretary?

1      Q.     That's correct.

2      A.     I wouldn't have sent it without a request from

3   them or from the principal, no.

4      Q.     But you don't recall anyone directing you to

5   send it to the superintendent?

6      A.     I don't recall whether they did or did not.

7      Q.     Okay.

8      A.     Either the principal would have or someone from

9   the superintendent's office would have called over.

10   That's why they would have been copied.

11      Q.     And who is Mr. Deal?

12      A.     The other assistant principal.

13      Q.     And so the substance of this e-mail sets out

14   that you had personally spoken to students, but earlier

15   you said that you didn't speak to any students, that you

16   were just following the directions of your principal.

17   So which one of those --

18      A.     I believe I said I don't remember two and a

19   half years ago when I spoke to whom about this.  I know

20   there was a day and the students removed the placards.

21   I don't recall any other conversations.

22      Q.     But a minute ago you testified that the first

23   you heard of it was from the principal when he directed

24   you to send this e-mail out, that you hadn't seen

25   students wearing signs or talked to any students.

1    A.   I said the first conversation I had with him

2  was about this.

3    Q.   Okay.  Okay.  So tell me about the students

4  that you saw wearing signs in 2011.

5    A.   I -- there may have been three or four in the

6  school.  And, honestly, that's all I remember.

7    Q.   Okay.  So you had talked to them by 10:59 a.m.,

8  according to this e-mail, you had already talked to

9  students; is that correct?

10    A.   It would have to be.

11    Q.   Three minutes earlier you sent the e-mail to

12  all of the teachers?

13    A.   Uh-hum.

14    Q.   Do you recall whether the conversation in which

15  your principal directed you to send this e-mail occurred

16  just prior to your sending the e-mail or could you have

17  had that conversation first thing in the morning, hours

18  earlier?

19    A.   It could have occurred during an administrative

20  meeting first thing that morning.  It could have -- I

21  have no idea when that conversation occurred.

22    Q.   But what we do know is that by 10:59 a.m. you

23  had already spoken to several students?

24    A.   Yes.

25    Q.   Do you know whether you had spoken to those

1  students prior to the principal informing you that they

2  weren't to be wearing those signs?

3      A.    I would have had his direction before I had

4  started speaking to students.

5      Q.    Okay.  And what did you mean by your statement

6  that the name is not important, any group follows the

7  same rules?

8      A.    That any group who had been having an event

9  that wasn't authorized, as I said here, any group who

10  wishes to be represented as a school has to follow the

11  proper channels.  So any group would have followed the

12  same rules.

13      Q.    Tell me what those rules were.  What was

14  violated in 2011 with respect to students wearing

15  placards, and --

16      A.    They didn't have authorization for some sort of

17  an organized event through the school, a

18  school-sponsored event.

19      Q.    And where here in the e-mail does it say that

20  this was an organized event?

21      A.    I don't know that it was.

22      Q.    So do you recall that that's what your

23  principal told you?

24      A.    I don't recall any specifics of that

25  conversation.  I recall there was a day, and there were

1   some students asked to remove placards, and that's all I

2   remember about that day.

3       Q.   Do you remember -- that's all you remember.  So

4   you don't remember that students were doing anything

5   other than wearing signs or placards?  That was your

6   testimony just now?  You don't recall anything other

7   than that?

8       A.   Yeah, I don't remember any other actions.

9       Q.   Okay.  And then by this e-mail, it reflects

10  that they were forced to remove those signs.

11          MR. JENSEN:  Object to form.

12      A.   I believe it says we spoke to them.  We talked

13  to less than two dozen between us.

14      Q.   The first e-mail said that they have been told

15  to remove their advertisements; isn't that true?

16      A.   You used the word forced.

17      Q.   If a student doesn't do what they're told by

18  the high school administration, you testified earlier

19  that there would be consequences, and you listed off

20  what those consequences could be.  Isn't that right?

21      A.   They would certainly vary for different

22  situations.  But, yes, there is a student code of

23  conduct.

24      Q.   No.  My question is:  If a student is told to

25  do something directly by an administrator, and they

1   refuse to do that, there's a disciplinary consequence to

2   that; isn't that right?

3       A.    There would likely have been.

4       Q.    Earlier you said there would be, so -- but now

5   you're saying maybe, so that students -- let me ask it

6   this way:  Are you saying that students can decide

7   whether or not to follow the direction of high school

8   administration?

9       A.    I am saying that when an event occurs, and we

10  sit down and talk with a student, sometimes things are

11  worked out amicably, and there's no discipline.

12      Q.    That's true, you did testify to that earlier.

13  But when you tell a student to do something, and they

14  refuse to do that, you testified earlier that that would

15  be disobedience, willful disobedience, and that there

16  would be a consequence for that.

17      A.    As I said, if we can sit down together and work

18  out something, they might apologize, we shake hands and

19  go on.  There's not necessarily going to be a documented

20  in-school suspension.

21      Q.    Sure.  But if you tell a student to do

22  something, and they say to you, no, what would you do as

23  an assistant principal?

24          MR. JENSEN:  Object to form.

25      A.    I would restate the question first.

1    Q.   Okay.

2    A.   Then I would ask them to come with me.

3  Depending on their actions, we would start with talk.

4  It might end there.

5    Q.   So it's possible that you could tell a student

6  to do something, they could refuse, and you would say

7  that's fine?

8    A.   With 1,200 teenagers, it happens very

9  regularly, yes.

10    Q.   Okay.  Students are welcome to ignore

11  directions from the superintendent -- I mean from the

12  school administration?

13    A.   No, that's not what I said.  I said that if we

14  can come to an amicable agreement, then we go on and we

15  could move forth with it.  We don't hold -- we don't do

16  discipline.

17    Q.   So long as they follow your direction?

18    A.   We resolve the issue.

19    Q.   I see.  Well, in 2011, do you recall whether

20  any students were told to remove their signs and failed

21  to do so?

22    A.   I believe it says here that's not the case.

23  Doesn't it say -- none of the students I talked to gave

24  me any trouble.  So I don't remember.  But I would say

25  by that, I meant everyone removed them.

1     Q.   Okay.  In the last correspondence about this

2  from you to Melba Barnwell, do you see at the top, the

3  e-mail --

4     A.   Yes.

5     Q.   -- dated April 15th?

6     A.   Yes.

7     Q.   Do you recall sending this e-mail?

8     A.   Not really.  Not -- I mean, obviously I did.

9  Do I remember sitting down and typing it, no.

10     Q.   So you estimated in this e-mail that there were

11  less than two dozen students that were talked to.

12     A.   Uh-hum.

13     Q.   Do you have any recollection whether it was

14  more than one dozen?

15     A.   No.

16     Q.   Do you have any idea why you would -- if it was

17  less than one dozen, why you would have chosen the two

18  dozen number?

19     A.   The other assistant principal had done most of

20  this.  I don't remember what I was doing, but I had

21  something else going on.  And he's the one who came and

22  said they've taken them off, I've talked to a couple

23  dozen kids.

24     Q.   Okay.  We'll come back to this.

25         MS. LITTRELL:  What exhibit number are we on?

1          THE COURT REPORTER:  Seven.

2          (Plaintiff's Exhibit No. 7 was marked for

3      identification.)

4  BY MS. LITTRELL:

5      Q.    I'm handing you what is marked as Exhibit No.

6  7.  Have you seen this document before?

7      A.    It looks like something that Amber would have

8  sent, so -- she signed it.

9      Q.    And is it titled to you?

10      A.    Uh-hum.

11      Q.    And what is the date on it?

12      A.    March 29th.

13      Q.    2012?

14      A.    2012.

15      Q.    Do you recall Amber sending this to you?

16      A.    I don't remember receiving it specifically.  I

17  can certainly say that she obviously did send it.

18      Q.    Do you remember reading it?

19      A.    Not really.  Not the occasion, no.

20      Q.    Do you remember what you did with this document

21  after you received it from Amber?

22      A.    I'm sure I would have referenced it to the

23  superintendent when I spoke with him.  But what I did

24  with it, it would have been on file in my office.

25      Q.    Okay.  So I'd like to go through this.  This is

1   a letter written by Amber, signed by Amber, and it's to

2   you.  And it was on March 29th, prior to the day of

3   silence, about three weeks prior.

4        A.    Uh-hum.

5        Q.    And the first sentence -- read along with me so

6   I don't get anything wrong -- "The National Day of

7   Silence is an organized event to peacefully and silently

8   protest anti-lesbian, gay, bisexual, and transgender

9   bullying."

10              Is there any part of that sentence that you

11   think is a problem?  Is Amber asking for anything in

12   that sentence that you take issue with?

13        A.    Personally or within school rules?

14        Q.    As the principal of the school.

15        A.    She has made a request for an event.  That's

16   not an issue.  That's an observation.

17        Q.    Fair enough.

18              And she says -- Amber says, "This event was

19   attempted by students at the school last year without

20   approval from the administration."

21              Do you see that?

22        A.    Uh-hum.

23        Q.    And she says -- she asks or says, "I would like

24   to prevent a repeat performance this year by getting

25   your approval and allowing the day of silence to be a

1    school-sanctioned event."

2         Do you see that?

3    A.    Uh-hum.

4    Q.    Okay.  So this was Amber's request to do what

5    they tried to do the year before without getting into

6    trouble.  Does that seem a fair characterization?

7         MR. JENSEN:  Object to form.

8    A.    Yes.

9    Q.    The first sentence of the next paragraph says

10   that, "This does not mean that you'll have to do

11   anything.  In fact, I'll most likely be doing most of

12   the legwork for the event.  We just sincerely hope that

13   you will allow us to participate in day of silence

14   without resistance from the administration."

15        So the first two sentences, is Amber asking you

16   for anything?

17   A.    Amber is asking to hold an event.

18   Q.    And is that against any rule or policy that you

19   can cite to?

20        MR. JENSEN:  Object to form.

21   A.    No.  She has the right to ask, as does any

22   student.

23   Q.    So what has she asked for in these first few

24   sentences that she needs permission to do?

25   A.    She's asked for recognition of an organization

1   that's not a high school organization to hold an event

2   on the high school campus.

3      Q.   And what organization are you referencing?

4      A.   She references -- she references LGBT, and she

5   wants to start an LGBT.  So that, I suppose, would be

6   the group.  But any student -- I mean, she hasn't given

7   me a specific group of students.  She just wants to hold

8   an organized event.

9      Q.   So I'm asking if there's anything about that

10   that is in violation of a policy; and, if so, can you

11   cite to that policy?

12      A.   She certainly has the ability to ask to

13   organize an event.

14      Q.   Is there anything about the event that she's

15   asking to organize that is against school policy that

16   you can cite to?

17      A.   I don't see anything here.  She is simply

18   asking for permission.

19      Q.   Okay.  And then in that second paragraph Amber

20   tells you that she has researched the legal rights of

21   students, and she acknowledges that there are

22   restrictions in place; is that right?

23      A.   Yes.

24      Q.   And then she cites to Lambda Legal?

25      A.   Uh-hum.

1      Q.    And quote, "Under the Constitution, public

2  schools much respect students' right to free speech, the

3  right to speak includes the right not to speak, as well

4  as the right to wear buttons or T-shirts expressing

5  support for a cause."

6           Would you agree with what Amber has stated thus

7  far in this letter to you?

8      A.    What am I agreeing to?  Has she stated this or

9  that --

10     Q.    That it's an accurate reflection of the law as

11 you understood it?

12          MR. JENSEN:   Object to form.

13     A.    I agree that the public schools must respect

14 students' right to free speech.

15     Q.    Do you agree that the right to speak includes

16 the right not to speak under the Constitution?

17          MR. JENSEN:   Object to form.

18     A.    I agree as long as it does not disrupt

19 classroom time.

20     Q.    Okay.  Is that your understanding of the limits

21 of free speech in schools, as long as it doesn't disrupt

22 class time?

23          MR. JENSEN:   Object to form.

24     A.    I don't have a specific understanding that I

25 could trot out to you and explain.

1    Q.    Uh-hum.

2    A.    And I didn't go into any sort of understanding

3    with her here.

4    Q.    Uh-hum.

5    A.    So I sent it to the superintendent and went

6    with his explanation from there.

7    Q.    So do you agree that students have a right to

8    wear buttons or T-shirts expressing support for a cause?

9    Do you agree that that's an accurate reflection of the

10   law?

11   A.    I believe as long as they do not reflect any

12   sort of, you know, hate or gang, and if they are within

13   the school -- the school policy does state that they

14   have to -- if they're selling or advertising for the

15   group, they have to have been given permission to do

16   that.

17   Q.    Is your testimony if they're expressing support

18   for a cause, they need permission to do that?

19   A.    I didn't try to make that interpretation to

20   her.  I referred it to the superintendent.

21   Q.    Okay.  The next sentence Amber says to you,

22   "This right to free speech does not extend to classroom

23   time."

24         And then she says, "If a teacher tells a

25   student to answer a question during class, the student

1   generally doesn't have a Constitutional right to refuse

2   to answer."

3          Would you agree that Amber is acknowledging

4   that what she's asking to do does not include refusing

5   to answer a question from a teacher?

6          MR. JENSEN:   Object to form.

7     A.    I agree that that's what she's stating here,

8   yes.

9     Q.    The next sentence she says, "We don't want the

10  day of silence to interfere with your teacher's

11  lessons."

12         Would you agree that that is further

13  communication to you that students don't intend to

14  disrupt classroom time by taking part in this?

15    A.    That is what she states.

16    Q.    Okay.   And then the next sentence says, "Our

17  goal is not to affect the learning experience of our

18  fellow students.   If anything, we want to educate."

19         Is that sentence -- is there anything about

20  that sentence that would lead you to believe that this

21  expressive event is going to disrupt the classroom?

22    A.    To educate could possibly.   But she doesn't say

23  that she's doing any disrupting here.

24    Q.    Okay.

25    A.    If she's speaking and interrupting in a class,

1   that could disrupt a classroom.  It doesn't say that she

2   is going to do that, though.

3       Q.   In fact, it says that she doesn't want to

4   interfere with teachers' lessons; is that correct?

5       A.   Right.

6       Q.   On the next page there's a sentence that

7   communicates that there is an official letter from a

8   senior counsel member of the ACLU, LGBT Project

9   enclosed.  Do you see that?

10      A.   Yes.

11      Q.   And then she, Amber, gives a website and says,

12  "If you want more information, you can look at the

13  website."

14      A.   Yes.

15      Q.   The next page of this exhibit is a letter

16  from -- on ACLU letterhead.  Do you see that?

17      A.   Yes.

18      Q.   Do you recall seeing that prior to today?

19      A.   I don't recall what this says, so...

20      Q.   Do you recall seeing a letter from the ACLU

21  about day of silence?

22      A.   I don't recall specifically the documents that

23  she gave me at that time.  Did she give me information

24  and did I turn it directly over to the superintendent,

25  yes.  I made very clear to her I was not making this

1    decision.  So there was no point in my debating the

2    cause with her.

3       Q.   Okay.  So have you ever seen this letter before

4    that's on ACLU letterhead?

5       A.   I don't remember seeing it.  It's very likely,

6    yes, that I did.

7       Q.   Okay.  Do you recall reading it?

8       A.   If she had given it to me, I would have looked

9    at it.

10      Q.   Can you identify what I'm handing you as --

11   marked as Exhibit 8?

12           (Plaintiff's Exhibit No. 8 was marked for

13       identification.)

14      A.   It's an e-mail from my secretary to the

15   superintendent's secretary.

16      Q.   Okay.  And what is the date on that e-mail?

17      A.   March 29th, 2012.

18      Q.   Okay.  And this e-mail, can you read over it

19   and describe what the e-mail's content is?

20      A.   It says just what I told you.  "I am sending

21   information to Mr. Cline hoping to receive official word

22   from him on the subject."

23      Q.   And do you recall having a conversation with

24   Jamie Olive?

25      A.   When she was my secretary, I spoke to her, yes,

1    quite regularly.

2        Q.    Do you recall having a conversation with her

3    that directed her to send this information along to --

4        A.    I would have asked her to send it over, yes.

5        Q.    And this information was sent through

6    interoffice mail.  Do you know what information was

7    passed along to Superintendent Cline on your behalf

8    that's referenced here?

9        A.    Well, it says the letter.  So it should have

10    been this letter.

11        Q.    Okay.  So you would agree that it appears that

12    Superintendent Cline received the same letter that you

13    received from Amber --

14        A.    Yes.

15        Q.    -- setting out that students didn't want to

16    interfere with teachers' class time?

17            MR. JENSEN:  Object to form.

18        Q.    We'll read it into the record again.

19            You would agree that Superintendent Cline

20    received the letter that says, "This right to free

21    speech doesn't extend to classroom time."

22            Right?  He received a letter that said that?

23        A.    Yes, he would have received the letter.

24        Q.    And he would have received the letter that says

25    Amber recognizes that if a teacher tells the student to

1    answer a question during class, the student generally

2    doesn't have a Constitutional right to refuse to

3    answer."  You received the letter that had that

4    information; right?

5        A.   Yes.

6        Q.   And he received a letter that has the

7    information that says, "We don't want the day of silence

8    to interfere with your teachers' lessons"; right?

9        A.   Yes.

10       Q.   And he received as well the attachment from the

11   ACLU that sets out day of silence?

12       A.   Yes.

13            (Plaintiff's Exhibit No. 9 was marked for

14        identification.)

15       Q.   Exhibit 9 is what I'm handing you now.  Can you

16   describe to me what this document is?

17       A.   All it has is a -- is the title.

18       Q.   Does it appear to be an e-mail?

19       A.   Yes, but it's not one that I was copied on.  So

20   I wouldn't know what it is.

21       Q.   Okay.  So you haven't seen this e-mail, you

22   weren't on this e-mail chain; is that right?

23       A.   Not according to this.

24       Q.   Okay.  But this appears to be an e-mail to

25   Adrian Cline; is that right?

1    A.   Yes.

2    Q.   And it appears to have been sent by Jan Lewis;

3  is that right?

4    A.   Yes.

5    Q.   And remind me who Jan Lewis is.

6    A.   She is one of the superintendent's secretaries.

7    Q.   And the subject is day of silence; is that

8  right?

9    A.   Yes.

10   Q.   And there are attachments to this e-mail.  Is

11 that what the indication from this document says?

12   A.   Yes.

13   Q.   Okay.  Do you have any reason to believe that

14 the attachments to this document were not the letter

15 that we've been taking about from Amber to you?

16        MR. JENSEN:  Object to the form.

17   A.   I have no way of knowing.  This is a

18 superintendent's e-mail.

19        (Plaintiff's Exhibit No. 10 was marked for

20     identification.)

21   Q.   I'm handing you what has been marked as Exhibit

22 10.  Can you describe what this document is, please?

23   A.   It's an e-mail from the superintendent to me

24 disapproving the day of silence.

25   Q.   Does it reflect that there are attachments to

1  this e-mail?

2      A.   Yes.

3      Q.   Okay.  And on the next page there is a letter,

4  the letter that we've been talking about to you that was

5  attached to this e-mail and the ACLU letter?

6      A.   Yes.

7      Q.   Okay.  Does this reflect that Superintendent

8  Cline received the letter from your secretary to his

9  secretary?

10     A.   Yes.

11     Q.   Okay.  And his response to this attachment to

12 this request, through you, is that it's inconsistent

13 with the district's past practice to approve student

14 protest on any of our campuses.  The attached meaning

15 the letter written to you that we have entered into the

16 record as Exhibit No. 7 is disapproved?

17     A.   Yes.

18     Q.   Does that reflect to you that what Amber was

19 asking to do as reflected in this letter was not

20 approved?

21     A.   Correct.

22     Q.   Okay.  And does it reflect to you that what she

23 has asked to do is not allowed?

24         MR. JENSEN:  Object to form.

25     A.   Yes.

1      Q.   Okay.  And is that how you understood the

2  direction from Superintendent Cline, that what Amber was

3  asking for in the attachments, which was a letter to you

4  that you passed on to him, was not allowed; is that

5  right?

6      A.   Yes.

7           (Plaintiff's Exhibit No. 11 was marked for

8       identification.)

9      Q.   Exhibit 11 is in front you now.  Can you

10  describe what this document is?

11     A.   It appears to be the exact same e-mail as the

12  prior one.

13     Q.   At the top it says it's from you.

14     A.   Oh, at the top.  Okay.

15     Q.   So is this an e-mail that was sent from you to

16  Superintendent Cline?

17     A.   Yes.

18     Q.   Okay.  So below that is the e-mail we just

19  talked about, or appears to be --

20     A.   Yes.

21     Q.   -- from Superintendent Cline to you copying his

22  secretary, subject, day of silence.  And the time -- the

23  date is April 2nd, 2012; is that right?

24     A.   Yes.

25     Q.   And the time that it was sent was 5:50 p.m.; is

1    that right?

2        A.   Yes.

3        Q.   Okay.   And the e-mail response that you sent to

4    him was sent at 6:12 p.m.; is that right?

5        A.   Yes.

6        Q.   Okay.   And what did you say in response to his

7    disapproval?

8        A.   I said, "Thank you," which is thank you for

9    e-mailing me back.   "I turned it down last year for the

10   same reason."

11           And I wasn't principal last year, so I think I

12   was just referencing the fact that it had been turned

13   down.

14       Q.   Okay.   And the reason it was turned down the

15   year before, please remind me, your recollection of why

16   it was turned down the year before?

17       A.   As assistant principal the year prior, I didn't

18   have the discussion with him.   And that's why I have no

19   idea why I said I turned it down.   I think I was simply

20   reminding him it wasn't in place last year, it hadn't

21   gone through.   My only involvement the year before had

22   been the removal of the placards.

23       Q.   So when you say, "I turned it down last year,"

24   is your testimony now that that is inaccurate and that

25   is untrue?

1    A.   Saying that I turned it down, I wasn't

2  principal.  So obviously I was not the one who did, who

3  turned it down.

4    Q.   Okay.

5    A.   I think I was just clarifying that it hadn't

6  been approved last year.

7    Q.   Okay.  And what is your recollection of the

8  reason that it was turned down the year before?

9    A.   I just said that the principal and the

10  superintendent would have had that discussion.

11    Q.   But in the e-mail that you sent to teachers,

12  you explained why it wasn't allowed.

13    A.   I explained that they had been directed not to

14  be -- not to allow students to wear placards.  For the

15  prior year?

16    Q.   Uh-hum.  I'm going to refer back to Exhibit 6.

17  And on the e-mail that starts this e-mail chain, which

18  was sent from you to DHS teachers, is that DeSoto High

19  School teachers?

20    A.   Yes.

21    Q.   Okay.  It says, "These students did not follow

22  proper channels required for any group to have a day

23  here.  They have been told to remove their

24  advertisements."

25    A.   Yes.

1    Q.   "If they ask, please explain that any group who

2   wishes to be represented at the school has to follow the

3   proper channels."  Is that right?

4    A.   Yes.

5    Q.   And so where in the 2011 explanation of why

6   students aren't allowed to wear signs of a national day

7   of silence, where does it say anything about a protest,

8   that the reason has anything to do with the fact that

9   it's a protest?

10    A.   In this e-mail?

11    Q.   Yes.

12    A.   I don't see it in this e-mail.

13    Q.   So help me understand why, in 2012, you say to

14   the superintendent that you -- when he says to you

15   it's inconsistent with past practice to approve student

16   protests on any campus, you say "I turned it down last

17   year for the same reason"?

18        MR. JENSEN:  Object, asked and answered.  She

19      has already told you why she did that.  Go ahead and

20      repeat your answer.

21    Q.   I'd like you not to repeat your answer.  I'd

22   like you to actually answer the question that I asked,

23   which is:  Why did you respond to the superintendent

24   saying that the reason it's disapproved is because it's

25   against past practice to approve student protests?  And

1  your response is, you turned it down last year for the

2  same reason?

3         MR. JENSEN:  Object to form.

4     A.   I said that -- this probably should have been

5  worded it was turned down.  I did not deny it.  I was

6  not the principal or the superintendent.

7     Q.   Well, what about the reason.  In 2011, it

8  appears that the reasoning, whether that was from your

9  principal or you, the reasoning that was in the e-mail

10 that you sent said it was because they didn't follow

11 proper procedures --

12    A.   Uh-hum.

13    Q.   -- and nothing about protests or a policy of

14 not allowing protests.

15         MR. JENSEN:  Object to form.

16    A.   I don't know what went on in their

17 conversation.

18    Q.   I'm sorry?

19    A.   I don't know what went on in their

20 conversation.

21    Q.   In whose conversation?

22    A.   The principal and the superintendent.

23    Q.   You're talking about 2011?

24    A.   Yes.

25    Q.   But your e-mail, your e-mail said that the

1    reason that these students couldn't wear their

2    advertisements, the direction that you were giving to

3    teachers about those students wearing signs, was because

4    they didn't follow proper procedures; is that right?

5         A.   That was the e-mail that I was directed to

6    send.

7         Q.   Okay.  In that mail, it didn't mention as a

8    justification anything about protests; is that right?

9              MR. JENSEN:  Objection; asked and answered.

10        Q.   Is that right?

11             MR. JENSEN:  You can go ahead and repeat your

12        answer again.

13        A.   No, it didn't use that word in that e-mail.

14        Q.   Okay.  And explain to me why you say to the

15   superintendent that you turned the day of silence

16   request down last year for the same reason that he says

17   it's disapproved this year, when that's -- when that is

18   inconsistent with your 2011 e-mail?

19             MR. JENSEN:  Objection; asked and answered.

20        This is the third time.

21             Go ahead and repeat your answer again.

22        A.   This e-mail was sent simply stating that it had

23   been turned down last year.  It did not go through.  I

24   was not privy to the conversations.

25        Q.   Doesn't it say it was turned down last year for

1   the same reason?

2       A.   It does.

3       Q.   What did you mean by that?

4       A.   Two and a half years ago --

5       Q.   Uh-hum.

6       A.   -- quite honestly, I don't know.

7       Q.   Read the e-mail from Superintendent Cline to

8   you, and then you read his response -- your response to

9   him.

10      A.   Uh-hum.

11      Q.   Doesn't it appear that you're saying it's the

12  same reason you're giving, that's the reason we turned

13  it down last year?

14      A.   It says it was turned down for the same reason,

15  uh-hum.

16      Q.   Okay.  So it's accurate to say that two years

17  in a row, students wanted to take part in a national

18  event called day of silence, and two years in a row they

19  were told that they could not?

20           MR. JENSEN:  Object to form.

21      A.   The students request was not approved for the

22  two years.

23      Q.   Right.  Okay.  And in 2011, it's your testimony

24  that the reason it wasn't approved was based on the

25  principal's decision; is that right?  At least the

1  principal's direction to you?

2      A.    Or the superintendent, whoever made the

3  decision.

4      Q.    And this year the reason is based on

5  Superintendent Cline's decision; is that right?

6      A.    Yes.

7            (Plaintiff's Exhibit No. 12 was marked for

8       identification.)

9      Q.    I'm handing you what was marked as Exhibit No.

10  12.  Can you tell me what that appears to be?

11     A.    An e-mail from Amber to Mr. Cline.

12     Q.    And have you ever seen this e-mail before?

13     A.    I'm sure I have.

14     Q.    Okay.  Do you see where it says that,

15  "Ms. Fusco informed me that peaceful protests are

16  against district policy, and that you denied permission

17  for us to participate at DHS"?

18     A.    What I denied for her was permission to

19  participate because Mr. Cline had denied it.

20     Q.    Okay.  And can you read the date and time of

21  that e-mail?

22     A.    April 10th, 2012 at 7:37 a.m.

23     Q.    Okay.  So that's 10 days before the scheduled

24  day of silence on April 20th; right?

25     A.    Yes.

1

2            (Plaintiff's Exhibit No. 13 was marked for

3        identification.)

4     Q.    I'm handing you what's been marked Exhibit 13.

5   Can you identify this document, please?

6     A.    It's an e-mail from Mr. Cline to me.

7     Q.    Do you recall receiving this?

8     A.    Yes.

9     Q.    Okay.  So earlier in your testimony you

10  testified that you had communicated with Superintendent

11  Cline personally, and that you had no further

12  communications with him.  Was that untruthful?

13          MR. JENSEN:  Object to form.

14    A.    I testified that we had had several

15  discussions, and that I couldn't tell you exactly how

16  many.

17    Q.    Okay.  Do you recall communicating with him by

18  e-mail about the day of silence, now that you see this

19  e-mail in front of you?

20    A.    I recall multiple communications.  Some were

21  verbal.  Obviously, some were by e-mail.  Some were

22  probably face to face.  Do I recall the exact dates and

23  times, no.

24    Q.    Sure.

25          So in this e-mail from Superintendent Cline to

1   you, do you see that it's dated April 12th?

2       A.   Yes.

3       Q.   And at 8:15 p.m.; right?

4       A.   Yes.

5       Q.   Okay.   And this e-mail, can you describe the

6   contents of this e-mail?

7       A.   He is stating in writing that it is

8   inconsistent with the district's practice, and he does

9   not approve the activity.

10      Q.   Okay.   I'm going to hand you Exhibit 14.   Can

11  you identify this document?

12           (Plaintiff's Exhibit No. 14 was marked for

13        identification.)

14      A.   It's the follow-up e-mail from me to Mr. Cline

15  that evening.

16      Q.   Okay.   April 12th at 8:38; is that right?   Do

17  you recall sending this e-mail to Superintendent Cline?

18      A.   Yes.

19      Q.   Okay.   Can you describe your response to him?

20      A.   I'm responding to the fact that I have

21  addressed it with her already, and I will address it

22  with her again.

23      Q.   Do you see what it actually says is that, "I've

24  told her no"?   Is that true?   Did you tell her no?

25      A.   I have been told no and I have responded no to

1  her.

2      Q.    And you also say that you have told her what

3  the ramifications would be if the protest occurred.  Can

4  you explain what you meant by that?

5      A.    She asked me specifically about some actions in

6  the student code of conduct, if a student does this,

7  what does the code of conduct say, if a student does

8  this, what does the code of conduct say.

9      Q.    So earlier when we were talking about the

10  conversations you had with Amber, I asked you to

11  describe the contents of those -- everything that you

12  could remember, and you didn't say anything about Amber

13  asking about specific code of conduct.  So which is

14  true?

15         MR. JENSEN:  Object to form.

16      A.    Well, a year and a half ago, without a document

17  in front of me, no, I wouldn't remember the specific

18  conversations.  They pertained to the day of silence.

19      Q.    So is your testimony now that you're looking at

20  this e-mail, you recall more details about your

21  conversations with Amber prior to day of silence --

22  well, actually here, prior to April 12th?

23      A.    I am noting where I have noted to him that I

24  had that discussion with her, yes.

25      Q.    And tell me again what that discussion that

1  you're referencing in your e-mail to Mr. Cline?

2      A.   She asked me about student behaviors as they

3  related to the student code of conduct.

4      Q.   So Amber Hatcher said to you exactly what you

5  just said, can you tell me about behavior as it relates

6  to the code of conduct, or did she ask it in a more

7  informal teenager, 15-year-old teenager kind of way?

8      A.   I'm sure she did in a more teenager way.

9      Q.   Can you recall what specifically she said to

10  you?

11     A.   I don't recall what specific actions she asked

12  me about, no.

13     Q.   Did you pull out the code of conduct, do you

14  recall?

15     A.   I don't recall pulling it out.  She would have

16  had a copy.  All students do.

17     Q.   Is it your testimony she had a copy of the code

18  of conduct during that conversation for you to go

19  through?

20     A.   No, that's not my testimony.

21     Q.   So do you recall either one of you having the

22  code of conduct physically and looking through it during

23  the --

24     A.   I don't recall that, no.

25          MR. JENSEN:  Object to form.

1    Q.    Could it have happened?

2    A.    It could have.

3    Q.    So it's possible that you pulled out the code

4    of conduct and went through it, but you just don't

5    recall; is that right?

6         MR. JENSEN:  Object to form.

7    A.    It is possible, but, no, I don't recall it.

8    Q.    Okay.  So in this e-mail you say that you've

9    told her what the ramifications would be if the protest

10   occurred.  Is that what you told her?

11   A.    What I recall were her asking questions about

12   specific student actions.

13   Q.    Such as?

14   A.    I just told you I don't remember.  She just had

15   several student actions.  If a student did this, what

16   would happen?  If a student did this, what would happen?

17   Q.    This is the subject of a federal lawsuit, and

18   your testimony is that you cannot recall what she asked

19   she could do that you told her that she could not do?

20        MR. JENSEN:  Objection; asked and answered.

21   Q.    Is that your testimony?

22   A.    This is a month and a half prior to graduation

23   in a large county high school.  I don't remember that

24   specific conversation, no.

25   Q.    Okay.  So is it fair to say that if she does

1    remember what the conversation was, that she has a
2    better recollection than you do because you have no
3    recollection of the exact conversation; is that fair?
4         MR. JENSEN:  Object to form.
5         A.    It's fair to say she might have a recollection.
6    Whether it's correct or not, I don't know.
7         Q.    Okay.  But you have no recollection; we've
8    established that.  Okay.
9         What did you mean when you said you don't think
10   she plans to disobey?  Disobey what?
11        A.    The student code of conduct.
12        Q.    Where in the student code of conduct does it
13   say protests are not allowed?
14        A.    Plans to disobey is a general statement.  I
15   don't think she plans to do something that's against the
16   student code of conduct because those are the questions
17   she was asking was about the student code of conduct.
18        Q.    Attached to this e-mail is her request to
19   Mr. Cline; right?
20        A.    Yes.
21        Q.    And it -- you can take a minute to look through
22   it, but if you want to point out where in here or where
23   in the letter she sent to you Amber threatens to do
24   something that's against the code of conduct.  I'd like
25   for you to point those instances out.

1    A.    There aren't.  That's why I have said I don't

2  think she intends to disobey, to do something that's

3  against the code of conduct.

4    Q.    Why do you need to have this back and forth

5  conversation with your superintendent if you don't think

6  she plans to violate the code of conduct?

7    A.    Generally, when he asks a question, I answer

8  it.

9    Q.    Okay.  And you said that you'll clarify the

10  matter with her again tomorrow morning.  So this is

11  April 12th.  So Friday, April 13th, which would be one

12  week before the event you tell him you are going to

13  clarify the matter.  Do you recall clarifying the matter

14  with Amber?

15    A.    If I told him that I would speak with her

16  again, then I spoke with her again.

17    Q.    Do you recall what you said in that

18  conversation?

19    A.    No.

20          (Plaintiff's Exhibit No. 15 was marked for

21      identification.)

22    Q.    I'm handing you what has been produced in

23  discovery that I've marked as Exhibit 15.  Do you

24  recognize this document or can you describe it for me?

25    A.    It says an e-mail from Melba Barnwell to Karen

1    Pella.

2        Q.    And you testified earlier that that is the

3    assistant principal; correct?

4        A.    Right.

5        Q.    And it was sent on Friday, April 13th, one week

6    before day of silence at 8:10; is that right?

7        A.    Yes.

8        Q.    Okay.   Any reason to believe that this isn't an

9    e-mail that was sent from Mrs. Barnwell to Mrs. Pella?

10       A.    No.

11       Q.    Okay.   And does it appear to be a forward of

12   the principal's e-mail to you saying that Amber's

13   activity is disapproved?

14       A.    Yes.

15       Q.    Okay.   Any idea why the secretary -- the

16   superintendent's secretary was sending to your assistant

17   principal this e-mail?

18       A.    No, I don't have any idea.

19       Q.    Is it possible that the superintendent wanted

20   to ensure that Amber got the message, whether it was

21   through you or through your assistant principal?

22       A.    Yes.

23             MR. JENSEN:   Object to the form.

24             Again, if you could just wait a couple seconds.

25       Q.    Was that e-mail that we just reviewed from

1  Superintendent Cline to you clarifying that it was

2  against past practice, in which you responded that you

3  had addressed it, and you told her no twice, and what

4  the ramifications would be -- that's Exhibit 14 that was

5  on Thursday, April 12th -- was that your last

6  communication with Superintendent Cline?

7      A.   I don't know if it was or not.

8      Q.   Do you recall another conversation?

9      A.   No, I don't recall whether we did or did not

10 speak again.

11     Q.   Okay.  Do you recall speaking to Superintendent

12 Cline during the week of day of silence?

13     A.   I just said I don't recall whether we did or

14 did not speak again.

15     Q.   Okay.

16          (Plaintiff's Exhibit No. 16 was marked for

17      identification.)

18     Q.   I'm handing you what has been marked Exhibit

19 16.  Can you identify what this appears to be?

20     A.   It's an e-mail to Mr. Cline from -- I guess

21 this is Lambda Legal.

22     Q.   Uh-hum.  Are you copied on it?

23     A.   Yes.

24     Q.   Okay.  And the date on that is 4-19-2012; is

25 that right?

1    A.   Yes.

2    Q.   Okay.  And it's a letter from a lawyer at

3  Lambda Legal, signed by me, that sets out that several

4  students who seek to participate in day of silence

5  activities at your high school have been severely

6  hampered in their efforts to do so.  And goes on to set

7  out the first amendment and students' rights to

8  participate in day of silence.

9         Do you recall getting this e-mail?

10   A.   Did you fax it as well?

11   Q.   I can't answer questions.

12   A.   I do recall two faxes coming in from Lambda

13 Legal.

14   Q.   Okay.  So do you -- did you -- did you look at

15 those faxes?

16   A.   I looked at them and then contacted or sent

17 them to the superintendent's office, and he had already

18 received this.

19   Q.   Did you have a conversation about this e-mail

20 or the letter, however it got to you?

21   A.   I am pretty sure we did not discuss it that

22 day.

23   Q.   Okay.  Do you recall discussing it the next

24 day, which would have been the day of silence?

25   A.   Not the communications from Lambda Legal, no.

1    Q.   So in this letter, a lawyer says, "We write on

2    behalf of students in your school wishing to participate

3    in day of silence, to put the school on notice that

4    failure to allow these students to exercise their right

5    to free speech and equal treatment implicates

6    Constitutional violations that can create both

7    individual and institutional liability."

8         Is there a reason that you chose to ignore a

9    letter that sets out that you could be individually

10   liable for violating students' right?

11        MR. JENSEN:   Object to form.

12   A.   I did not make this decision for this event.

13   Superintendent made this decision.

14   Q.   I understand.   But this -- you were copied on

15   this letter, it was sent directly to you, and it

16   implicates liability.   And is it your testimony that you

17   didn't have a conversation about this letter?

18   A.   I don't recall a conversation on that day about

19   this letter.

20   Q.   Okay.   Do you recall what you did after you

21   received this letter?

22   A.   I contacted or sent it to the superintendent's

23   office.   This was his decision.

24   Q.   And what did you do next after you contacted or

25   sent this to the superintendent's office?

1    A.    I wouldn't have done anything.

2    Q.    But what did you do?  You're guessing I

3   wouldn't have done.  What do you recall doing on --

4   after you received this letter?  Do you remember if you

5   received it that evening?  It was sent at 6:27.  You

6   said you worked till 7:00 usually?

7    A.    I'm there usually, yes.  I don't recall getting

8   it in e-mail.  I recall getting a fax.

9    Q.    And do you recall whether that fax -- you got

10   that fax before you left for work on Thursday or when

11   you first arrived on Friday?

12    A.    I wouldn't have received a fax in the evening.

13   The fax machine is not near my office.

14    Q.    Okay.  Do you recall when you got this letter,

15   when you first saw it?

16    A.    No, I don't recall the date because there was

17   more than one that was faxed at different points.  I

18   referred them directly to the superintendents's office.

19   I did not handle, discuss, or deal with them at that

20   time.

21    Q.    What do you mean you referred them?  These are

22   letters.

23    A.    I sent them to the superintendent's office to

24   make certain he had a copy.

25    Q.    And how did you send them to him?  Did you fax

1  them?

2      A.   I would have handed it to my secretary -- what

3  I would have done is I would have handed it to my

4  secretary and said make sure the superintendent has a

5  copy; if he doesn't, send this.

6      Q.   That's what you would have done.  What did you

7  do?

8      A.   Handed it to my secretary and said make sure

9  the superintendent has a copy.  If he doesn't, send

10  this.

11     Q.   Okay.  And you acknowledge this was sent to you

12  by e-mail; right?  That's your e-mail address --

13     A.   Yes.

14     Q.   -- that you're CC'd on?

15          Do you recall forwarding this to anyone?

16     A.   I don't recall forwarding it.  It is possible

17  that I did forward it on to him.

18     Q.   Is it your testimony that once it was off your

19  desk and you ensured that it was on its way to the

20  superintendent, that you paid this letter no mind after

21  that?

22          MR. JENSEN:  Object to form.

23     A.   It was the superintendent's decision.  So I

24  handed -- I gave the decision to him as to how to

25  respond.

1    Q.   Okay.  And what did he tell you you should

2  respond?  How did he tell you you should respond?

3    A.   He did not.  He said that would come from the

4  superintendent's office.

5    Q.   He said that would come from the

6  superintendent's office?

7    A.   A response, any response to Amber or to Lambda

8  Legal would come through the superintendent's office.

9    Q.   And when was that conversation?

10   A.   I don't recall an exact date.

11   Q.   Well, it would have been --

12   A.   But Lambda Legal sent some information

13  afterward, and we would definitely have had a

14  conversation afterward about it.

15   Q.   On April 19th, at 6:27, this letter arrives in

16  your e-mail box.  Do you recall seeing it?

17       MR. JENSEN:  Object to form.

18   A.   I don't recall seeing the e-mail.  I recall

19  getting a fax.

20   Q.   Okay.  And the next day, which was the day of

21  day of silence, you had been aware of, you have this

22  letter that has been faxed to you and e-mailed to you,

23  what do you do next with this letter?

24   A.   I made certain the superintendent was aware of

25  it.

1    Q.    And did you have a conversation with the

2    superintendent after you made sure he was aware of it?

3    A.    Not at that time.

4    Q.    Did you have a conversation with the

5    superintendent on April 20th, 2012, about this letter?

6    A.    If that was the day of silence, our

7    conversation would have regarded the day of silence.  I

8    don't recall a conversation about this letter.

9    Q.    Okay.  Do you recall a conversation with anyone

10   else about this letter?

11   A.    My secretary, in asking her to transfer it.  I

12   don't recall having a conversation about it.  It is very

13   possible the administrative team took note of it.

14   Q.    It is possible but you don't recall having a

15   conversation with them?

16   A.    No, I do not.

17   Q.    Do you often get letters from legal

18   organizations setting out that if you violate students'

19   rights, that you will incur liability?

20   A.    Not often.

21   Q.    How often in the year and a half that you

22   worked as a principal did you receive a letter from a

23   lawyer?

24   A.    There would have been one, maybe one to two

25   other instances at most.

1    Q.   Okay.  And what did you do in those instance?

2    A.   Notify the superintendent and HR.

3    Q.   Okay.  Did you notify HR in this instance?

4    A.   No.  I notified the superintendent.

5    Q.   And did you notify anyone else?  Did you send

6  this to the school board?

7    A.   I do not communicate directly with the school

8  board, no.

9    Q.   Did you send this to the school board's

10 attorney or the school district attorney's office?

11   A.   I turned it over to the superintendent, and he

12 handled it from there.

13   Q.   Okay.

14        (Plaintiff's Exhibit No. 17 was marked for

15    identification.)

16   Q.   I will hand you what has been marked as Exhibit

17 17.  Can you identify that document for me?

18   A.   Yes.  It's an e-mail from me to the teachers.

19   Q.   It also went to the staff as well; right?

20   A.   Yes.

21   Q.   Okay.  What's the subject?

22   A.   What is the subject?

23   Q.   Yes, please?

24   A.   Protesting.

25   Q.   Okay.  And it's marked as high importance; is

1  that right?  That's what this e-mail reflects?

2      A.    It does.  I don't do any of that on my e-mail,

3  so...

4      Q.    Okay.  And do you recall sending this e-mail?

5      A.    Yes.

6      Q.    Okay.  And tell me why you sent this e-mail.

7      A.    To prevent any teacher from taking steps that

8  might lead to a student getting in trouble when we might

9  could have handled that with administration and simply

10  talking to a student.

11      Q.    And why would a teacher get the student in

12  trouble for not violating school policy?

13          MR. JENSEN:  Object to form.

14      Q.    Is it your testimony that you sent this e-mail

15  out in order to protect students?  Is that what I

16  understood you to say?

17          MR. JENSEN:  Object to form.

18      A.    It would be to prevent a situation from

19  occurring that didn't need to occur, to help protect a

20  student who might not have needed to have gotten in

21  trouble.

22      Q.    Help me understand why a student would get into

23  trouble who didn't need to get into trouble.

24      A.    There might have been a discussion or an

25  argument between the student and teacher in the

1    classroom over policy.  It's not an infrequent thing to

2    happen.

3        Q.   Over what policy?

4        A.   Any policy.

5        Q.   All right.  So let's go through this e-mail and

6    see if your explanation sort of makes sense.  So you

7    send an e-mail on the day of silence, and you say to the

8    teachers, "Please note we have a group of students today

9    who have an intention of protesting."

10       A.   Uh-hum.

11       Q.   "The district has an absolute policy against

12   protesting on school campuses."

13       A.   Uh-hum.

14       Q.   Is that truth -- truthful?  Was that a truthful

15   statement when you said it?

16       A.   That is me jotting out an e-mail running out

17   the door as the bell is ringing to release classes.

18       Q.   So what's the answer to the question?

19       A.   To keep the teachers from getting into a

20   discussion that might lead a student to arguing and

21   having something disciplinary.

22       Q.   I'm sorry.  The question is:  You have stated

23   that the district has an absolute policy against

24   protesting on school campuses.  Isn't that what this

25   e-mail says?

1     A.    It does.

2     Q.    Okay.  And is that statement that you made in

3  this e-mail a truthful statement?

4           MR. JENSEN:  Object to form.

5     A.    That is me putting it down in a hurry.

6     Q.    Putting what down in a hurry?

7     A.    Putting down that this protest will not occur.

8  It was not me trying to word something that is legally a

9  statement about policy.  It is saying they may not

10 protest, and as I was dashing out the door.

11    Q.    And why did you tell your teachers that

12 students may not protest?

13    A.    Because the superintendent had denied this

14 event.

15    Q.    Was it your understanding that the district has

16 an absolute policy against protesting on school

17 campuses?

18    A.    That is my wording as I'm running out the door

19 in a hurry.

20    Q.    Is it your understanding that the district had

21 an absolute policy against protesting on school

22 campuses?

23    A.    My understanding was that past practice

24 prevented a protest.  I was simply wording off of that

25 statement.

1     Q.   Okay.  In the next sentence you say, "If you

2 have students who are wearing a placard in protest of an

3 issue or disrupting the hallways or classrooms, please

4 notify the dean or administration, and we will handle

5 it."

6         Is that right?

7     A.   Yes.

8     Q.   What do you mean by placard?

9     A.   Any sort of sign.

10     Q.   Okay.  Any sort of sign.  Would that include

11 any sort of T-shirt that has a message?

12     A.   It says placard.

13     Q.   I know what it says.  I'm asking you what you

14 meant by placard.  So a placard is only something that

15 is attached or affixed, something that you hold in your

16 hand?  Help me understand what you mean by placard.

17     A.   I was referring to some sort of a sign that

18 they had added to their body or clothing.

19     Q.   And by this e-mail you're saying if some

20 student is wearing a sign that they have added to their

21 clothing in protest of an issue, please notify the dean

22 or administration, and we will handle it; is that right?

23     A.   Yes.

24     Q.   And earlier you testified that you don't really

25 recall what you said to your administration or to the

1  dean about how to handle students who are sent to the

2  office as a result of day of silence. Do you stand by

3  that testimony now?

4      A.   Yes.

5      Q.   Okay. So if you haven't had a conversation

6  with the dean or the administration about what to do

7  about how to handle it, how did you expect them to

8  handle it?

9      A.   I expected anything that did come up, that we

10  would take as a case by case, and hopefully simply talk

11  with the students. I didn't address if this occurs, we

12  will do this.

13      Q.   And you say "we." Does that include you? Who

14  do you mean by "we"? You said "we" would --

15      A.   Whoever might be needed to talk with the

16  students.

17      Q.   Okay. So you put the teachers on notice that

18  the group of students had an intention of protesting;

19  right? That's the first sentence. "Teachers note that

20  we have a group of students who have an intention of

21  protesting."

22          And then you tell them that, "The district has

23  an absolute policy against protesting on school

24  campuses"; right? That's what this e-mail says; right?

25      A.   Yes.

1    Q.    And then you tell them, "If you have students

2  who are wearing a placard in protest of an issue, please

3  notify the dean, and we will handle it."

4    A.    Yes.

5    Q.    Okay.  If you were a teacher, and you got this

6  e-mail, and it says, "We have an absolute policy, please

7  notify the dean," do you think it's reasonable for that

8  teacher to believe that what the student is doing is

9  against a school policy?

10          MR. JENSEN:  Object to form.

11    A.    I think it's possible.

12    Q.    Okay.  And your testimony here today is that

13  even though you didn't have a conversation with the

14  administration about what specifically to do, you felt

15  that they would simply talk to the students?  Is that

16  what you said?  Why don't you tell me again.

17    A.    I said that's where we'd always start.

18          MR. JENSEN:  If you need a refresher, let me

19      know, and I can have the court reporter read it

20      back.

21          THE WITNESS:  Okay.

22          MR. JENSEN:  Since counsel doesn't remember

23      what your earlier testimony was.

24  BY MS. LITTRELL:

25    Q.    In the next sentence in this e-mail that you

1  sent to the teachers and staff, you say, "If a student

2  refuses to participate in class by taking part in a

3  silent protest, that is considered a disruption."

4       On what did you base this statement?

5  A.   What did I base this statement?

6  Q.   Uh-hum.

7  A.   What I said was if they are refusing to

8  participate in class, let us speak with them.

9  Q.   No, that's not what you said.  You said that's

10 considered a disruption.  I'm trying to understand on

11 what basis you made that assertion.

12 A.   That a teacher was trying to conduct a

13 classroom discussion, and students might be refusing to

14 participate.

15 Q.   Had that happened in the past?

16 A.   Do students refuse to participate in classroom

17 discussions, yes.

18 Q.   By taking part in the silent protest?

19      What you don't say is if a student refuses to

20 participate in class, that's considered a disruption.

21 You don't say that.

22 A.   Uh-hum.

23 Q.   You say only if they're taking part in a silent

24 protest, that's considered a disruption.  That's what

25 that sentence says; right?

1        A.    It does says that here.

2        Q.    Okay.  And then what the teachers are to do is

3   to notify the administration; is that right?

4        A.    Yes.

5        Q.    Okay.  And if a student causes a disruption,

6   are there particular ways that the administration is

7   supposed to handle that?  Is there a policy about that?

8        A.    You'd have to be specific about a disruption.

9   There are all different kinds.

10       Q.    Okay.  A disruption by refusing to participate

11  in class by taking part in a protest, that kind of a

12  disruption, is that subject to the list of consequences

13  you laid out earlier, verbal reprimand, in-school

14  suspension, out-of-school suspension?

15       A.    Any student refusing to participate would be

16  subject to the student code of conduct.

17            (Plaintiff's Exhibit No. 18 was marked for

18        identification.)

19       Q.    I'm handing you what's been marked Exhibit 18.

20            MR. JENSEN:  You marked it 17.

21            MS. LITTRELL:  Can you hand that back to me and

22        I will mark it 18?

23  BY MS. LITTRELL:

24       Q.    Exhibit No. 18, do you recognize this document?

25       A.    Without the cover, I couldn't tell you the name

1    of it.

2        Q.    What does it appear to be?

3        A.    It's a school document, district document.

4        Q.    DeSoto County School District document?

5        A.    It's a district document of some sort, yes.

6        Q.    A district.  So it could be from any district?

7        A.    No.  It says DeSoto County.

8        Q.    And you see it has a stamp, board approved July

9    12th, 2011, on the front?

10       A.    Yes.

11       Q.    Turn to Page 3.  Do you see this notice to all

12   parents from Adrian Cline?

13       A.    Yes.

14       Q.    Have you ever seen this page before?  Does it

15   appear to be something that would be within the DeSoto

16   County School District policy manual?

17       A.    It does.

18       Q.    Can you turn to Page 24, please?

19       A.    Classroom teacher's role?

20       Q.    Yes.  So on this page, the school district sets

21   out what a teacher can do if a student fails to follow

22   the rules.  So, for example, if the student refuses to

23   participate in class, the teacher has certain steps that

24   they are instructed or allowed to make.  Is that a fair

25   reflection of this document?

1      A.    Yes.

2      Q.    Okay.  And so some of those steps, if a student

3  refuses to participate in class, may include withholding

4  a privilege, a time out, counseling, detention, extra

5  work, task assignment, or parent conference; right?

6      A.    Uh-hum.

7      Q.    Why didn't you allow teachers to proceed as

8  usual if a student refused to participate in class?

9      A.    Because I wished to have the students to be

10  allowed to discuss with administration rather that get

11  into an argument with a teacher over classroom policy.

12     Q.    But your e-mail doesn't say send students to

13  the dean so we can discuss the situation; isn't that

14  right?  It says notify the situation, and we will handle

15  it?

16     A.    Correct.

17     Q.    And you -- and you testified earlier that you

18  didn't discuss with administration how they would handle

19  it; is that right?

20          MR. JENSEN:  Object to form.

21     A.    We did not discuss specific incidents and what

22  would be done each specific incident.

23     Q.    What did you discuss?

24     A.    That the students needed to be able to -- that

25  it would be better to talk with students and try to

1  resolve an issue rather that going in to a lot of

2  disciplinary issues when there was no need for it.

3      Q.   So your position in the e-mail is that

4  protesting is against school district policy, and that a

5  student who refuses to participate by taking part in a

6  protest is considered a disruption, but now your

7  testimony is that you just wanted to be able to talk

8  with them if that happened; is that right?

9          MR. JENSEN:   Object to form.

10     A.   Always the school does what is in the best

11 interest of the student's education, and if we can

12 resolve a situation by talking through it, then that's

13 in the best interest of the student's education.

14     Q.   What do you mean by talking through it to

15 resolve it?  Does that mean asking them to remove their

16 placard?                              .

17     A.   It might.

18     Q.   And why would you ask a student to remove their

19 placard when they are taking part in a protest?

20         MR. JENSEN:   Object to form.

21     A.   I didn't ask a student to remove a placard.

22     Q.   Why would you, though?

23         MR. JENSEN:   Object to form.

24     Q.   If that's one of the options of talking through

25 it that you just testified to?

1    A.    I don't know why I would.  Since I didn't, I
2  would have no reason to know why I would.

3    Q.    Would you approve of your administrators or the
4  dean of students asking a student to remove their
5  placard?

6        MR. JENSEN:  Object to form.

7    A.    I have enough faith in my administrators to
8  know that they would not have started with that.

9    Q.    They would not have started with that?

10   A.    They would have had a discussion with a student
11  about how best to participate and work on their
12  education that day.

13   Q.    So your testimony is that because you were
14  concerned with students' education, you sent an e-mail
15  to the teachers to have the students removed from class
16  instead of just allowing the teacher to deal with it as
17  part of a normal course of business?

18        MR. JENSEN:  Object to form.

19   A.    Yes.  It's easier to speak with one student
20  rather than have a teacher stop class to have a
21  discussion, and then all of the entire class is stopped.

22   Q.    Okay.  But generally when a student refuses to
23  follow directions, you would agree that there is steps
24  that the teacher takes and is authorized to take short
25  of sitting the student out of instruction time; is that

1  right?  Is that what this document says?

2     A.    Most often.

3     Q.    Okay.  And it's not until step three, according

4  to the classroom teachers' role, if all these other

5  steps fail, that a student gets sent out of class to the

6  dean of students; is that right?

7     A.    And this is specific to disciplinary action,

8  yes.

9     Q.    It sounds like it's specific to when a student

10  fails to follow the rules.  That's what it says in step

11  one, when a student fails to follow the rules.

12     A.    Yes.  And a teacher has taken step one and step

13  two, at that point there would very likely be

14  disciplinary action.  We're trying to circumvent going

15  through all of those steps.

16     Q.    Uh-hum.  So is it your testimony that even

17  though you set out to tell all of the teachers that

18  protesting is against district policy, that really what

19  you wanted to have happen is for the administrators to

20  have an opportunity to talk to the students if they were

21  taking part in this protest, which is against an

22  absolute policy?  Is that your testimony?

23         MR. JENSEN:  Object to form.

24     A.    What I wanted to do is resolve any difficulties

25  with the least intrusion in the classroom and to the

1   students.

2       Q.   And how is sending an e-mail to all of the

3   teachers telling them that there's an absolute policy

4   against protesting and alerting them that there are

5   students who have an intention of protesting, and then

6   telling them that if a student is wearing a placard in

7   protest of an issue or taking part in a protest by being

8   silent, that's cause to notify the dean as opposed to

9   waiting to see if there is actually any disruption?

10          MR. JENSEN:  Object to form.

11      A.   If I wait to see, then there's already been a

12  discussion, and likely an argument with the student and

13  the teacher.

14      Q.   And by a discussion, in particular with respect

15  to day of silence, which is designed to generate

16  dialogue, is that what you were trying to do is ensure

17  that that conversation didn't happen?  That students who

18  were taking part in this protest designed to call

19  attention to an issue would not be able to call

20  attention to that issue?

21          MR. JENSEN:  Object to form.

22      A.   No, that's not the intention.

23      Q.   Didn't you just testify that you wanted to

24  ensure that there wasn't a classroom discussion?

25      A.   I wanted to ensure that the teacher did not

1  take class time to have a discussion with a student who

2  was refusing to answer.

3      Q.    In your e-mail you don't say anything about

4  refusing to answer; is that right?  Take a look at it.

5  It's Exhibit 17.

6      A.    Uh-hum.

7      Q.    In fact, it says if you have students who are

8  wearing a placard in protest of an issue, that's a

9  concern, that's a reason to notify the administration;

10 is that correct?

11     A.    Students who are wearing the placards were

12 being silent, so they were not talking.  So there's the

13 difficulty.

14     Q.    These are disjunctive and separate sentence?

15     A.    Uh-hum.

16     Q.    So the first sentence says, "If you have

17 students who are wearing a placard in protest of an

18 issue, notify the dean."

19     A.    Uh-hum.

20     Q.    Okay.  Nothing in that sentence has any

21 reference to refusing to answer a question; right?

22     A.    Not in that sentence, no.

23     Q.    And that's what you're putting teachers on

24 notice of, that if you have students who are wearing the

25 placard, notify the dean?

1          MR. JENSEN:  Object to form.

2     Q.   Is that accurate?  Is that what this e-mail

3  says?  It may not have been what you meant, but is that

4  what the e-mail says?

5     A.   The e-mail says that if there is a student that

6  is participating, notify administration, take them out

7  of the classroom.

8     Q.   Okay.

9     A.   They're all educated personnel.  I didn't have

10  anybody who didn't interpret it that way.

11     Q.   And were you notified of any students?

12     A.   I was not.

13     Q.   Okay.  When were you first notified about any

14  discipline or any students that were removed from class,

15  or otherwise engaged with the dean or the

16  administration, as a result of day of silence?

17     A.   When was I first notified?

18     Q.   Uh-hum.

19     A.   It was, I believe, a little later in the day of

20  that day.  There was some sort of big event that went on

21  that morning that I was tied up with for several hours.

22  I don't even know what it was.  Something pertaining to

23  graduation.  So it would have been later in the morning

24  or early afternoon possibly.

25     Q.   And tell me about that, that first

1    conversation.  Who was it with, what was it about?

2        A.   I believe it was the dean's secretary.

3        Q.   Ms. Howell?

4        A.   Yes.

5        Q.   What did she say to you?

6        A.   She said that they had had Amber Hatcher and

7    her grandson up in the office.

8        Q.   That's all that was said?

9        A.   I believe she said Amber had been disciplined.

10   She didn't clarify anything much.  She was either

11   waiting for a parent or she had gone home.  And her

12   grandson, she had sent her grandson home.

13       Q.   Does the dean's secretary have the authority to

14   send her grandson home?

15       A.   She's his guardian.

16       Q.   And so she could send him home at any given

17   point of any given day if she wanted to?

18       A.   Yes.

19       Q.   Did she tell you she had sent him home for any

20   reason?

21       A.   Yes.  He had refused to speak in class, and

22   then he had refused to speak to her.

23       Q.   Anyone else talk to you about R▮▮▮ M▮▮▮'s

24   actions on that day?

25       A.   No.

1    Q.    The only conversation you had about R     's

2    activities on that day was with his grandmother?

3    A.    I don't recall speaking with anybody else.

4    It's possible his name came up with the dean later, but

5    I -- grandmama had sent him home.

6    Q.    And tell me what was said to you about Amber

7    Hatcher.

8    A.    She had simply said that Amber had been up at

9    the dean's office and that -- I don't recall whether she

10   was still there and was waiting for her dad or couldn't

11   reach him.    That there had been some -- she said she had

12   been disciplined.    That was about the extent of it.

13   Q.    Did you talk to anybody else about Amber

14   Hatcher that day?

15   A.    Later that day, yes.    Not at that time.

16   Q.    Okay.    What was the next conversation you had

17   about Amber Hatcher?

18   A.    I would have relayed some information over to

19   the superintendent's office that Amber Hatcher had been

20   disciplined, what I had been told by the dean's

21   secretary.

22   Q.    Why would you take it -- why would you take

23   that step to relay to the superintendent's office that a

24   student had been disciplined?

25   A.    Because this was an event that he had said no

1  to.

2      Q.    Do you remember what time you relayed that
3  information?

4      A.    No, but I do think I sent it in an e-mail.

5      Q.    Do you remember talking to him on that day, the
6  superintendent?

7      A.    Through -- him or his secretary, I'm sure I
8  did.  I don't recall the exact conversation.  I notified
9  his office.  And then when I spoke with the dean later,
10  and she clarified that wasn't exactly what had happened,
11  so then I had to recontact him and say, no, the
12  secretary didn't give me all the information.  I talked
13  to the dean, here's the clarified information.  And that
14  could have been the next day.

15      Q.    But it was either on the day of silence or the
16  next day?

17      A.    Yes.  I had been in several meetings.  The
18  dean's daughter was ill, she was in a meeting.  So it
19  took us a little while to get some communication.

20      Q.    On the day of silence itself, you testified
21  that the first conversation that you had with anyone on
22  your staff about day of silence, any students
23  participating in day of silence was Linda Howell.  Is
24  that accurate?

25      A.    I said the first information I had about Amber

1   or a student coming up to the dean's office was from

2   Linda Howell.

3       Q.   Okay.  Well, tell me about any conversations

4   you had relevant to day of silence prior to --

5       A.   I don't remember having any other conversation

6   about it.

7       Q.   Do you remember having any conversations about

8   Amber Hatcher prior to speaking with Linda Howell?

9       A.   Not that morning, no.  I was in a meeting for a

10  while.

11      Q.   Okay.  Did you speak to your administrators or

12  dean of students prior to speaking to Linda Howell about

13  day of silence activities?

14      A.   I don't remember having a conversation with

15  them that morning.  I just really don't remember.

16      Q.   Tell me the next conversation that you recall

17  on the day of silence about Amber Hatcher or day of

18  silence activities or any students who were involved in

19  the day of silence activities.

20      A.   After which?  I just named four conversations.

21      Q.   I'm sorry.  Could you --

22      A.   I had the conversation with Linda Howell.

23      Q.   Okay.  One conversation with Linda Howell.

24  Tell me your next --

25      A.   I had a conversation with probably the

1    superintendents's secretary.

2       Q.    Probably.  You don't recall?

3       A.    No.

4       Q.    Okay.  So you're testifying you had four

5    conversations, but you don't recall one of them; is that

6    right?

7       A.    I had a conversation with someone in the

8    superintendent's office.  I believe it was the

9    secretary, simply giving her some information.

10      Q.    What information?

11      A.    That I had spoken with the dean's secretary,

12   and that she had said Amber and her grandson --

13      Q.    Go ahead.

14      A.    -- had both been in the dean's office.

15      Q.    Had both been in the dean's office.  Is that

16   all you relayed to the superintendent's office?

17      A.    I said that Amber had been disciplined.  She

18   had given me information that Amber had come to the

19   dean's office, and she had been disciplined for

20   participating in the day of silence.  That was about all

21   the information that I got from her.

22      Q.    And did you reprimand anybody for disciplining

23   a student for taking part in day of silence?

24      A.    That was the dean that was speaking with her,

25   not a teacher.  And I had not yet been down to the

1   dean's office to speak with her.  That was the secretary

2   I had spoken with.

3       Q.   Okay.  Secretary -- the dean's secretary told

4   you that Amber had been disciplined for participating in

5   day of silence?

6       A.   She didn't tell me any specifics really.

7       Q.   We'll let your testimony speak for itself.

8            You communicated to somebody in the

9   superintendent's office that Amber had been disciplined,

10  and also that R█████ -- did you mention him by name in

11  that conversation?

12      A.   I don't remember.

13      Q.   Did you mention any other students who had been

14  disciplined or in any way --

15      A.   Those are the only two students I'm aware of.

16      Q.   Okay.  That had been involved in the day of

17  silence whatsoever?

18      A.   Those were the two students she mentioned when

19  I spoke with her.  Those were the only two students I

20  was aware of.

21      Q.   So in your communication to the

22  superintendent's office, you only mentioned those two

23  students in terms of any day of silence activities; is

24  that right?

25      A.   That's all I remember mentioning.

 1    Q.    Tell me about the third conversation that you
 2   had.
 3    A.    Then I would have had a conversation with the
 4   dean, and I don't recall whether it was that afternoon
 5   or the next morning, clarifying exactly what had gone
 6   on.
 7    Q.    This was a Friday.  So when you say the next
 8   morning, do you mean Saturday?
 9    A.    No, Monday.  It was either Friday afternoon or
10   Monday morning.
11    Q.    So it's your testimony that the next
12   conversation that you had about day of silence
13   activities was with the dean; is that right?
14    A.    The next conversation about any student who had
15   received any sort of discipline or who had come to the
16   dean's office in regards to the day of silence was with
17   the dean.
18.   Q.    Okay.  Tell me about that conversation.
19    A.    She had clarified that Amber had come to the
20   office.  She had not called her up.  She had arrived in
21   the front office.  There were multiple students standing
22   there waiting for bus passes.
23    Q.    Let me interrupt you for a second because I'd
24   like to figure out how this conversation started.
25   You're jumping in, unless that's exactly how it started.

1    The conversation with the dean was hello, hello, what

2    did you say next?

3         A.    What went on with Amber and R██████?

4         Q.    Okay.   And?

5         A.    She said that Amber had come to the dean's

6    office.   She had not been called.   And when she arrived,

7    there were a number of students standing there asking

8    for bus passes.   She assumed Amber was one of those

9    students.   Made a general request, "What are you all

10   doing here?"   Amber began cursing her.

11        Q.    Is that what she said to you in this

12   conversation either on Friday or Monday?

13        A.    Uh-hum.

14        Q.    Okay.   Did she tell you what she said?

15        A.    I don't remember what her words were.   Amber

16   began cursing her.   There were multiple students and two

17   secretaries there.

18        Q.    Okay.   Who were those students?

19        A.    I don't know who the students were.   I just

20   know the group -- whoever came up for bus passes,

21   because she was in a group.

22        Q.    This, of course, is hearsay; you didn't see

23   this?

24        A.    I was not there.

25        Q.    Okay.   The information that was passed on to

1   you is that there were multiple students waiting for bus

2   passes, and that Amber was amongst them?

3       A.   Yes.

4       Q.   What else did she tell you about those students

5   waiting for bus passes?  Were they standing, sitting?

6       A.   They were all standing up.  She must have had a

7   student in her office or been on the phone, because she

8   opened the door to her office, there was a group of

9   students.

10      Q.   In her office?

11      A.   In the hallway outside of her office.

12      Q.   You just said she opened the door?  What door?

13      A.   To her office.

14      Q.   She opened the door to her office, and there

15  were students standing in the hallway?

16      A.   She was in her office.  She came out of her

17  office, and there were a group of students in the

18  hallway.

19      Q.   Did she tell you how big that group was?

20      A.   No.

21      Q.   Could have been three students, could have been

22  30?

23      A.   I didn't ask.

24      Q.   Okay.  You don't know the number of students?

25      A.   No.

1    Q.   And you said there were also a number of -- you

2    were told that there were a number of other witnesses?

3    A.   I said there were a number of students in the

4    hallway that were waiting for bus passes.

5    Q.   Did she say that there were other people

6    around?

7    A.   She didn't say that, no.

8    Q.   Okay.  Tell me what she said next.

9    A.   She asked them something along the lines of

10   what are you all doing here, what do you all want?

11   Q.   Is she in charge of bus passes, the dean?

12   A.   They're handled in the office right next to her

13   where her secretary and the secretary are.

14   Q.   Did she say whether those students were in line

15   for the office next door?

16   A.   She said there were a group of students outside

17   her door, which would be in front of the window of

18   attendance in the dean's office.

19   Q.   And she said to you that she asked this group

20   of students what do you want?  Is that your testimony?

21   A.   Something along those lines.

22   Q.   Okay.  And then what did she say?

23   A.   She said Amber began cursing.

24   Q.   Uh-hum.

25        Go ahead.

1    A.    She tried to get her into her office.   She
2  refused initially.

3    Q.    Uh-hum.

4    A.    And then came in.   And she settled down once
5  she got into the office, and they tried to reach dad.
6  And she was going to write her up for whatever the code
7  is for cursing at a, you know, a school board employee.
8  I think she simply held her there until the dad came.   I
9  don't think she ever actually put that code into the
10  system.   I could be wrong.   I'm not positive about that.

11    Q.    You're testifying to what you remember her
12  saying.

13    A.    Uh-hum.

14    Q.    And you're also guessing a lot.   So just
15  confine your answers, if you would, to what Dean Jones
16  told you on that Friday or Monday.

17    A.    She told me that she got Amber into the office.

18    Q.    The first time that you spoke to her about
19  Amber's discipline on day of silence.   This is the first
20  conversation.

21    A.    Uh-hum.

22    Q.    We don't know if it was Friday or Monday?

23    A.    Uh-hum.

24    Q.    And what you recall her saying, we've gone all
25  the way through to where she went into her office, and

1    you say she told you that she calmed down?

2        A.    Uh-hum.

3        Q.    And then you told me that she tried to reach

4    her father?

5        A.    Uh-hum.

6        Q.    Okay.  And what do you recall her telling you?

7        A.    They couldn't reach the father.  So Amber was

8    waiting in ISS while they tried to reach him.

9        Q.    That sounds like it was happening in real time

10   as opposed to the day after.  You said you talked to her

11   after the discipline, right, instead of Friday after the

12   discipline or Monday after the discipline.  So -- and

13   now you're saying that what she told you was that Amber

14   was waiting in ISS?

15       A.    When Amber came into her office, and they

16   couldn't reach her father, she waited in ISS while they

17   tried to reach the father.  It was a time period before

18   they could reach him.

19       Q.    What else do you remember her telling you?

20       A.    That she had disciplined Amber for cursing at

21   her.  That it was not related to anything else.

22       Q.    She specifically said it wasn't related to

23   anything else?

24       A.    Yes.

25       Q.    She specifically said it was not related to day

1  of silence?

2      A.    Uh-hum.

3      Q.    Did she mention day of silence to you at all in

4  that conversation?

5      A.    Yes, because Amber said it was related, and the

6  dean said, no, it was not.  So I asked her if Amber had

7  a history of cursing at her, and she said yes, and

8  pulled out the discipline file where she did.  It had

9  surprised me.  She never cursed at me.  I had never seen

10 that behavior.

11     Q.    Tell me about this discipline history that you

12 looked at.  Do you recall what -- how many infractions

13 for cursing you are now testifying she showed you?

14     A.    I think she had two.

15     Q.    And, again, you weren't there; right?

16     A.    No, I wouldn't have handled the discipline.

17     Q.    So you never heard Amber cuss at anyone prior

18 to this?

19     A.    No, I had never heard her cuss at anyone.

20     Q.    What else did the dean of students, Dean Jones,

21 say to you in this conversation?

22     A.    That was about it regarding Amber.

23     Q.    What else about day of silence or any actions

24 that she took on day of silence?

25     A.    R███████ had come up, but that his grandmama had

1   sent him home.

2       Q.   Is that all she said?

3       A.   Well, he wouldn't talk in class, and then he

4   refused to answer his grandmama.  She was a little more

5   colorful about what grandmama said to R███████.  But she

6   sent him home.  Grandmama sent R███████ home.

7       Q.   This is again what the dean told you, you

8   didn't witness it?

9       A.   No.

10      Q.   What the dean has told you in this first

11  conversation is sort of post day of silence?

12      A.   Yes.

13      Q.   Was about Amber?

14      A.   Yes.

15      Q.   And about R███████?

16      A.   Yes.

17      Q.   And what else?

18      A.   That was it.

19      Q.   Okay.  Then did the conversation end?

20      A.   Yes.

21      Q.   What happened -- what was your next

22  conversation you had about day of silence that you

23  recall?

24      A.   I would have clarified to the superintendent's

25  office the reason why Amber had been disciplined.

1      Q.    Did you?

2      A.    Yes.

3      Q.    When did you do that?

4      A.    After that conversation.  And I believe it was

5   Monday.

6      Q.    Okay.  So right after the conversation with

7   Dean Jones in which you clarified that Amber had not, in

8   fact, been disciplined for day of silence --

9      A.    Yes.

10     Q.    -- that you thought she had but, in fact, it

11  had been for a different reason?

12     A.    Yes.

13     Q.    And that happened right after your conversation

14  with Dean Jones?

15     A.    Yes.

16     Q.    Okay.  And that conversation with Dean Joan was

17  either on Friday or Monday following day of silence?

18     A.    Yes.

19     Q.    What was your next conversation that you had

20  about day of silence?

21     A.    I don't recall any conversations coming up

22  again directly related to that until Lambda Legal would

23  have contacted the superintendent's office.

24     Q.    Is that in reference to the Open Records Act

25  request, is that what --

1    A.    Whatever is the first request was that came

2    through to the superintendent's office.

3    Q.    What happened after that came through -- do you

4    recall what the conversation was after that occurred?

5    A.    The superintendent's office requested all the

6    records that we had, and we just copied them and sent

7    them over.

8    Q.    Tell me about the standard operating procedure

9    for getting bus passes.  What's the policy, what's the

10   practice regarding students getting bus passes?

11   A.    There's not so much of a procedure.  It's not a

12   big event at the high school, unlike elementary.  Most

13   students have their bus passes before the year starts.

14   But sometimes we have a family that changes locations,

15   and we have to get bus passes for them that day, or we

16   have a new family that's moved in, and, of course, bus

17   pass have to be issued that day.  Somebody wants to go

18   spend the night with a friend.  So we have to get bus

19   passes issued correctly for that day.

20         But ordinarily it's not a -- you know, it's a

21   parent calling in and asking, I need to put my child on

22   the bus for this day, can we get a bus pass.

23   Q.    When that happens, how is that handled?  Do

24   students come to the --

25   A.    To the attendance secretary.

1    Q.   Okay.  Do they get called up by the attendance

2  secretary or do they go -- they have to affirmatively go

3  to the attendance secretary and ask?

4    A.   It could have been office driven or student

5  driven, either way.

6    Q.   Does the dean ever hand out bus passes?

7    A.   If they're busy in the office, she very likely

8  could have.

9    Q.   Is that part of her job responsibilities?

10    A.   If they're busy, and she needs to help out.

11        (Recess from 9:40 p.m. until 9:45 p.m.)

12  BY MS. LITTRELL:

13    Q.   Regarding the e-mail that you sent to the

14  teachers that we've talked to about the day of silence,

15  did you talk to anybody about sending that e-mail before

16  you sent it?  Did you talk to anybody specifically about

17  that e-mail before you sent it?

18    A.   I really don't recall whether I did or not.

19    Q.   So you might have?

20    A.   I don't recall whether I did or not.

21    Q.   Did the superintendent direct you to send that

22  e-mail?

23    A.   I don't recall him specifically saying

24  something.

25    Q.   Does that mean he might have directed you to

1    send the e-mail?

2        A.    I don't recall.

3        Q.    So in your -- in the first conversation that

4    you testified about having with the superintendent's

5    office, you told them that disciplinary action had been

6    taken against Amber based on her participation in the

7    day of silence?

8        A.    Yes.

9        Q.    At that point were you told what she had done

10   that was a violation of school policy?

11       A.    The dean's secretary had told me she had been

12   disciplined, and it had to do with the day of silence.

13   I don't know that she said more than that.  I really

14   don't remember.

15       Q.    Okay.  And if you don't remember, then you

16   don't recall asking for more details?

17       A.    I remember she said that she was disciplined,

18   and that it was due to the day of silence.  I remember

19   she said she had been disciplined for being in the

20   office on the day of silence.

21       Q.    Uh-hum.

22             And then we've -- to your knowledge, has the

23   dean of students ever sent for someone to come to her

24   office in order to give them a bus pass?  To your

25   knowledge, has that ever happened?

1    A.    To my knowledge, no.

2    Q.    How does it work in terms of discipline

3 logistically?  How do students get from the classroom to

4 the dean's office?  Do you have intercom, do you use

5 cell phones?

6    A.    It depends on the infraction.  Teachers use an

7 online format to write a student up.  If it is something

8 that is not an emergency or not a direct disruption to

9 the classroom, they may write the form up.  When the

10 dean gets it, she deals with the student at that point.

11 The student may have remained in the classroom.

12    Q.    Uh-hum.

13    A.    More likely, the teacher might call the dean's

14 office and say I'm sending someone, I'll get the form

15 written as soon as I can, I'm in the middle of teaching.

16    Q.    What do you mean, call on a cell phone or

17 intercom or --

18    A.    Either intercom or the phone line.  They've got

19 both in their rooms.

20    Q.    Okay.  So there's a phone that's in every

21 teacher's room that they can contact the dean?

22    A.    Yes.  Yes.

23    Q.    And so in your e-mail when you say notify the

24 administration, is that what you meant?

25    A.    Call someone, yes.

1    Q.    Did you mean to send the student to the dean,

2  is that one way in which the --

3    A.    I didn't specify.  It could have been anything.

4    Q.    Could have been anything.  What does that mean?

5    A.    They could have called someone, they could have

6  sent an e-mail, they could have sent the student.

7    Q.    Okay.  Do you recall any other conversations

8  that you had with anyone regarding day of silence other

9  than the ones that you have talked about right now, just

10  to make sure that we've exhausted that?

11    A.    Those are the ones that I recall.

12    Q.    Okay.  Do you recall any other communications

13  besides the conversations that you had about Amber and

14  day of silence?

15    A.    About the day of silence?

16    Q.    Uh-hum.

17    A.    I don't recall any others.

18    Q.    Okay.  And when you were testifying earlier you

19  said there were four conversations that you could

20  recall.  Let me make sure I have these down.

21          The first is with Linda Howell, the dean's

22  secretary.  She is the one who originally told you that

23  two students had gotten any consequence for

24  participating in day of silence, R██████ and Amber.

25          You said that you communicated to the

1  superintendent's office to give them information that

2  Amber and R&#9608;&#9608;&#9608; had been involved.  Do you remember

3  how that communication took place?

4      A.   I believe I sent an e-mail.  Often when I do

5  that, the secretary has called and said just send me an

6  update, and then I'll respond with an e-mail.  But I

7  don't recall whether they had called or not.

8      Q.   Do you recall whether you were prompted to send

9  that communication?  That is, did you affirmatively take

10 steps to communicate with the superintendents's office

11 or did you respond to a request, hey, what's going on

12 with the day of silence?

13     A.   I just said I don't recall whether they had

14 called me first or whether I sent the e-mail over.

15     Q.   Could have been either way?

16     A.   Could have, uh-hum.

17     Q.   And then the third conversation was with Dean

18 Jones, the conversation took place --

19     A.   Yes.

20     Q.   -- either Friday or Monday?

21     A.   Yes.

22     Q.   And that's where the dean clarified to you what

23 actually happened with Amber?

24     A.   Yes.

25     Q.   And what she understood had happened with

230

1   R█████ and his grandmother?

2       A.   Yes.

3       Q.   Did she say she was a witness to that

4   conversation with R██████ and the dean's grandmother?

5       A.   Who?

6       Q.   With R█████ and his grandmother.

7       A.   She was in her office.  They sit side by side.

8   I don't know that she visually saw it.

9       Q.   You don't know if she heard it either?

10      A.   No, I think she heard it.

11      Q.   She said that she heard it?

12      A.   Yes.

13      Q.   And then the fourth conversation is the

14  conversation that you had with the superintendent's

15  office.  Do you recall if that was with the

16  superintendent himself or with one of the secretaries

17  where you clarified that, in fact, Amber had been

18  disciplined solely apart from day of silence?

19      A.   I think it was with the secretary, but I'm not

20  a hundred percent positive.

21      Q.   Okay.  And do you think that that

22  conversation -- was it a conversation or was it an

23  e-mail which you clarified?

24      A.   I know I clarified it in e-mail.  I don't

25  recall if we had a verbal conversation prior to it or

1   not.

2      Q.    Okay.  Do you remember telling the

3   superintendent anything else besides the clarification

4   regarding Amber?

5      A.    That's all I remember.

6      Q.    Okay.  And then the next conversation that you

7   recall happening was in response to a request for

8   records; is that right?

9      A.    That's the one I'm positive of, yes.

10     Q.    What did you do after the superintendent's

11  office got in touch with you and asked for records

12  relating to day of silence?

13     A.    What did I do?

14     Q.    Uh-hum.

15     A.    I had my secretary send the records.

16     Q.    Do you recall looking at those records?

17     A.    I may have.  I would have had to provide a

18  couple of the e-mails to her.  So I would have glanced

19  at those as I was providing them to her.

20     Q.    Would you have altered any documents at that

21  point?

22     A.    I would probably have written something

23  specific for her to send.  But would I have changed a

24  document, no.  There would be no purpose.

25          (Plaintiff's Exhibit No. 19 was marked for

232

1          identification.)

2               MS. LITTRELL:  I think we're on Exhibit 18.

3               THE COURT REPORTER:  Nineteen.

4          Q.   I will show you what has been marked as Exhibit

5     19.  What is this document that I've handed you?

6          A.   This is an e-mail from me to the

7     superintendent's secretary.

8          Q.   Do you know why you CC'd yourself?

9          A.   I regularly CC'd myself on almost any e-mail

10    that I sent.

11         Q.   But does this go to your work e-mail or does

12    this go to a different address?

13         A.   No, it's my work e-mail.

14         Q.   And the subject is Friday's protest?

15         A.   Yes.

16         Q.   Okay.  So is this the document -- is this the

17    e-mail that you sent to Melba?  Is this the clarifying

18    e-mail or is this the first e-mail?

19         A.   No, this would have been the first e-mail.

20         Q.   Okay.  So how did you get the information that

21    Amber was dressed in a shirt protesting the occasion?

22         A.   It must have come from Mrs. Howell.  I remember

23    her telling me it was with the protest.  I don't

24    remember her telling me a shirt, but that would have

25    been the only person I had gotten the information from.

1    Q.    Why did you think it was important to include
2  that in the information sent to the superintendent's
3  office.  It seems pertinent, isn't it?
4    A.    It's a detail that would have been related.
5    Q.    Okay.  So this is the first e-mail that you
6  sent.  And in it you say that two other students were
7  asked to comply with removing their protest tags; isn't
8  that right?
9    A.    Yes.
10   Q.    Okay.  But earlier when I asked you if there
11  had been any other students involved, you testified that
12  there had not been.
13   A.    Well, there weren't any other students involved
14  with any disciplinary action.  I don't remember these
15  two students.  So I don't think I would have ever even
16  known their names.
17   Q.    How did you get the information that there were
18  two other students who were involved?
19   A.    Must have come from Mrs. Howell at the time.
20  That's the only other person I had spoken with.
21   Q.    But you don't recall who told you?
22   A.    No.
23   Q.    And you don't recall any other details about
24  those students?
25   A.    No.

1    Q.    Again, referencing the free speech policy that

2    says students have the right to express divergent points

3    of view and have freedom of expression, help me

4    understand how asking students to remove their protest

5    tags complies with the free speech policy.

6         MR. JENSEN:  Object to form; lack of

7    foundation.

8    A.    I didn't ask these two students.  I was simply

9    reporting what I got as a first notice before going down

10   and confirming and seeing what actually did happen.

11   Q.    All right.  But you are reporting that students

12   were asked to remove their tags; is that right?

13   A.    Yes.

14   Q.    Okay.  And did you -- does that, in your

15   opinion, comport with the free speech policy?

16        MR. JENSEN:  Object to form.

17   A.    I wasn't stating an opinion to her about this.

18   I simply was saying I was told there were two.  I hadn't

19   yet reached the dean to confirm anything.

20   Q.    Do you remember earlier when we looked over

21   Exhibit 1, which was the principal's -- the high

22   school's job description --

23   A.    Yes.

24   Q.    -- that it's the principal's responsibility to

25   supervise the operation of all activities and functions

1   at the school?  Does that sound familiar?

2       A.   Yes.

3       Q.   And in number 46 it says the responsibilities

4   to implement the school board policies, state statutes

5   and federal regulations, you agreed that that was a

6   principal's responsibility?

7       A.   That's all school board's policies

8   responsibility.

9       Q.   I'm sorry?

10      A.   That responsibility is for every school board

11  member, employee.

12      Q.   This is specifically about the principal.

13      A.   It is only on the principal's list, yes.

14      Q.   Okay.  And so asking students to remove their

15  expressive messages, is that in compliance with school

16  board policies?

17          MR. JENSEN:  Object to form; lack of

18      foundation.

19      A.   I didn't ask the students to remove these.  I'm

20  simply reporting that I was told someone had.

21      Q.   Isn't your responsibility to supervise the

22  assigned personnel?

23      A.   Yes.

24      Q.   And by Florida law, isn't it the principal's

25  responsibility to direct the activities of school

1  personnel?

2       MR. JENSEN:  Object to form.

3    Q.   To your knowledge, is that Florida Statutes?

4    A.   Within scope, yes.

5    Q.   I'm sorry.  With what?

6    A.   Within scope, yes.

7    Q.   Within scope.

8       So if I'm reading the e-mail correctly, and

9  please correct me if I'm wrong, you're the principal of

10  the high school, and you had the authority to direct the

11  activities of your personnel; right?

12   A.   Correct.

13   Q.   And you had testified earlier that you were the

14  supervisor to at least the dean of students?

15   A.   Yes.

16   Q.   When we talked about chain of command --

17   A.   Yes.

18   Q.   -- and the assistant principals were underneath

19  you.  And in this e-mail you're acknowledging that

20  students were asked to remove their expressive messages.

21  Did you take any action as a result of that to find out

22  more about it?

23       MR. JENSEN:  Object to form.

24   A.   When I went back and had the talk with the

25  dean, I talked with her about Amber and R          I

1   don't recall what our conversation was about any other

2   students, whether this information was even correct or

3   not.  Our whole conversation was focused on Amber at

4   that point.

5       Q.   Does it concern you as the principal of the

6   high school that students were asked to remove their

7   expressive messages?

8            MR. JENSEN:  Object to form.

9       A.   I would expect the teachers to follow through

10  with the policies, school board policies.

11      Q.   Does that mean that they respect students'

12  right to expression or that they implement the policy

13  against protesting?

14           MR. JENSEN:  Object to form.

15      A.   That means that they follow the student code of

16  conduct, and they -- I can't even speak -- that they

17  expect expression when it does not disrupt education.

18      Q.   Okay.  So is it your testimony or your opinion,

19  I guess I should ask -- is it your opinion that if a

20  protest tag disrupted classroom instruction, that it

21  would be okay to ask the student to remove that?

22           MR. JENSEN:  Object to form.

23      A.   I don't have an opinion as it applies to

24  policies.  I follow through with what I'm instructed by

25  the superintendent to do.  I don't bring my opinion into

1 decisions.

2     Q.   With respect to executing your responsibility

3 to ensure that all the laws, school board policies and

4 federal and state laws are followed, does that include

5 the Constitution?

6         MR. JENSEN:  Object to form.

7     Q.   Is that your understanding that it includes the

8 Constitution?

9     A.   Yes.

10     Q.   So according to two e-mails that you have sent,

11 as an administrator, once as an assistant principal and

12 once as a principal, you're aware that students are told

13 to remove signs, and you're fine with that; is that

14 right?

15         MR. JENSEN:  Object to form.

16     A.   On the first e-mail, I was following the

17 instructions of the principal.  There's no opinion in it

18 as far as fine or not fine.  I was following

19 instructions.

20         On this e-mail, I am reporting what someone has

21 down that I have not yet verified.  Again, it is not my

22 opinion as to whether it was correct or not.  I was

23 simply reporting an action that I had been told.

24     Q.   And is it your opinion that it's constitutional

25 to ask students to remove their protest signs?

1           MR. JENSEN:  Object to form.

2       A.    When the students have permission for an event

3   and are participating as they should, then I don't

4   object to any of their activities.

5       Q.    And by contrast, if they don't have permission?

6       A.    If they haven't followed through with

7   permission, then I would follow the student code of

8   conduct or the superintendent's instructions.

9       Q.    What does that mean with respect to students

10  who are wearing expressive messages in the context of an

11  unauthorized event?

12          MR. JENSEN:  Object to form; lack of

13      foundation.

14      A.    Since I didn't ask them to remove these, it

15  doesn't mean anything other than I'm reporting a

16  statement to the superintendent.

17      Q.    Uh-hum.  But you're the supervisor of the

18  administrators who are forcing students to remove

19  expressive messages; isn't that right?

20          MR. JENSEN:  Object to form.

21      A.    Reporting on an event to which he has taken

22  authority.

23      Q.    Okay.  Did you look into who these students

24  were and any circumstances surrounding their having been

25  asked to remove their protest signs?

1    A.    As I said, I honestly don't remember.    I

2  remember focusing on Amber and talking with him about

3  that.   I do not remember what the actions were there.

4    Q.    Okay.   So you've raised a defense which is

5  being appealed in the Eleventh Circuit called qualified

6  immunity.   Are you familiar with that term?

7         MR. JENSEN:   Do not discuss anything we have

8     discussed or any knowledge you know solely based

9     upon my discussions with you.

10    Q.    I'm not asking about any particular

11  conversation with your attorney.   I'm asking if you

12  understand what qualified immunity is.   If you don't,

13  that's fine, I'll tell you.

14         MR. JENSEN:   Again, do not repeat anything I

15     have told you that you know solely because I have

16     told it to you.

17    A.    Very vaguely.

18    Q.    Okay.   Well, would you have any reason to

19  disbelieve me if I told you that qualified immunity is

20  that a government official is protected from making

21  discretionary decisions and actions in their

22  discretionary capacity so long as what they do does not

23  violate clearly established constitutional law?   Does

24  anything about that sound --

25    A.    Somewhat within my scope of understanding, yes.

1    Q.   Okay.  So your argument to the trial court, and

2   now on appeal in the Eleventh Circuit, was that you did

3   not violate clearly established law with respect to the

4   first amendment?

5        MR. JENSEN:  Okay.  At this point, don't answer

6        that question.  You have strayed beyond what's

7        allowed by the Court in document 80.  Her legal

8        defenses that were filed with the Eleventh Circuit

9        have nothing to do with whether or not she is

10       entitled to qualified immunity.  And it's an

11       inappropriate thing to be asking anyway.

12       MS. LITTRELL:  Mr. Jensen, that is almost

13       ludicrous.  We are -- I'm asking her about qualified

14       immunity.  The order that you referenced says that

15       we can ask questions regarding qualified immunity.

16       MR. JENSEN:  Her understanding of qualified

17       immunity has nothing to do with whether or not she's

18       entitled to qualified immunity.  You are straying

19       beyond the order.

20       MS. LITTRELL:  We don't have a lot of time.  So

21       I'm just going to ask my question.  I was trying to

22       frame it in a way that we were speaking the same

23       language.

24  BY MR. LITTRELL:

25       Q.   What is your understanding of students' first

1    amendment rights?

2        A.    Well, first amendment is the right to free

3    speech.  As a school board employee, any given

4    situation, I refer specifically to the superintendent

5    and to HR with their interpretation for the school

6    system.

7        Q.    Okay.

8        A.    And then I follow their directions with regards

9    to the school.

10       Q.    So what is your understanding of clearly

11   established law as it pertains to students' ability to

12   express themselves while on school campus?

13           MR. JENSEN:  Object to form.

14       Q.    And if you don't know, say you don't know, you

15   just refer.

16       A.    I don't know that I could give you an answer

17   that sounds...

18       Q.    Give me any answer.

19       A.    Students have a right to discuss topics, to

20   talk with each other, to express dissent and opinion.

21       Q.    Uh-hum.

22       A.    That would be the premise off which my

23   understanding is based.

24       Q.    Are there any limits on those rights?

25       A.    Yes.

1      Q.    Tell me about your understanding of those

2    limits.

3           MR. JENSEN:   Object to form.

4      A.    To impede the education of other students or

5    the running of the school system with regards to

6    education.

7      Q.    Okay.  So if students are wearing protest tags

8    or signs, and there is no impeding of the educational

9    process, would it be a violation of their constitutional

10   rights, as you understand it as the head of the school,

11   to discipline them or force them to remove those tags?

12          MR. JENSEN:   Object to form.

13     A.    I haven't objected to any students wearing the

14   tags with this incident.  I have reported to the

15   superintendent.

16     Q.    But you know that students were asked to remove

17   their tags; right?

18     A.    I know that the dean's secretary, who also gave

19   me other incorrect information, reported that to me.  I

20   do not remember whether I found out if it was correct or

21   not.

22     Q.    But did you look into it?

23     A.    I would have gone back and had the conversation

24   with the dean, yes.  I do not remember what it was.  My

25   big focus was on Amber.

1   21.   Do you recognize this document?

2       A.   I believe it's part of the contract paperwork

3   that is filled out.

4       Q.   Is that your signature?

5       A.   This one is, yes.

6       Q.   By "this one," is it above the line that says

7   signature?

8       A.   Yes, it says signature.

9       Q.   Okay.   It's notarized as well, right, by you?

10  It has been notarized, I should say?

11      A.   It has been notarized, yes.

12      Q.   And this is an oath of loyalty that you signed;

13  right?

14      A.   Yes.

15      Q.   That says that you swear or affirm that you

16  will support the Constitution of the United States.   Do

17  you remember signing this?

18      A.   This, no.   I mean, back in 2009, no, I don't

19  remember this particular paper.

20      Q.   Okay.   But is that your signature?

21      A.   Yes.

22      Q.   Okay.   Did you ever hear from Superintendent

23  Cline after you sent the e-mail to Melba that said only

24  two students have received any consequence from

25  protesting?   Did Superintendent Cline contact you?

1      A.    I believe I spoke with his secretary when I

2    sent the corrected report.  I don't think I spoke with

3    him in between that time.

4      Q.    Did he ever talk to you about a day of silence

5    say in the week after, the week following?

6      A.    I believe our conversation was through the

7    secretary.  I don't remember a direct conversation.

8      Q.    Okay.

9      A.    I don't remember it.

10      Q.    And what was that conversation?

11      A.    My information being sent, the correction to

12    the secretary.

13      Q.    And, again, the e-mail that was sent April 23rd

14    at 9:56 a.m., this is the original or this is the

15    clarification?

16      A.    Which e-mail is that?

17      Q.    It's Exhibit 19.

18      A.    That's the original.

19      Q.    So there was a clarification that was sent?

20      A.    I don't know if it was sent in e-mail or if it

21    was by phone.  It was one or the other.

22      Q.    And you don't recall whether that was a

23    conversation with the superintendent himself or with one

24    of his secretaries; is that right?

25      A.    I believe it was with a secretary.

1    Q.    And in that follow-up conversation, you

2  clarified what?  What's wrong with this e-mail, or what

3  is inaccurate?

4    A.    That Amber had not been sent to the front

5  office, that she had come on her own.  That there was no

6  information about a shirt entering into the discipline.

7  She was disciplined for cursing the dean.

8    Q.    Is there anything else that was clarified?

9    A.    That was the clarification.

10    Q.    And that was by a telephone conversation?

11    A.    It was either e-mail or by phone.  I don't

12  remember which one.

13    Q.    If you don't remember, how do you know that it

14  happened?

15    A.    Because I clarified to them that this -- that I

16  had been given incorrect information by the secretary.

17    Q.    But you're also testifying that you don't

18  recall that conversation.

19    A.    I said I don't remember if it was by phone or

20  by e-mail.

21    Q.    So you remember a conversation, you remember

22  what was said, but you don't remember how it was said?

23  Is that your testimony?

24    A.    I don't remember whether it was by phone or by

25  e-mail.

1    Q.   Do you remember whether it was face to face?

2    A.   Very unlikely.

3    Q.   But you don't recall?

4    A.   I talked to the secretary by phone several

5    times a day.  Most likely, it was by phone to the

6    secretary.

7    Q.   Could it have been directly to Superintendent

8    Cline?

9    A.   It could have been, but I don't think it was.

10   Q.   Because you don't recall?

11   A.   Because I began the conversation with a

12   secretary, and I believe I clarified it to the

13   secretary.

14   Q.   But you don't know for sure?

15   A.   I'm not positive.

16   Q.   Okay.  Do you know when that conversation took

17   place?  It was after Monday, April 23rd?

18   A.   It would have been either toward the end of

19   that day or the next day.

20   Q.   Okay.  And it might have been by e-mail; is

21   that right?

22   A.   It could have been.

23   Q.   So it would have been produced in response to

24   our request to produce all documents related to day of

25   silence?

249

1    A.    Right.

2    Q.    So if we don't have it, then --

3    A.    It was probably verbal.

4    Q.    It would have been verbal.  Okay.

5          (Plaintiff's Exhibit No. 22 was marked for

6     identification.)

7    Q.    I'm handing you what has been marked Exhibit

8    22.  I remembered some -- sorry.

9          Do you recognize this document?

10   A.    It's a disciplinary incident.

11   Q.    Okay.  Which is what?

12   A.    What's filed in the program when discipline is

13   entered for a student.

14   Q.    Okay.  And where it says incident date and

15   time, what does that reflect?  Does it reflect when the

16   incident took place?

17   A.    It would have -- I believe that prints when

18   it's entered, generated.  Generated 1:51.  April 23rd.

19   I'm not sure if that is input by hand or if that's

20   generated by the computer when it begins and when it

21   ends.

22   Q.    So it's possible that that is the time that the

23   event or the incident took place?  Like it says,

24   incident date and time.  But your testimony is that it's

25   also possible that it could be automatically generated

1    or that time and date stamp could change; is that right?

2        MR. JENSEN:   Object to form.

3    Q.   I'm trying to understand what this --

4    A.   I'm not sure if this is automatically generated

5    or not.

6    Q.   So how would -- when you're looking at records,

7    how would you know when the incident took place?

8    A.   The date should be correct.

9    Q.   So under incident date, you're saying that that

10   would be the date the incident took place; is that

11   right?

12   A.   I'm saying that should be correct, yes.

13   Q.   Okay.   That's the policy, as you understand it,

14   is to enter the date that something took place; is that

15   right?

16   A.   Yes.

17   Q.   Okay.   And so in this discipline report it says

18   Amber Hatcher's discipline report; is that right?

19   A.   Yes.

20   Q.   And it reflects that the incident took place on

21   Monday, April 23rd; is that right?

22   A.   Yes.

23   Q.   At 1:23; is that right?

24   A.   Yes.

25   Q.   Okay.   So that would be after the day of

1    silence; is that right?

2        A.    Yes, it does say that.

3        Q.    Okay.  And this is the discipline report that

4    reflects that Amber was disciplined for refusal to

5    follow directions; is that right?

6        A.    This reflects -- this says that she was sent to

7    the dean's office, where she was insubordinate and

8    disobedient.

9        Q.    So do you have any information or evidence that

10   there's another discipline incident report that was

11   generated prior to April 23rd at 1:23?

12       A.    Do I know if there was another disciplinary

13   incident?

14       Q.    Uh-hum.

15       A.    Around that time, the only one I'm aware of is

16   the one that occurred on the day of silence, whatever

17   the date was.

18       Q.    April 20th.

19       A.    Okay.

20       Q.    And so this says that Amber was sent to the

21   administration, doesn't it?

22       A.    It does say that.

23       Q.    And it says it in two places; right?

24       A.    Yes.

25       Q.    And this is at 1:23, according to the incident

252

1  time.  It was Monday, according to the incident date.

2      A.   Uh-hum.

3      Q.   And this report was generated at 1:51 p.m.;

4  right?

5      A.   Yes.

6      Q.   Okay.  So was this before or after you had the

7  conversation with Dean Jones in which she clarified?

8      A.   I had that conversation with her either Monday

9  afternoon or Tuesday morning.  I don't remember which

10  one it was.

11     Q.   So earlier you had testified it was either

12  Friday or Monday.  Are you changing your testimony?

13         MR. JENSEN:  Object to form.

14     A.   Okay.  I'm sorry.  If the incident happened on

15  Friday, then it was either Friday afternoon or Monday

16  morning, yes, you're correct.

17     Q.   Okay.  So it appears that this discipline

18  incident report was filed after your conversation, if

19  the incident date and time accurately reflects when it

20  was entered?

21     A.   It does appear there.  I've seen dates on these

22  be incorrect quite frequently.

23     Q.   Why would that happen?

24     A.   Usually with them being put in, because it's

25  been a very busy day, and they've been put in at a later

1  time.   That's usually when I see them come in with an

2  incorrect date.

3     Q.   Okay.  So this was after your conversation in

4  which Dean Jones told you all of the information that

5  you testified to earlier about what actually happened

6  with Amber?  You said that happened -- that conversation

7  took place Monday morning.  This was generated, entered

8  Monday afternoon.  Is that accurate?

9     A.   That's what it says.

10     Q.   Okay.  Is there anything in here that talks

11  about her cursing?

12     A.   Well, it says she was being insubordinate.  It

13  doesn't say cursing.

14     Q.   Okay.  Anything in here that talks about her

15  refusing to step into the intervention room or refusing

16  to step into the dean's office, any of the things that

17  you testified to earlier?

18     A.   It says that she was being willfully

19  disobedient, which would be what that would have fallen

20  under.

21     Q.   But it doesn't -- you weren't there, so you

22  don't --

23     A.   No, I wasn't.

24     Q.   We just know what this says?

25     A.   Correct.

1    Q.   And it does not say that she tried to get her

2   to step into her office, and she refused?

3    A.   It doesn't say that.

4    Q.   When this was initially generated, it didn't

5   say any of those things; right?

6    A.   Correct.

7    Q.   Okay.  It just says what it says here, which

8   speaks for itself?

9    A.   Yes.

10    Q.   Okay.

11         (Plaintiff's Exhibit No. 23 was marked for

12      identification.)

13    Q.   I'm handing you what is Exhibit 23.  What is

14   this document?

15    A.   It's a discipline incident.

16    Q.   Okay.  What's the discipline date and time?

17    A.   It's the same, April 23rd at 1:23.

18    Q.   So does that indicate to you that this date and

19   time is static under incident date and time, that this

20   reflects when the incident happened, it is not

21   automatically generated?

22    A.   In glancing at it, it appears that this was

23   printed twice.  Is it different?

24    Q.   At the bottom it says the time the report was

25   generated on both of those.

1    A.    It could have very well been input at this

2   point and then added to later if someone finished

3   something up.  But there are two different times on it,

4   yes.

5    Q.    So to be clear, the incident date on Exhibit 22

6   is April 23rd at 1:23, that's the time the incident --

7   that's the incident date and time?

8    A.    Yes, that's what --

9    Q.    And then at the bottom it says this report was

10  generated on Monday, April 23rd at 1:51; is that

11  correct?

12   A.    On Exhibit 22, it does, yes.

13   Q.    And then on Exhibit 23 it says the incident

14  date and times are exactly the same; isn't that right?

15   A.    Yes.

16   Q.    It says this report was generated on Wednesday,

17  May 9th at 11:50 a.m.  Is that accurate?  Is that what

18  the document reflects?

19   A.    Yes.  And I don't know if that's the date it

20  was printed or what that date reflects.

21   Q.    How can you not know if you're the principal of

22  the school what the incident report and discipline

23  incident forms mean?

24   A.    I don't necessarily know what the technical

25  generated, whether that was the date it was printed or

256

1   not. When I have a specific question, I would go to the

2   dean and ask.

3       Q.   Okay. So in this -- in Exhibit 23 at -- the

4   report that was generated May 9th at 11:50 a.m., does it

5   appear to -- are there any alterations in this

6   discipline report? Does it appear to reflect the same

7   actions by Amber and the same actions taken?

8       A.   It looks like it's the same.

9       Q.   Okay. So Monday -- I'm sorry. I don't know if

10  it was Monday. It was May 9th. It was weeks later

11  after the dean entered all the information, this report

12  is generated and it's exactly the same. Is that an

13  accurate statement?

14      A.   That's what it looks like, yes.

15      Q.   Okay. How often do administrators, or you

16  yourself, go back in to discipline reports and make

17  alterations?

18      A.   Fairly common for the dean or the assistant

19  principal if there's been an addendum or change of

20  discipline, or they realize that information has been

21  left off. They may be dealing with upwards of 30, 40,

22  50 incidents per day. So it's not unusual for them to

23  go in and finish up paperwork at a later date.

24      Q.   So weeks later they would go back and open up a

25  discipline report and embellish and add more

1  information?

2      MR. JENSEN:  Object to the form.

3      A.    These are exactly the same.  It looks like it

4  was simply reprinted at a later date.

5      Q.    It does.  I guess I should ask if that is in

6  keeping with the policies of the school, which is to

7  accurately reflect what happened in the discipline

8  report?

9      A.    I'm not certain what you're asking me.

10     Q.    What you testified to a minute ago was that

11  administrators go back and alter discipline reports to

12  -- if the discipline has been changed; right?

13         MR. JENSEN:  Object to form.

14     Q.    Why would an administrator go back and alter a

15  discipline incident report?

16         MR. JENSEN:  Object to form.

17     A.    There's no alteration.

18     Q.    I'm asking you --

19     A.    Why would they?

20     Q.    Yeah, why would they?  You earlier testified

21  that there was a reason.

22     A.    If something had been overturned or changed.

23  You know, if a student had maybe been changed from ISS

24  to OSS, and they needed to go back in and document that.

25  There would have been one or two incidences where the

1   superintendent had to overturn something, and they would

2   have had to go back in and rescind and take it off the

3   record, that there was no punishment reflected for the

4   student.

5       Q.   Okay.  So if discipline changes, there would be

6   a reason to change the documentation of it?

7       A.   Yes.

8       Q.   But here, May 9th, weeks afterwards, there was

9   no reason to change anything, so nothing was changed?

10          MR. JENSEN:  Object to form.

11      A.   No, there was nothing changed here.

12      Q.   Okay.

13          (Plaintiff's Exhibit No. 24 was marked for

14       identification.)

15      Q.   Exhibit 24 I will hand to you now.  Do you

16   recognize this?

17      A.   Just a public records request.

18      Q.   Okay.  And are you copied on the e-mail

19   address?  Is that your e-mail address that's on the top

20   there?

21      A.   Yes.

22      Q.   Do you remember receiving this Public Records

23   Act request?

24      A.   Yes.

25      Q.   Okay.  And what is the time -- the date and

1    time on this?

2        A.    May 9th.

3        Q.    Okay.  At 8:05.  So May 9th at 8:05 you receive

4    a Records Act Request from Lambda Legal; is that right?

5        A.    Yes.

6        Q.    And it asks for information related to day of

7    silence.  Is that your recollection?

8        A.    I don't recall anything about it other than we

9    received a records request, and I let the

10   superintendent's office handle it.

11       Q.    Okay.  Did you open the attachment, do you

12   recall?

13       A.    I don't recall.

14       Q.    Do you normally open attachments when they are

15   included in an e-mail?

16       A.    If they're pertinent to me or I'm going to act

17   on them, yes.

18       Q.    How would you know if they are pertinent to you

19   if you're going to act on them?

20       A.    If the e-mail is pertinent to me.  This is

21   addressed to the superintendent.

22       Q.    Okay.  So even when you're copied on something,

23   you generally don't open the attachment?

24       A.    I don't recall if I opened this one or not.

25            (Plaintiff's Exhibit No. 25 was marked for

1          identification.)

2          Q.    I'm going to show you what has been marked

3     Exhibit 25.   Have you ever seen this document?

4          A.    I don't remember this one, but I know that we

5     did receive records requests.

6          Q.    Okay.   And the subject of the records request

7     is what?

8          A.    The day of silence.

9          Q.    And, again, this was the attachment to the

10    e-mail that was sent to you and Superintendent Cline May

11    9th, the morning of May 9th; is that right?

12         A.    This says May 8th.

13         Q.    The date on the order says May 8th, but the

14    date on the e-mail says May 9th; right?

15         A.    Yes.

16         Q.    Okay.   Any reason to believe that the e-mail

17    which references attached please find an Open Records

18    Act request in the Exhibit 25 that I've handed you are

19    different?

20         A.    No.

21         Q.    Now I'll hand you what I will mark as Exhibit

22    26.

23              (Plaintiff's Exhibit No. 26 was marked for

24         identification.)

25         Q.    Can you describe this document, please?

1      A.    This is a discipline report.

2      Q.    Okay.  And, again, the incident date and time

3   is the same as the other incident reports that you've

4   seen so far, the one that was generated on April 23rd

5   and the one that was generated on May 9th --

6      A.    Yes.

7      Q.    -- at 11:50 a.m.

8            And, again, the type of discipline was refusal

9   to follow directions; right?

10     A.    Yes.

11     Q.    Okay.  And in this one you'll notice that there

12  are additional -- there's additional information added.

13     A.    It looks like she simply added more details.

14     Q.    Uh-hum.  And so would you agree that this

15  document appears to have been altered between May 9th at

16  11:50 and May 9th at 2:38?

17           MR. JENSEN:  Object to form.

18     Q.    Is that what appears to have happened as far as

19  your understanding of procedure?

20     A.    I agree that an addition has been made.

21     Q.    Okay.  And that addition, according to these

22  time stamps, would have happened between 11:50 on May

23  9th and 2:38; is that right?

24     A.    Yes.

25     Q.    Do you have any personal knowledge of why the

262

1   discipline incident report has additional information?

2       A.    No.

3       Q.    This is Exhibit 25 (sic) that I will hand to

4   you now.  Do you recognize this document?

5       A.    It's an incident report.

6       Q.    Okay.  And do you see what time this was

7   generated?

8       A.    It's the next day.

9       Q.    May 10th?

10      A.    Yes.

11      Q.    Does it appear to have been altered from -- the

12  May 9th, from the last discipline report that was

13  generated?

14          MR. JENSEN:  Wait a second.  Are you making

15      that 25?  Because there's a 25, 26, and then we're

16      going to 25 again.

17          MS. LITTRELL:  That's correct, for the record.

18      I can't read my own handwriting.

19          So Exhibit 25 is the Public Records Act request

20      letter to Adrian Cline.  What you have marked as

21      Exhibit 24 should be Exhibit 26.  Let me make that

22      change.  Can you hand me back what you have marked

23      as Exhibit 24, which should be -- can you hand me

24      back what is marked as Exhibit 25?  Do we have more

25      than one of these?  This is correct.  Okay.  Can

```
 1       you -- what other documents do you have?
 2            THE WITNESS:  Twenty-six.
 3            MS. LITTRELL:  Twenty-six.  I'm sorry for the
 4       confusion.  Give me just a moment here.
 5            Can you hand me back the discipline incident
 6       report that's May 9th at 11:50?
 7            MR. JENSEN:  Here you go.
 8            MS. LITTRELL:  Thank you.
 9            And then the discipline incident report that's
10       May 10th at 9:17.  Thank you.  So we got that.
11  BY MS. LITTRELL:
12       Q.   We're going to clarify for the record Exhibit
13  26, which I'm handing you now, is the discipline
14  incident report that is dated generated May 9th at
15  11:50.  Do you see that?
16       A.   Yes.
17       Q.   Okay.  And we've already -- we've talked about
18  the May 9th, 11:50 a.m., is precisely the same as the
19  discipline incident report that was generated on April
20  23rd.
21            I'm going to hand you what has now been
22  clarified to be Plaintiff's Exhibit 27.  And that is a
23  discipline report that was generated May 9th at 2:38
24  p.m.
25            (Plaintiff's Exhibit No. 27 was marked for
```

1        identification.)

2        Q.   And this is the discipline incident report in

3   which additional information was added between May 9th

4   at 11:50 and May 9th at 2:38.  And that's Exhibit 27.

5            And then finally Exhibit 28 is the third

6   discipline incident report.  And this one was generated

7   May 10th at 9:17.  Are we all together?  It's

8   Plaintiff's Exhibit 28.

9            (Plaintiff's Exhibit No. 28 was marked for

10        identification.)

11       A.   I don't have 23 anymore.

12       Q.   So as to Exhibit 28, do you see that this --

13   can you compare that to 27 and describe to me whether

14   this has any changes to it?

15       A.   It looks like someone is clearly noting they're

16   making an amendment.

17       Q.   Did you make that amendment?  Do you know who

18   made that amendment?

19       A.   These would have been handled within the dean's

20   office.

21       Q.   Okay.  And it appears that there's quite a lot

22   of new information that has been added between May 9th

23   at 2:38 and May 10th at 9:17.

24       A.   There are details added.

25       Q.   Okay.  And that's additional details that were

1    added between May 9th at 11:50 and May 9th at 2:38; is

2    that right?  Do you have any idea why the information

3    was added?

4        A.   No.

5        Q.   Okay.  Do you find it interesting that the

6    alterations were made on the same day that the Open

7    Records Act request arrived in the superintendent's and

8    in your e-mail box?

9             MR. JENSEN:  Object to form.

10            MS. LITTRELL:  Sure.

11       A.   I notice that the dates are the same.

12       Q.   Okay.  Do you recall being told to go back into

13   the discipline incident for Amber Hatcher and make

14   amendments or alteration?

15       A.   No.  My secretary was asked to send over

16   paperwork.

17       Q.   Okay.

18       A.   I do not know if anyone else was communicated

19   with.

20       Q.   Okay.  But it's your testimony that you did not

21   make any alterations on May 9th or May 10th to the

22   discipline incident report?

23       A.   I don't handle the discipline incidents.  So I

24   don't -- no.

25       Q.   No, you did not make any alteration on May 9th

1    or May 10th?

2        A.   I don't remember making -- I don't have any

3    knowledge of making changes.

4        Q.   Okay.

5            (Plaintiff's Exhibit No. 29 was marked for

6         identification.)

7        Q.   Do you recognize this document or can you

8    describe it to me?

9        A.   It's a Genesis report, which is the system

10   that's used to track information for the counties.  It's

11   not a report I use.

12       Q.   Does it appear to be -- is it a report that

13   you've seen in general, not the specific one, but --

14       A.   I used different reports.  This is not a report

15   that I used, but...

16       Q.   Does it appear to be an accurate reflection of

17   DeSoto County High student discipline summary?

18       A.   For this student or for --

19       Q.   Just generally.

20       A.   Yes.

21       Q.   Have you seen a student discipline report

22   before and this appears to be that?

23       A.   Yes.

24       Q.   Can you decipher for me what these categories

25   mean?  So it says incident number and then type, and it

1   has three letters.  Do you know what those letters stand

2   for?

3       A.    They're district codes or state codes.  I

4   imagine these are district codes.  I couldn't tell you

5   off the top of my head what those codes are.

6       Q.    Is there a key somewhere?

7       A.    There is somewhere.  I don't believe it's in

8   the code of conduct.  The key is in this Genesis

9   program.  And I believe that's the one that was used by

10  the dean and the assistant principals, coded in the

11  program, and they pick from a drop down.

12      Q.    Okay.  And this reflects that Amber Hatcher was

13  disciplined on the day of silence for one day; is that

14  right?  And the action taken was IR; is that right?

15      A.    Yes.

16      Q.    Okay.  So this indicates that there is a

17  disciplinary report in her record of what happened on

18  day of silence; is that right?

19      A.    Yes.

20            (Plaintiff's Exhibit No. 30 was marked for

21       identification.)

22      Q.    I'm showing you what has been marked as Exhibit

23  30.  Do you recognize this?

24      A.    It's a discipline report.

25      Q.    Okay.  And this one was generated, according to

1   the date and time, the same exact time as Amber's was,

2   is that right, Monday, the 23rd at 1:23?

3       A.   Yes.

4       Q.   Okay.  And in this one the incident notes say

5   simply that student refused to follow class rules when

6   given by a teacher; is that right?

7       A.   Yes.

8       Q.   And this is R████ M█████'s.  And this report

9   was generated on Wednesday, May 9th, at 11:52 a.m.; is

10  that right?

11      A.   Yes.

12          (Plaintiff's Exhibit No. 31 was marked for

13       identification.)

14      Q.   I'll give you what's been marked as Exhibit 31.

15  Do you recognize this?

16      A.   Yes.

17      Q.   What is this?

18      A.   It's a discipline report.

19      Q.   Okay.  And this is for R████ M█████; is that

20  right?

21      A.   Yes.

22      Q.   And it's the same incident date and time, April

23  23rd at 1:23; correct?

24      A.   Yes.

25      Q.   Okay.  And this was generated May 9th at 2:40;

1  is that right?

2      A.   Yes.

3      Q.   Okay.  So that was about two hours and --

4  roughly two hours and 45 minutes after the discipline

5  report that we've marked as Exhibit 30.  Does it appear

6  that there have been changes made to this discipline

7  incident report?

8      A.   It appears that details have been added.

9      Q.   Do you have any idea why those details would

10  have been added weeks after the event?

11      A.   No.

12      Q.   Did you personally make these alterations?

13      A.   No.

14      Q.   Can you tell me who would have had access to

15  make those alterations on this incident report?

16      A.   The dean, the assistant principals, some of the

17  secretaries.

18      Q.   Okay.

19           (Plaintiff's Exhibit No. 32 was marked for

20        identification.)

21      Q.   I'm going to hand you what's been marked as

22  Plaintiff's Exhibit 32.  Can you identify and tell me

23  what this is?

24      A.   It's an e-mail from my secretary to Mr. Cline.

25      Q.   Are you copied on it?

1      A.    Yes.

2      Q.    Okay.  And this is dated May 9th at 12:00 p.m.;

3  is that right?

4      A.    Yes.

5      Q.    So roughly eight minutes after the discipline

6  report was generated that did not have any alterations,

7  is that right, according to the math?

8      A.    Yes.

9      Q.    Okay.  And this has attached to it discipline

10  scans; is that right?

11      A.    Yes.

12      Q.    And then we've acknowledged that those

13  discipline reports were changed roughly two hours and 40

14  minutes later, after this went to you; is that right?

15      A.    They were made more specific.  The report was

16  not changed.  More specific details were added to these.

17      Q.    Something was added?

18      A.    More specific details were added, yes.

19      Q.    If it said one thing at one moment and said

20  something different at another moment, isn't that a

21  change?

22      A.    More specific details were added, yes.

23      Q.    So it was changed to add more information.  Did

24  you add that information?  You've already testified that

25  you haven't; right?

1     A.    No.

2         Q.    Did you direct anyone to make those

3    alterations?

4     A.    I had my secretary send over the details.    I

5    did say that I don't know if the superintendent was in

6    communication with anyone else about clarifications or

7    not.

8         Q.    Did you direct anyone to make any changes to

9    those discipline reports?

10     A.    No.    I would have said to send the specific

11   information.

12        Q.    Okay.  So the answer is no, you didn't?

13     A.    I don't remember telling anybody to do any --

14   send the reports.

15             (Plaintiff's Exhibit No. 33 was marked for

16         identification.)

17        Q.    We'll mark this as Exhibit 33.  Do you

18   recognize this e-mail?  Is that your e-mail address?

19   Does it appear to be an e-mail sent from you?

20     A.    Yes.

21        Q.    To Adrian Cline and to yourself?

22     A.    Uh-hum.

23        Q.    Okay.

24     A.    No, I don't remember clarifying any of this.

25   But I told him that I did clarify it, so, yeah.

272

1    Q.    So in this you acknowledge that you made

2  amendments to the discipline report; is that right?

3    A.    Yeah, I did tell him that I did here.

4    Q.    Okay.  But you don't have any recollection of

5  doing that; is that right?

6    A.    No, I don't remember going back and doing this.

7  He must have asked for specifics, and I must have added

8  them.

9    Q.    Did he ask for specifics?  Do you recall him

10  asking for specifics?

11    A.    He would always ask for specifics.  I don't

12  recall him asking for specifics here.

13    Q.    Okay.

14         (Plaintiff's Exhibit No. 34 was marked for

15          identification.)

16    Q.    This is Exhibit No. 34.  Can you identify what

17  this document is, please?

18    A.    It's a discipline report.

19    Q.    Okay.  From DeSoto County High?

20    A.    Yeah.

21    Q.    Does this appear to be a redacted version of

22  something that would be generated by the school?

23    A.    It's something that would have been done off of

24  Genesis, yes.

25    Q.    Okay.  And this reflects that Amber Hatcher was

 1  disciplined on the day of silence, is that right,

 2  4/20/12?

 3      A.   Yes.

 4      Q.   And in the description, in this discipline

 5  report the description is irresponsible; is that right?

 6      A.   That's what it says, yes.

 7      Q.   Okay.  And that's different than the discipline

 8  reports that describe her infraction as refusal to

 9  follow directions; is that right?

10      A.   It can fall on a lot of things, but it does

11  sound somewhat different.  There are multiple, multiple

12  codes that can be used.

13      Q.   Are there more than one software?  You talked

14  about Genesis.  Is that the only discipline software

15  that you have?

16      A.   No.  There is Grade Book and Principal Viewer,

17  and discipline is handled in all of them.

18      Q.   Okay.  So is it unusual for a student to be

19  described as having committed one violation in one of

20  those software programs and then described differently

21  in another?

22      A.   It probably would have come off the code which

23  would be entered.  This ZZZB code would generate this

24  description.

25      Q.   And who enters that information?

1      A.    The dean's secretary.

2      Q.    Okay.  Is she the only one that enters that

3    information?

4      A.    The majority of the time.  If she were out

5    sick, it is possible that someone else could have

6    entered it.

7      Q.    Okay.  Interesting.

8            Who is Kim Hall?

9      A.    I don't think I know.

10           (Plaintiff's Exhibit No. 35 was marked for

11       identification.)

12     Q.    Do you recognize this document?

13     A.    It's an e-mail from my secretary to Mr. Cline.

14     Q.    No, above that, this appears to be a forward of

15   that e-mail from your secretary to Mr. Cline that's sent

16   from you to your personal e-mail account.  Does that

17   accurately --

18     A.    Oh, yes.

19     Q.    Okay.  How often do you send e-mails to

20   yourself?

21     A.    It would vary.  If I'm keeping documentation

22   that needs to be kept and not, you know, not deleted off

23   a server or lost or something, then I might keep it on a

24   separate e-mail account.

25     Q.    Okay.  Do you have a recollection of why you

1  would have forwarded this e-mail or -- this e-mail in

2  particular to your personal account?

3      A.   I believe I sent a number of things related to

4  this case and just other important e-mails that had been

5  sent back and forth in the county just for storage to my

6  personal account.

7      Q.   Okay.  And so this was sent February 27th,

8  2013?

9      A.   Yes.

10     Q.   Is that right?

11     A.   Uh-hum.

12     Q.   When were you removed from your position as the

13  high school principal?

14     A.   It was in February.  I'm not certain of the

15  exact date, but earlier in February, I believe.

16     Q.   So did you still have access to your e-mails as

17  the principal?

18     A.   Yes.  At that time, yes.

19     Q.   When did you not have access to the e-mails any

20  longer?  Do you recall?

21     A.   Somewhere in April, I believe.

22     Q.   Okay.

23          (Plaintiff's Exhibit No. 36 was marked for

24       identification.)

25     Q.   I'm handing you what's marked as Plaintiff's

1    Exhibit 36.  Could you describe what this document is?

2        A.    I am asking one of the IT directors to confirm

3    a date for me, and he is looking for the information.

4        Q.    And so when did you send this e-mail?

5        A.    March 25th.

6        Q.    2013; right?  So after you had been transferred

7    from the position as the principal?

8        A.    Yes.

9        Q.    Do you recall why you were needing this

10   information?  You no longer were the principal of

11   students, high school students.

12       A.    Because I was named in this suit, and I was

13   being asked questions that from a year and a half ago, I

14   didn't remember dates of.  So I was simply asking him to

15   confirm a date for me.

16       Q.    Okay.  So this was March 20, '13.  Do you

17   recall any other requests to review information in 2013?

18       A.    Requests to review information?

19       Q.    Were you asking for information to help -- I

20   believe you testified a minute ago because you were

21   named in a lawsuit, and you wanted to get records?

22       A.    Uh-hum.

23       Q.    Did you gather any other records in 2013?

24       A.    I believe I was asked specifically to confirm

25   dates, and I was simply checking to see what the record

1    showed.

2        Q.   Do you recall who you were asked that by?

3            MR. JENSEN:   Don't reveal any communications

4        from any attorney that may be representing you.

5            If that was a communication from an attorney,

6        just simply say -- I object to privilege.

7        A.   Object to privilege.

8        Q.   Actually, he gets to object to that, but it's

9    find of fun to say it every now and then.

10           MR. JENSEN:   This deposition has been going on

11       now for seven and a half hours.  So I think that's a

12       day.

13           MS. LITTRELL:   We have taken at least two

14       30-minute breaks.  So I think you're kind of off.

15           MR. JENSEN:   I don't think we've taken two

16       30-minute breaks.  I gave you credit for one.

17           Madam Court Reporter, could you see the total

18       minutes on the breaks we've taken.

19           COURT REPORTER:   I can tell you we've been

20       going six hours, 17 minutes and 34 seconds.

21           (Discussion off the record.)

22           MS. LITTRELL:   Thank you.

23           MR. JENSEN:   Fair enough.

24           (Plaintiff's Exhibit No. 37 was marked for

25            identification.)

BY MS. LITTRELL:

    Q.   I'll hand you what has been marked Exhibit 37.
Do you recognize this document?

    A.   Yes.

    Q.   Tell me about it.  Describe it for me.

    A.   It's simply a calendar item.

    Q.   Okay.  And what's the subject of the calendar?

    A.   A meeting with Amber Hatcher and Rupert Brown.

    Q.   Who is R█████ B████?

    A.   A student at the high school.

    Q.   Do you recall what this meeting was about?

    A.   Yes.

    Q.   Tell me.

    A.   They both had requests for clubs that they were
wanting to start, and there were some similarities.  And
the presentation and acceptance of a club has to have
bylaws to the superintendent.  So I was explaining to
the school board and superintendent, I was explaining to
them the process through which they would need to go to
make a request.

    Q.   Okay.  This had to do with starting a club?

    A.   Yes.

    Q.   Do you recall what club Amber was trying to
start?

    A.   Amber wanted an LGBT.

1    Q.   Okay.  What's the name of your -- what is your

2  husband's name?

3         MR. JENSEN:   That has nothing to do with

4     anything.   Do not answer that question.   It is

5     beyond the scope permitted by the court order

6     document 80.  She will not be discussing her family

7     with you at this deposition.

8    Q.   A community member named Mark Fusco made a

9  presentation to the school board.  Do you know Mark

10 Fusco?

11   A.   Yes.

12   Q.   Okay.  Are you related to him?

13   A.   Yes.

14   Q.   Okay.  I'll hand you what we're going to mark

15 as Exhibit 38.  Do you recognize this document?

16        (Plaintiff's Exhibit No. 38 was marked for

17     identification.)

18   A.   Yes.

19   Q.   What is this?

20   A.   It's the minutes from -- the agenda from a

21 school board meeting.

22   Q.   The agenda or the meeting minutes?

23   A.   Let's see.  This is -- it looks like maybe it's

24 the minutes.

25   Q.   Tuesday, April 23rd minutes?

1    A.   Yes.

2    Q.   Do you see on the second page under public

3  presentations a community member Mark Fusco approached

4  the podium to speak?

5    A.   Yes.

6    Q.   Were you at that school board meeting?

7    A.   Yes, I was.

8    Q.   Can you tell me what Mr. Fusco discussed?

9    A.   He was discussing the current environment under

10  the new superintendent.

11    Q.   Can you give me anymore information?

12    A.   The fact that multiple employees have been

13  accused by her or have been disciplined if they have

14  spoken up, and he wanted the board to be aware.

15    Q.   Okay.  Was he speaking on your behalf?

16    A.   He was speaking on the behalf of multiple

17  employees.

18    Q.   Okay.

19         MS. LITTRELL:  Let's mark this as Exhibit

20     Number 39.

21         (Plaintiff's Exhibit No. 39 was marked for

22      identification.)

23    Q.   I'm handing you what's been marked as

24  Plaintiff's Exhibit 39.  Do you recognize this document?

25    A.   Yes.

1     Q.    Okay.  And what is it?

2     A.    It's a motion to dismiss.

3     Q.    Okay.  Filed by you, am I right, defendant

4    Shannon Fusco, motion to dismiss?

5     A.    Yes.

6     Q.    Can you turn to Page 17?

7     A.    Where are the page numbers?

8     Q.    The very top.

9     A.    I have 11 pages.

10     Q.    I'm sorry.  Document 17, Page 8 of 11.  See

11    where it states, "Plaintiff's claim is about more than

12    the mere wearing of an expressive shirt"?

13     A.    Yes.

14     Q.    Okay.  So this is your argument to the court on

15    why the case should be dismissed against you; is that

16    right?

17          MR. JENSEN:  Object to form.

18     A.    Yes.

19     Q.    Is that your understanding of what this

20    document is?

21     A.    Yes.

22     Q.    Okay.  And the next sentence says that

23    "Exhibits to the complaint reveal that plaintiff was

24    attempting to organize an on-campus protest involving

25    numerous students."

1         Is that your concern with respect to day of

2    silence?

3    A.    Where are you?

4    Q.    The second sentence of the first paragraph.

5    A.    I would have a difficult time interpreting the

6    legal language in which this is couched.

7    Q.    So plaintiff was attempting to organize an

8    on-campus protest involving numerous students, what part

9    of that do you feel is too legalistic?

10   A.    The exhibits to the complaint, I'm not sure

11   what exhibits are being referred to here.

12   Q.    Okay.  Well, were you concerned with the fact

13   that Amber was attempting to organize an on-campus

14   protest involving numerous students?  Was that your

15   concern with respect to day of silence or was that a

16   concern with respect to day of silence?

17         MR. JENSEN:  Object to form.

18   A.    The concern that I addressed with the

19   superintendent was an attempt to organize without

20   permission.

21   Q.    Wasn't she attempting to get permission from

22   you?  Wasn't that the request?

23   A.    She was attempting to get permission from the

24   superintendent because it was turned over to him.

25   Q.    Okay.  Okay.  Just -- it's a little confusing.

1    She was attempting to be involved in a protest without

2    permission, and she was asking for permission.  That

3    seems to be a little contradictory, but we'll just let

4    that sit.

5          The next sentence, the argument that is made is

6    that, "The participants planned to hang posters on walls

7    regardless of whether the posters were approved by the

8    school administration."

9          Was that a concern of yours with respect to day

10   of silence?

11         MR. JENSEN:  Object to form.

12   Q.    Were you afraid of posters being put on walls?

13         MR. JENSEN:  Object to form.

14   A.    I was questioning whether anything that she

15   might do as part of this protest would happen, whether

16   it was approved or not, any activity that she might

17   make.

18   Q.    Were you specifically concerned about posters

19   being put on walls without approval?  Do you recall?

20         MR. JENSEN:  Object to form.

21   A.    I was concerned about multiple activities, any

22   activity that she might take part in that wasn't part of

23   an approved activity.

24   Q.    Do you recall whether or not you were concerned

25   about posters?

1            MR. JENSEN:  Objection; asked and answered.

2            MS. LITTRELL:  Is hasn't been answered.

3            MR. JENSEN:  Yes, it has.  You just don't like

4      the answer.

5   BY MS. LITTRELL:

6       Q.   Were you concerned about posters?

7            MR. JENSEN:  Objection; asked and answered.

8            You can answer again if you so desire.

9       A.   I was concerned about anything that she might

10  do with the activity.

11      Q.   That's not the answer to my question.

12           MR. JENSEN:  Yes, it is.  You can answer it.

13      We can burn the rest of your time asking the same

14      question over and over or you can move on.

15  BY MS. LITTRELL:

16      Q.   Were you concerned about posters?

17           MR. JENSEN:  Objection; asked and answered.  Go

18      ahead and repeat your answer.

19      Q.   Your evasive answer, which is that you were

20  concerned about lots of things.

21      A.   I was concerned about any activity involved

22  with this.

23      Q.   Including posters on walls?

24           MR. JENSEN:  Objection; asked and answered.

25      This is what, five times now.  You can go ahead and

1    repeat the same answer again.

2    Q.   Or you could give me an honest answer.

3         MR. JENSEN:  She gave you an honest answer.

4    You are bullying this witness, and now you're -- we

5    are taking a break for a couple of seconds.

6         (Recess from 11:12 p.m. until 11:18 p.m.)

7    BY MS. LITTRELL:

8    Q.   Okay.  We're back on the record.

9         Were you concerned with the topic of human

10   sexuality coming into conversations on day of silence?

11   A.   No.

12        MS. LITTRELL:  Let's mark this as Exhibit 40,

13   please.

14        (Plaintiff's Exhibit No. 40 was marked for

15    identification.)

16   Q.   I'm going to hand you what is Exhibit 40.  Do

17   you recognize this document?

18   A.   Yes.

19   Q.   Tell me what it is, please.

20   A.   It's the code of conduct that's used for the

21   high school.

22   Q.   Okay.  It starts with Page Number 41.  And if

23   you'll turn to the next page, 42, does this accurately

24   describe level one offenses as you understood them to be

25   in place when you were the principal --

1    A.    Yes.

2    Q.    -- at DeSoto County High School?

3          Okay.  And so disruptive behavior is on this

4    list of level one offenses; is that right?

5    A.    Yes.

6    Q.    As is lack of cooperation; right?

7    A.    Yes.

8    Q.    Okay.  And the actions that teachers can take

9    if a student is disruptive or doesn't cooperate are

10   listed here?

11   A.    Yes.

12   Q.    Okay.  Classroom work details, small

13   disciplinary report, et cetera.  Is there anywhere on

14   here that reflects that a student can be sent home for

15   the day if they don't cooperate with the teacher?

16   A.    It doesn't say it on this page, no.

17   Q.    And why is refusal to respond in class a

18   different kind of infraction than lack of cooperation?

19   A.    Many of the disciplinary interventions or codes

20   overlap.

21   Q.    Uh-hum.

22   A.    Refusing to respond in class would overlap with

23   lack of cooperation.

24   Q.    Okay.  Is it possible that you would have a

25   student, for example, who had laryngitis on a particular

1   day and who was unable to speak in class?

2       A.   Yes.

3       Q.   And would that student be sent to the dean's

4   office?

5       A.   There's no refusal on their part.  So, no.

6       Q.   They couldn't -- they would not be responding

7   verbally.  What's the difference between that and a

8   student who is not responding verbally because they're

9   taking part in a protest?

10      A.   One is a medical reason.

11      Q.   What's the disruptive distinction?

12      A.   One is a medical distinction.  The student is

13  not capable of responding.  One is a student refusing to

14  respond.

15      Q.   If you'll turn to Page 49 of the code of

16  conduct, Number 13 talks about disorderly conduct as

17  disrupting the educational process.  Do you see that?

18      A.   Yes.

19      Q.   The first offense gets three days out-of-school

20  suspension; is that right?

21      A.   Yes.

22      Q.   Okay.  And the concern with day of silence was

23  that it would be disruptive to the educational

24  environment; is that right?

25      A.   The concern was that it was not an approved

1    event.

2       Q.   So were you concerned that it would be

3    disruptive?

4       A.   I was concerned that it wasn't approved, and

5    the superintendent had said that I disapprove this

6    event.

7       Q.   I understand.  Were you concerned that it would

8    be disruptive?

9       A.   As I stated earlier, my opinions don't come

10   into it.  I was given the directive that the event was

11   disapproved, and my thought on it didn't enter into

12   following through with his direction.

13      Q.   Did you feel that you had the opportunity to

14   disagree with the superintendent's decision?

15      A.   This decision or any decision?

16      Q.   This decision with respect to day of silence.

17      A.   No.

18      Q.   Okay.  Did you feel you had the ability to

19   disregard this decision?

20      A.   No.

21      Q.   On Page 50 of this document, on the next page

22   at the very top, there is an offense called unauthorized

23   presentation, unauthorized distribution of a

24   publication, or an unauthorized assembly.  Is that what

25   the concern was with respect to day of silence?

1    A.    It wasn't clarified to me other than this was
2    disapproved.

3    Q.    Okay.   In your -- attached to your affidavit
4    was the students' rights and responsibilities.   Do you
5    recall?

6    A.    Yes.

7    Q.    Have you seen that?

8         And it talks about that students have the right
9    to assembly.   Does that sound familiar to you?   Here it
10   is.   It is Number 4 on Page 13.   So Number 14 of the
11   students' right says they have the right to assemble
12   peacefully on school grounds; correct?

13   A.    Correct.

14   Q.    But then in the code of conduct an offense is
15   unauthorized assembly; is that right?

16   A.    Number 15?

17   Q.    That's right.

18   A.    Yes.

19   Q.    So does that indicate that there is some
20   interpretation that goes along with what students have
21   the right to do and what they can get in trouble for
22   doing?   So they have the right to assemble peacefully,
23   but if they have an unauthorized assembly, then that is
24   an offense that is punishable by these minimum
25   consequences?

1      A.   As it is worded here, yes.

2      Q.   Okay.   The discipline reports that we looked at

3   for Amber, all of them set out that an attempt to notify

4   parent was made.   Student was not suspended but would

5   have been allowed to be checked out by a parent.

6           What does that mean with respect to discipline?

7   Is that an in-school suspension, an out-of-school

8   suspension, something else?

9      A.   It's not an out-of-school.   It states clearly

10   that it's not.   It says that if the parent had wished to

11   come or if they were able to be reached to come pick her

12   up, then they could have done so.

13      Q.   So I didn't see that listed in the code of

14   conduct as a discipline consequence, that they can be

15   checked out by a parent.

16      A.   It's not a disciplinary action.   It's a

17   commonly used technique by deans to give a student some

18   breathing room.   If they feel like that, you know, I

19   don't want to discipline the student further, I don't

20   want to put things on the record further, I just want

21   you to take a little breathing space.   And so they won't

22   go to ISS.   They'll simply ask the parent do you want to

23   pick them up for the day.

24      Q.   Okay.   Would that still generate a discipline

25   incident report?

1    A.    It would vary based on the situation.  It might

2  or might not.

3    Q.    Okay.  What's the difference between being

4  removed from classes and being either picked up by a

5  parent, an out-of-school suspension where you were sent

6  home for the day?

7    A.    Well, out-of-school suspension is one of the

8  more serious consequences that can be given, and it is

9  kept in the student's cum file on record.

10   Q.    Uh-hum.

11   A.    Whereas if a parent had simply picked up a

12 student, there's not going to be a discipline record,

13 they just were checked out.

14   Q.    Uh-hum.  But in terms of the student's ability

15 to access instruction time, the result would be the

16 same; isn't that right?

17   A.    They wouldn't be in class for either one.

18 Could they have made up work for both, yes.

19   Q.    Do they have an ability to -- is there any due

20 process for out-of-school suspension, do you know?  Do

21 they have an appeal process for that?

22   A.    There's an appeal process in place that covers

23 multiple different things.  I believe that this appeal

24 would fall under that.

25   Q.    And Amber was not suspended, according to this,

1   in terms of her discipline consequence --

2       A.   No.

3       Q.   -- but she would have been allowed to be

4   checked out by a parent?  A parent couldn't be contacted

5   so she spent all day in the intervention room.  Would

6   that qualify as an in-school suspension?

7       A.   If it were coded that way, it would have been

8   listed ISS, in-school suspension.

9       Q.   But -- and the practical effect seems to me to

10  be the same; is that right?  If you're in the

11  intervention room for the day, you're in the

12  intervention room for the day whether it's coded ISS or

13  something different?  The practical effect is the same;

14  right?  They're in the same room; right?

15      A.   Simply waiting for a parent and ISS, is that

16  the same thing?  Is that what you're asking me?

17      Q.   If a student spends all day in the intervention

18  room, what's the difference between -- the practical

19  difference between that and ISS?  Not how it's coded;

20  what's the practical difference?

21      A.   There wouldn't necessarily be a disciplinary

22  infraction on the record, but they would not be in the

23  classroom.

24      Q.   Okay.  So in the event of Amber, where she

25  could have either been checked out by a parent to leave

1  campus or spend the day in the intervention room, either

2  way she could not communicate her message to her peers;

3  is that a correct statement?

4      A.    She wasn't in the classroom.  So she wouldn't

5  have been talking to her peers, correct.

6      Q.    If she would have been sent home, she wouldn't

7  have been able to communicate her message either; is

8  that right?

9      A.    Correct.

10     Q.    Okay.  And the same with respect to R████████ by

11 being picked up by a parent or be allowed to leave, he

12 wasn't able to express his message in day of silence?

13     A.    Correct.

14     Q.    Why did you leave the DeSoto County High School

15 principal position?

16         MR. JENSEN:  At this point, I'm going to

17     object.  That is way beyond the scope that's allowed

18     by the Court's order.  It's got nothing to do with

19     this incident, and it's got nothing to do with her

20     entitlement to qualified immunity.

21         MS. LITTRELL:  You know well that impeachment

22     is a valid purpose, and there's nothing in this

23     order that says we can't ask about information that

24     would be available for impeachment.

25         MR. JENSEN:  Yes, it does.  You do not get full

1    discovery from her while she has a pending qualified

2    immunity defense.  You only get to examine her about

3    her entitlement to qualified immunity.  So you will

4    not be asking her questions about that today.

5  BY MS. LITTRELL:

6    Q.   So, will you tell me the reason that you were

7  accused of wrongdoing as the principal of DeSoto County

8  High School?

9        MR. JENSEN:  This is a violation of the Court's

10    order.  Don't answer that question.

11        MS. LITTRELL:  You're directing your witness or

12    your client not to answer questions with respect to

13    the ongoing investigation alleging wrongdoing

14    against her; is that right?

15        MR. JENSEN:  That is correct.  And that's also

16    a topic of another motion for protective order

17    that's currently pending with the Court.

18        MS. LITTRELL:  Uh-hum.

19  BY MS. LITTRELL:

20    Q.   Are you willing to tell me what the accusations

21  are in reference to -- that led to your leaving as

22  principal of DeSoto County High School?

23        MR. JENSEN:  Again, it would be my advice that

24    you not disclose that.

25        THE WITNESS:  So how do I respond?

1          MR. JENSEN:  If you wish to take my advice --

2     well, I'm asking you.  Do you want to take my advice

3     and not respond to that question?

4          THE WITNESS:  Yes.

5          MR. JENSEN:  She will not be responding to

6     those questions.

7          MS. LITTRELL:  Are you directing her not do?

8          MR. JENSEN:  Yes, I am.

9          MS. LITTRELL:  Can we certify the question?

10    We'll take it to the Court.  And I'll reserve

11    whatever time we have left in the deposition to

12    follow up with that line of questioning.

13          Do you have questions for your witness?

14          MR. JENSEN:  Just a couple.

15                    CROSS-EXAMINATION

16    BY MR. JENSEN:

17    Q.   Ms. Fusco, do administrators have the ability

18    to use their discretion when dealing with a student

19    violation?

20    A.   Yes.

21    Q.   And if a student is in the intervention room

22    and they wish to discuss the appropriateness of their

23    being sent there, and they don't agree with the dean,

24    can they ask to speak with an assistant principal about

25    the issue?

1     A.    Yes.

2     Q.    Do all school employees, do they have access to

3     the policies and procedures of the district?

4     A.    Yes, they do.

5     Q.    And do they have supervisors available to

6     resolve any misunderstandings if they have questions?

7     A.    The HR department, yes.

8     Q.    The March 29th letter that Ms. Hatcher sent,

9     I'd like to direct your attention to the second

10    paragraph where it says, "With the support of teachers,

11    students could lead or take part in a silent lesson or

12    complete a written assignment."

13          That is advocating for a change in the daily

14    lesson plan, is it not?

15    A.    Yes.

16    Q.    Does a change in the established lesson plan,

17    is that something that you would handle or is that

18    something that would go up the chain of command to the

19    superintendent, if lesson plans were going to be

20    deviated for the day?

21    A.    Ordinarily, that would simply be handled by the

22    teacher if they made a change in their lesson plans.

23    Q.    All right.  Does the superintendent have the

24    ability to decide whether or not he wants the lesson

25    plans changed for the day?

1       A.    He could.

2       Q.    Okay.

3             MR. JENSEN:    That's all the questions I have.

4       Thank you very much.

5             She'll read, unless you've got more.

6             MS. LITTRELL:    Yeah.

7              REDIRECT EXAMINATION.

8    BY MS. LITTRELL:

9       Q.    Just sort of redirect to the point of when a

10   student is in an intervention room, that they have the

11   ability to speak to an assistant principal.  How would

12   that be accomplished?

13      A.    By asking politely.

14      Q.    Asking whom politely?

15      A.    The para who is in the room would be the person

16   they would direct a question to.

17      Q.    Has that person, to your knowledge, been

18   directed that if a student asks to speak to an

19   administrator, that they have the right to do so?  Is it

20   written -- I'm sorry.  Let me clarify that.

21             Is it written down in a policy anywhere that

22   you could point to that a student has the right to ask

23   to speak to an assistant principal when they're placed

24   in the intervention room?

25      A.    I don't know of a policy.  It occurs regularly.

298

1      Q.   Okay.  Did -- and the March 29th letter that

2   Mr. Jensen referred to, he was reading from the

3   attachment to the letter.  So just for the record, I

4   don't know if you noticed, but that was the form letter

5   from the ACLU and not the direct letter that was sent to

6   you by Amber; is that right?  Did you notice that?  Do

7   we need to take a look at it?

8      A.   That he was reading from the ACLU form, yes.

9      Q.   Yes.  Okay.

10          MS. LITTRELL:  That's all the questions I have

11      for now, for today, for this deposition.

12          MR. JENSEN:  She'll read.

13          THEREUPON, the deposition of SHANNON D. FUSCO,

14   taken at the instance of the Plaintiff, was concluded at

15   11:40 p.m.

16          NOTE:  The original and one copy of the

17   foregoing deposition will be held by Ms. Littrell; copy

18   to Mr. Jensen.

19

20

21

22

23

24

25

1        DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS

2

3            The original of the Errata Sheet has been

4    delivered to Mr. Jensen, Counsel for Defendants.

5

6            When the Errata Sheet has been completed by the

7    deponent and signed, a copy thereof should be delivered

8    to each party of record and the ORIGINAL delivered to

9    Ms. Littrell, Counsel for Plaintiff, to whom the

10   original deposition transcript was delivered.

11

12                    INSTRUCTIONS TO DEPONENT

13

14           After reading this volume of your deposition,

15   indicate any corrections or changes to your testimony

16   and the reasons therefor on the Errata Sheet supplied to

17   you and sign it.  DO NOT make marks or notations on the

18   transcript volume itself.

19

20   *** REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

21   COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

22

23

24

25

1  ATTACH TO THE DEPOSITION OF SHANNON D. FUSCO
   CASE:   HATCHER v. DESOTO COUNTY BOARD OF EDUCATION, ET
2  AL
   CASE NO.:  2:13-cv-138-FtM-38DNF
3

4                          ERRATA SHEET

5       I, SHANNON D. FUSCO, have read the foregoing

6  deposition given by me on October 9, 2013, in Sebring,

7  Florida, and the following corrections, if any, should

8  be made in the transcript:

9  PAGE    LINE              CORRECTION AND REASON THEREFOR

10

11

12

13

14

15

16

17

18       Subject to the above corrections, if any, my

19  testimony reads as given by me in the foregoing

20  deposition.

21            SIGNED at _____ Florida, this

22  _____ day of _____, 2013.

23

24            _____

25                    SHANNON D. FUSCO

301

1                    CERTIFICATE OF REPORTER OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HIGHLANDS

5

6         I, the undersigned authority, hereby certify

7    that the witness named herein personally appeared before

8    me and was duly sworn.

9

10        WITNESS my hand and official seal this 9th day

11   of October, 2013.

12

13

14

15

16

17

18

19

20

21   JULIE SEBRING, FPR

22   NOTARY PUBLIC - STATE OF FLORIDA

23   MY COMMISSION NO.  EE182179

24   EXPIRES:  April 29, 2016

25   SCLAFANI WILLIAMS COURT REPORTERS, INC.

1                   REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF HIGHLANDS

5

6         I, JULIE SEBRING, Florida Professional Reporter,

7    and Notary Public in and for the State of Florida at

8    large, hereby certify that the witness appeared before

9    me for the taking of the foregoing deposition, and that

10   I was authorized to and did stenographically and

11   electronically report the deposition, and that the

12   transcript is a true and complete record of my

13   stenographic notes and recordings thereof.

14        I FURTHER CERTIFY that I am neither an attorney,

15   nor counsel for the parties to this cause, nor a

16   relative or employee of any attorney or party connected

17   with this litigation, nor am I financially interested in

18   the outcome of this action.

19        DATED THIS 18th day of October, 2013, at Sebring,

20   Highlands County, Florida.

21

22

23

24   JULIE SEBRING, FPR
     SCLAFANI WILLIAMS COURT REPORTERS, INC.

25